## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No.** 1:22-cv-1070-PAB

STANTON MEATS, JASON CARILLO, KRESTINA
COOMBS, DAVID DAVIS, BRIAN DONOVAN,
CHRIS GALLEGOS, DESTINY GLANTZ,
CAMERON HARRIS, JULIE ANNE NEIL, ANDREZ
RIOS, JARED WHITAKER, AND WILLIAM WULF,

      Plaintiffs,

v.

RIDLEY'S FAMILY MARKETS, INC.,

      Defendants.

---

## DEFENDANT RIDLEY'S FAMILY MARKETS, INC.'S
## MOTION FOR SUMMARY JUDGMENT

---

Defendant Ridley's Family Markets, Inc. ("**Ridley's**"), by and through undersigned

counsel, respectfully submits this Motion for Summary Judgment against all Plaintiffs.

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................................3
I.      MOVANT'S STATEMENT OF undisputed MATERIAL FACTS...................................4
      Plaintiff Stanton Meats ........................................................................................ 7
      Plaintiff Krestina Coombs.................................................................................... 10
      Plaintiff David Davis ........................................................................................... 12
      Plaintiff Brian Donovan....................................................................................... 14
      Plaintiff Chris Gallegos........................................................................................ 16
      Plaintiff Destiny Glanz ........................................................................................ 19
      Plaintiff Cameron Harris...................................................................................... 21
      Plaintiff Julie Anne Neil ...................................................................................... 23
      Plaintiff Andrez Rios ........................................................................................... 25
      Plaintiff Jared Whitaker ....................................................................................... 27
II.     Argument ............................................................................................................. 29
      A.     The FLSA Statute of Limitations Eliminates the Claims of Davis, Gallegos, Neil,
           Wulf, and Donovan. ...................................................................................... 29
           1.     The Claims of Davis, Gallegos, Neil, and Wulf Fail Outright ................. 30
           2.     Donovan's Claims Fail Because there is No Evidence of Willfulness..... 31

    B.    The Claims of Meats, Coombs, Davis, Donovan, Gallegos, Glantz, Harris, Neil, Rios, and Whitaker Fail as a Matter of Law Because the Undisputed Evidence Shows They Were Properly Classified as Exempt under the FLSA ..................... 32

        1.    The Administrative Exemption Applies to Meats, Coombs, Davis, Donovan, Gallegos, Glantz, Harris, Neil, Rios, and Whitaker ................ 32

        2.    The Executive Exemption Applies to Plaintiffs Meats, Donovan, and Gallegos, as well as Coombs, Davis, Glanz, Harris, Rios, and Whitaker. 38

III.    CONCLUSION .................................................................................................... 44

## TABLE OF AUTHORITIES

Page(s)

Cases

*Baldwin v. Trailer Inns, Inc.,*
    266 F.3d 1104 (9th Cir. 2001) ................................................................................. 36

*Brillas v. Bennett Auto Supply Inc.,*
    675 F.Supp.2d 1164 (S.D. Fla. 2009) .............................................................. 33, 36

*Burson v. Viking Forge Corp.,*
    661 F. Supp.2d 794 (N.D. Ohio 2009) .................................................................. 38

*Gellhaus v. Wal-Mart Stores, Inc.,*
    769 F. Supp.2d 1071 (E.D. Tex. 2011) ................................................................. 39

*Hernandez v. Domenico Farms, Inc.,*
    414 P.3d 700 (Colo. 2018) ..................................................................................... 28

*Kibler v. Kroger Companies,*
    2022 WL 268056 .................................................................................................... 30

*Maestas v. Day & Zimmerman, LLC,*
    972 F. Supp.2d 1232 (D.N.M. 2013) .................................................................... 38

*McLaughlin v. Richland Shoe Co.,*
    486 U.S. 128 (1988) ............................................................................................... 30

*Mumby v. Pure Energy Services (USA), Inc.,*
    636 F.3d 1266 (10th Cir. 2011) ............................................................................. 31

*Ott v. Chacha in Art LLC,*
    506 F.Supp. 3d. 1133 (D. Colo. 2020) ............................................................. 33, 34

*Rozenblum v. Ocean Beach Properties,*
    436 F. Supp.2d 1351 (S.D. Fla. 2006) .................................................................. 39

*Slusser v. Vantage Builders, Inc.,*
    576 F. Supp.2d 1207 (D.N.M. 2008) .................................................................... 38

*Sticker v Easter Off Road Equipment, Inc.,*
    935 F.Supp. 650 (D. Md. 1996) ........................................................................ 33, 34

Statutes

29 U.S.C. §213(a)(1) ................................................................................................... 32

29 U.S.C. § 256 ........................................................................................................... 29

Regulations

29 C.F.R. § 541.100 ................................................................................................................. 35

29 C.F.R. § 541.102 ................................................................................................................. 36

29 C.F.R. § 541.200 ................................................................................................................. 32

29 C.F.R. § 541.201(a) ............................................................................................................ 33

29 C.F.R. § 541.700(a) ............................................................................................................ 32

29 C.F.R. § 541.700(b) ..................................................................................................... 32, 35

29 C.F.R. § 541.700(c) ............................................................................................................ 37

29 C.F.R. § 541.701 ................................................................................................................. 38

## INTRODUCTION

This Court should grant summary judgment because there are no issues of material fact, and because Ridley's is entitled to judgment as a matter of law. Plaintiffs were all assistant managers of Ridley's, and managed grocery stores on behalf of Ridley's in Utah, Idaho, Wyoming, and Colorado. Ridley's classified them as exempt under the Fair Labor Standards Act ("FLSA"). Plaintiffs claim the classification was erroneous, and that Ridley's should have paid them overtime. Plaintiffs originally attempted to proceed as an FLSA collective action under the related case *Esparsen v. Ridley's Family Markets, Inc.,* Case No. 1:18-cv-01556-RM, currently pending before Judge Moore of this Court. The collective was dismissed, resulting in the Plaintiffs in the instant case filing suit on an individual basis.

Ridley's is entitled to summary judgment on the individual claims of each Plaintiff, on two different grounds. First, Ridley's is entitled to summary judgment on the claims of five of the Plaintiffs by reason that their claims are time barred. Second, Ridley's is entitled to summary judgment on the claims of ten of the Plaintiffs because the undisputed record evidence shows that they were properly classified as administrative and/or executive employees under the FLSA.

## I.   MOVANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      Defendant Ridley's Family Markets, Inc. ("Ridley's"), is a family-owned chain of supermarkets and other retail stores headquartered in Twin Falls, Idaho, and operating stores in Idaho, Wyoming, Utah, Nevada, and Colorado. (Declaration of Donald Mark Ridley ("Ridley Decl.") at ¶ 2. A true and correct copy of the Ridley Decl. is attached hereto as Exhibit 1.)

2.      Each Ridley's store is managed by a Store Director and an Assistant Store Manager ("ASM") (ASMs are sometimes referred to as Assistant Store Directors or "ASDs" and those terms are used interchangeably). Along with the Store Director, the ASM is responsible for running the supermarket to which they are assigned. Together they manage all aspects of the store including without limitation managing the store's employees and overseeing all aspects of the efficient operation of their supermarket. This is the ASM's primary duty and responsibility, and the reason they were hired. This includes being aware of and observing what tasks need to be done, directing employees in completing those necessary tasks, stepping in to assist in those tasks as needed, and overseeing all other administrative tasks to ensure a well-managed store and a positive customer experience. (Ridley Decl., ¶ 3.)

3.      Store Directors and ASM's work closely together to manage the store to which they have been assigned. These two positions often work alternating schedules, so there are times that they are at the store together, as well as times when either is the senior manager on site, with oversight and supervision over the entire store. For the ASM this usually constitutes approximately 30% of their time. Even when both the Store Director and the ASM are at the store, both are nevertheless involved in the management of all aspects of the store to which they are assigned, and ASM's typically manage the center store operations and employees (typically consisting of

grocery, dairy, general merchandise and frozen foods). (Ridley Decl., ¶ 4.)

4.      For ASMs specifically, this includes without limitation being substantively involved in the hiring and firing process by making suggestions and recommendations, being involved in the employee disciplinary process by providing day-to-day coaching and guidance and giving advice and suggestions for formal discipline, being involved in the employee evaluation process by either directly evaluating employees under their supervision or with whom they regularly interact, or by providing input to the Store Director for such employees, and being involved in the pay and promotion process by providing suggestions and advice regarding employees under their supervision or with whom they regularly interact. (Ridley Decl., ¶ 5.)

5.      This also involves various administrative tasks including without limitation, ordering store inventory, opening and/or closing and securing the store, making various financial reports, responsibility for merchandising and displays, responsibility for the physical facility, counting and securing the tills, making bank deposits, and ensuring an efficient store operation and positive customer experience, all of which require the ASM to exercise independent judgment and thought. (Ridley Decl., ¶ 6.)

6.      While ASMs are expected to do whatever is needed to keep the store running efficiently, and will often perform the same tasks as other hourly employees, such as stocking shelves, running the cash registers, or unloading freight, they never lose their primary responsibility of managing and ensuring an efficient operation of the store. (Ridley Decl., ¶ 7.)

7.      ASM's are paid on a salary basis in an amount substantially more than the hourly employees that they supervise. For example, Plaintiff Stanton Meats, who held various hourly positions with Ridley's, earned between $5.15 and $9.60 per hour as an hourly employee ($206-

$384 per full-time week), but as an ASM was started at $900 per week and was paid $1,087.50 per week at the time of his resignation. This was typical of all ASMs at the time. ASM's are also eligible for a bonus largely based on the financial results of the store they are responsible for, which the hourly employees they supervise are not. During all times relevant to this case, all of the Plaintiffs in this case were paid more than $684 per week. (Ridley Decl., ¶ 8.)

8. The decision to pay ASMs on a salary basis was made many years ago based upon these employees' duties, and following industry standards. Other than the instant lawsuit, and the related *Esparsen* case which started out as a collective action, Ridley's decision to pay ASMs on a salary basis has never been challenged, questioned, or found to be inappropriate or illegal. (Ridley Decl., ¶ 9.)

9. Plaintiffs were all ASMs of Ridley's, and were originally part of an earlier failed attempt to bring an FLSA collective against Ridley's under the case *Esparsen v. Ridley's Family Markets, Inc.*, Case No. 1:18-cv-01556-RM currently pending before Judge Moore of this Court. (*See* First Amended and Substituted Complaint ("Compl."), Dkt. 9, ¶¶ 39, 73-74.)

10. Each Plaintiff filed a notice of consent in the *Esparsen* case. (Compl., ¶ 73.)

11. In particular, Plaintiff Davis filed his consent on 4/14/20; Gallegos filed his consent on 4/6/20; Neil filed her consent on 4/14/20; Wulf filed his consent on 4/13/20; and Donovan filed his consent on 4/24/20. (Compl., ¶ 76.)

12. During his last week working for Ridley's, Mr. Donovan did not work at all on April 24 or April 25, 2018, only worked 5 hours and 20 minutes on April 26, 2018, and only worked 26 total hours for that entire week. (Ridley Decl., ¶ 10.)

13. Plaintiff William Wulf worked for Ridley's for one week, from September 18

through September 24, 2016. (Deposition of William Wulf ("Wulf Dep.") at 10:14-12:22 (the cited portions of the Wulf Dep. are attached as Exhibit 2).)

**Plaintiff Stanton Meats**

14.    Stanton Meats ("**Meats**") was first employed by Ridley's in June of 2005 as a bagger at the Hyrum, Utah store, and held various positions over a several year period. Meats was promoted to Assistant Manager at Ridley's Midway, Utah store in April of 2015. He worked in Midway until his transfer to Ridley's Highland, Utah store in September, 2016, where he was also the ASM. In January, 2017, he became the ASM in Ridley's Pinedale, Wyoming store. (Deposition of Stanton Meats ("Meats Dep.") at 24:15-19; 30:14-17; 32:8-13; 33:11-22 (the cited portions of the Meats Dep. are attached as Exhibit 3).)

15.    As ASM, Meats was responsible for making sure the store functioned efficiently. He walked the store looking for and solving problems as needed, helping customers and employees, and doing whatever needed done. (*Id.* at 29:25-30:4; 39:6-11; 42:21-24; 52:14-17; 61:4-8.)

16.    Meats worked alongside a Store Director, though their schedules were not identical, such that Meats was the senior manager onsite for two to three hours each day, and one to two full days a week, during which time the entire store and its employees would fall under his supervision. (*Id.* at 35:20-36:8.)

17.    Nevertheless, even when the Store Director was there, Meats was in charge of the "center store" operations and employees. (*Id.* at 28:14-18.)

18.    There were typically two to ten center store employees present on any given day. Meats supervised these employees, made sure they had what they needed, answered their

questions, instructed them, listened to their complaints, and stepped in to help as needed. (*Id.* at 28:19-25; 29:18-24; 39:1-5; 40:17-20; 41:12-24.)

19.     Meats' duties and responsibilities with regard to employees included scheduling, training and providing feedback to employees, delegating and directing work, assigning specific tasks, and employee discipline. (*Id.* at 39:17-40:1; 41:25-42:16, 44:17-45:9; 49:3-18; 52:20-53:2.)

20.     As an ASM, Meats participated in the employee evaluation process, sitting in on formal evaluations, and preparing or reviewing evaluation forms, or printing them for the store director. (*Id.* at 42:25-44:12.) He would occasionally provide advice to the store director on pay rates and raises. (*Id.* at 47:15-48:3.)  He was also asked "a couple of times" to provide feedback on the promotions of employees. (*Id.* at 48:4-15.)

21.     He was also involved in the hiring process, reviewing applications, sitting in on interviews, asking questions, and afterwards discussing the applicant with the store director. (*Id.* at 45:17-46:6.)  He conducted several interviews on his own when the store director was absent. (*Id.* at 46:7-13.)  He also did an initial screening of applicants, sorting job applicants into two piles, one to be interviewed and one not to be interviewed. (*Id.* at 47:1-14.)

22.     Meats' duties and responsibilities also included ordering store product, and merchandising. (*Id.* at 38:20-21.) He worked with the store manager and the grocery manager to decide on particular displays and what product was needed for the displays; he wrote grocery orders quite frequently, and also monitored whether purchases were being kept low as compared to sales, to ensure the store was making money. (*Id.* at 49:21-52:3.) Meats gave input as to where products would be displayed or what products would be put on the shelves and their location on the shelves. (*Id. at* 53:5-9.) He also had responsibility over signage and if signage were missing,

Meats would direct the appropriate employee to fix it. (*Id.* at 53:24-54:8.)

23.     As ASM, Meats opened and/or closed the store, depending on his schedule. As part of opening the store, Meats used the computer in the managers' office to enter the sales from the previous day. He also made the cash deposit to deliver to the bank and checked the email for any necessary communications. (*Id.* at 37:16-38:16.)

24.     As ASM, Meats had responsibilities for employee and customer safety. When an employee or customer got injured, Meats would fill out an accident report, notify the store director, and notify the owner, Mark Ridley. Meats recalled filling out "a couple" of accident reports. Meats was responsible for addressing hazards, either delegating the work to someone or doing it himself, and was responsible for enforcing employee safety policies. Meats also filled out workers' compensation forms whenever employees got hurt. (*Id.* at 54:9-55:21; 58:8-12.)

25.     As ASM, Meats was responsible for aspects of store security. He had a set of keys and opened or closed the building two or three times a week. He had access to the store safe. If he were opening the store, he would verify the cash count from the closing manager, take the tills out of the safe, and put them in the registers. If he were closing, he would count down the tills, prepare a deposit for the next morning, and have a final count for the safe for the day. (*Id.* at 55:25-57:20.) In the Pinedale store, Meats was also responsible for making sure the sporting goods or hardware manager locked the firearms up at night. (*Id.* at 57:21-58:4.)

26.     Various of the stores he worked at had store-specific features, such as a gas station, a U-Haul rental, a Subway restaurant, a post-office, or a pizzeria. As ASM, Meats was trained on those store-specific responsibilities. For example, in one store, Meats' had some responsibilities for fuel usage and U-Haul reports; for the store with a Subway he had responsibility for various

Subway reports; for the store with a post-office he trained on processing packages received from customers. (*Id.* at 26:22-27:23; 31:18-32:1.)

27.     Meats attended weekly conference calls with corporate as often as he could, taking notes, and disseminating information to other employees. Meats actively participated in department head meetings, provided input into areas he had knowledge of. (*Id.* at 59:6-60:24.)

28.     Meat's last day at Ridley's was May 2, 2019. (*Id.*, 64:14-16.)

### Plaintiff Krestina Coombs

29.     Krestina Coombs ("**Coombs**") is a former employee in Ridley's Hyrum, Utah store, where she held a variety of positions over her 11-year career, including deli clerk, closing night manager, grocery manager, two stints as Assistant Manager (first in January, 2016-October, 2017, and again in August 2018-December, 2018), and store director (December, 2018-March, 2019). (Deposition of Krestina Coombs ("Coombs Dep.") at 13:13-19; 14:18-25; 24:6-9; 31:17-25, 65:13-25) (The cited portions of the Coombs Dep. are attached as Exhibit 4.)

30.     As ASM, Coombs' was responsible for the "Center Store" and managing the center-store employees, including giving directions and instructions, planning work, checking on work, training, reporting on employees, and making recommendations as to hiring and firing. (*Id.* at 47:23-53:22.)  Additionally, during the times that Coombs was the senior manager onsite (typically 2-3 hours per day, and 1-2 days per week), she was in charge of the entire store and all of its employees. (*Id.* 64:18-65:2; Ridley Decl., ¶ 4.) Moreover, during the last two months of her second stint as ASM, her Store Director was absent for "probably at least 90 percent of the time" so she was the senior manager on site—during which time she was "basically managing the store," including directing employees, taking care of problems that popped up, resolving employee

complaints, and reporting employee disciplinary matters to upper management (which resulted in termination of at least one employee). (Coombs Dep. at 43:13-47:7.)

31.     Her additional duties and responsibilities as ASM as included: Ordering product, checking emails for customer complaints; ensuring employee time entries were correct; giving direction to center store employees; walking the store to ensure things were getting done; giving instructions to employees; planning work for center store employees; training employees; giving input on employee evaluations; reporting employees for disciplinary action; and interviewing at least one job applicant who was eventually hired (checker). (*Id.* at 32:2-25; 47:8-51:20.)

32.     Coombs had responsibility for employee safety, including regular store inspections and directing employees as to clean up tasks. (*Id.*, 58:5-59:12.)

33.     Coombs assisted with store security, counting money onsite, opening the store, and responding to shoplifting incidents. (*Id.*, 42:3-43:12.)

34.     Coombs participated in periodic strategic discussions with upper management about how to grow the store. (*Id.*, 61:10-22.)

35.     Coombs responsibilities included ordering store inventory, and she had significant discretion as to what products to order, and the amounts, particularly around the holidays, admitting that if she ordered too much or too little of something, that "fell on her shoulders." (*Id.*, 56:4-57:14.)

36.     Coombs admitted that the only thing a store director did that she did not do as an assistant manager was "most of the interviewing," and that as an ASM she did essentially the same things as a store director. (*Id.*, 67:5-21.)

37.     Coombs last day was March 23, 2019, as Store Director. (*Id.,* 65:13-25.)

**Plaintiff David Davis**

38.     David Davis ("**Davis**") was first employed by Ridley's in February 2012 as a deli clerk in the Hyrum, Utah, and served in various positions thereafter until he was promoted to Assistant Manager in September, 2014, where he worked until his resignation in January of 2016. (Deposition of David Davis ("Davis Dep.") at 9:3-7, 20:16-21:3, 68:7-12 (the cited portions of the Davis Dep. are attached as Exhibit 5).)

39.     Davis was the senior manager on site for the entire store and its employees for several hours a week, and at least one full day a week—approximately one-third of his total worktime. Moreover, for several weeks towards the end of his tenure, the store director was out helping set up a new store, and during that entire time Davis supervising all store operations and employees on a fulltime basis. (*Id.* at 23:20-26:7; 41:20-24; 66:2-67:4.)

40.     Davis described his job as ASM as walking around the store taking care of problems, helping people, and just doing "whatever needs to be done." (*Id.* at 51:17-23.) This included responsibilities for customer service, "getting the load out," making sure carts were brought in, helping run the front desk area, monitoring cooler temperature logs, and generally looking for and addressing problems (*Id*. at 31:25-32:17; 33:22-34:12; 44:12-18; 65:1-66:1.)

41.     When he was not "walking around the store," he was in the managers' office, where he had specific responsibility for the following tasks: store bookkeeping using the store computer, balancing the tills either at closing or opening, two to three times a week, (*id.* at 29:24-31:23; 44:12-18; 59:18-25), accessing the safe, putting the tills in the safe, counting all the money to make sure it matched the books, recording the money in the program, and locking the safe (*id.* at 55:13-56:2); making bank deposits (*id.* at 56:3-8); and meeting with employees or applicants, or

participating in manager conference calls. (*Id.* at 65:1-66:1.)

42.     With regard to employee supervision and management, his responsibilities included giving instruction to employees and the closing manager in the form of a "to do" task list that he compiled while walking the store, or otherwise assigning tasks to employees if something needed to be done (*id.* at 34:19-35:17); training employees on various tasks (*id.* at 39:7-11); sitting in on employee performance evaluations (*id.* at 40:3-17; 44:23-45:6); employee scheduling (*id.* at 35:18-36:9); helping employees with questions over how to do their jobs (*id.* at 37:18-22); reporting employees for disciplinary action, which in at least one case resulted in an employee's termination (*id.* at 40:19-41:24); sitting in on interviews for new hires and providing feedback about candidates (*id.* at 43:11-15; 43:18-23); filling out and signing various company employee forms (*id.* at 45:12-47:14). Davis agreed that his recommendations and involvement in employee evaluations may have been considered for compensation decisions. (*Id.* at 44:5-8.)

43.     He had responsibility over product ordering and merchandising, including building orders for store product (*id.* at 47:15-48:2; 71:12-18); helping prepare for the annual case lot sale and putting in the case lot order, and placing and organizing the product in the store (*id.* at 48:4-20; 74:16-76:5); and changing, moving around, and cleaning up "endcaps" and aisle displays (*id.* at 49:3-19). He also had responsibility over signage. (*Id.* at 50:8-13.)

44.     He also had responsibility over aspects of the physical facility, and employee and customer safety, including by checking freezers and refrigeration units "almost every hour" to make sure temperatures were proper and maintaining temperature logs, as well as doing safety checks throughout to make sure there were no hazards (*Id.* at 50:14-51:16; 53:6-12; 64:13-25.)

45.     He had responsibility over store security, and was one of three people who had store

keys (*id.* at 54:24-55:10); he had responsibility for making sure doors were shut and locking the store (*id.* at 53:16-54:3; 54:21-23); he made sure that the firearms were locked up in the sporting goods department at night (*id.* at 54:7-20); and he responded to theft issues (*id.* at 57:4-58:1).

46.     He resolved customer complaints and handled customer returns. (*Id.* at 58:2-17.)

47.     He also participated in monthly or biweekly conference calls with the store management. These calls happened monthly or biweekly on a regular basis and they were attended by store managers and department managers, and employees from corporate. After the meetings, Davis was responsible for communicating information to department managers if they had not been on the call. If the Store Director had not been on the call, Davis would discuss his notes with the Store Director afterwards. (*Id.* at 61:10-62:19.) He also accompanied upper management on walkarounds during popup visits to check store status. (*Id.* at 63:8-64:12.)

48.     Davis' last day of work at Ridley's was January 15, 2016. (*Id.* at 68:2-12.)

### Plaintiff Brian Donovan

49.     Brian Donovan ("**Donovan**") was hired as an ASM for Ridley's Wellington, Colorado store in March of 2018 and worked for approximately one month until his termination on April 26, 2018. (Deposition of Brian Donovan ("Donovan Dep.") at 13:12-23; 42:21-25; 43:23-25 (the cited portions of the Donovan Dep. are attached as Exhibit 6).)

50.     Donovan came to Ridley's with extensive retail grocery experience, having worked as ASM and store director for Albertson's and Sprouts, where his responsibilities included customer service, cash handling, schedule writing, inventory, safety, supervising employees and day-to-day operations of the store. (*Id.* at 11:21-12:15; 14:24-15:12.) He agreed that his duties for Ridley's were the same as any other ASM job he had had. (*Id.* at 18:19-24.)

51.     Like other of Ridley's ASM's, Donovan had primary responsibility over the center-store and directly supervised the center-store employees—around eight employees total, and two to three there on any given day. (*Id.* at 22:17-23:1-6). Along with the center-store employees, he also supervised the dairy manager and frozen foods manager as well. (*Id.* at 24:3-12).

52.     Similarly, as ASM Donovan was in charge of the entire store and supervised all departments and employees in the absence of the Store Director, which was up to four hours a day, and one to two days a week. (*Id.* at 20:10-21:1; 24:13-16; 41:20-42:3.)

53.     Donovan's duties included coaching and giving feedback to employees, guiding and directing employees, answering questions, and responding to and resolving employee complaints, or escalating them as appropriate. (*Id.* at 25:5-26:15.)

54.     He also planned the work for center-store employees, and checked in with the other department managers, as he had done at his previous jobs. He would check on the other departments throughout the day, but spent a significant amount of time in the grocery department because it was "kind of, a mess."  (*Id.* at 21:22-22:21; 26:10-27:7.)

55.     And though he was there for only a short time, he understood his duties and responsibilities included training employees, providing feedback to the store director regarding employees under him, sitting in on or recommending discipline of employees, and input into employee hiring. (*Id.* at 27:17-30:20.)

56.      As ASM, Donovan's duties included ordering dry inventory, filling out sales, purchases and cash forms, and merchandising, through building grocery and frozen end caps and displays, and lobby displays, using his past experience to do so. (*Id.* at 31:15-33:12.)

57.     As ASM, Donovan's duties included walking around the store, making sure things

and people were working, looking for problems, safety issues, spills, and other similar problems, and directing employees to resolve them, or to work in a safe manner. (*Id.*at 34:13-35:13.)

58.     He had access to and responsibility for the store keys, and would open or close the store. When opening, he would put the tills out. When closing,  he would make sure necessary product was covered—such as produce. He would walk the grocery department and make sure all of the ad items were full, check the back doors, lock up the back doors, and make sure that frozen food was frozen and that there were no issues. He would then count out the tills and the safe and the lottery, and then locked up to leave. (*Id.* at 36:2-13.)

59.     He also had access to the safe, and made bank deposits. (*Id.* at 36:14-37:4.)

60.     Donovan's last day at Ridley's was April 26, 2018. (*Id.* at 43:23-25.)

<u>**Plaintiff Chris Gallegos**</u>

61.     Chris Gallegos ("**Gallegos**") worked as an assistant manager/third person for Harmons Groceries in Ogden, Utah starting in November 2013, prior to starting at Ridley's in September of 2015 when Ridley's took over the Harmon's store. (Deposition of Chris Gallegos ("Gallegos Dep.") at 8:20-9:10, 10:23-25, 11:1-25 (the cited portions of the Gallegos Dep. are attached as Exhibit 7).)

62.     He described his job at Harmons as "Helping run the entire store in a timely and efficient manner, completing all of grocery duties, such as freight, order, dates and face, help in all other departments as needed, responsible for opening/closing the store." (*Id.* at 9:11-9:20.) He agreed that his job at Ridley's as Grocery Manager was largely the same as his job at Harmon's. (*Id.* at 13:23-14:3; 15:14-21.)

63.     In his position as grocery manager at Ridley's, Gallegos supervised stock clerks

who helped him with duties and responsibilities for groceries, and he was able to delegate tasks as needed. As grocery manager, Gallegos understood that the center store employees – groceries, frozen foods, dairy – all reported to the assistant manager. (*Id.* at 15:22-16:18; 18:14-19:1.)

64.     Gallegos was promoted to ASM on May 25, 2016. Gallegos stated that as ASM he was responsible for total store procedures, overseeing everyday production and making sure everything was getting done and handled in a good manner, and "helping every department push forward and get through the day…." (*Id.* at 30:22-31:12.)

65.     As ASM, he supervised the center store employees on any given shift which could be more than 25 employees at once. (*Id.* at 31:13-32:20.)

66.     His duties included assigning tasks or directing employees as he received direction or plans from the store manager. (*Id.* at 33:4-33:22.)

67.     His duties included employee scheduling, helping employees if they were struggling with their workload, handling simple employee complaints, employee training, and giving feedback to employees on a daily basis. (*Id.* at 33:23-36:9.)

68.     He was also trained on calculating "labor rates," meaning determining, based on sales, how many hours of labor could be scheduled for each department, and occasionally filled in for the store director on this task. (*Id.* at 54:18-55:24.)

69.     He sat in on employee evaluations performed by the store manager and gave feedback as necessary or requested. He also participated in employee disciplinary meetings performed by the store manager. (*Id.* at 36:15-37:22.)

70.     As an ASM, Gallegos participated in employee terminations performed by the store manager. (*Id.* at 39:14-20.)  He also participated in new hire interviews, and at times he performed

these interviews on his own, giving his notes and recommendations to the store director. (*Id.* at 40:7-41:20.)  As an ASM his responsibilities included giving input on employee promotions for the store director to consider. (*Id.* at 43:7-14.)

71.  As an ASM, he would sign company forms—mostly dealing with employee evaluations—when needed. (*Id.* at 44:7-18.)

72.  Along with his full-time supervisory responsibilities over the center-store operations and employees, Gallegos was also the senior manager on site when the Store Director was not there, which was 2-3 hours per day, and one-two days per week, and during which time he was in charge of the entire store and all employees. (*Id.* at 38:9-39:4.) He estimated that this sole-manager time was up to 30 percent of his work time. (*Id.* at 60:6-14.)

73.  As an ASM, he was responsible for ordering store inventory. He would do "big pallet large orders" at the request of the store director, but could do "small pallet orders" at his own discretion, and did not have a dollar limit on what he could order. (*Id.* at 44:19-46:11.)

74.  He was responsible for merchandising, stating that he could direct the grocery manager to build displays for special events, or set up ads or posters. (*Id.* at 46:24-47:24.)

75.  As an ASM, he had responsibility to ensure "safety books" were posted in different corners and sweep and safety logs were being filled out hourly by each department. He stated that as assistant manager, apart from his office responsibilities, he would be "out in the store, walking around… checking logs, making sure work is getting done… answering questions, assisting customers… just basically ensuring that the store is operating and functioning in a good [manner]."(*Id.* at 47:25-49:4)

76.  His responsibilities included overseeing the physical facilities and equipment,

calling in service a "couple times" for a broken forklift or the HVAC system. (*Id.* at 49:14-50:6.)

77.     As ASM, his responsibilities included opening and closing the store, which required him to have keys to the building and the combination to the safe. Only the two store assistants and the store director had keys. (*Id.* at 50:7-51:10.) When closing, he was responsible for counting the tills, counting the total money, setting additional cash aside for a bank deposit, and ensuring the money made it into the safe. (*Id.* at 51:4-52:5.) He would also occasionally make the bank deposits. (*Id.* at 52:6-21.)

78.     His responsibilities included handling shoplifting incidents and he would call the police maybe two or three times a month. (*Id.* at 52:22-53:21.)

79.     He was responsible for filling out accident reports, enforcing store policies, and he regularly participated in store meetings. (*Id.* at 54:8-13; 55:25-56:3; 56:15-58:7.)

80.     For a period of several weeks prior to Gallegos leaving employment with Ridley's in March 2017, there was no store director over him. During that time he was acting as a store director on a full-time basis, participating in conference calls with corporate, and addressing all employee issues and scheduling. (*Id.* at 58:8-59:13.)

81.     Gallegos' last day of work at Ridley's was March 13, 2017. (*Id.* 24:2-15.)

**Plaintiff Destiny Glanz**

82.     Destiny Glanz ("**Glanz**") was hired as a deli manager for Ridley's Sheridan, Wyoming store in of March of 2015, and became an Assistant Manager approximately a year later. (Deposition of Destiny Glanz ("Glanz Dep.") at 10:7-10, 14:7-15; 28:19-21.) (The cited portions of the Glanz Dep. are attached as Exhibit 8.)

83.     As an ASM, Glanz was expected to be out in the store, walking around, looking for

problems and issues that needed to be solved, employees that were not working, or unsafe conditions. (*Id.* at 44:10-16.)

84.     As ASM, Glanz had supervisory authority over the grocery manager, who was over the "center-store." Additionally, when the store director was not there, which was 2-3 hours each day, plus the store director's days off or vacation days (one to two days a week), Glanz was the senior manager on site and supervised all employees (10-15 on any given day), directing their work, telling them what to do and where to do it. (*Id.* at 30:14-33:9.) During this time, Glanz would be handling the store and any employee issues that come up. (*Id.* at 41:12-42:4.) Nevertheless, Glanz acknowledged that even when the store director was there, she had the authority to direct employees' work. (*Id.* 32:11-21.)

85.     Glanz' responsibilities included instructing employees, addressing employee complaints, doing employee coaching, responding to disciplinary matters, making recommendations to the store manager as to employee discipline, making recommendations regarding hiring, and occasionally sitting in on new hire interviews (*Id.* at 33:22-37:6.)

86.     When Glanz was not walking the store, her responsibilities included "computer paperwork." (*Id.*, at 25:12-22). She described this responsibility as "book work," which entailed counting the safe and verifying the money every morning, going through a stack of paperwork to enter every day's daily sales for each department and making sure that the day balanced out. (*Id.* at 40:3-13; 41:2-16.) Glanz had the combination to the store safe, which held all of the store's money, the extra key to the pharmacy, and any lost-and-found wallets, purses or credit cards. (*Id.* at 46:22-47:21.) She also was responsible for making bank deposits. (*Id.* at 47:22-48:1.)

87.     As ASM, Glanz also had responsibility for, and decision making authority over,

merchandizing displays in the store. (*Id.*, 42:5-19.) This also included being involved in planning as to where to place product. (*Id.* at 51:23-52:5.) She also had responsibility over purchasing product for the store, and had decision making authority about how much product to purchase, making sure not to order too much. (*Id.* at 42:23-43:25.)

88.     Her responsibilities as an ASM also included employee and customer safety. She filled out hourly floor sweep logs, as well as any incident reports for customer or employee injuries. As an ASM, it fell on her to enforce Ridley's policies. (*Id.* at 44:5-46:18; 51:6-16.)

89.     When asked to put a percentage on her work time doing purely management-type duties, such as directing employees, ordering, helping employees, book work, etc., she stated 25%. However, she also admitted that during the remaining 75% she did not "turn off" her management responsibilities, and that employees would regularly come to her and she would respond, and help as needed to keep the store functioning. (*Id.* at 54:23-56:3.)

### Plaintiff Cameron Harris

90.     Cameron Harris ("**Harris**") held various positions with Ridley's starting as hardware clerk in Pinedale, Wyoming, becoming ASM in 2015, and working his way up to Store Director of Ridley's Pinedale store, which title he held throughout 2017 and 2018, and during which time he managed 30-40 employees at any given time. (Deposition of Cameron Harris ("Harris Dep.") at 41:20-42:9.) At his request, Harris was transferred to Ridley's Highland, Utah store in August, 2018, as an ASM, where he remained until his resignation in November, 2018. (*Id.* at 24:23-25.) (The cited portions of the Harris Dep. are attached as Exhibit 9.)

91.     As ASM, Harris had directly supervisory authority over the grocery department and its employees, directing their work, giving them instructions, and telling them what to do. (*Id.*,

65:4-20, 70:10-71:19; 73:17-74:6; 89:9-14.) Additionally, there were times that Harris was the senior manager on site (typically two-three hours per day, and one-two days per week), during which time he was in charge of the entire store and all of its employees. (*Id.* at 42:10-14; Ridley Decl., ¶ 4.)

92.     He admitted that as ASM he had the same authority as the store director with the exception of having to get approval for hiring and firing, directing department heads, and employee discipline (though he could send someone home). (Harris Dep., 71:20-72:23.)

93.     He could resolve employee complaints, and he trained grocery employees. (*Id.*, 73:17-74:23.) His responsibilities also included providing input regarding employee evaluations, making recommendations regarding raises or otherwise been involved in discussions regarding employee compensation, and participating in applicant interviews; his responsibilities also may have included making recommendations for termination. (*Id.*, 75:13-77:25.)

94.     As ASM he had authority to implement employee accommodations. (*Id.*, 105:18-106:7.)

95.     Harris' ASM responsibilities included ordering groceries for the store, being responsible for the money at closing time, counting the safe, and otherwise helping out around the store as needed. (*Id.*, 45:11-25; 78:12-80:17.)

96.     Harris also had a set of keys for the Pinedale store. (*Id.* at 64:10-12.)

97.     An ASM, Harris was also responsible for merchandising, setting up displays, and setting up departments. (*Id.*, 78:4-11.)

98.     Harris had responsibilities over employee safety, and had the authority and responsibility to correct unsafe behaviors or situations without input from the store director. (*Id.*,

80:18-81:13.)

99.   As ASM, Harris attended weekly department head meetings. (*Id.* at 83:17-21.)

100.   He represented Ridley's at two or three trade shows per year. (*Id.* at 90:22-92:19; 95:16-19.)

101.   Harris's last day of work at Ridley's was in November, 2018 (Compl. ¶ 34.)

**Plaintiff Julie Anne Neil**

102.   Julie Anne Neil ("**Neil**") started at Ridley's in Casper, Wyoming as an assistant manager on March 17th of 2015 after Ridley's acquired the Casper Safeway in approximately December of 2014. (Deposition of Julie Ann Neil ("Neil Dep.") at 16:6-18:23.) She became ASM at Ridley's Eagle Mountain, Utah location on May 3, 2015, (*Id.* at 21:10-25; 23:1-3); moved to Ridley's North Orem location on August 10, 2015, (*id.* at 23:17-24:3); and then became ASM at Ridley's "Lolo's" in Provo on October 20, 2015 (*id.* at 24:20-25). (The cited portions of the Neil Dep. are attached as Exhibit 10.)

103.   Like her ASM cohorts, as an ASM Neil had responsibilities for the center-store operations and employees. While she initially denied direct supervisory authority over the employees, she admitted under oath that the center store employees would come to her first with any problems, and later admitted that her duties and responsibilities included giving center store employees direction and coaching when needed. (*Id.* at 40:22-43:1.) She also admitted that when the store director was not present, which was one-two days per week, and around two hours per day—25-30% of her total work time—she was the senior manager at the store, in charge of running the store and directly supervising its 25-30 employees. (*Id.* at 34:4-35:20; 40:1-7.)

104.   Neil's responsibilities as ASM included walking around the store looking for

problems, making sure employees were working, and making sure there were no spills or other hazards. She estimated that 50-60% of her day was spent walking the store and ensuring all departments were running smoothly and that there wasn't anything to be cleaned or restocked. (*Id.* at 37:14-38:22).

105.    As ASM, Neil was frequently the liaison between the store director and the employees. (*Id.* at 38:23-39:18)

106.    As an ASM, she had the authority to report and/or escalate employee disciplinary matters to a department manager. (*Id.* at 44:9-22)

107.    As an ASM, she also had responsibility for product ordering, which she did two or three times a week. (*Id.* at 48:8-15; 50:2-6.) She agreed that ordering was generally "straightforward," but occasionally she had to make a decision on how much of something to order. (*Id.* 50:2-51:9.)

108.    She had responsibility for merchandising, including setting up product displays, which required her to "get creative" with how she displayed a product. (*Id.* at 46:10-47:14.)

109.    She also had responsibility for employee and customer safety as she walked around looking for unsafe conditions, either solving the problem herself or directing another employee to do so. (*Id.* at 52:12-53:7.)

110.    She did temperature checks as she walked around the store. (*Id.* at 54:2-7.)

111.    As an ASM, her responsibilities included opening the store and entering sales figures from the night before in the computer. (*Id.* at 28:23-29:17) Neil used the company computer to enter the sales reports, print off paperwork, look up sales, and occasionally to type up work schedules. (*Id.* at 34:9-35:20; 36:2-37:3; 46:2-6.) She also did minor bookkeeping. (*Id.* at 56:13-

57:14).

112.     When she opened the store, she would count the safe down, get the "Coinstar" receipts so she could add those to a report, printed off "the stuff that the departments needed to know," then she would distribute that information to the departments, and ask how they were doing, and "just kind of make sure everything was good." (*Id.* at 60:7-61:8.)

113.     She had responsibilities to close the store. She had keys to the store, and the safe combination, and when closing, she would secure the tills in the safe, and would walk around the store making sure everything was secure and all of the doors shut and locked. (*Id.* at 54:11-57:4.)

114.     Neil did not work for Ridley's beyond June, 2016. (Compl., ¶ 35.)

### Plaintiff Andrez Rios

115.     Andrez Rios ("**Rios**") was hired by Ridley's as an ASM in May, 2019, working at Ridley's store in Wellington, Colorado for approximately three months until he resigned in August, 2019. (Deposition of Andrez Rios ("Rios Dep."), Ex. 1; 11:20-23; 12:8-16; Ex. 2; 53:10-20.) Rios had significant retail grocery experience, having worked as an assistant manager for Walmart and Safeway. (*Id.* at 12:25-13:15; 15:2-8;15:12-15). (The cited portions of the Rios Dep. are attached as Exhibit 11.)

116.     Like his co-ASMs, Rios had primary responsibility over the center-store operations and employees, though in Rios' case those were divided into two—perishable and non-perishable—with Rios overseeing perishable (dairy and frozen foods) and overseeing two employees, consisting of the Dairy manager and one employee under the Dairy manager. (*Id.* at 26:11-27:25.) Outside of his primary responsibilities over perishable foods, and like his co-ASMs, Rios was also the senior manager on site approximately 30% of the time in the absence of the Store

Director, and during that time Rios was over the entire store. During that time he would walk the store, making sure the store was functioning and the employees were working, and looked for and resolved problems. (*Id. at* 28:12-29:1, 51:8-25.)  During that time he handled whatever came up, addressed the needs of the employees, and ran the store. (*Id.* at 21:13-22:6.)

117.   As ASM, his duties and responsibilities included handling employee complaints, and providing feedback to employees if they were doing something wrong or needed encouragement. (*Id.* 29:2-22.) He believes he may have also informally participated in the employee evaluation process, and provided feedback about employees, which he acknowledged would have also gone into decisions about employee pay (*Id.* 30:9-18; 31:5-32:7; 33:15-22)

118.   As ASM, Rios' duties also included office work, including end of day cash reconciliation, counting the cash drawers and putting them in the safe at the end of the day, preparing the bank deposit, and setting up the cash drawers for the next day. (*Id.* 20:1-7; 24:14-26:10.)  He also filled out order forms and "probably other paperwork." (*Id.* 35:1-22.)

119.   As ASM, Rios' duties and responsibilities included ordering and filling the freezer, ordering and filling the dairy, and ordering and filling the dry or non-perishable items. (*Id.* at 24:14-25:5.) Rios used discretion in ordering, and had decision making authority over how much to order, including whether to order extra product for special events or for a holiday. (*Id.* at 36:11-37:5.) He also had input into store financials, with responsibility to make sure that he did not exceed the grocery budgets when ordering product. (*Id.* at 39:18-24.)

120.   He had responsibility for merchandising, with discretion to set up displays or signage, deciding where it would be displayed, or if they needed a special display for something. He testified that he "definitely had the reins on that." (*Id.* at 35:23-37:5.)

121.    He had responsibility for employee and customer safety and store security. As he walked the store, he looked for and resolved safety issues, including wet-spills and other slip-and-fall hazards, overstuffed product on shelves, and other similar problems, with the authority to direct other employees to remedy the situation. (*Id.* at 37:6-38:7.) He also had responsibility for closing and locking the store. In that regard, he would walk the floor, check the bathrooms and each corner of the store, do the reconciliation, arm the security system, and lock the doors behind him. (*Id.* at 38:15-39:8.)

122.    He also personally held weekly meetings with department managers in which he discussed merchandizing, and other product issues. (*Id.* at 41:24-42:16.)

123.    Rios' last day of work at Ridley's was August 9, 2019. (*Id.* 53:6-15.)

### Plaintiff Jared Whitaker

124.    Jared Whitaker ("**Whitaker**") started working for Ridley's as a stocker at its Lolo's store in Provo, beginning in 2013, and ending in 2014. (Deposition of Jared Whitaker ("Whitaker Dep.") 8:23-9:5, 12:13-24, 17:1-6, 18:2-4.) He was rehired as a Closing Manager in August, 2016 at Ridley's Orem, Utah store, an hourly position. (*Id.* at 18:5-19-7.)   In January 2017, Jared Whitaker was promoted to ASM of Ridley's Highland, Utah store, where he worked until he took an hourly position as a clerk on September 2, 2018. (*Id.* at 15:16-23; 19:17-19; 20:17-21:15; 24:6-8; 72:3-20.) (The cited portions of the Whitaker Dep. are attached as Ex. 12.)

125.    As an ASM Whitaker had responsibilities for the center-store operations and employees, which in his case also including the deli, produce and bakery, being responsible for the smooth functioning of these departments. (*Id.* at 42:20-43:25)

126.    Along with his responsibilities over the center store, deli, produce, and bakery,

Whitaker was the senior manager on site in charge of the entire store and its employees when the Store director was not there. This included the store director's one day off a week, plus an hour or two each day. (Whitaker Depo at 29:4-31:3, 62:23-64:9.)

127.    As an ASM,  Whitaker was able to direct and give instructions to employees. He also trained and coached employees, and provided feedback to employees. (*Id.* at 44:1-22; 48:19-49:9.)  He also resolved employee complaints, or escalated complaints to the store director if it were something he could not resolve. (*Id.* at 47:6-48:7.)

128.    Whitaker had responsibility for employee and customer safety, with the authority to direct employees to respond to unsafe conditions. (*Id.* at 58:12-21.)

129.    He helped to make sure the store ran smoothly. (*Id.* at 62:10-63:2)

130.    As an ASM, Whitaker participated in new hire interviews, and provided feedback on interviewees, and at least one of his recommendations was hired. (*Id.* at 34:15-35:16; 51:12-21). He participated in the employee evaluation process, providing feedback on employees he had knowledge of. (*Id.,* 49:10-50:20.) He was occasionally asked to offer his opinion regarding employee promotions. (*Id.* at 53:20-54:3.) He also recalled participating in at least one employee disciplinary meeting. (*Id.* 50:24-51:7.)

131.    As an ASM, Whitaker had responsibility over ordering store inventory. To do that, he would access the upcoming ads on the computer to see what was going on sale, as that would affect how much he would need to order specifically for the event. This was frequently in conjunction with a holiday, where he would need to anticipate additional product needs, and order sufficient amounts. He would also consider whether to determine whether to add or subtract product from an order. (*Id.* at 33:3-34:11.)

132.    He also had responsibility over the physical facility. He had store keys and would unlock the store if he were the first to arrive. If he were closing, he would lock the store at night. (*Id.* at 59:4-20.) Whitaker called police about shoplifters "a couple times." (*Id.* at 59:23-60:8.)

133.    He was responsible for making bank deposits on a regular basis. (*Id.* at 54:14-23.)

134.    Whitaker occasionally sat in on conference calls with assistant managers and grocery managers in preparation for big holiday events. (*Id.* at 61:22-62:9.)

135.    Whitaker's last day of work at Ridley's as an ASM was September 2, 2018, and he left Ridley's entirely in October, 2018. (*Id.* at 72:3-73:10.)

## II.    ARGUMENT

### A.    The FLSA Statute of Limitations Eliminates the Claims of Davis, Gallegos, Neil, Wulf, and Donovan. [1]

The claims of Davis, Gallegos, Neil, and Wulf fall outside of the FLSA's statute of limitations, and are thus time barred. Additionally, the claims of Plaintiff Donovan fail for lack of evidence of willful misconduct that would otherwise extend the statute of limitations.

Section 255(a) and Title 29 U.S.C. sets forth a two-year statute of limitations for the recovery of back wages and liquidated damages, except that in the case of a "willful" violation, that limitation period is extended to three years, counting back from the commencement of the action. While an action is usually "commenced" upon the filing of a complaint, in the case of an FLSA collective action the date of "commencement" and the date on which the statute of

---

[1] Plaintiffs assert identical claims under Colorado state law as well, however only three plaintiffs ever worked in Colorado, including Wulf, Donovan, and Rios. Regardless, Colorado employs the same statutes of limitation and same analysis for a misclassification claim under its state law, and to the extent Wulf's and Donovan's claims fail under federal law, they also fail under Colorado state law. *E.g., Hernandez v. Domenico Farms, Inc.,* 414 P.3d 700 (Colo. 2018).

limitations is tolled for a putative member of an FLSA collective is the date that individual putative plaintiff files his or her "written consent."  29 U.S.C. § 256.

As set forth in their complaint, Plaintiffs were previously part of an attempt to proceed against Ridley's under an FLSA collective action, and each filed a consent, spread over several weeks in April and May, 2020: Davis, 4/14/20; Gallegos, 4/6/20; Neil, 4/14/20; Wulf, 4/13/20; Donovan, 4/24/20. Thus, under 29 U.S.C. § 256, and based on the dates the individual Plaintiffs filed their written consents, any portion of Plaintiff's claims based on activities occurring prior to approximately April, 2017 fail outright regardless of willfulness; and any portion of those claims based on activities occurring prior to approximately April, 2018, fail to the extent there is no evidence of willful conduct on the part of defendant.[2]

### 1.    The Claims of Davis, Gallegos, Neil, and Wulf Fail Outright

The claims of plaintiffs Davis, Gallegos, Neil, and Wulf fail outright, regardless of whether the two- or three-year limitation applies. The undisputed evidence shows that Davis' last date of employment with Ridley's was in January, 2016; Gallegos' last date of employment with Ridley's was March 13, 2017; Neil did not work with Ridley's beyond June, 2016; and Wulf worked barely

---

[2] In their complaint, Plaintiffs anticipated this defense in hopes of avoiding it. They included an allegation that the Court should equitably toll the statute of limitations, though Plaintiffs have never formally moved for such, neither in this case nor in the related *Esparsen* case, and the time for doing so may have passed. *E.g., Kibler v. Kroger Companies,* 2022 WL 268056, No. 21-cv-00509-PAB-KMT, Jan. 28, 2022 (considering Plaintiffs' motion for equitable tolling made at the time of conditional certification). Regardless, even if Plaintiffs were now to move for equitable tolling, there is no supporting evidence that Defendant has actively deceived any Plaintiff, that any Plaintiff has been lulled into inaction by Defendant, or that any Plaintiff did not have notice of their own claims or were somehow prevented from diligently pursuing their claims. *Id.* at *6. As this Court noted, "Equitable tolling is to be invoked sparingly, 'only when a litigant's failure to meet a legally mandated deadline unavoidably [arises] from circumstances beyond that litigant's control.'" *Id.*  All of these Plaintiffs had learned counsel at the time of their consents, and were aware of their "claims". There is no record evidence to support equitable tolling.

one week with Ridley's, with his last day on September 24, 2016. Thus, their claims fall outside the limitations period and this Court should dismiss them with prejudice.

### 2. Donovan's Claims Fail Because there is No Evidence of Willfulness

The claims of Plaintiff Donovan fail because there is no record evidence of "willfulness." Thus the two-year statute of limitations applies and eliminates his claims. For purposes of the FLSA, in order to invoke the longer three-year statutory period, the plaintiff bears the burden of showing that the employer either knew or showed reckless disregard whether its conduct was prohibited by statute. *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133 (1988). "Reckless disregard can be shown through action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Mumby v. Pure Energy Services (USA), Inc.,* 636 F.3d 1266, 1270 (10th Cir. 2011). Plaintiffs have no evidence to support a finding of willfulness. Plaintiffs have not otherwise conducted any further discovery on this issue, and discovery is over.

Because the two year statute of limitations applies, Donovan's claims also fail. Donovan filed his written consent on April 24, 2020, meaning his actionable claims only go back to April 24, 2018. While the undisputed record evidence shows that Donovan's last day worked was April 26, 2018 (i.e., the last two days of his employment fall within his claim window), the undisputed evidence also shows that he did not work at all on April 24 or 25, 2018, only worked 5 hours and 20 minutes on April 26, 2018, and only worked 26 hours that entire week. (Ridley Decl., ¶ 10.) Thus, Donovan has no claim to overtime hours for the last two days of his employment, and his claims are lapsed as a matter of law.

**B.**   **The Claims of Meats, Coombs, Davis, Donovan, Gallegos, Glantz, Harris, Neil, Rios, and Whitaker Fail as a Matter of Law Because the Undisputed Evidence Shows They Were Properly Classified as Exempt under the FLSA.**

Beyond the statute of limitations issues, the claims of Plaintiffs Meats, Coombs, Davis, Donovan, Gallegos, Glantz, Harris, Neil, Rios, and Whitaker fail because they were properly classified as exempt under the Fair Labor Standards Act ("FLSA"). The undisputed evidence set forth in detail above shows that each of these plaintiffs met the requirements of the FLSA's administrative and/or the executive exemption. These claims fail as a matter of law.

Employees working in an "administrative" or "executive" capacity are exempt from the FLSA's overtime requirements. 29 U.S.C. §213(a)(1). Plaintiffs meet the requirements of the administrative and/or executive exemptions as a matter of fact, and law.

**1.**   **The Administrative Exemption Applies to Meats, Coombs, Davis, Donovan, Gallegos, Glantz, Harris, Neil, Rios, and Whitaker**

The FLSA's administrative exemption applies to those employees (1) who are compensated on a salary basis of at least $684 per week, and (2) whose "primary duty" consists of performing office or non-manual work directly related to management or general business operations of the employer or the employer's customers and includes the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200.

**a.**   **Plaintiffs Meet the Salary Basis**

Plaintiffs meet the salary basis test. There is no dispute that Plaintiffs were paid a salary of not less than $684 per week.

**b.**   **Plaintiffs Meet the Primary Duty Test**

Similarly, Plaintiffs meet the primary duty test. The regulations define "primary duty" as the "principal, main, major or most important duty that the employee performs." 29 C.F.R. §

541.700(a). Rather than determining the amount of time dedicated to any duty, the determination

of an employee's primary duty looks at all of the facts in a particular case. Per the regulations:

> [t]ime alone . . . is not the sole test, and nothing in this section requires that exempt
> employees spend more than 50 percent of their time performing exempt work.
> Employees who do not spend more than 50 percent of their time performing exempt
> duties may nonetheless meet the primary duty requirement if the other factors
> support such a conclusion.

29 C.F.R. § 541.700(b). Thus, any contention that Plaintiffs' "exempt" activities did not constitute

a majority of their work is irrelevant.

> The regulations also provide guidance on "management and general business operations:"

> To meet this requirement [of doing work "directly related to management or general
> business operations"], an employee must perform work directly related to assisting
> with the running or servicing of the business, as distinguished, for example from
> working on a manufacturing production line or selling a product in a retail or
> service establishment.

29 C.F.R. § 541.201(a).  These Plaintiffs satisfy these requirements.

Interpretive caselaw is helpful in the application of these regulations, and shows Ridley's

entitlement to summary judgment. In *Brillas v. Bennett Auto Supply Inc.,* 675 F.Supp. 2d 1164

(S.D. Fla. 2009), the court determined that an employee who was both an assistant manager and

store manager throughout his tenure met the requirements for both the administrative and executive

exemptions. The court found persuasive as to the administrative exemption the employee's

responsibilities to complete various store reports, keeping track of such things as inventory,

accounting, and cash registers, assisting customers and other employees, helping find the right

products, and resolving customer issues. *Id.* at 1170-72. The court determined that Plaintiff was

exempt.  It stated that "under both tests, numerous courts have held that when considering the

question concerning whether management was an employee's 'primary duty,' a more useful

question is whether or not the employee's managerial duties constituted the primary value the employer placed on the employee. *Id.* at 1168-69. The rationale of *Brillas* supports dismissal of Plaintiffs' claims.

Similarly, in *Sticker v Easter Off Road Equipment, Inc.,* 935 F.Supp. 650 (D. Md. 1996) (cited favorably by *Ott v. Chacha in Art LLC*, 506 F.Supp. 3d. 1133, 1141 (D. Colo. 2020), the court determined that plaintiff, a retail manager, met the administrative exemption, finding persuasive the following: organizing charges, balancing the cash register, tracking sales, making the bank deposit, maintaining store displays, opening or closing the store on time, maintaining inventory, supervising other employees and managers, making sure the store was stocked and, either alone or with a co-manager being responsible for the day-to-day operations of the store. As to that point, the court concluded that, even if the plaintiff spent more than half of his worktime performing non-exempt work, his primary duty was to manage the store. *Id.* at 659 ("Because administration of the store had 'special significance relative to the [plaintiff's] other duties,' administration was the plaintiff's 'primary duty.'"). That rationale of *Sticker* supports dismissal.

The undisputed facts set forth in detail above show that all of the Plaintiffs' primary duties were to manage the store for maximum efficiency, stepping in to help and doing whatever was needed. Each testified to duties and responsibilities similar to the plaintiffs in the above-cited cases. For example:

**Stanton Meats**: In the absence of the store director, Meats was in charge of the entire store. Meats' administrative duties included supervising, directing, and scheduling employees; being in charge of product merchandising, exercising discretion over displays, and signage. He ordered store product and monitored purchases to make sure the store was making money; he opened and

closed the store on time, entered sales reports, counted and secured the tills, prepared and made bank deposits, and secured the store; he filled out accident and injury reports and other various reports; and he attended weekly management meetings.

**Krestina Coombs**: In the absence of the store director, Coombs was in charge of the entire store. Her administrative duties included supervising, directing, training, coaching, and planning work for "center-store" and other employees; she resolved customer complaints; verified employee time entries; had responsibility for employee safety, and store security, counting and securing money onsite, opening the store, and responding to shoplifting incidents; participated in periodic strategic discussions with upper management about how to grow the store; ordering store inventory with discretion, admitting that errors fell on her shoulders.

**David Davis**: In the absence of the store director, Davis was in charge of the entire store. He had responsibilities for customer service, monitoring cooler temperatures, and looking for and addressing problems. He did bookkeeping, balanced and secured the tills, accessed the safe, made financial reports, bank deposits, and was on management calls. He supervised, directed, trained, and evaluated employees. He was responsible for product ordering and merchandising, signage, the physical facility, employee/customer safety, and store security; and he participated in monthly or biweekly conference calls with the store management. He resolved customer complaints.

**Brian Donovan**: In the absence of the store director, Donovan was in charge of the entire store. His administrative duties included supervising, planning and directing work for, coaching, and resolving complaints of employees; ordering store product, merchandising, opening and closing the store, and making bank deposits. He walked the store making sure things and people were working, and he looked for and resolved problems, safety issues, spills, and other similar

issues. When closing, he made sure necessary products were covered and inventory was sufficient, counted and secured the tills and the lottery, and secured all the doors.

**Chris Gallegos**: In the absence of the store director, Gallegos was in charge of the entire store. His administrative responsibilities including supervising, scheduling, training, coaching, evaluating, and resolving complaints of employees; he calculated "labor rates;" he ordered store inventory, with the ability to do "small pallet" orders at his own discretion; he was responsible for merchandising; he was responsible for employee and customer safety, and the physical store facilities; he was one of three people with keys, and had responsibility for opening and closing the store; he counted and secured the tills, made deposits, and responded to shoplifting; he enforced store policies, and regularly participated in management meetings.

**Destiny Glanz**: In the absence of the store director, Glanz was in charge of the entire store. Glanz' administrative responsibilities including supervising, directing, and coaching, disciplining, recommending, and responding to employees; "book work;" counting the safe, verifying cash, and "stack[s]" of paperwork. She had access to the safe and made bank deposits. She had decision making authority over merchandising. She had responsibility for product purchase, with decision making authority over how much to order. She was responsible for employee and customer safety, and admitted that even when she was not doing "management" duties, she still had management responsibilities.

**Cameron Harris**: In the absence of the store director, Harris was in charge of the entire store. Harris' administrative responsibilities included supervising, directing, instructing, training, evaluating, resolving complaints of, and making recommendations about employees; ordering store product; the store's money at closing time; counting the safe. He was responsible for

merchandising, setting up displays, and setting up the various departments. He was responsible for employee safety, with the authority and responsibility to correct unsafe behaviors or situations. He attended weekly management meetings, and represented Ridley's at trade shows.

**Julie Anne Neil**: In the absence of the store director, Neil was in charge of the entire store. Neil's administrative responsibilities included supervising, directing, coaching, and resolving problems of employees. 50-60% of her day she walked the store looking for problems, made sure employees were working, checked for hazards, ensured all departments were running smoothly, and checked the store facility and inventory. She was responsible for product ordering, with discretion as to how much to order. She was responsible for merchandising for which she "had to get creative." She did temperature checks throughout the store facility. She completed sales reports and other paperwork, and did some bookkeeping. She opened the store, counted the safe, and distributed necessary information to the departments. She had keys and the safe combination, and at closing was responsible for securing the tills and the facility.

**Andrez Rios**: In the absence of the store director, Rios was in charge of the entire store. Rios' administrative duties included supervising, evaluating, handling complaints of, and providing feedback to employees. He did much office work, including cash reconciliation, counting and securing the tills, preparing deposits, and setting up the tills. He was responsible for product ordering, and had discretion in doing so, with decision making authority over how much product to order, including for special events or holidays. He had input into the store financials, with responsibility to not exceed his grocery budget. He had merchandising responsibilities, with discretion as to displays and signage. He was responsible for employee and customer safety, walking around looking for and resolving safety issues. He was responsible for closing the store,

and would walk the floor, check "each corner, do the reconciliation, arm the security system, and lock the doors. He also personally held weekly meetings with department managers.

**Jared Whitaker**: In the absence of the store director, Whitaker was in charge of the entire store. Whitaker's administrative responsibilities included supervising, directing, coaching, training, resolving complaints of, interviewing, disciplining, and evaluating employees; employee and customer safety; ordering store inventory, which required him to review past ads or even consider the weather, which could affect how much he ordered. He had responsibility over the store facility. He had keys to the store, and would open or close the store. He was responsible for making bank deposits. He also sat in on management meetings.

Thus, while their precise duties varied, each of these plaintiffs performed significant administrative duties, including supervising employees, overseeing inventory purchasing, merchandising, employee/customer/store safety and security, and other activities related to the store's financial success, cash-handling, and customer service. It was for these activities that they were hired, and these are precisely the same activities that prompted other courts to find the employees exempt from the FLSA under the administrative exemption.  Thus, Plaintiffs' claims fail as a matter of law and this Court should dismiss their claims.[3]

**2.      The Executive Exemption Applies to Plaintiffs Meats, Donovan, and Gallegos, as well as Coombs, Davis, Glanz, Harris, Rios, and Whitaker**

Also, the executive exemption applies to Plaintiffs Meats, Donovan and Gallegos, based on their admitted daily supervision of center store employees, and to Coombs, Davis, Glanz,

---

[3] As set forth previously, Donovan and Rios also assert identical claims under Colorado law. However, the same analysis applies to render their state law claims invalid as well.  *E.g., Ott v. Chacha in Art, LLC,* 506 F.Supp. 3d. 1133 (D. Colo. 2020) ("[A] determination that he is exempt under the FLSA, also results in his exempt status under Colorado state law.")

Harris, Rios, and Whitaker based upon their admitted supervision of the entire store and all employees for a third of their work time. The FLSA's regulations set forth the broad requirements for the executive exemption, stating that such employees are those (1) who are paid a salary of not less than $684 per week; (2) whose "primary duty" is "management of the enterprise" or a "customarily recognized department or subdivision thereof;"; (3) who "customarily and regularly direct[] the work of two or more other employees;" and (4) who have the authority to "hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100. As set forth above, Plaintiffs meet the salary basis test.

### a.      Plaintiffs Meet the Primary Duty Test

Plaintiffs meet the primary duty test. As summarized above, the "primary duty" test does not look at the amount of time. Indeed, with particular applicability to the executive exemption, the regulations provide a relevant example with regard to "primary duty:"

> Thus, for example, assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty *even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register*.

*Id.* at § 541.700(c) (emphasis added). Courts applying this regulation have explained that "when considering the question concerning whether management was an employee's 'primary duty,' a more useful question is whether or not the employee's managerial duties constituted the *primary value the employer placed on the employee*." *Brillas v. Bennett Auto Supply, Inc.*, 675 F.Supp. 2d 1164, 1168 (S.D. Fla. 2009) (emphasis added); *see also, Baldwin v. Trailer Inns, Inc.,* 266 F.3d

1104, 1115 (9th Cir. 2001) (plaintiffs' "principal value to [defendant] was directing the day-to-day

operations of the park even though they performed a substantial amount of manual labor").

> "Management" is defined as well:

> Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

> The undisputed and very detailed evidence set forth above shows that Plaintiffs' primary

duty was "management." Each plaintiff testified as to the broad management duties that each

performed on a daily basis to keep their stores running smoothly, and beyond that managing the

center store operations and employees on a full-time basis, and/or managing the entire store

approximately a third of their time.

> Similarly, regardless of how frequently Plaintiffs claim they participated in such activities

in comparison to their other non-exempt activities, "management" was nevertheless their primary

duty, and the undisputed evidence shows that is why they were hired. *Brillas,* 675 F.Supp. 2d at

1168. As the example from the regulations aptly points out, these assistant managers performed

exempt work such as "supervising and directing the work of other employees, [and] ordering

merchandise," and may have management as their primary duty *even if the assistant managers*

*spend more than 50 percent of the time performing nonexempt work such as running the cash register.* 29 C.F.R. § 541.700(c).

### b. Customarily and regularly directed two or more employees.

As to directing the work of two or more employees, the undisputed evidence shows at the very least that Plaintiffs Meats, Donovan, and Gallegos regularly directed two or more employees *on a daily basis* as part of their overseeing center-store operations, with Meats testifying that he supervised at least 2-10 employees on a daily basis, Donovan testifying that he supervised at least 2-3 employees on a daily basis, and Gallegos testifying that he supervised at least 25 employees on a daily basis. *See,* Facts 17, 18, 51, 65, *supra.* Without question, daily supervision of two or more employees meets the "customarily and regularly" requirement.

These employee numbers are in addition to the other employees these three plaintiffs regularly supervised when they were the senior manager onsite, in charge of the entire store and all of its employees. That of course also applies to the other plaintiffs as well, regarding whom the undisputed evidence shows that they easily meet the numbers threshold when considering the time that they were the senior manager onsite—a full third of their work time. According to the plain language of the regulations, that supervisory time also meets the numbers threshold, which does not require a "daily" or constant supervisory authority, but only requires that it occur "regularly and customarily." In that regard, the regulations instruct:

> The phrase "customarily and regularly" means a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed "customarily and regularly" includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks.

29 C.F.R. § 541.701. Supervision of more than two employees for at least one-third of an ASM's time is certainly greater than occasional, and is normally and recurrently done week after week,

nor is it isolated or one-time. Thus, while Meats, Donovan, and Gallegos clearly meet this requirement on a daily basis, this requirement applies also to and is satisfied by Coombs, Davis, Gallegos, Glanz, Harris, Rios, and Whitaker by reason of their supervisory duties in absence of the Store Director.

### c.   Plaintiffs had authority to "Hire and Fire."

These plaintiffs also meet the fourth element of the exemption. As to this element, there is no strict requirement that Plaintiffs actually have the authority to hire and fire, only that they have some involvement in such aspects of the employment relationship as retention, advancement, promotion and other similar aspects.

Caselaw provides helpful examples as to the breadth of this factor. In *Slusser v. Vantage Builders, Inc.,* 576 F. Supp.2d 1207 (D.N.M. 2008), the court found the following tasks determinative: giving employee evaluations and making employee recommendations. *Id.* at 1222-23. Similarly, in *Maestas v. Day & Zimmerman, LLC,* 972 F. Supp.2d 1232 (D.N.M. 2013), the court considered the following evidence relevant: employee evaluations, and investigating misconduct and recommending discipline.  *Id.* at 1245. In *Burson v. Viking Forge Corp.,* 661 F. Supp.2d 794, 804-05 (N.D. Ohio 2009), the court found persuasive the following: (1) plaintiff's involvement in the interview process; (2) plaintiff made recommendations as to pay increases and promotions; (3) plaintiff gave employees verbal warnings. Similarly, in *Gellhaus v. Wal-Mart Stores, Inc.,* 769 F. Supp.2d 1071, 1082-83 (E.D. Tex. 2011), the court found the following evidence persuasive: (1) part of plaintiff's duties as an assistant manager were conducting "'employee coaching,' which were essentially performance reviews;" (2) some of plaintiff's recommendations were followed regarding hiring and changes in employment status. Application

of the rationales in each and all of these cases supports dismissal here.

In *Rozenblum v. Ocean Beach Properties,* 436 F. Supp.2d 1351 (S.D. Fla. 2006), the Court found the fourth prong of the executive exemption to apply to plaintiff despite the following facts viewed in the light most favorable to the employee:

> Plaintiff never hired or fired an employee nor did Plaintiff have the authority to hire or fire any employee. Although Plaintiff often complained to [employer] about the performance of certain employees, he never specifically recommended to [employer] that an employee should be hired, fired, or receive a raise. However, he did report to [employer] about performance problems with employees and recommended that Cohen address these issues. . . . According to [employer], Plaintiff was 'the captain of the ship' when [employer] was not at the hotel. He expected Plaintiff to handle problems as they arose and make the appropriate decisions to solve them.

*Id.* at 1355. Finding factual disputes as to whether the plaintiff could hire and fire, the court nevertheless concluded they were immaterial and granted the *employers'* motion for summary judgment, finding the second part of the test satisfied, stating that "Plaintiff frequently made suggestions and recommendations as to the hiring and firing of employees which [employer] gave particular weight to." *Id.* at 364.

Like the *Rozenblum* plaintiff, Plaintiffs in the instant case were the "captain of the ship" for at least nearly a third of the workweek.

The undisputed evidence shows at a minimum that Meats, Donovan, and Gallegos meet the elements of the executive exemption on at least a daily basis, through their management responsibilities and daily supervision of multiple employees in the center-store operations, and their broader responsibilities that included directing, coaching, resolving complaints of, evaluating, interviewing, and otherwise making recommendations about hiring, firing, discipline,

and/or promotions. Additionally, based on their management responsibilities along with their broader supervisory responsibilities over the entire store and all employees for at least one-third of their work time, the undisputed evidence shows that the executive exemption applies also to Coombs, Davis, Glanz, Harris, Rios, and Whitaker, who also supervised, directed, coached, resolved complaints of, evaluated, interviewed, and/or made recommendations regarding hiring, firing, promotions, and/or terminations of employees. The claims of these nine plaintiffs should be dismissed under the executive exemption as well.

### III.    CONCLUSION

For all of the foregoing reasons, Ridley's respectfully requests that the Court grant this Motion and enter judgment in favor of Defendant.

DATED this 20th day of April, 2023

SNELL & WILMER L.L.P.

*/s/ David P. Williams*
David P. Williams (UT#07346)
SNELL & WILMER L.L.P.
15 W. South Temple, Suite 1200
Salt Lake City, Utah 84101
Telephone:  801.257.1900
Facsimile:  801.257.1800
Email: dawilliams@swlaw.com

***Attorneys for Defendant***
***Ridley's Family Markets, Inc.***

**<u>CERTIFICATE OF SERVICE</u>**

This is to certify that on April 20, 2023, a true and correct copy of the above and foregoing document was filed using the Court's CM/ECF system, which effectuated electronic service on all counsel of record.

*/s/ David P. Williams*

4862-6106-0184

45