Exhibit 9

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF COLORADO

 3

 4   JONATHAN ESPARSEN, individually)
     and on behalf of all others   )    [CERTIFIED COPY]
 5   similarly situated,           )
                                   )
 6              Plaintiffs,        )
                                   )
 7       v.                        ) No. 1:18-cv-01556-RM-GPG
                                   )
 8   RIDLEY'S FAMILY MARKETS, INC.,)
                                   )
 9              Defendant.         )
     _____)
10

11

12        VIDEOTAPED DEPOSITION OF CAMERON HARRIS

13               Salt Lake City, Utah

14             Tuesday, January 18, 2022

15

16

17

18

19

20

21

22

23

24

25   Reported by:  Daren S. Bloxham, RPR No. 000335
```

```
 1          Deposition of Cameron Harris, taken at Snell &

 2    Wilmer, located at 15 W. South Temple, Ste. 1200, Salt

 3    Lake City, Utah, on January 18, 2022, at 12:57 p.m,

 4    before Daren S. Bloxham, Certified Court Reporter, in and

 5    for the State of Utah.

 6

 7                    A P P E A R A N C E S

 8    FOR THE PLAINTIFF:

 9          April Rheaume, Esq.
            SANFORD LAW FIRM
10          10800 Financial Centre Parkway
            Kirkpatrick Plaza, Suite 510
11          Little Rock, Arkansas 72211
            800-615-4946
12          april@sanfordlawfirm.com

13

14    FOR THE DEFENDANT:

15          Mark O. Morris, Esq.
            SNELL & WILMER
16          15 W. South Temple, Ste. 1200
            Salt Lake City, Utah 84101
17          801.257.1900
            mmorris@swlaw.com

18

19    ALSO PRESENT:  Gavin Bohne (videographer)

20

21

22

23

24

25
```

1    2018, you never kept track of the occasions when you had

2    to stay later than you were scheduled for whatever

3    reason, did you?

4        A.   Not that I recall, no.

5        Q.   And no one else was keeping track of that for

6    you, were they?

7              MS. RHEAUME:  Object to form.

8              THE WITNESS:  No.

9        Q.   (By Mr. Morris) So I infer from your testimony

10   that as long as you adhered to the schedule that was

11   given to you, you show up at 7 and you leave at 6, you

12   show up at 9, you leave at 8, as long as that occurred,

13   you thought you were being treated fairly?

14       A.   That's what I agreed to, yes.

15       Q.   Did you enjoy being a manager at Ridley's?

16       A.   Not really, no.

17       Q.   Why not?

18       A.   It was a lot of stress that came with the job

19   and took a lot of time from my family.

20       Q.   Were you married -- well, tell me when you got

21   married.

22       A.   I got married in December of 2013.

23       Q.   Okay.  You quit in November of '18 from the

24   Highland store?

25       A.   That sounds right.

```
 1   manager.

 2        Q.    Okay.  And then produce would have a department

 3   head?

 4        A.    Correct.

 5        Q.    Do you know if they were being paid hourly?

 6        A.    Yes, they were paid hourly.

 7        Q.    Were those department heads scheduling other

 8   employees like you were doing in hardware?

 9        A.    Yes, they were.

10        Q.    How many department heads were there in

11   Pinedale at any one time, not physically in the store,

12   but just had that role?

13        A.    Just on staff?  I would say there were three.

14        Q.    Hardware and what?

15        A.    Well, besides the hardware, there were three --

16        Q.    Okay.

17        A.    -- is what I mean to say.  There was produce

18   department head, meat department -- and I guess there was

19   four.  You've got produce, meat, deli, and bakery.

20        Q.    When you were store director in Pinedale, how

21   many employees were you responsible for total?

22        A.    I don't remember the number.

23        Q.    Do you remember what the range would have been?

24        A.    I'd say anywhere -- as the store director, over

25   50 to 60 employees maybe.
```

1    Q.   How many employees at any one time would you

2    expect to see in the Pinedale store, everyone included,

3    managers and hourly employees?

4    A.   Maybe around 30 to 40.

5    Q.   30 or 40?

6    A.   Yeah, to be in store at that time.

7    Q.   That's how many people it takes to operate a

8    Ridley's grocery store?

9    A.   That's what we had at the time in Pinedale.

10    Q.   Okay.  On the occasions when you were the only

11    manager at the store, no store director, no other

12    assistant manager, you knew that you were responsible for

13    those 30 to 40 employees in the store, didn't you?

14    A.   At the moment, yes.

15    Q.   Going back to hardware manager, how many

16    employees would you say you hired to work in your

17    department while you were at Ridley's?

18    A.   That I hired as the hardware manager?

19    Q.   Yeah.

20    A.   I did not hire any of them as the hardware

21    manager.

22    Q.   I'm sorry.

23    A.   As the hardware manager, I did not hire any of

24    them.

25    Q.   Okay.  So if I wanted to go and work in the

 1      Q.   Do you think if you had gone to Val and said, I
 2   can't work with this person anymore, you need to let them
 3   go, that Val would have overruled your decision and kept
 4   that person on?
 5           MS. RHEAUME:  Object to form.
 6           THE WITNESS:  He might have.  I don't know.
 7      Q.   (By Mr. Morris) Did you get along with Val?
 8      A.   I did, yes.
 9      Q.   He trusted you, didn't he?
10      A.   He did.
11      Q.   Tell me about the additional responsibilities
12   you did get when you became an assistant store manager in
13   Pinedale.
14      A.   I was to write grocery orders for the store,
15   unload the grocery trucks two or three times a week, fill
16   in as a cashier when needed, work the customer service
17   booth, for example, Western Union services and other
18   things that couldn't be done on the cash register,
19   throwing freight to the shelf, stocking the items,
20   organizing the stockroom, assist the hardware department
21   in filling propane bottles when they couldn't get out
22   there for customers, assisting them unload -- to unload
23   their truck when there wasn't somebody who could do that,
24   assist customers in that department, be responsible for
25   the money at closing time, counting the safe.

 1    thing.

 2         Q.   No, I understand.   Store director sets the

 3    schedules.   But in terms of when he's on site and an

 4    employee comes to you as the assistant manager, it sounds

 5    like you didn't feel as obligated to go to Justin to get

 6    approval for a discretionary decision like you did with

 7    Val?

 8         A.   Maybe on occasion, but most of the time I would

 9    refer to him.

10         Q.   Did you have a set of keys for the store in

11    Pinedale when you were an assistant store manager?

12         A.   Yes, I did.

13         Q.   Were there any keys to anything that the store

14    director had that you did not have as an assistant store

15    manager?

16         A.   That I don't know.

17         Q.   As far as you know, you had an identical set?

18         A.   Yes.

19         Q.   To do your job as an assistant store manager in

20    Pinedale, did you need any -- anything that was the --

21    the company provided to you, like a laptop or a computer

22    or workstation of any kind?

23         A.   Not that I can think of, no.

24         Q.   Other than a set of keys and maybe a name tag

25    that identified you as a manager, were you given anything

1   to perform your job as an assistant store manager that

2   you didn't have before?

3        A.   I don't believe so.

4        Q.   While you were an assistant store manager and

5   you had employees working under you in Pinedale, you felt

6   like you could direct their work, didn't you?

7             MS. RHEAUME:  Object to form.

8             THE WITNESS:  It depended on the task.  I mean,

9   if -- if it pertained to grocery, then I might be able to

10  tell them or ask them to do a certain thing.  But they

11  were primarily scheduled to do the job they were hired

12  for through Val.

13       Q.   (By Mr. Morris) Well, I understand Val set the

14  schedule, but if someone was stocking shelves and they

15  were doing a horrible job of it, you didn't run and tell

16  Val, did you?

17       A.   Not generally, no.

18       Q.   You would tell that employee, Look, this is how

19  you've got to do it, right?

20       A.   Yes.

21       Q.   Is there anyone in the store that was working

22  below people in management, like you, Scott, and Val,

23  whose activities you felt you had no right to direct?

24  Oh, no.  I'm sorry.  I can't tell you how to stock those

25  shelves or how to display things in the deli or display

1  to have Mark's final approval on it to make sure

2  everything was in order.  But it wasn't my -- my

3  understanding that I could just as an assistant manager

4  make that call right then and there.

5       Q.   How about just sending someone home, saying, I

6  can't get ahold of anyone, but you're not -- you're not

7  working here for the rest of the day, you could do that,

8  couldn't you?

9       A.   Yes, I believe so.

10      Q.   As an assistant store manager, you've got 30 or

11 40 people in the store, you would tell employees to do

12 things, wouldn't you?

13      A.   Maybe on occasion if they would ask, but they

14 knew their position and their roles, and they had things

15 to do, so I generally did not have to.

16      Q.   Well, a customer drops a jar of peanut butter

17 on aisle 3, and someone -- Jim is stocking the shelf

18 down, you know, a few feet away.  You had the right to

19 say, Jim, could you clean this up, please?

20           MS. RHEAUME:  Object to form.

21           THE WITNESS:  I suppose I could, yes.

22      Q.   (By Mr. Morris) You knew you could -- as an

23 assistant store manager, you knew you had the ability and

24 the right to say, Jim, please clean up this mess?

25      A.   Yes.

1    Q.   You didn't have to run to Val and say, Hey, I

2    want Jim to clean up that mess on aisle 3?

3    A.   That's correct.

4    Q.   And there were other mundane typical tasks that

5    employees in a grocery store do that you felt you had the

6    ability to direct as an assistant store manager, right?

7    A.   As long as they weren't tasked by their

8    department head or the store director, then if I was the

9    only manager there, I could assign those tasks.

10   Q.   But even if the store director were there,

11   if -- if something comes up, a dropped -- you know, a

12   broken jar of something or -- I mean, too many shopping

13   carts in the parking lot, you look outside and there's

14   all these carts out there, as an assistant store manager,

15   you could go to any one of your employees and say, Could

16   you go out and get all the carts in?

17   A.   Yes, I could.

18   Q.   You knew you could?

19   A.   Yes.

20   Q.   Can you think of anything that you did not

21   think -- so we've talked about hiring and firing.  I

22   understand you didn't feel like could you hire people and

23   fire people as an assistant store manager, correct?

24   A.   Correct.

25   Q.   Okay.  You also said you couldn't discipline

```
 1    them, right?

 2         A.    Correct.

 3         Q.    You could send them home --

 4         A.    Yes.

 5         Q.    -- in a -- you know, I mean, there are

 6    different circumstances.

 7         A.    In certain circumstances.

 8         Q.    Because that's an example I gave you, right?

 9         A.    Yes.

10         Q.    Can you think of anything else that you felt

11    that you could not do as an assistant store manager

12    without having the store manager's approval?

13         A.    Nothing comes to mind at the moment, no.

14         Q.    In fairness, you said you didn't think you

15    could direct the heads of departments?

16         A.    Yes.  That is correct.

17         Q.    Okay.  So hire, fire, discipline, directing

18    department heads?

19         A.    Correct.

20         Q.    Everything else that a store director is

21    entitled to do you felt, as an assistant store manager,

22    you had the right to do?

23         A.    Yes, other than what we just discussed.

24         Q.    Did employees ever come to you and complain

25    about anything?
```

1       A.   I'm sure they did.

2       Q.   **You didn't feel like you had to go to Val every**

3    **single time to resolve that employee complaint, did you?**

4       A.   Maybe not every single time, no.

5       Q.   **Can you give me an example of an employee**

6    **complaint that you ever got where you felt, oh, I've to**

7    **take this to Val, I can't handle this on my own?**

8       A.   Yes, I can think of an instance where our deli

9    department head had a complaint about another department

10   head in the way that they shared the cooler space.  And I

11   went ahead and just took that to Val.  That's not

12   something that I really can make a final call on.

13      Q.   **Okay.  But resolving a dispute between**

14   **department heads seems consistent with your idea that you**

15   **couldn't direct them?**

16      A.   Correct.

17      Q.   **If two employees were on an aisle stocking**

18   **shelves, and one thought peanut butter should go this far**

19   **and the other one thought that peanut butter should only**

20   **have three feet of space instead of four, you could**

21   **resolve that dispute among hourly employees without**

22   **having to go to Val to resolve it, couldn't you?**

23      A.   As it pertained to the grocery department, yes.

24      Q.   **Is that because it was not deli, not meat, not**

25   **produce, and not hardware?**

 1       A.   In the example you gave, yes, that it was part

 2   of the grocery department.

 3       Q.   **Is it fair to say that as an assistant store**

 4   **manager, grocery was sort of your department, like**

 5   **hardware was the hardware manager's department?**

 6       A.   That's fair to say, yes.

 7       Q.   Okay.  I get it.

 8            **How much of your job as an assistant store**

 9   **manager was training new employees their jobs?**

10       A.   I -- I don't recall training -- I don't really

11   recall training any of the grocery employees or any other

12   employees that I can think of personally.

13       Q.   **Whose job was it?**

14       A.   There were -- we had like a customer service

15   manager who would -- who would train the cashiers.  She

16   was like the head cashier.  As far as stockers and that

17   thing go, they kind of had a lead on that team.  That

18   wasn't really an official title, but the most experienced

19   person would show them how do that.  But I don't

20   recall -- well, do I recall training maybe a grocery

21   manager.

22       Q.   **While you were an assistant store manager?**

23       A.   Yes.

24       Q.   **When did you first get your training as -- to**

25   **work cash register?**

1       A.   I believe it was just kind of as the days went

2   on when I was -- well, I learned to work the register

3   when I was first hired with Ridley's as a hardware clerk.

4       **Q.   Who trained you?**

5       A.   My supervisor, the hardware manager.

6       **Q.   When you were the hardware manager, did you**

7   **train new employees in the hardware department?**

8       A.   Yes, I suppose I did.  I did.

9       **Q.   Okay.  And so when you were promoted from being**

10  **the hardware manager to assistant store manager, did you**

11  **train less?**

12      A.   Yeah.  Yes.

13      **Q.   Okay.  Did you ever provide written evaluations**

14  **of employees?**

15      A.   As assistant manager?

16      **Q.   Yes.**

17      A.   Not that I recall.

18      **Q.   So we're not going to find any forms like this**

19  **where -- like Exhibit 2 where Cameron Harris is**

20  **evaluating an employee that worked under you as an**

21  **assistant store manager?**

22      A.   I don't recall.  I may have filled one of those

23  out, but I can't think of a particular instance or

24  person.

25      **Q.   Any reason why you couldn't fill one out?**

1       A.    It was mostly the store director's position to

2    evaluate job performance.

3       **Q.    Did he ever ask you for input?**

4       A.    He -- he's -- yeah.  He's -- I'm sure he's

5    asked me for input.

6       **Q.    So your testimony is you don't recall actually**

7    **performing an evaluation of any employees while you were**

8    **an assistant store manager?**

9       A.    Not that I can recall, no.

10      **Q.    I can't remember if I asked you this earlier.**

11   **I'm sorry if I'm repeating a question.**

12            **Did you ever recommend to Val, We've got to**

13   **fire this person?**

14      A.    I can't recall if I have or not.

15      **Q.    Could have happened, but you just don't**

16   **remember?**

17      A.    Correct.

18      **Q.    Okay.  How about hiring, did you ever interview**

19   **anyone before they became a Ridley's employee?**

20      A.    I may have been in the room while they were

21   being interviewed by the store director, but I've never

22   conducted them as an assistant store manager that I can

23   remember doing.

24      **Q.    Okay.  So you never -- in all your time as an**

25   **assistant store manager, you never said, You're hired?**

1      A.    No.

2      **Q.    What involvement did you have as an assistant**

3   **store manager in how much people got paid?**

4      A.    That was not my place.  It was a payment

5   schedule put forth by corporate.  That was up to the

6   store director to work with them on.

7      **Q.    So you never recommended that Susan get a raise**

8   **because she's just been outstanding the last three**

9   **months?**

10      A.    I may have recommended, yes.

11      **Q.    Did Val follow your recommendation?**

12      A.    I'm sure on occasion.

13      **Q.    Did you know what the people working under you**

14   **were paid?**

15      A.    Not particularly, no.

16      **Q.    There were times when you were involved in**

17   **determining whether someone gets a raise or a pay cut?**

18      A.    It wasn't my decision, no.

19      **Q.    I know it wasn't your decision.  My question**

20   **was you were involved with decisions about whether to**

21   **give someone a raise or a pay cut because of poor**

22   **performance?**

23      A.    I may have been in the room to voice an opinion

24   to the manager after being in that situation where they

25   were talking to the employee, yes.

1      Q.    Okay.  Did you ever have any involvement in

2   whether an employee would be transferred?

3      A.    No.

4      Q.    How about merchandising?

5      A.    If you mean, you know, setting the displays and

6   setting up the department, yes, then as an assistant

7   manager, that was one of my responsibilities.

8      Q.    How about -- so as an assistant store manager,

9   you did have responsibility for how product was

10  displayed?

11     A.    To a certain degree, yes.

12     Q.    Okay.  How about what product was purchased,

13  did you have a role over grocery, for example, of

14  customers would come in and they -- they like -- you

15  know, they keep asking me about this product that we

16  don't have.  Did you have a role in deciding what

17  products would be purchased and put on display for sale?

18     A.    Yes, I could -- I could make that call within

19  reason.

20     Q.    Okay.  What's a product that you're proud you

21  brought in that wasn't there before?

22     A.    There was a lot of call for organic and

23  gluten-free items, just, for example, some salad dressing

24  that was gluten free that people had, that certain diet

25  restriction that they --

1      Q.    Salad dressing has gluten in it?

2            MR. MORRIS:  Did you know this, April?

3            MS. RHEAUME:  Uh-huh (affirmative).

4            THE WITNESS:  There is a lot of things that do.

5            MR. MORRIS:  I'm shocked.  I had no idea.

6            THE WITNESS:  Yes.  When you live in a small

7      town and there's a small percentage of people that have

8      that restriction, it really -- really makes them happy.

9      Q.    (By Mr. Morris) Huh.  Any other things that you

10     did on your own in terms of ordering product?

11     A.    As an assistant manager, other than the

12     day-to-day grocery orders, what we were low on, out of,

13     what we needed to prepare for, that was primarily a

14     decision made with Val when there was big purchases for

15     upcoming seasonal items, or Halloween candy, for example,

16     would be one that comes to mind.

17     Q.    So when you wanted to order gluten-free

18     product, what was the process you went through?

19     A.    Generally I would run it by Val, and it was --

20     if it was just one item that was something I could cut

21     into the section, then I wouldn't receive a lot of

22     pushback on it.

23     Q.    So how does that happen?  So, you know,

24     customers are saying, Hey, you don't have gluten-free

25     salad dressing, I mean, what -- what does Cameron do in

1    response to numerous customer requests like that?

2         A.   Well, I'd bring it up to -- bring it up to

3    management, the store director.  And then I would have

4    access to a product catalog from our food distributor and

5    find something comparable or something exactly what

6    they're looking for if they mention it by name and order

7    a case in and cut it into the set.

8         Q.   And you -- you made the determination where to

9    display it?

10        A.   Yes.

11        Q.   What department it would go into?

12        A.   The only things I had access to were

13   grocery-specific department.  For example, the food

14   distributor had different categories of departments, like

15   deli and produce, that I wouldn't order from.  But if it

16   pertained to the dry groceries and the freezer, then I

17   could, yes.

18        Q.   Employee safety, if you saw an unsafe practice

19   by an employee, you wouldn't wait to tell Val about it

20   before stopping it, would you?

21        A.   Correct.  I would not.

22        Q.   Do you recall fashioning or creating any safety

23   protocols at the store in Pinedale while you were an

24   assistant store manager?

25        A.   Not me, no.

```
 1        Q.   Just to be clear, so if you ever saw any of the
 2   60 employees in a store -- I mean, total, any of the 30
 3   or 40 that were there at any one time doing anything that
 4   you thought was not safe, as an assistant store manager,
 5   you had the right to direct them to stop whatever it was
 6   they were doing that you thought wasn't safe?
 7        A.   As it pertained to safety, yes.
 8        Q.   Or to do something to be more safe?
 9        A.   Yes.
10        Q.   If you ever saw a hazard in the store, you knew
11   that you had the right to correct that condition as an
12   assistant store manager?
13        A.   Correct.
14        Q.   Do you know if -- do you recall if Ridley's had
15   a written safety policy?
16        A.   There may have been something at hiring that
17   you signed.  I -- I believe there -- there could have --
18   I'm pretty sure there was.
19        Q.   And, again, if someone were violating a safety
20   protocol, you didn't think you had the right to fire
21   them?
22        A.   Correct.
23        Q.   Was there an alarm system in Pinedale?
24        A.   I don't believe there was, other than a couple
25   of emergency exits.  There wasn't an entire system.
```

1      Q.    Like when you opened the store at 7:00, you

2   didn't have to turn off an alarm or turn it on when you

3   left at midnight?

4      A.    Not that I remember, no.

5      Q.    As an assistant store manager, how much

6   responsibility did you have for making sure proper

7   notices were posted, things that the law requires you to

8   put up for employees to see on bulletin boards and things

9   like that?

10     A.    As far as I knew, I did not have any

11  responsibility to make sure those were posted.

12     Q.    Who was -- who was responsible in your mind for

13  making sure that happened?

14     A.    That would have been the store director from

15  what I understand.

16     Q.    Okay.  Did the Pinedale store, when you were

17  assistant store manager, have a budget of some kind?

18     A.    As I was an assistant?  I mean, that's --

19  that's hard to answer because I know as a store director,

20  there was.  But when I was an assistant, I don't recall

21  really being privy to any of those -- those budgets or

22  anything like that.

23     Q.    So Val never consulted with you when he was

24  trying to figure out a store budget?

25     A.    Not -- not that I recall, no.

1     Q.   And when you were store director, you didn't

2   get input from your assistant store managers when you set

3   a budget for the Pinedale store?

4     A.   Not that I remember, no.

5     Q.   Were you ever involved in any kind of

6   investigations, an employee complained about being

7   harassed, for example?

8     A.   The only investigations I remember are -- the

9   one brought to us from the Department of Justice.  But as

10  far as other investigations, I don't remember of any

11  right offhand.

12    Q.   When you became assistant store manager, were

13  you given any sort of handbook or written materials that

14  were different from what you had been given as a hardware

15  manager?

16    A.   No.

17    Q.   How many management meetings weekly would you

18  attend typically as an assistant store manager?

19    A.   As an assistant, I don't remember -- there may

20  have been one weekly meeting with the department heads,

21  that I believe once a week we met.

22    Q.   When you were store director, how many times a

23  week did you call your management people together?

24    A.   Probably the same.  Just that one weekly

25  meeting.

 1   assistant store manager?

 2        A.   As an assistant store manager, I did have the

 3   right to ask them.  Now, whether they complied or not, I

 4   could not force them to.

 5        Q.   Well, could Val force them to do it?

 6        A.   I guess at the end of it, no.  You can't --

 7        Q.   No.

 8        A.   -- be physically forced to do anything, no.

 9        Q.   Of course not.  But did you have the authority

10   to direct them -- as an assistant store manager, you had

11   the authority to tell someone who's stocking on aisle 3

12   they need to go and help you on aisle 4.  You had that

13   authority, didn't you?

14        A.   Yes, for the grocery department.

15        Q.   Okay.  Were you ever disciplined in all the

16   time that you worked for Ridley's?

17        A.   Not that I can think of, no.

18             MS. RHEAUME:  Can I pause for a second?  It

19   seems like that light is in your eyes.

20             THE WITNESS:  It is.

21             (A discussion was had off the record.)

22        Q.   (By Mr. Morris) As an assistant store manager,

23   were there any meetings in the store that you were

24   required to attend other than the weekly management

25   meeting?

```
 1          A.   Not that I remember, no.

 2          Q.   Do you have any social media accounts?

 3          A.   I think I have a few that I use occasionally.

 4          Q.   When you were assistant store manager, do you

 5     remember ever describing what you did at Ridley's in

 6     social media, emails to friends?

 7          A.   Not that I remember, no.

 8          Q.   Did you keep a personal journal or diary during

 9     the time you were an assistant store manager for

10     Ridley's?

11          A.   No, I did not.

12          Q.   Did you keep any notes or records of any kind

13     of day-to-day activities, weekly while you were an

14     assistant store manager?

15          A.   As far as did I keep them until now or at --

16          Q.   Well, the first question is did you ever keep

17     any while you were working there?

18          A.   Day-to-day stuff, to-do tasks, things like

19     that, but nothing long term.

20          Q.   And they're gone now?

21          A.   Yes.

22          Q.   Did you ever need to drive as an assistant

23     store manager, ever need to get in a vehicle and drive

24     anywhere?

25          A.   Occasionally.  There were times when I was an
```

 1   assistant store manager where I went to a couple of trade

 2   shows for the company.  There was some travel involved

 3   there.

 4        Q.   Like where would the trade show be?

 5        A.   They held the shows in -- there's one in Reno,

 6   Nevada, one in Vegas for Ace Hardware, that sort of

 7   thing.

 8        Q.   And Ridley's would pay for your travel and

 9   hotel stays?

10        A.   Yes, they would.

11        Q.   Do you remember any hourly employees being

12   brought along on those?

13        A.   I -- I don't recall.

14        Q.   What did you understand your purpose in being

15   there at these trade shows for Ridley's?

16        A.   It was for merchandising our hardware store.

17        Q.   So it was -- were these trade shows while you

18   were the hardware manager?

19        A.   There were some while I was the hardware

20   manager, yes.

21        Q.   But there were others while you were the

22   assistant store manager?

23        A.   That is correct.

24        Q.   Would you travel with the store director and

25   the other assistant store manager?

 1       A.   It was usually people from the corporate

 2  hierarchy so to speak.

 3       **Q.   It would be unusual to send all three managers**

 4  **from a store to one of these?**

 5       A.   Yes.

 6       **Q.   And leave Pinedale undefended?**

 7       A.   Very unusual.

 8       **Q.   Okay.  How many of those would there be a year?**

 9       A.   Upwards of two or three between the two

10  different events.

11       **Q.   So during your duration as hardware manager,**

12  **assistant store manager, or store director, how many of**

13  **those do you think you attended?**

14       A.   Oh, gosh.  I'd say upwards of maybe five to

15  six.

16       **Q.   Five to six?**

17       A.   Yes.

18       **Q.   Okay.  You got paid while you were doing that?**

19       A.   Yes.

20       **Q.   You had the ability to authorize some**

21  **expenditures as an assistant store manager, didn't you?**

22       A.   Other than the ordering grocery, I don't -- I

23  can't think of any other expenditures that I could

24  authorize.

25       **Q.   Okay.  So what would you do when you ordered**

1    that remained at the store but was not mine to take.

2        Q.   If you weren't in the store -- I understand

3    there were -- once or twice a month, you might have to

4    stay longer because someone didn't show up.  If you

5    weren't in the store or at a trade show, you weren't

6    working for Ridley's, were you?

7        A.   As an assistant store manager, no, I was not.

8        Q.   How about as a store director?

9        A.   There were times where I would work --

10       Q.   You'd be at home and you get a phone call?

11       A.   Yes, all the time.

12       Q.   Sure.  Okay.  Not surprising.

13            Were there any corporate meetings that you

14   attended while you were an assistant store manager?

15       A.   No, I don't think so.

16       Q.   So the only travel were these trade shows?

17       A.   Trade shows, and then I remember having to

18   travel -- well, as an assistant store manager, just the

19   trade shows, yes.

20       Q.   What other travel do you remember doing at any

21   time you worked for Ridley's?

22       A.   I remember going to the Wyoming Capitol to meet

23   with the ATF agents that were handling our investigations

24   and things and having kind of a refresher course, I guess

25   you could call it, or just kind of a here's what you need

1    that they are accommodated appropriately, whether it's

2    how long they can stand or -- that's the best example I

3    can think of.

4         Q.   And so in all your years in a management

5    position at Ridley's, you were never involved in an

6    employee asking for what you've just characterized as an

7    accommodation?

8         A.   Not that I can remember, no.

9         Q.   If someone had come to you, if an employee had

10   come to you and said, you know, I've got a temporary

11   disability, I was in an accident, I've -- I can't stand

12   for long periods of time, you would just say, Not my

13   problem because I'm only an assistant store manager?

14             MS. RHEAUME:   Object to form.

15             THE WITNESS:   Not necessarily.  I would run it

16   by the store director and most likely accommodate them

17   under his direction.

18        Q.   (By Mr. Morris) So there's a cashier who has

19   pain because they were in an accident or something and

20   they say, I can't stand here anymore.  You wouldn't say,

21   Take a seat, take a break, you would have to go back and

22   find Val --

23             MS. RHEAUME:   Object to form.

24             MR. MORRIS:   Excuse me.

25        Q.   (By Mr. Morris) -- and leave her standing there

 1   at the cash register in pain?

 2            MS. RHEAUME:  Now object to form.

 3            THE WITNESS:  No.  I -- I would probably

 4   accommodate them for the time being until the situation

 5   was understood by the store manager.

 6        Q.   (By Mr. Morris) Of course you would, right?

 7        A.   Yes.

 8        Q.   I didn't understand the testimony you gave

 9   about the 30 to 40 employees at the store.  So maybe not

10   at any one time, but during the course of a day, there

11   would be that many employees.  Is that what you meant to

12   say?

13        A.   That's -- that's what I would mean, yes.

14        Q.   Okay.  I get that.

15        A.   Different shifts.

16        Q.   Okay.  At any one time -- I mean, there are

17   peak hours.  I mean, you're going to need more employees

18   there at 3 in the afternoon, I assume, than you would at

19   7 in the morning.  Is that fair to say?

20        A.   Yes.

21        Q.   What time or times of day are typically -- were

22   typically the busiest in Pinedale?

23        A.   I would say generally the evening about

24   people's quit time for work, 5:00 and on.  And then

25   probably more so in the afternoon around lunchtime,

```
 1                    REPORTER'S CERTIFICATE

 2    STATE OF UTAH )

 3    COUNTY OF UTAH )

 4

 5             I, Daren S. Bloxham, a Certified Shorthand

 6    Reporter, Registered Professional Reporter, hereby

 7    certify:

 8             THAT the foregoing proceedings were taken

 9    before me at the time and place set forth in the caption

10    hereof; that the witness was placed under oath to tell

11    the truth, the whole truth, and nothing but the truth;

12    that the proceedings were taken down by me in shorthand

13    and thereafter my notes were transcribed through

14    computer-aided transcription; and the foregoing

15    transcript constitutes a full, true, and accurate record

16    of such testimony adduced and oral proceedings had, and

17    of the whole thereof.

18             I have subscribed my name on this 25th day of

19    January, 2022.

20             _____

21                      Daren S. Bloxham
                        Registered Professional Reporter #335
22

23

24

25
```