```
                                                                    Page 1
 1               IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF COLORADO

 3

 4    STANTON MEATS, JASON CARILLO, ET        )
      AL.,                                    )
 5                                            )
                     Plaintiffs,              )
 6                                            )
             v.                               ) Civil No.
 7                                            ) 1:22-CV-1070-PAB
                                              )
 8                                            )
      RIDLEY'S FAMILY MARKETS, INC.,          )
 9                                            )
                     Defendants.              )
10    _____)

11

12              ZOOM DEPOSITION OF BRIAN DONOVAN

13                     Salt Lake City, Utah

14                 March 2, 2023, at 1:00 p.m.

15

16

17

18

19

20

21

22      Reported by:   Mary R. Honigman, RPR No. 972887

23                     Job#8438

24

25
```

CERTIFIED COPY

Page 2

```
 1           Zoom deposition of BRIAN DONOVAN, taken in
 2   Salt Lake City, Utah, on March 2, 2023, at 1:00 p.m.,
 3   before Mary R. Honigman, Certified Court Reporter, in
 4   and for the State of Utah.
 5
 6              A P P E A R A N C E S
 7      FOR THE PLAINTIFF:
 8           Laura Edmondson, ESQ.
             SANFORD LAW FIRM, PLLC
 9           10800 Financial Centre Parkway, Suite 510
             Little Rock, Arkansas 72211
10           866-912-1838
             laura@sanfordlawfirm.com
11
12      FOR THE DEFENDANTS:
13           David P. Williams, ESQ.
             SNELL & WILMER
14           15 W. South Temple, Suite 1200
             Salt Lake City, Utah 84101
15           (801) 257-1900
             dawilliams@swlaw.com
16
17
18      Videographer: Chad Potts
```

Page 3

```
                    I N D E X

EXAMINATION                                      PAGE

BY: MR. WILLIAMS                                    4


               E X H I B I T S
NUMBER           DESCRIPTION                     PAGE
EXHIBIT 1   3/10/18 Employment Application          8
EXHIBIT 2   3/12/18 Ridley's Employee Information  13
EXHIBIT 3   5/7/18 Employee Termination Report     42
```

Page 4

```
 1                    PROCEEDINGS
 2           VIDEOGRAPHER:  Good afternoon.  We
 3   are here for the deposition of Donovan -- Brian
 4   Donovan.
 5           MR. WILLIAMS:  Brian Donovan.
 6           VIDEOGRAPHER:  Thank you.  In the
 7   case of Stanton Meats, et al., v. Ridley's Family
 8   Markets, et al., in the civil action number
 9   1:22-cv-1070-PAB in the United States District Court
10   for the District of Colorado.  If the counsel could
11   please state their name for the record and then
12   we'll swear in the witness and begin the deposition.
13           MR. WILLIAMS:  David Williams on
14   behalf of the defendant, Ridley's Family Markets.
15           MS. EDMONDSON:  Laura Edmondson on
16   behalf of Plaintiffs.
17                    BRIAN DONOVAN,
18     having been first duly sworn to tell the truth, was
19           examined and testified as follows:
20       Q   (BY MR. WILLIAMS)  Hi, Brian.  Thank you
21   for spending some time with us.
22       A   Of course.
23       Q   First of all, I see that you're in your car.
24   I assume you're parked and not driving?
25       A   I am, yes.
```

Page 5

```
 1       Q   Okay.  I just want to make sure that you're
 2   safe and that we can proceed.  Have you ever had your
 3   deposition taken before?
 4       A   No.
 5       Q   Okay.  We have a court reporter taking down
 6   everything that we say, so it's important that you
 7   answer audibly.
 8       A   Okay.
 9       Q   And it's also important that we don't speak
10   over one another, so if you'll wait for me to finish my
11   question, I'll -- I'll wait until you're done with your
12   answer, and we'll hopefully have a cleaner record that
13   way.  Do you understand that you're under oath today?
14       A   Yes.
15       Q   And it's the same as if you're sitting in a
16   courtroom in front of a judge giving sworn testimony?
17       A   Yes.
18       Q   And you are represented by Laura Edmondson
19   here at this deposition?
20       A   Yes.
21       Q   Any reason why you can't give truthful
22   answers to my questions today?
23       A   No.
24       Q   Okay.  What did you do to prepare for this
25   deposition?
```

STANTON MEATS vs RIDLEY'S FAMILY MARKETS
BRIAN DONOVAN - 03/02/2023                                                                                       Pages 6..9

Page 6
1   A   Nothing, really.  Just talked to Laura
2   once and just tell you what I know.
3   Q   Okay.  So other than speaking with counsel,
4   you didn't review any documents?  You didn't do any
5   other preparations?
6   A   No.
7   Q   Okay.  What made you decide to become part of
8   this litigation?
9   A   Well, as an assistant manager, I ended up
10  working 55 hours a week, which is more than full
11  time, and I was only paid for a 40-hour week.
12  Q   Okay.  I assume the first time you heard
13  about this litigation was when you got a notice from
14  the Sanford Law Firm?
15  A   Correct.
16  Q   Okay.  Before that time, had you ever
17  considered filing a lawsuit against Ridley's?
18  A   No.
19  Q   Never consulted an attorney in that regard?
20  A   No.
21  Q   Okay.  What are your expectations in this
22  litigation?
23  A   Just to be reimbursed for the hours that I
24  worked over 40.
25  Q   Okay.  You worked a little over a month; is

Page 7
1   that --
2   A   Yeah, it was -- it wasn't very long.  I
3   couldn't give you exact dates, but it wasn't very
4   long I was there.
5   Q   Okay.  We'll look at some documentation a
6   little bit later.  Have you done any calculations as to
7   what you think you're owed?
8   A   No, not really.  I know that when I -- I
9   worked 55 hours a week and then some.
10  Q   Okay.  So probably less than a thousand
11  dollars?
12  A   If the calculation comes out properly.
13  Q   I mean, it's whatever the hours you worked?
14  A   Correct.
15  Q   Fair enough.  Okay.  I want to talk about
16  your educational background --
17  A   Okay.
18  Q   -- and your work history.
19  A   Okay.
20  Q   But I think I can cut that part a little bit
21  short by introducing this document.  Are you -- are you
22  on an iPhone?
23  A   I'm on a laptop.
24  Q   A laptop.  Okay.  So you can see documents if
25  I show them to you?

Page 8
1   A   Think so.  I'm not very good with the
2   computers, but --
3   Q   You won't have to do anything.  It's going to
4   pop up on your screen in one second here.
5       I'm going to show you a document that we
6   will mark as Exhibit 1 to your deposition.
7       (Exhibit No. 1 marked.)
8   A   Okay.
9   Q   (BY MR. WILLIAMS)  For the record, this is
10  an application that I think you filled out for
11  employment at Ridley's in or around March of 2018.
12  Do you recognize this application?
13  A   I do not remember it.
14  Q   Okay.  Any reason to believe you didn't fill
15  this out --
16  A   No.
17  Q   -- to get a job with Ridley's?
18  A   No.
19  Q   Okay.  For education, this shows that you
20  went to Rocky Mountain High School, graduated from
21  that; is that correct?
22  A   Yes.
23  Q   What year did you graduate?
24  A   '90.
25  Q   Okay.  Followed by a stint at the University

Page 9
1   of Northern Colorado; is that correct?
2   A   Correct.  I went for four years there.
3   Q   Okay.  You went for four years.  You have
4   checked here associate's degree.  Did you eventually
5   get a bachelor's degree from there?
6   A   I did not finally get a bachelor's, no,
7   but an associate's I got, actually, through Aims
8   Community College, which is not listed.
9   Q   Okay.  So you got an associate's degree from
10  Aims Community College?
11  A   Correct.
12  Q   What was that degree in?
13  A   Fire science.
14  Q   Fire science?
15  A   Yes.
16  Q   So fighting forest fires, stuff like that?
17  A   Structure fires.  Structural fires.
18  Q   Structural fires.  Okay.  And what did you
19  study -- when did you go to Aims College?
20  A   Sort of, in the middle of that time.  I
21  couldn't give you an exact date.
22  Q   Okay.  And did you go to University of
23  Northern Colorado?
24  A   Yes.
25  Q   What did you study there?

Page 10

1    A    Psychology and kinesiology, or exercise
2  physiology.
3    Q    Okay.  And approximately when did you go to
4  the University of Northern Colorado?
5    A    Right out of high school, so '90 -- '90 --
6  '91 through '95.
7    Q    Okay.  And how far did you get at University
8  of Northern colorado?
9    A    Within a semester of graduating, pretty
10 much.
11   Q    Okay.  Any reason why you didn't want to
12 complete it?
13   A    Just decided not to.
14   Q    Okay.  Any other education that's not listed
15 here?
16   A    Just certifications, as far as personal
17 training and, like, CPR-type things.
18   Q    Okay.  What certifications do you have?
19   A    Well, they're expired now, but I did have
20 a personal training certification and CPR and EMT
21 certification.
22   Q    Did you -- did you work as a paramedic or
23 firefighter?
24   A    No.  Just as a personal trainer.
25   Q    Personal trainer.  Okay.  When did you do

Page 11

1  that?
2    A    Before I even worked at Sprouts, so '96,
3  '97-ish.
4    Q    Okay.
5    A    I don't remember exact dates.
6    Q    And I'm not going to hold you to exact dates.
7  It's been a long time.  Okay.  So looking back at
8  Exhibit 1, I show employment at Sprouts from
9  January 2011 to October 2017; is that correct?
10   A    Correct.
11        THE COURT REPORTER:  What was your
12 answer?
13        THE WITNESS:  Yes.
14        THE COURT REPORTER:  Okay.  Can you
15 just wait until he finishes his question before you
16 answer?
17        THE WITNESS:  Yeah.
18        MR. WILLIAMS:  And I'll try to do
19 better to remind you.  I know it's -- you anticipate
20 my questions and I -- easy to do.
21   Q    (BY MR. WILLIAMS)  So Sprouts shows the
22 title of store manager; is that correct?
23   A    Yes.
24   Q    Okay.  How long did you have the title of
25 store manager at Sprouts?

Page 12

1    A    Five years.
2    Q    So roughly 2012 to 2017?
3    A    Yes.
4    Q    And store manager was the last job that you
5  had at Sprouts?
6    A    Yes.
7    Q    Okay.  You list here customer service, cash
8  handling, schedule writing, inventory, and safety.  I
9  assume as the store manager, I mean, you basically ran
10 the store; isn't that correct?
11   A    Yes.
12   Q    Okay.  So you -- you supervised the employees
13 there, basically responsible for the day-to-day
14 operations of the store; is that fair?
15   A    Yes.
16   Q    Okay.  You have separately listed, Sprouts
17 Farmer's Market.  Is that a separate entity?
18   A    No.  I don't know why that's on there
19 twice.
20   Q    Okay.  So it shows -- it reflects the same
21 employment with Sprouts, same time frame, same title --
22 store manager -- and here, you describe duties and
23 responsibilities as entire store management.  So is
24 that a fair summary?
25   A    Yes.  I don't know why that's on there,

Page 13

1  actually.  The supervisor's name on the first one is
2  actually my wife.  So I don't know why that's on
3  there.
4    Q    Tanza Martin is your wife?
5    A    Yes.
6    Q    Okay.  I assume this was an online
7  application that you filled out?
8    A    Possibly.  Like I said, I don't remember.
9    Q    Okay.  I'm going to show you a document that
10 we'll mark as Exhibit 2 to your deposition.
11        (Exhibit No. 2 marked.)
12   Q    (BY MR. WILLIAMS)  This is a document
13 entitled Ridley's Family Markets Employee
14 Information.  Is this the paperwork filled out by
15 Ridley's when you were first hired in March of 2018?
16 Do you see that?
17   A    Yes.
18   Q    Does that accurately reflect your -- your
19 hiring by Ridley's in 2018?
20   A    Yes.
21   Q    Okay.  You were hired as assistant manager to
22 the Wellington, Colorado store?
23   A    Yes.
24   Q    Okay.  I'm going back to Exhibit 1.  Your
25 employment with Sprouts ended in October of 2017?

Page 14

```
 1   A    Correct.
 2   Q    And you started with Ridley's in March of
 3   2018.  Did you have a job in between those?
 4   A    No.
 5   Q    Okay.  Were you looking for employment?
 6   A    I, sort of, was.  I wasn't in a big hurry,
 7   but, yes.
 8   Q    So going back to your job at Sprouts, entire
 9   store management.  I assume, you know, you supervised
10   employees, did evaluations, had to manage inventory,
11   had to manage store purchases, basically everything; is
12   that -- is that accurate?
13   A    Yes.
14   Q    Okay.  How did you hear about the position at
15   Ridley's?  How did you come to be hired there?
16   A    If I recall correctly, they contacted me.
17   There were some employees who had worked for me
18   previously -- it's not listed on here -- when I was
19   a store manager and an assistant manager for
20   Albertsons, so there were employees at Ridley's that
21   had worked for me prior.  I believe they contacted
22   me.  I, 100 percent, do not remember, but I believe
23   that's how I found out about it.
24   Q    When did you work at Albertsons?
25   A    1995 to, I think, December 2010.  I went
```

Page 15

```
 1   right from Albertsons to Sprouts.
 2   Q    And you mentioned that you were the assistant
 3   manager at Albertsons?
 4   A    Assistant manager and store manager.
 5   Q    And store manager?
 6   A    Yes.
 7   Q    Okay.  So, basically, the same duties and
 8   responsibilities as you had at Sprouts?
 9   A    Yes.
10   Q    Okay.  So you came to Ridley's with fairly
11   significant grocery retail experience?
12   A    Yes.
13   Q    And you believe that you were recommended
14   by -- by current employees of Ridley's that you had
15   worked with at Albertsons?
16   A    Yes.
17   Q    Any idea who those workers were?
18   A    I do not know who it was.  There were --
19   there were quite a few who worked there, but I don't
20   know who it was.
21   Q    Okay.  Where did -- what Albertsons did you
22   work at?
23   A    A lot of them.  I worked Fort Collins
24   stores, Greeley, Longmont, Loveland.  Mostly
25   Northern Colorado stores.
```

Page 16

```
 1   Q    Did you ever do any work in Laramie?
 2   A    No.  I helped, but I didn't ever work
 3   there, no.
 4   Q    Okay.  The reason I ask is in my review of
 5   documents, I seem to remember someone from the Ridley's
 6   Laramie store having recommended you, and so that's
 7   possibly the connection.
 8   A    That's possibly -- I don't remember his
 9   name, but I think he was a store manager there.
10   Maybe it was him.  I don't -- I don't know.
11   Q    Okay.  Regardless, somehow, you connect with
12   Ridley's, and it looks like you filled out on
13   application.  I assume you interviewed for the
14   position?
15   A    Yes.
16   Q    Okay.  Do you remember who you interviewed
17   with?
18   A    The store manager and, I believe, the
19   district manager.
20   Q    Okay.  Do you know who the store manager was
21   at the time?
22   A    I remember her name was Michelle.
23   Q    Michelle.  Was the regional manager
24   Ramiz Abed?
25   A    Yes.
```

Page 17

```
 1            MR. WILLIAMS:  Mary, that's
 2   R-a-m-i-z A-b-e-d, I believe.
 3            THE COURT REPORTER:  Thanks.
 4   Q    (BY MR. WILLIAMS)  Brian, did those -- the
 5   interviews take place in person, or were they over
 6   the phone?
 7   A    First, over the phone and then in person.
 8   Q    Okay.  Let's break them down separately.  The
 9   phone interview, was that with both Michelle and Ramiz?
10   A    Just Ramiz.
11   Q    Just Ramiz.  And what did Ramiz tell you --
12   what did you talk about in that first -- that first
13   interview?
14   A    That he had a position open; that I'd been
15   recommended, really.  That's all I really remember.
16   It's been a long time.
17   Q    Okay.  So it seems like it was a fairly short
18   conversation?
19   A    Probably, yes.
20   Q    Just to gauge your interest?
21   A    Yes.
22   Q    And then you had a -- what I assume to be a
23   more extensive interview with Michelle and Ramiz in
24   person?
25   A    Yes.
```

Page 18

1   Q   Was that at the store in Wellington?
2   A   Yes.
3   Q   Okay.  Tell me about that interview.
4   A   Well, as well as I remember, he basically
5   described the job to me and told me a little bit
6   about Ridley's Market.  That's all I really remember
7   about it.  It's -- like I said, it's been a really
8   long time.
9   Q   Sure.  Do you remember any details about what
10  he told you about the job?
11  A   Not particularly, no.
12  Q   Okay.  Do you remember -- I mean, you had
13  been an assistant manager before?
14  A   Yes.
15  Q   You'd been a store manager before.  I assume
16  there was nothing in his description that struck you as
17  odd or -- or unusual?
18  A   No.
19  Q   Seemed like it would be like any other
20  assistant manager job that you had?
21  A   Seemed like it would be more hours, but it
22  did seem like the same responsibilities, yes.
23  Q   Same duties and responsibilities?
24  A   Yes.
25  Q   Okay.  I've gotten a sense in my discussions

Page 19

1   with -- with some of your coworkers that the hours are
2   fairly standard for retail grocery chains.  Is that not
3   your experience?
4   A   They -- they are -- well, no, not really.
5   50 hours is, basically, what's expected.
6   Q   Okay.  And your schedule with Ridley's, were
7   you on the -- the 6/5 schedule?
8   A   I truly don't remember.  I do remember
9   they were 11 hours -- 11 hours a day with one
10  back-to-back schedule, meaning, close and open.
11  Q   Okay.  So you're working 55 hours, basically,
12  a week?
13  A   55, yes.  But if there's stuff that had to
14  get done, you stayed longer.
15  Q   Okay.  So you're scheduled for 55 and
16  basically worked as needed beyond that?
17  A   Yes.
18  Q   Okay.  You were certainly -- after you spoke
19  with Ramiz, obviously, you were interested in the
20  position?
21  A   Yes.
22  Q   Okay.  And who notified you that you had been
23  hired -- offered the position?
24  A   I'm not sure if it was Ramiz or Michelle.
25  Q   Okay.  You considered Michelle to be your --

Page 20

1   your supervisor?
2   A   Yes.
3   Q   You reported to her on a day-to-day basis?
4   A   Yes.
5   Q   Okay.  Let me -- let me -- well, let's talk
6   about schedules, first of all.  It's my
7   understanding -- first of all, were you the only
8   assistant manager at the store?
9   A   Yes.
10  Q   Okay.  It's my understanding that
11  schedule-wise, that your schedule will overlap with the
12  store director but not be exactly the same schedule; is
13  that fair?
14  A   At times, yes.
15  Q   Okay.  So in a typical week, there would be
16  two, three, maybe four hours a day where you're working
17  without the store director and one to two days a week;
18  is that true for your experience?
19  A   That sounds pretty close, yes.
20  Q   Okay.  And during those times, you were the
21  senior manager at the store; is that correct?
22  A   Yes.
23  Q   Okay.  So, roughly, 20 to 30 percent of your
24  work time?
25  A   Well, yeah.  I guess that sounds about

Page 21

1   right, yeah.
2   Q   Okay.  As best as you can recall -- I know
3   it's been a long time and you weren't there that
4   long -- kind of, walk me through your first few days
5   there.  I assume you're figuring out systems, meeting
6   people.  Tell me -- tell me how that went.
7   A   Gosh, that's a tough question because I
8   truly don't remember.
9   Q   And that's fair.  If you don't, you don't
10  remember.
11  A   I would assume that she took me around and
12  introduced me to the employees and walked the store,
13  backroom and such, and display expectations, and
14  that type of thing.
15  Q   Okay.  I assume you didn't need a lot of
16  management training?  I mean, you had done this quite a
17  bit before?
18  A   Right.
19  Q   So, basically, you're just learning the
20  systems that were particular to Ridley's; is that fair?
21  A   Yes.
22  Q   Okay.  So I want to talk about your duties
23  and responsibilities while you were an assistant
24  manager for Ridley's.  We're going to start really
25  broad, and then we're going to narrow it down a little

Page 22

1  bit.  So why didn't you give me just a summary of what
2  you saw your duties and responsibilities as?
3       A    Well, while I was there with her, I more
4  or less did the grocery department.  So I worked on
5  displays, stocked groceries, worked orders, worked
6  back stock, stocked frozen food, stocked dairy.  But
7  when Michelle was gone, I would open up the store
8  and put tills out and cashier.
9            Obviously, during the day, I cashiered all
10 day long, and checked in with departments, and then
11 went really into the grocery department.  Their
12 grocery department was, kind of, a mess, so that's
13 where I spent a lot of my time.
14      Q    Okay.  Do you understand what I mean when I
15 say center store?
16      A    Yes.
17      Q    Okay.  It's my understanding that center
18 store employees, groceries, what have you, kind of,
19 fall under the supervision of the assistant manager; is
20 that your experience?
21      A    In that company, yes.
22      Q    Okay.  How many employees would be in the
23 grocery department?
24      A    Total?  Total, or --
25      Q    Let's talk total and then on any given day.

Page 23

1       A    Okay.  So total would be, maybe, eight.
2       Q    Okay.
3       A    And then on any given day, two -- two or
4  three, depending if there was a load.
5       Q    Okay.
6       A    Including myself.
7       Q    Okay.  And who would those employees be,
8  titles?
9       A    Grocery clerk.
10      Q    Okay.
11      A    Grocery clerk, dairy clerk, frozen food
12 clerk, yeah, stocker.  Then they had a -- like, a
13 key person that when I wasn't closing, they would be
14 closing the store, which would mean they were in the
15 grocery department, cashier.
16      Q    Okay.  Is that the grocery manager?
17      A    We didn't actually have a grocery manager
18 at that time.
19      Q    Okay.
20      A    I was, kind of, the grocery manager, but,
21 yeah, that, I think possibly would be -- I think
22 they called them the key person.  I don't think they
23 were called grocery manager.
24      Q    Was your store big enough to have, like, a
25 frozen manager or produce manager or anything like

Page 24

1  that?
2       A    Yes.
3       Q    Okay.  Were those considered a grocery and
4  fall under you?
5       A    No.  Frozen food, yes; dairy, yes, but not
6  produce, not bakery, not deli, not meat.
7       Q    Okay.  So you had a -- a dairy manager as
8  well?
9       A    Yes.
10      Q    Okay.  And so the dairy manager and the
11 frozen manager, basically, were under you as well?
12      A    Yes.
13      Q    Okay.  Of course, when the store director
14 wasn't there, you were, kind of, over all the
15 departments; is that fair?
16      A    Yes.
17      Q    So I want to talk about the employees that
18 were in grocery and frozen and dairy.
19      A    Okay.
20      Q    I assume as part of your duties and
21 responsibilities, the assistant manager is basically
22 walking the store, helping out where needed, cashiering
23 if need be, doing other tasks, just basically making
24 sure the store is functioning in an efficient manner;
25 is that fair?

Page 25

1       A    That is what the expectations are.  I
2  spent most of my time stocking shelves.
3       Q    Okay.  Why is that?
4       A    They were understaffed.
5       Q    Okay.  So I assume you could direct the
6  employees to the extent they were there, but it sounds
7  like a lot of the time, there weren't employees to
8  direct; is that true?
9       A    Yes.
10      Q    Okay.  To the extent they were there, you
11 certainly had the authority to say, Hey, come help me
12 with this, or you need to go do this right now?
13      A    If I needed to be, yes.
14      Q    Okay.  I assume as part of your -- your
15 responsibilities, you would give feedback to employees
16 as needed, direction, guidance, answer questions,
17 listen to their grievances.  I'd assume that all fell
18 within your area of responsibility?
19      A    Yes, in the absence of the store manager.
20      Q    Okay.  I assume employee grievances were a
21 fairly common occurrence?
22      A    Yes.
23      Q    Venting?
24      A    Venting, more likely.  Not necessarily a
25 grievance because they were not a union store.

STANTON MEATS vs RIDLEY'S FAMILY MARKETS
BRIAN DONOVAN - 03/02/2023
Pages 26..29

Page 26
1  Q   Okay. And that's -- that's a fair
2  distinction. So just gripes, venting, wanting to get
3  whatever they have on their chest off their chest; is
4  that fair?
5  A   Yes. Usually, We need more help.
6  Q   Okay. And I assume you do your best to talk
7  them through whatever and, if needed, escalate it up to
8  a higher authority?
9  A   Yes.
10  Q   I assume with these employees, you were able
11  to give instructions, assign tasks as needed, help plan
12  work. Did you do that?
13  A   Well, most of the employees that were
14  there in the outside departments, which would mean
15  the outer departments, not center store --
16  Q   Right.
17  A   -- they had a manager and they had their
18  job duty list. Mostly, what I would do is give
19  anybody within the grocery department a list or a
20  plan.
21  Q   Okay. You bring up a good point. The
22  outside departments had their own managers. Did you
23  have to -- did you have to check in on those managers,
24  or what was your interaction with them?
25  A   I did, only because that's the world that

Page 27
1  I came from, as far as being a store manager. I
2  don't necessarily know that that was my
3  responsibility. But when Michelle wasn't in the
4  store, that would be my responsibility.
5  Q   And, certainly, that was your experience, and
6  so that's what you put into play here?
7  A   Correct.
8  Q   Okay. Scheduling. Did you work on
9  scheduling at all?
10  A   I did not write any schedules. I don't --
11  I don't remember 100 percent, but I do not recall
12  writing any schedules.
13  Q   Okay. Did you review any schedules, work
14  with any other department managers with scheduling,
15  anything like that?
16  A   No. I never did.
17  Q   Okay. I know you were there for only about a
18  month, but during that time, did you ever have the
19  opportunity to train new employees?
20  A   No. I don't believe so.
21  Q   Okay. Did you even hire anybody during that
22  period?
23  A   No.
24  Q   Okay. And that's certainly something that
25  you've done as a manager for other organizations?

Page 28
1  A   Many, many times, yes.
2  Q   I assume you would have expected to do that
3  for Ridley's had the opportunity come up?
4  A   Yes.
5  Q   Coaching, providing feedback to employees. I
6  assume that's a fairly commonplace thing that you did
7  as an assistant manager for Ridley's?
8  A   I never had to do that. Michelle mostly
9  took care of all of that stuff. I was more of a --
10  I was helping out more, so...
11  Q   Okay. What about informally? I mean, just
12  as you're walking around talking to employees and
13  responding to gripes and whatever?
14  A   I would give my professional advice but
15  not anything that was trained through Ridley's.
16  Q   Okay. Did you ever participate in any
17  employee performance evaluations?
18  A   No.
19  Q   Did you ever sit in on any?
20  A   Not that I remember.
21  Q   What about providing feedback to Michelle
22  regarding any of the employees that fell under your
23  jurisdiction?
24  A   Possibly. I don't have a good answer
25  because I do not remember.

Page 29
1  Q   Okay. Certainly, you would expect to have
2  that in your duties and responsibilities, though?
3  A   I would expect to, yes.
4  Q   Okay. Do you ever remember sitting in on or
5  recommending or disciplining any employees?
6  A   I do not recall, no.
7  Q   Okay. Again, I assume that's something you
8  could have done for the employees that fell under you,
9  if need be?
10  A   If it needed to be. They were so
11  short-staffed that whenever any of those meetings
12  happened, I was at the checkout.
13  Q   Well, hopefully, you didn't have to fire
14  anybody in that one-month period.
15  A   No.
16  Q   But did you participate in any employee
17  terminations?
18  A   No.
19  Q   Do you remember even any employees being
20  terminated during that time period?
21  A   No.
22  Q   Okay. I assume -- I mean, even during that
23  one-month period you're short staffed, you're probably
24  trying to hire; is that fair?
25  A   We -- yes. There was -- I believe there

STANTON MEATS vs RIDLEY'S FAMILY MARKETS
BRIAN DONOVAN - 03/02/2023
Pages 30..33

Page 30
1  was something maybe on Indeed, one of the hiring
2  websites.
3      Q    Okay.  Did you ever review any applications
4  or anything like that?
5      A    No.
6      Q    Okay.  Did you ever sit in on any interviews?
7      A    No.
8      Q    Okay.  Did you ever recommend anyone to be
9  interviewed?
10     A    No.  Not that I recall, no.
11     Q    Okay.  If one of those employees fell under
12 your departments, I assume you would expect to have had
13 input in those?
14     A    One of the employees -- can you repeat the
15 question?
16     Q    Sure.  You're over the grocery, over frozen,
17 over dairy.  I assume that if you're hiring for one of
18 those departments, you would expect to have had input
19 into that process?
20     A    Yes.
21     Q    Okay.  Let's talk about reports and forms.
22 What reports and forms did you have to fill out as an
23 assistant manager?
24     A    The only thing that I had to do is when
25 the store manager was off, I had to fill out, like,

Page 31
1  the paperwork from the day before.  So sales,
2  purchases, that type of thing.
3      Q    Okay.  Basically, the --
4      A    Cash.
5      Q    -- the reconciliation?
6      A    Yes, yeah.
7      Q    Any other forms you remember filling out or
8  using?
9      A    Not that I remember.
10     Q    Did you have any logs as you walked around,
11 temperature checks, safety checks, anything like that?
12     A    Not personally for me.  I know the outer
13 departments had to do temp checks and stuff like
14 that.
15     Q    Okay.  Tell me about merchandising.  What was
16 your involvement with that?
17     A    I basically -- so I had to build the
18 displays that were on grocery end caps and grocery
19 lobby displays, frozen end caps; stock the shelves.
20 I usually didn't face, unless I was closing.  The
21 one -- I think I closed one shift a week or two
22 shifts a week, but the closing grocery person would
23 face the store so I didn't have to do that.
24     Q    What does that mean?
25     A    Facing it?  Pulling stuff forward so it

Page 32
1  looks nice on the shelves.
2      Q    Got you.  Okay.  So for merchandising,
3  putting up displays, I assume as, kind of, the head
4  over that department, you, kind of, had the say as to
5  where things went and how displays looked, what have
6  you?
7      A    No.  They had schematics.
8      Q    Okay.
9      A    They had -- we had -- we have, like, an
10 end planner, and then you just follow the end
11 planner how it was supposed to go.
12     Q    Okay.  You certainly have the authority to
13 inspect it and make sure it meets specifications?
14     A    Yes.
15     Q    Okay.  What about any special events or what
16 have you?  Did you have the opportunity to participate
17 in any of those?
18     A    I don't believe so.
19     Q    Okay.  No case lot sales, nothing like that?
20     A    That happened right before I got there.
21     Q    Okay.  Did you have any say as to where a
22 product would be displayed in the store?
23     A    No.  I don't believe I did.  I believe
24 everything was schematic.  Maybe in the lobby when
25 you first walk in.  There were certain items that

Page 33
1  had to be there and then if I built them, I would
2  build it as I felt was best.
3      Q    Okay.  You knew how to merchandise?  You knew
4  how to build displays?
5      A    Yes.
6      Q    And so you would -- you would do it as best
7  you could, based on your experience?
8      A    Correct.
9      Q    Okay.  What about product purchasing?  Did
10 that fall under your responsibility?
11     A    Just in the grocery -- dry grocery
12 department.  I would write orders.
13     Q    Okay.  Did you have -- I mean, did you have
14 the ability to estimate, you know, I think we're going
15 to need this much.  You know, we've got something
16 coming up, so we're going to need a little bit extra.
17 Was that something you could do?
18     A    That, I never did, because they were
19 preordered further out.  So I wasn't there long
20 enough to do it.  I don't know if it was my
21 responsibility.  I believe Michelle did that.
22     Q    Would you have expected -- if you had been
23 there longer, you would have expected to be able to do
24 something like that?
25     A    I was never told that was my

Page 34

1 responsibility. Coming from my previous experience,
2 yes, I would expect that. But they had some
3 different things, being a smaller market, than the
4 bigger stores had.
5     Q    Okay. Other than ordering, did you have the
6 ability to spend Ridley money?
7     A    Not that I know of, no.
8     Q    Okay. Did you ever have to have -- order
9 equipment repairs, anything like that?
10    A    Not while I was there. Not that I
11 remember having to do and if it ever happened,
12 Michelle did it.
13    Q    Okay. I assume as store manager walking
14 around, you know, making sure things are working,
15 people are working, I assume you're looking for
16 problems, safety issues, spills, stuff like that. Is
17 that part of your responsibility?
18    A    That's part of everyone's responsibility
19 really, yes.
20    Q    Okay. If you found something, I assume you
21 could direct somebody to help clean it up or do it
22 yourself?
23    A    Yes. Usually, do it yourself, but, yes.
24    Q    If someone was around and available to help,
25 you could direct them to do that?

Page 35

1     A    Yes, I could.
2     Q    Okay. Did you ever have to fill out any
3 injury reports for employees or customers?
4     A    Not that I recall, no.
5     Q    Okay. What would you do if you came across
6 an employee that was doing something unsafe? You know,
7 standing on a stool or something unsafely or --
8     A    I would ask them -- I'm sorry.
9     Q    Go ahead.
10    A    I would ask them to get down.
11    Q    Okay. I mean, that's something that would
12 certainly fall within your responsibility?
13    A    Yes. Everybody's responsibility.
14    Q    Sure. Okay. How about building security? I
15 assume you had a set of keys?
16    A    I believe I did. I may have only had a
17 key -- actually, I did not have a key. They left
18 their key in a lockbox.
19    Q    Okay.
20    A    And so we would unlock the doors, put it
21 back in the box, and then at night if I was closing,
22 I believe I would lock the doors. So I did not have
23 a set of keys, no.
24    Q    Okay. But you would -- on occasion, you
25 would either open or close the store?

Page 36

1     A    Yes.
2     Q    Okay. Tell me -- tell me what you would
3 do -- what your process was to close down the store?
4     A    I would lock the store and make sure
5 everything -- like, for instance, certain things in
6 the produce department were covered. I would walk
7 the grocery department and make sure all of our ad
8 items are full, check the back doors, lock up the
9 back doors, make sure, obviously, that frozen food
10 was frozen and there were no issues. Mostly, just
11 in frozen to make sure nothing was -- that those
12 were working, and then count out the tills and the
13 safe and the lottery, and then locked up to leave.
14    Q    Okay. You had the -- was the safe a key safe
15 or a combo?
16    A    It was a combination of both.
17    Q    Okay. I assume you had access to the safe?
18    A    I did.
19    Q    Okay. Did you ever have to make bank
20 deposits?
21    A    Yes.
22    Q    How frequently?
23    A    I believe we did them daily. So it was
24 just dependent on if Michelle and I were there, one
25 of us would go. If it was just me, I would go. If

Page 37

1 it was just her, she would go.
2     Q    Okay. So it certainly wasn't unusual for you
3 to do a bank deposit?
4     A    No.
5     Q    Okay. Was there an alarm system?
6     A    I don't believe there was an alarm system.
7 I think there was just a firearm.
8     Q    Did you ever have to call the police for any
9 reason?
10    A    No.
11    Q    Okay. Did you ever have to deal with
12 shoplifters or anything like that?
13    A    No. Not there.
14    Q    Okay. Good store?
15    A    Yeah. It's a small town.
16    Q    Sure. So assistant manager, do you remember
17 having any responsibility for legal compliance issues?
18 You know, OSHA forms, employee posters, stuff like
19 that?
20    A    No, not in the time that I was there.
21    Q    Okay. Just never came up during that time?
22    A    Yes.
23    Q    Okay. I assume had you been there longer,
24 you would have expected to be involved in that
25 somewhat?

Page 38

1  A   That was 100 percent up to Michelle.
2  Q   Okay.  Did you have any responsibility or
3  input into budgeting issues for the store?
4  A   No.
5  Q   Okay.  Were you aware that you would get a
6  quarterly budget from corporate?
7  A   Probably.  I can't say that I remember
8  that.  Most -- most companies don't get a quarterly;
9  they get a weekly and a yearly, but -- or a monthly.
10 But I don't remember exactly what Ridley's did, and
11 I don't remember seeing that.
12 Q   Okay.  How about any employee investigations,
13 store investigations, anything like that?  Again, I
14 know you were only there for a month.  Were you
15 involved in any of those --
16 A   No.  I never did that.
17 Q   As assistant manager, did you participate in
18 the weekly conference calls with corporate?
19 A   I never did.  I think I did once when
20 Michelle was on vacation.
21 Q   Okay.  So when you're covering for Michelle,
22 that's something that you would do?
23 A   Yeah.  I just sat in on it.  I didn't ever
24 speak.
25 Q   Okay.  What about meetings with the

Page 39

1  department heads?
2  A   Just once, when Michelle was on vacation.
3  Q   Okay.  Would you participate in those
4  otherwise?
5  A   Yeah, I think I did.  Maybe -- no, I don't
6  think I did, because I think they were on a day that
7  I closed and they held them in the mornings.
8  Q   Okay.  I mean, you've got -- you've got two
9  or three departments under you.  I assume you're
10 meeting with those department heads on a -- on a
11 periodic basis informally?
12 A   When I would see them daily, I would talk
13 to them.  I didn't have a formal meeting with them,
14 no.
15 Q   And that's all I'm referring to.  I mean,
16 you're --
17 A   Yes.
18 Q   -- you're interacting with them.  I mean,
19 you're obviously checking on them and making sure that
20 they have what they need and their departments are
21 operating?
22 A   Yes.
23 Q   Okay.  Tell me what the reconciliation at the
24 end of the day, what that entailed?
25 A   At the end of the day?

Page 40

1  Q   Or was it in the morning?
2  A   Well, we ran a final sales report -- gosh,
3  I truly don't remember how they closed the store
4  down.  In the morning is when we balanced the books.
5  Q   Okay.  Tell me what -- what you would do in
6  that regard.
7  A   You'd have -- actually, it was all online.
8  We -- you would count and make sure the tills
9  weren't short, and then you'd rebuild the tills
10 first thing in the morning for that day.  And then I
11 don't remember where we got the report, but then you
12 would add the numbers in on their spreadsheet and
13 then send it off to the regular -- the corporate
14 office or whatever.
15 Q   Okay.  I assume you did that on the computer
16 at the store?
17 A   Yes.  In the office.
18 Q   In the office.  And that was an office that
19 you shared with the store director?
20 A   Yeah.  Well, it was her office, and I -- I
21 just was in there when she wasn't there.
22 Q   Sure.  Was there just one desk in there?
23 A   I believe so, yes.
24 Q   Okay.  Other than working on the computer
25 doing the reconciliation, would you access the office

Page 41

1  for any reason?
2  A   Not that I remember.  There may have been,
3  like, tags or something in there that I would need,
4  pencils or pens or whatever.  But other than that,
5  there was no really other reason to be in there.
6  Q   Did you ever have to sit in on any -- on any
7  meetings in that office either with or without the
8  store director?
9  A   Other than the meeting that I had when she
10 wasn't there, I had a store meeting, like I said
11 earlier.
12 Q   Right.
13 A   But other than that, not necessarily any
14 meetings.
15 Q   Okay.  Interviews, anything like that?
16 A   No.
17 Q   Okay.  Any other duties and responsibilities
18 that we haven't talked about?
19 A   Not that I can recall, no.
20 Q   Okay.  And I want to summarize.  I -- would a
21 fair summary be, you know, as an assistant manager,
22 you're -- you're certainly in charge of your little --
23 your little areas, making sure they're functioning,
24 making sure the store is functioning efficiently.  In
25 the absence of the store director, you know, that

Page 42

1 broadens out to the entire store, just making sure it's
2 running; is that -- is that fair?
3    A    Yes.
4    Q    Okay.  Have you ever described your duties
5 and responsibilities for Ridley's on a resume or, like,
6 a LinkedIn profile, anything like that?
7    A    No.  I was there for such a short period,
8 I never even put that on my applications.
9    Q    Okay.  During your time at Ridley's, did you
10 keep a day planner, a calendar, anything like that?
11   A    No.
12   Q    Okay.  Any other notes related to your work
13 as an assistant manager for Ridley's?
14   A    No.
15   Q    Did you keep track of your hours that you
16 worked?
17   A    No.
18   Q    Sorry, I didn't know I had that up all this
19 time.  Let me share Exhibit 3.
20           (Exhibit No. 3 marked.)
21   Q    (BY MR. WILLIAMS)  Let me share a document
22 that we'll mark as Exhibit 3 to your deposition.  An
23 Employee Termination Report shows the last day
24 worked of April 26 of 2018; is that correct?
25   A    That is correct, but that is not correct.

Page 43

1    Q    What is not correct?
2    A    "Under the influence."
3    Q    Oh, okay.  So at the bottom, it says,
4 Explanation of final incident:  Caught stealing
5 shooters in liquor store and being intoxicated during
6 work hours.  Is that what you're referring to?
7    A    Yeah.  Well, and it is also checked there,
8 too.
9    Q    Okay.  What's your side of the story?
10   A    I took shooters with the intent to buy
11 them, but I never drank them or took them.
12   Q    Okay.  So you -- you say you weren't
13 intoxicated during work hours?
14   A    No.
15   Q    Okay.
16   A    Not that I recall.  I don't -- I never
17 drank at work, so...
18   Q    Okay.  Do you recognize that manager's
19 signature?  Would that be Michelle's signature?
20   A    It very well -- I don't know.
21   Q    You just don't know either way?
22   A    Yeah.
23   Q    Okay.  Regardless, is the last day worked
24 April 26?  Any reason to believe that's not accurate?
25   A    No.

Page 44

1    Q    Other than your attorney, have you
2 communicated with anyone else about this lawsuit?
3    A    No.  Well, let me rephrase that.  Yes, my
4 wife.
5    Q    Okay.  What have you talked to your wife
6 about the lawsuit?
7    A    Just that I didn't know what it was about
8 until I talked to the law firm, and that was pretty
9 much it.
10   Q    Okay.  I assume you're just keeping her
11 informed of what's going on?
12   A    Yes.  She's my wife.
13   Q    Does she know you're in a deposition today?
14   A    She does.
15   Q    Okay.  Did you take time off work to be
16 deposed today?
17   A    I am currently at work.
18   Q    Okay.  Currently at work.  Where do you --
19 where do you currently work?
20   A    It's called Black Label Services.
21   Q    Black Label Services?
22   A    Yes.
23   Q    What do you do?
24   A    I'm an outside sales rep.  It's an oil and
25 gas company.  I'm an outside sales rep.

Page 45

1    Q    Okay.  How long have you worked there?
2    A    A month.
3    Q    Oh, so brand new?
4    A    Brand new, yeah.
5    Q    Okay.  So take me -- you work at Ridley's.
6 Where did you work next?
7    A    It's called Kum & Go.  It's a convenience
8 store --
9    Q    Convenience store?
10   A    Yes.
11   Q    I'm sorry, I didn't mean to interrupt.
12   A    It's a -- go ahead.
13   Q    Kum & Go is a convenience store that you
14 worked at?
15   A    Yes.
16   Q    How long did you work there?
17   A    Right around five years.  Four and a half
18 years, five years.
19   Q    Okay.  So until recently?
20   A    Yes.  As a matter of fact, I left them
21 January 15th and started here January 28th, I think.
22   Q    Okay.  What was your position with Kum & Go?
23   A    General manager.
24   Q    Okay.  At any particular location?
25   A    Windsor, Colorado.

Page 46

1  Q   Okay. And why did you leave Kum & Go?
2  A   To get out of retail. I -- these guys
3  shopped in my store all the time, and they were
4  recruiting me for about a year. And, finally, I
5  jumped ship to come out and do something different.
6  Q   Okay. And you're outside sales, you say?
7  A   Yes.
8  Q   What products do you sell?
9  A   I -- well, I'm assigned to just one
10 product in particular. It's a -- it's called an
11 EPOD. It's a -- how do I describe it? An
12 environmentally clean way to expend methane gas.
13 Q   Okay. What's your territory?
14 A   Everywhere in Colorado.
15 Q   The state of Colorado, basically?
16 A   Yeah.
17 Q   Okay. Fair enough. Do you participate in
18 social media?
19 A   LinkedIn.
20 Q   LinkedIn. You have a LinkedIn profile?
21 A   Yes.
22 Q   Okay. Give me one second. Let me take a
23 look at my notes. I think we're about ready to wrap
24 up.
25          MR. WILLIAMS: Okay, Mr. Donovan.

Page 47

1  Thank you for your time. I don't have any further
2  questions.
3           THE WITNESS: Thank you.
4           MS. EDMONDSON: We do not have any
5  questions either. We reserve any for trial.
6           VIDEOGRAPHER: Thank you. This will
7  complete the deposition. The time is approximately
8  3:11 p.m. mountain time, on March 2nd 2023.
9           THE COURT REPORTER: Would you both
10 like electronic copies?
11          MS. EDMONDSON: We're not requesting
12 a copy of the transcript at this time.
13          MR. WILLIAMS: Yes, please.
14     (The deposition concluded at 2:10 p.m.)
15
16
17
18
19
20
21
22
23
24
25

Page 48

1            REPORTER'S CERTIFICATE
2  STATE OF UTAH   )
3  COUNTY OF SUMMIT )
4
5       I, Mary R. Honigman, a Registered Professional
6  Reporter, hereby certify:
7       THAT the foregoing proceedings were taken before
8  me at the time and place set forth in the caption hereof;
9  that the witness was placed under oath to tell the truth,
10 the whole truth, and nothing but the truth; that the
11 proceedings were taken down by me in shorthand and
12 thereafter my notes were transcribed through
13 computer-aided transcription; and the foregoing transcript
14 constitutes a full, true, and accurate record of such
15 testimony adduced and oral proceedings had, and of the
16 whole thereof.
17      I have subscribed my name on this 19th day of
18 March, 2023.
19
20      *Mary Honigman*
         _____
              Mary R. Honigman
21       Registered Professional Reporter #972887
22
23
24
25