Page 1

```
 1
 2              IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLORADO
 3                            - - -
 4
 5   Civil Action No. 1:22-cv-1070-PAB
 6
 7   STANTON MEATS, JASON CARILLO,      )
     KRESTINA COOMBS, DAVID DAVIS,      )
 8   BRIAN DONOVAN, CHRIS GALLEGOS,     )
     DESTINY GLANTZ, CAMERON HARRIS,    )
 9   JULIE ANNE NEIL, ANDREZ RIOS,      )
     JARED WHITAKER, AND                )
10   WILLIAM WULF,                      )
                                        )
11        Plaintiffs,                   )
                                        )
12                                      )
     RIDLEY'S FAMILY MARKETS, INC.,     )
13                                      )
          Defendants.                   )
14                                      )
     ----------------------------------
15
16            VIDEOTAPED DEPOSITION OF
17                 JARED WHITAKER
18            VIA ZOOM VIDEOCONFERENCE
19                FEBRUARY 13, 2023
20
21
22
23
24
25
```

CERTIFIED COPY

STANTON MEATS vs RIDLEY'S FAMILY MARKETS
JARED WHITAKER - 02/13/2023                                                                Pages 2..5

Page 2
```
 1  APPEARANCES OF COUNSEL:
 2  FOR PLAINTIFFS:
 3          Sean Short
            SANFORD LAW FIRM, PLLC
 4          Via Zoom Videoconference
            10800 Financial Centre Parkway, Suite 510
 5          Little Rock, Arkansas 72211
            501.221.0088
 6          Sean@sanfordlawfirm.com
 7
 8  FOR DEFENDANTS:
 9          David P. Williams
            SNELL & WILMER LLP
10          Via Zoom Videoconference
            15 West South Temple, Suite 1200
11          Salt Lake City, Utah 84101
            801.257.1900
12          Dawilliams@swlaw.com
13
14  ALSO PRESENT:
15          Tyler Larsen, Videographer
16
17
18
19
20
21
22
23
24
25
```

Page 3
```
 1  JARED WHITAKER, WITNESS
 2  INDEX OF EXAMINATION                              PAGE
 3  Examination by Mr. Williams                          4
 4  Reporter's Certificate                              76
 5
 6  INDEX OF EXHIBITS
    EXHIBIT                                           PAGE
 7
    No. 1     Payroll Status Change                    15
 8
    No. 2     Employee Termination Report              16
 9
    No. 3     Employee Information Record              19
10
    No. 4     Payroll Status Change                    72
11
    No. 5     Perpetual History Report                 73
12
```

Page 4
```
 1            MONDAY, FEBRUARY 13, 2013, 1:04 P.M.
 2                          - - -
 3       THE VIDEOGRAPHER:  Good afternoon.  We are going
 4  on the record.  My name is Tyler Larsen, the court
 5  reporter is Amanda Richards, we represent JD Legal
 6  Support.  The time and date indicated on the video
 7  screen is 1:04 p.m. on February 13th, 2023.
 8            This is in the matter of Stanton Meats, et
 9  al. vs. Ridley's Family Markets, Inc., Case
10  No. 1:22-cv-10710-PAB.  This is in the U.S. District
11  Court, the District of Colorado.
12            Counsel will now state their appearances for
13  the record and then the witness will be sworn.
14       MR. WILLIAMS:  Sorry.  Go ahead, Sean.
15       MR. SHORT:  Sean Short of Sanford Law Firm for
16  Plaintiffs.
17       MR. WILLIAMS:  And David Williams on behalf of the
18  Defendants Ridley's Family Markets.
19            JARED WHITAKER,
20    called as a witness herein, having been first duly
21       sworn, was examined and testified as follows:
22                      EXAMINATION
23  BY MR. WILLIAMS:
24       Q.   Thank you, Jared.  I see that you're in your
25  car.  Are you -- you're not driving or anything, are
```

Page 5
```
 1  you?
 2       A.   No.  I'm parked outside of my -- the job site
 3  I'm working on, so.
 4       Q.   Okay.  So we have this noticed for three or
 5  four hours.  I don't think we'll go that long, but I
 6  just want to make sure you're -- you're not driving and
 7  that you're -- that you're safe with us.
 8       A.   Yeah.
 9       Q.   Okay, perfect.
10            Have you ever had your deposition taken
11  before?
12       A.   No, I have not.
13       Q.   Okay.  We are being recorded.  The court
14  reporter is taking down everything that you and I say.
15       A.   Okay.
16       Q.   So it's important that we don't talk over
17  each other.  Wait until my -- my questions are done and
18  then I'll -- I'll try to wait until you're done
19  answering.  It's also important, because we're getting
20  a record of this deposition, that your answers are --
21  are verbal.  It's hard for the court reporter to record
22  a shake of the head or a nod of the head, so make sure
23  you answer verbal.  And if you don't understand a
24  question, please let me know and I'll do my best to
25  clarify.
```

Page 6

1  Q. You understand that you're under oath today?
2  A. Yes.
3  Q. Okay. And you are represented by Mr. Short
4  today; is that correct?
5  A. Yes.
6  Q. And is there any reason why you can't give
7  truthful answers to my questions today?
8  A. No.
9  Q. What did you do to prepare for this
10 deposition?
11 A. I mean, I was explained by my attorney what a
12 deposition is. I mean, so.
13 Q. Okay. Other -- other than meeting with your
14 attorney, did you review any documents or anything like
15 that?
16 A. Yeah. I mean, I was given the email
17 documents in regards to what the case is and like what
18 the case is about.
19 Q. Okay. So you received some documentation
20 from counsel that you've reviewed?
21 A. Yes.
22 Q. Okay. And you -- what made you decide to be
23 part of this litigation?
24 A. It made sense, I mean, given -- given the,
25 what the case is about.

Page 7

1  Q. Okay. And in your mind, what is the case
2  about?
3  A. Not being financially compensated for the
4  hours worked.
5  Q. Okay. Did you ever complain to anyone about
6  having a management role at the store?
7  A. Yes.
8  Q. Who did you complain to?
9  A. Several people, but superiors, people above,
10 you know, all the mangers above me. Justin White,
11 David Peterson.
12 Q. Okay. And what did you complain about?
13 A. How much I was in the store.
14 Q. Your time commitments?
15 A. Right.
16 Q. Okay. We'll go through that in a little bit.
17    What are your expectations in this
18 litigation?
19 A. Just to be fairly compensated.
20 Q. Okay. What's your ideal outcome?
21 A. To be paid for the -- the many hours of
22 overtime.
23 Q. Okay. Do you have an amount in mind? Have
24 you -- have you talked about amounts?
25 A. Well, no. I haven't been -- I haven't been

Page 8

1  able to go back and add up all the hours, but, I mean,
2  you know, nothing extra, just the hours worked over.
3  That's all.
4  Q. Okay. I want to start out talking about your
5  background to get some background information and let's
6  start with your education. Did you graduate from high
7  school?
8  A. Yes.
9  Q. Okay. What high school?
10 A. American Fork.
11 Q. What year?
12 A. 2003.
13 Q. After high school did you attend college or a
14 vocational school or anything like that?
15 A. No.
16 Q. Have you ever taken any college classes?
17 A. No.
18 Q. How about any professional licensures, any
19 vocational like electrician or something like that?
20 Any -- any other education?
21 A. No.
22 Q. Okay.
23    You were first employed by Ridley's,
24 according to my records, in 2013. Does that sound
25 correct?

Page 9

1  A. Yes.
2  Q. Okay. Where were you -- what Ridley's store
3  were you first employed at?
4  A. It was called Lolo's. It was down in Provo,
5  Utah.
6  Q. Okay. Is Lolo's the name of the store or was
7  that the name of a location?
8  A. The name of the store. It's located in
9  Provo, Utah.
10 Q. Okay.
11 A. Did this freeze?
12 MR. SHORT: I think it did. It's frozen on my
13 end.
14 THE VIDEOGRAPHER: David might have froze. Should
15 we go off the record?
16 MR. SHORT: Yeah, that's fine.
17 THE VIDEOGRAPHER: Okay.
18   (Recess taken from 1:11 p.m. to 1:27 p.m.)
19 MR. WILLIAMS: Thank you. And thank you for your
20 patience. I'm not sure what happened. We'll keep our
21 fingers crossed that technology serves us now.
22 Q. (BY MR. WILLIAMS) Okay. So, Jared, we were
23 talking about your educational background and I think I
24 dropped off talking about professional certificates,
25 license. Any other credentials, any other education

Page 10
1  like that?
2      A.   No, I don't.
3      Q.   None, okay.  And then you were first hired by
4  Ridley's in 2013, had a stint from 2013 to 2014,
5  according to my records, and then rehired in 2016.
6  Does that sound right?
7      A.   Yes.
8      Q.   Okay.  Did you have a job before you started
9  at Ridley's the first time?
10     A.   I have had a job before I was employed at
11 Ridley's, yeah.
12     Q.   Okay.  Tell me about the first job you had
13 before you went to Ridley's the first time.
14     A.   A coalminer.
15     Q.   A coalminer?
16     A.   Correct.
17     Q.   Okay.  Where at?
18     A.   Eastern Utah, a couple different mines down
19 in the Price/Carbon County area.
20     Q.   Okay.  And I assume you were a miner?
21     A.   Correct.
22     Q.   Okay.  That's tough work.  How long -- how
23 long were you working there?
24     A.   Oh, a number of years.
25     Q.   Okay.  So why did you leave that and go work

Page 11
1  for Ridley's?
2      A.   I moved back up here.
3      Q.   Where do you currently live?
4      A.   Springville.
5      Q.   Springville, okay.  So let's talk about your
6  first job at Ridley's.  How did you come to be employed
7  at Ridley's the first time?
8      A.   I walked into Lolo's and asked for an
9  application.  The store wasn't open yet.  I drove by
10 and saw that they were, you know, big hiring sign, and
11 they were like renovating it.  I don't know what it
12 used to be, but they were doing construction stuff in
13 it, so I asked if they were hiring.
14     Q.   Okay.
15     A.   And Ryan Rasmussen was the first boss I ever
16 had at Ridley's.  He hired me on.
17     Q.   What was Ryan Rasmussen's position; do you
18 remember?
19     A.   He was a store manager.
20     Q.   He was -- was he the store director?
21     A.   Yeah.
22     Q.   Okay.  Do you know who the assistant manager
23 was at the time?
24     A.   Maybe Don.  Maybe Don.  I'm not sure.
25     Q.   Is Don male or female?

Page 12
1      A.   Male.
2      Q.   Male.  Do you know Don's last name?
3      A.   I believe it's Young, but not a hundred
4  percent on that.
5      Q.   Okay.  Did you get an interview before you
6  were hired?
7      A.   Yes.
8      Q.   And who interviewed you?
9      A.   Ryan.
10     Q.   Ryan did.  And he made you the offer of
11 employment?
12     A.   Correct.
13     Q.   And what was your -- what was your first job
14 with Ridley's?
15     A.   To stock shelves at night in the graveyard
16 shift.
17     Q.   Okay.  What were your hours?
18     A.   I was a graveyard shift.  I don't know.  I
19 started somewhere around 9:00 or 10:00, I think, and
20 worked through the night, left in the morning.
21     Q.   Was it full-time, 40 hours a week?
22     A.   Yeah.
23     Q.   Okay.  How long did you have that position?
24     A.   A few months I'd say.
25     Q.   Okay.  What was your next position at

Page 13
1  Ridley's?
2      A.   They moved me to a different store that
3  actually had the title Ridley's on it and I worked in
4  the dairy department doing dairy stuff.  Same thing,
5  but with dairy.
6      Q.   Okay.  That was still in 2013?
7      A.   Yeah.  I'd assume so.
8      Q.   Okay.  What store did you move to?
9      A.   It was a Orem store.
10     Q.   Okay.  Do you remember who your supervisors
11 were?
12     A.   Oh, my gosh.
13     Q.   I know I'm --
14     A.   Oh, yeah --
15     Q.   -- testing your memory here.
16     A.   -- actually I do.  Ken, Ken was a store
17 director and Aaron was a -- was the assistant.
18     Q.   Okay.  Do you know Aaron's last name?
19     A.   Watson.
20     Q.   Aaron Watson, okay.  Did you have any
21 interactions other than knowing Mr. Watson?  Did he
22 supervise you at all?  Did he interview you?
23     A.   No.  I wasn't -- they didn't interview me.
24 It was one day I was, um, I was told that I was going
25 to go to that store.

STANTON MEATS vs RIDLEY'S FAMILY MARKETS
JARED WHITAKER - 02/13/2023                                                        Pages 14..17

Page 14
1   Q.   Okay.  So you didn't have to fill out an
2   application or anything?
3   A.   No.  They just told me to go to Orem.
4   Q.   Okay.  Didn't have -- who told you?  Was it
5   Rasmussen?
6   A.   Yeah.  I mean, I assume so.  I just -- one
7   day it was like hey, they need you in the Orem store.
8   Q.   Okay.
9   A.   And it was good for me because at the time I
10  lived in Orem, so it was cool.
11  Q.   So it was closer to your home?
12  A.   Yeah.
13  Q.   Okay.  And who was your super -- who was your
14  immediate supervisor in Orem?
15  A.   Aaron is who I spoke to the most, but, I
16  mean, but if I needed anything, I had to go to -- I
17  would go to Ken.
18  Q.   Aaron was your day-to-day supervisor, kind of
19  oversaw what you did and gave you directions?
20  A.   Well, he'd come check on -- check on me, make
21  sure I was working I guess.
22  Q.   Okay.  Fair enough.
23  A.   Yeah.
24  Q.   So what was your next job after that at
25  Ridley's?

Page 15
1   A.   I got sent to Midway.  Midway.  Midway I
2   became what they call a grocery manager.  That's a
3   salaried position.
4   Q.   Okay.  And when was that?
5   A.   A couple months after going to Orem I guess.
6   I mean, it all happened kind of fast, so.
7   Q.   Okay.  One second.  I'm going to show you a
8   document here.  Hopefully you'll be able to see it.
9            (Pause in the proceedings.)
10  MR. WILLIAMS:  Okay.  Let me show you a document
11  that we're going to mark as Exhibit 1 to your
12  deposition.  For the record, this document is entitled
13  a Payroll Status Change, Employee Jared Whitaker,
14  Effective Date 1-22-17.
15           (Exhibit 1 marked.)
16  Q.   (BY MR. WILLIAMS) This document shows that
17  effective 1-22-17 you are going from a closer making
18  $12 an hour to ASM, I assume that's assistant manager,
19  making a salary.  Do you see that?
20  A.   I see it.
21  Q.   Okay.  Does that accurately reflect your --
22  your employment in January of 2017?
23  A.   Yes.
24  Q.   Okay.  So before this time were you -- where
25  were you working before this time?

Page 16
1   A.   Before the salaried position?
2   Q.   Yes.
3   A.   I was in the Store 1160, which is Center
4   Street in Orem, as a closer.
5   Q.   Okay.  So you were a closer, you're still
6   being paid an hourly wage; is that correct?
7   A.   Yes.
8   Q.   Okay.  And then you were moved to 1167.  I
9   assume that's Midway.
10  A.   No.  You're on two different time frames
11  here.
12  Q.   Okay.  Explain to me what -- where -- where
13  I'm going wrong.
14  A.   Well, I stopped employment in 2014.
15  Q.   Okay.  Give me one second.  Let's see if I
16  have a document for that.
17           (Pause in the proceedings.)
18  MR. WILLIAMS:  Okay.  Let me show you a document
19  that we'll mark as Exhibit 2 to your deposition.  This
20  is an Employee Termination Report.
21           (Exhibit 2 marked.)
22  Q.   (BY MR. WILLIAMS) It shows that your
23  employment terminated, and I'll just say for the first
24  time.  You worked twice at Ridley's; correct?
25  A.   Yes.

Page 17
1   Q.   Okay.  So this shows an effective termination
2   date of April 20th of 2014; is that correct?
3   A.   That looks correct.
4   Q.   Okay.  So what job were you doing as of April
5   2014?
6   A.   Grocery Manager in Midway.
7   Q.   Grocery Manager in Midway, okay.  What were
8   your duties and responsibilities as Grocery Manager in
9   Midway?
10  A.   Everything.  Order groceries, stock the
11  shelves, stock the dairy, stock the frozen, fill in on
12  the registers when other -- when the cashiers would
13  have to take a break or go to lunch.
14  Q.   Tell me about ordering.  What did you do in
15  that regard?
16  A.   Scanned a barcode on the shelf when that spot
17  was empty.
18  Q.   And that -- what did that do?
19  A.   It ordered that product.
20  Q.   Okay.  Did you have any -- I mean, other than
21  scanning it when it was empty, did you have any other
22  duties and responsibilities with ordering product?
23  A.   Just -- just fill the shelves.  Like unload
24  the truck when it got delivered and then take it to the
25  aisles and stock the shelves with it.

Page 18

1   Q.   Okay. Fair enough.
2        And then that job ended April 20th of 2014;
3   is that correct?
4   A.   Sounds right.
5   Q.   Okay. And then you were rehired in 2016; is
6   that correct?
7   A.   Yes.
8   Q.   Okay. How did you come to be rehired in
9   2016?
10  A.   I was reached out to by David Peterson.
11  Q.   Okay. How did Mr. Peterson reach out to you?
12  A.   Email or something. I can't -- email or
13  phone.
14  Q.   Okay. What did he say; do you remember?
15  A.   If I was looking for a job.
16  Q.   Okay.
17  A.   Yes, I was.
18  Q.   Okay. And what was your first job coming
19  back?
20  A.   To work like the night auditor. Or not night
21  a auditor, but like a night closer position in the Orem
22  store. So the last cashier.
23  Q.   Give me one second. I want to make sure we
24  have a complete record here. Okay. I'm showing you a
25  document marked Exhibit 3 to your deposition.

Page 19

1        (Exhibit 3 marked.)
2   Q.   (BY MR. WILLIAMS) And that shows a hire date
3   of August 31st of 2016 and an hourly pay rate of $12 an
4   hour at Orem, title of Closing Manager. Does that
5   accurately reflect the job that you were hired to in
6   August of 2016?
7   A.   Yeah, that looks right.
8   Q.   And how long did you hold the job of closer?
9   Or closing manager, sorry.
10  A.   Until the date on that other document you had
11  when I moved to ASM at another store.
12  Q.   Okay.
13  A.   In January.
14  Q.   And you are referring to Exhibit 1, is that
15  correct, this document that I'm showing you?
16  A.   Yeah.
17  Q.   Okay. And so on January 22nd of 2017 you
18  became Assistant Store Manager; is that correct?
19  A.   Yes.
20  Q.   Okay. How did you come to be employed as the
21  assistant store manager?
22  A.   Um, I was looking to get, you know, a pay
23  raise and David Peterson told me about this position,
24  so they transferred me over there.
25  Q.   And what store was this?

Page 20

1   A.   It's in Highland, Utah.
2   Q.   Highland, okay. So you had expressed
3   interest to Mr. Peterson in moving up in the chain; is
4   that correct?
5   A.   Yeah.
6   Q.   Do you remember when you did that,
7   approximately?
8   A.   I don't. I mean, it was before I got the job
9   there, right. I don't know. At some point between
10  August and January. I think I had been -- I think I
11  had been working a couple months when I expressed a
12  desire to have a bump in pay.
13  Q.   Okay.
14  A.   I was working pretty late at night, and I
15  thought I could get, you know, more pay for working at
16  night, and that's when he offered me this instead.
17  Q.   Okay. Did he tell you about the position?
18  A.   Yeah.
19  Q.   What did he tell you?
20  A.   That it was salary like the one I had had in
21  2014.
22  Q.   Okay.
23  A.   So more responsibility.
24  Q.   Okay. Did he tell you what the
25  responsibilities would be or just say it would be more

Page 21

1   responsibility?
2   A.   I can't recall the exact verbiage, so.
3   Q.   Okay.
4   A.   I recall it being, you know, him stressing
5   that it was more responsibility.
6   Q.   Okay. That was a promotion for you?
7   A.   I'm sorry, say it again.
8   Q.   That was a promotion for you?
9   A.   It was a promotion.
10  Q.   Okay. You mentioned that he told you it
11  would be a salaried position?
12  A.   Yes.
13  Q.   Did he tell you about the hours?
14  A.   Yeah. I mean, I'm pretty sure. He said you
15  work about 50 hours a week.
16  Q.   And this was all before you were offered the
17  job as an assistant manager?
18  A.   Yes.
19  Q.   Okay. Did you learn at some point what the
20  duties and responsibilities would be as an assistant
21  manager?
22  A.   Yes.
23  Q.   Okay. When was that?
24  A.   First day on the job.
25  Q.   Okay. And whose -- I assume your first day

Page 22

1  on the job meeting with the store director; is that
2  correct?
3       A.   Yes.
4       Q.   Who was --
5       A.   Justin White.
6       Q.   Justin White is your store director?
7       A.   Yes.
8       Q.   Okay.  What did he tell you about your duties
9  and responsibilities?
10      A.   That I would be doing everything he needed me
11 to do in the store to keep it functioning.
12      Q.   Okay.  Did he elaborate on that or just say
13 that you're going to be doing everything that he needs
14 you to do?
15      A.   That was -- that was what he said and that's
16 his style.
17      Q.   That's his style, okay.  Fair enough.
18           Did you consider him to be your direct
19 supervisor?
20      A.   Yes.
21      Q.   Okay.  And was he your -- tell me his name
22 one more time.
23      A.   Justin White.
24      Q.   Justin White, okay.  Was Justin White the
25 store director for your entire time as an assistant

Page 23

1  manager?
2       A.   No.  Most of it, but no.  I had a -- I had
3  another one after him.
4       Q.   Who did you have after Justin?
5       A.   Clint Harris.  Harris?  Yeah.
6       Q.   And how long was he your store director?
7       A.   Not very long.  It was shortly after that
8  that I -- that I left.  It was maybe, I don't know, a
9  month.  Maybe --
10      Q.   So --
11      A.   Maybe two months.  I'm not sure.  It was
12 pretty short though.
13      Q.   So a month or two is all?
14      A.   Yeah.
15      Q.   Okay.  And did Justin give you any training
16 to be an assistant manager?
17      A.   No.  It was just the stuff I was already
18 doing.
19      Q.   Okay.  And what was that?
20      A.   Filling in on the registers, stocking the
21 shelves, ordering the groceries, go to the deli, work
22 in the deli at the, you know, if the deli people were,
23 you know, sick or late, stuff like that.
24      Q.   Okay.  So other than -- we'll call this
25 on-the-job training.  Is that fair?

Page 24

1       A.   Yeah.  No cake decorator showed up.  I've had
2  to decorate cakes.  I don't think the customer was very
3  happy with what they got, but, I mean, I've done -- I
4  got called in to all of it.  I baked bread.  It's the
5  first time in my life I baked bread, so yeah.
6       Q.   So as Assistant Store Manager you were paid a
7  salary for the whole time; correct?
8       A.   Yes.
9       Q.   How -- how -- how were you paid?  Was it
10 every -- was it every two weeks?
11      A.   I'm going to say yes.
12      Q.   Okay.
13      A.   Sounds right anyway.
14      Q.   Okay.  Did you get benefits as Assistant
15 Manager?
16      A.   I had benefits before.  It's the same
17 benefits from being a full-time employee.
18      Q.   Okay.  What about bonuses?  Were you eligible
19 for any bonuses?
20      A.   They said I was.
21      Q.   Okay.  Did you ever earn any bonuses?
22      A.   I don't recall ever seeing any bonuses.
23      Q.   Okay.  Not that you know of?
24      A.   Not that I know of.  Not that I can remember
25 anyway.

Page 25

1       Q.   Did you receive salary increases throughout
2  your tenure?
3       A.   I think I did.  That last couple months when
4  I went with Clint I think they put me -- that paper
5  jogged a memory that you showed me I was making 9.25
6  for salary.  I believe I went to 9.50.  I think they
7  gave me a small bump after so long.
8       Q.   Okay.  As a -- as Assistant Manager, did you
9  have a regular work schedule?
10      A.   Yes.  Yes and no.
11      Q.   Okay.  Explain what you mean.
12      A.   Well, there was like -- there was like a hard
13 copy, well, on a computer copy, like my schedule, you
14 know, of what days and what time shifts I was going to
15 cover and that was, you know, that's like hardline,
16 right, but then I also, yeah, I had to be available for
17 when we were shorthanded at the store.  Or, you know,
18 or if one of the department managers wasn't there, then
19 I would just either -- if I was already there, I'd stay
20 or if I was home, then I'd come in.
21      Q.   Okay.  Did you keep track of the hours that
22 you worked?
23      A.   No.  Well, maybe the wrinkles on my face,
24 but.
25      Q.   So you're not -- you're not clocking in?

Page 26

1   A.   No.  They didn't -- they didn't have us clock
2  in and out.  There was no system for that for the --
3  the managers.
4   Q.   Okay.  So, I mean, I understand that you're
5  filling in and, you know, if someone is not showing up,
6  then you're called in to cover.  Putting that aside,
7  you said that there was a written schedule --
8   A.   Yes.
9   Q.   -- of your start times and your ending times.
10  And did that vary from day to day?
11   A.   Start and end times?
12   Q.   Yes.
13   A.   Yeah.  Well, I mean, it varied like week to
14  week.  It was -- it was however Justin wrote it.  You
15  know what I mean?  So if he felt like he needed an
16  extra hand during this time block in the day, then, you
17  know, maybe that 12-hour, 11-hour shift would be
18  shifted over, you know, to cover that.
19   Q.   Okay.  Did you have any say in setting the
20  schedule or was that just given to you?
21   A.   No.  That was just given.
22   Q.   Okay.
23   A.   I mean, I also had like, you know, if a day
24  was requested off, right.  Like any other employee, if
25  you request a day for a wedding or doctor's

Page 27

1  appointment, and then that got worked around if it was
2  able to, you know.
3   Q.   Okay.  How did you work out vacation time,
4  time off?
5   A.   I can't remember how it accrued.  I think
6  that it accrued for so many hours worked, you earn an
7  hour.  It showed it on the paystub, so.  I don't recall
8  ever taking any vacation is why.  I didn't pay much
9  attention to it.
10   Q.   Do you ever remember wanting to take a
11  vacation and it being denied or you just never took it?
12   A.   There was -- there just wasn't real time.
13   Q.   Okay.
14   A.   Right?  There wasn't coverage.  Oh, I took
15  time when I got married.  Oh, yeah.
16   Q.   When was that?
17   A.   Yeah.  When was that?
18   Q.   Yes.
19   A.   Well, she's not here to see me forget.  It
20  was June -- it was June -- it was June 2nd.  I forget
21  the year.  2018.  Wait, no.  Yeah, maybe it was '18.
22   Q.   And I'm not going to hold you to any of these
23  dates.
24   A.   Yeah, don't put -- don't put that one in the
25  record.

Page 28

1   Q.   But you were -- you were -- you were able to
2  take some time off for your wedding?
3   A.   Yeah.  I took a few days.
4   Q.   Okay.  Now, scheduling coverage.  It's my
5  understanding that there always needed to be either a
6  store director or an assistant manager while the store
7  was open.  Is that correct?
8   A.   I mean, if that's policy, I'm not -- I don't
9  recall it, the actual policy.
10   Q.   Okay.
11   A.   I do know that that was not always the case.
12  Actually, there's always chunks of the day, especially
13  in the late evening, that, or overnight, that it would
14  just be, you know, an hourly employee like what I used
15  to do as a closing manager.  I would have a key to the
16  store and I could -- to lock the store when I left.
17   Q.   Okay.
18   A.   So it wasn't always an actual salaried person
19  there.
20   Q.   But the closing manager could be there and
21  had the key to the facility and could lock up when they
22  were done.  Is that correct?
23   A.   Yeah.  There was like four, four different --
24  four or five people that had keys.
25   Q.   Okay.  I assume there were times on the

Page 29

1  schedule where your work time overlapped with the store
2  director's work time?
3   A.   Yeah.  Like every -- every shift.
4   Q.   Okay.  Did you work identical shifts or was
5  there a time where you were there without the store
6  director?
7   A.   The only times I was -- so our shifts
8  overlapped almost entirely minus, say, an hour at the
9  end of the day, right, so that he would leave at 6:00,
10  5:30-6:00, and then I would be there one more hour with
11  the closing manager and then go, and then plus, like,
12  his day off.  And then all the other times I would, you
13  know, have to stay the whole night because the closing
14  manager was called in or something.
15   Q.   Okay.
16   A.   Or for a while we didn't have one.
17   Q.   So his day off, he had one day a week off.
18  Is that correct?
19   A.   Yeah.
20   Q.   I mean, generally speaking?
21   A.   Well, in that store -- in that particular
22  store, I don't know of any other Ridley's, but in that
23  one for sure on Sundays that store was closed.
24   Q.   Okay.
25   A.   All the other stores I worked at in Ridley's

Page 30

1 that was not the case, they were all open, but in this
2 city I think it was a city thing. They didn't let that
3 store be open, but --
4    Q.   Okay.
5    A.   -- so Sunday Was closed.
6         And the way Justin writes the schedule,
7 because we're supposed to do 60 hours. As a salaried
8 person, they have us do 60 hours one week and 50 hours
9 on a different week on the next one, so in the next pay
10 period you have a 60 and a 50. Justin would write
11 it -- often he would write it as 55 hours each week.
12 And so sometimes like half the Saturday he wouldn't be
13 there.
14        That was -- and then he always -- we always
15 got Sunday except for like case lot stuff or big loads.
16 Then he would have me come in Saturday night and help
17 the graveyard people stock the shelves, break down
18 the -- break down the order and stock the shelves.
19    Q.   Okay. What percentage of your time would you
20 estimate you were at the store without the store
21 director there?
22    A.   I don't know. I mean, not too much.
23    Q.   20 percent? 10 percent? 50 percent? I
24 mean, can you give me an estimate?
25    A.   No, not very high.

Page 31

1    Q.   Well, at least one hour a day and possibly a
2 day a week. Is that -- is that accurate?
3    A.   Sounds pretty good.
4    Q.   Okay. What about did you show up in the
5 mornings at the same time or did you ever open the
6 store without him there and then he would show up?
7 Tell me how that worked.
8    A.   Yeah. If he didn't -- if he was taking a day
9 off or something, then I would open the store.
10 Normally he opens the store and I show up an hour after
11 or two hours after he's opened.
12    Q.   Okay. And so he would be there early to open
13 and then he would be the one to leave earlier in the
14 evening. Is that -- is that accurate?
15    A.   Yeah.
16    Q.   Okay. Okay. So this Store 1167 is the Orem
17 store; is that right?
18    A.   You'd have to reference those documents. I
19 can't remember the numbers of all the stores. It's
20 been years ago now.
21    Q.   You were an assistant manager at the Orem
22 store?
23    A.   After Highland, yeah. I -- after Highland I
24 transferred to the north Orem store under Clint Harris
25 for a couple more months and then that's -- and then my

Page 32

1 time with Ridley's ended after that.
2    Q.   Okay. I'm sorry, I want to -- Justin White.
3 Okay. Let's talk about Justin.
4    A.   That's in the high -- that's in the store
5 that's in Highland.
6    Q.   That's fine, sorry. Okay. I'm sorry.
7    A.   The one that I took on January 20 --
8    Q.   2nd?
9    A.   Right.
10    Q.   That's at the Highland store, okay. At the
11 Highland store, let's talk about that one first, did
12 you have a workspace that was reserved for management
13 employees? Office space, anything like that?
14    A.   Yes. There was one big office, it had a few
15 computers in it, and it was for store manager,
16 assistant manager, and then all the department managers
17 as well.
18    Q.   Okay. And what did you do in the office? Is
19 that for the administrative work that you did?
20    A.   Yeah. Well, I mean, I didn't do anything,
21 but yeah.
22    Q.   Okay. Did you have access to the computers
23 there?
24    A.   Yes.
25    Q.   Okay. Did you ever use the computers as an

Page 33

1 assistant manager?
2    A.   Yes.
3    Q.   What did you use the computers for?
4    A.   I would pull up -- on there I could -- see,
5 on there I had access to where I could pull up the
6 upcoming ads before they were printed and so I would
7 reference -- I'd get on there and reference what was --
8 what ads were going to come up, right, because that
9 would affect -- that would affect how much different
10 product groceries I might need to order specifically
11 for that event, right. It's usually a holiday kind of
12 a thing.
13    Q.   Okay.
14    A.   Yeah.
15    Q.   So in preparation for holidays or special
16 events you would anticipate that you may need, you
17 know, more of this one certain product or something
18 else?
19    A.   More ketchup, yeah.
20    Q.   More ketchup?
21    A.   Yeah.
22    Q.   Okay. And you would do that just based on
23 looking at the ads or what?
24    A.   Well, no, because I could see, that holiday
25 the year prior, how much did we order.

STANTON MEATS vs RIDLEY'S FAMILY MARKETS
JARED WHITAKER - 02/13/2023
Pages 34..37

Page 34

1  Q.  Okay.
2  A.  And then I could add or subtract off
3  depending on, you know, what we think the weather's
4  like, for example, and so that's -- that's what I would
5  do.  That's how I would reference that.
6  Q.  And that was part of your job as an assistant
7  manager?
8  A.  Yeah.  Well, I mean, it was supposed to be a
9  grocery manager thing.  But, yeah, but I did it.
10  Q.  That's what you did?
11  A.  Yeah.
12  Q.  Fair enough.  What else did you do in the
13  office?
14  A.  Eat my lunch.
15  Q.  Okay.  Did you ever meet with any employees
16  in the office?
17  A.  That's -- that is where Justin would meet
18  with employees or potential employees.
19  Q.  Okay.
20  A.  I would -- I would be invited to sit in
21  there.  Especially if it was -- if it was a female
22  employee or a female interviewing, he would have myself
23  and -- and then if it was a female, then he would have
24  Kelly, who was our customer service manager, he would
25  have her come in and sit as well.  We would just be in

Page 35

1  the office, all of us together.
2  Q.  Acting as a witness?
3  A.  Yeah.  I mean, right.
4  Q.  Did you participate in the questioning or
5  anything like that?
6  A.  No.
7  Q.  Okay.  Did you give any feedback when you
8  were done saying hey, I think this or this?
9  A.  If he asked me.
10  Q.  Is that something he would do routinely?
11  A.  I wouldn't say routinely, but like, I mean,
12  like I recommended someone I knew personally and so,
13  you know, I obviously gave my opinion on the person
14  because I knew her.
15  Q.  Was that person subsequently hired?
16  A.  She was, part-time for a little bit, yeah.
17  Q.  Kind of talk me through a typical day when
18  you and the store director are there, what you're
19  communicating back and forth or if you both have your,
20  you know, kind of your separate areas of
21  responsibility.  Just kind of talk to me about that.
22  A.  So pretty -- pretty common day is I come in
23  and he's breaking down the safe, getting the registers
24  into the tills to start the day off.  I would then jump
25  in the one till that we would keep open in the mornings

Page 36

1  and start handling the customers that were coming in
2  early until our regular morning cashiers showed up.
3  Usually about two hours into the store being opened is
4  when that shift started, so I'd be manning the register
5  until then.
6          And once that person got in to take over the
7  register, then it'd be, you know, then I would
8  immediately move to breaking down the load.  We had --
9  every day you have to stock the shelves.  In that store
10  especially.  It's a big store, it's busy, so we had a
11  load almost every single day.  And what was not put on
12  the shelves from the day prior would just be added to
13  the next day and so I would immediately go into that.
14          He would head to the office to do, you know,
15  schedule writing.  He had like conference meetings,
16  phone conference meetings, right, and, you know, busy
17  paperwork stuff.  Usually sometime around the afternoon
18  after -- after he came back to lunch, he would come
19  back, you know, he'd come down and I would head to
20  lunch, and then we would, you know, we would divide and
21  conquer what department was shorthanded, you know,
22  where do we need help.
23          And so usually after lunch I was done
24  throwing groceries on the shelf and I would move to,
25  you know, produce to help produce or I would wash

Page 37

1  dishes in the bakery because at that point most of the
2  bakery employees are done for their shift because they
3  would start at like 2:00 in the morning, right.  So I'd
4  be in there cleaning the bakery, sweeping, mopping,
5  washing dishes.
6          Then, I don't know, that usually wrapped up
7  the day by then.
8  Q.  Okay.  Let's talk about breaking down loads.
9  Is it only you doing that or are you -- do you have a
10  team of people breaking down loads?
11  A.  Whoever isn't currently helping a customer
12  face to face was supposed to be helping.
13  Q.  Okay.  And if they weren't, what would you
14  do?
15  A.  I would just work alone then.
16  Q.  So you'd never ask someone to help you?
17  A.  I can ask.  I can even -- I can even act like
18  hey, you're supposed to do this with authority, but
19  some of the kids got wise and they realized that, like,
20  especially after an incident with another employee.
21  She, you know, no -- no reprimands could be given to
22  her by me.  They just had to be busy at the moment, so
23  didn't matter.
24  Q.  Did somebody tell you you couldn't reprimand
25  an employee?

Page 38

1  A.  Well, yeah.  I tried to follow through with
2  letting someone go and I was, yeah, I was told that we
3  can't do that, so.  Then it was like easy, you know,
4  obvious insubordination kind of thing.  Given my, you
5  know, given my title -- did I just lose video?  You
6  there?
7  Q.  No.  You're still there.
8  A.  Given, like, my title you would think that
9  that meant I could hold people accountable, but I
10 learned in that instance that I could not.  Sorry.  I'm
11 plugging my phone in.
12 Q.  No worries.
13 A.  Okay.
14 Q.  Okay.  So in the morning when you're there
15 breaking down loads, how many employees are in the
16 store?
17 A.  In the morning?
18 Q.  Yeah.
19 A.  Me and Justin, the store manager.  You would
20 have a small army in the bakery.  Bake -- the bakery
21 folks.  I don't know, there'd be four or five of them
22 in the bakery.
23 Q.  Have I still got you guys?
24 MR. SHORT:  You got me.  I think Jared may have
25 jinxed himself.

Page 39

1  MR. WILLIAMS:  At least it's not mine.  Let's go
2  off the record for just a moment.
3      (Brief recess.)
4  Q.  (BY MR. WILLIAMS) Okay.  Jared, when we --
5  when we lost you we were talking about the number of
6  employees that you had working with you in the morning.
7  Why don't we start over with that.
8      What -- how many employees are in the store
9  at that time?
10 A.  It'd be Justin, the store manager.  A typical
11 day myself, be four or five people in the bakery.
12 There would be usually right around 7:00 or 8:00 is
13 when you'd start seeing like the deli manager and the
14 produce manager come in and then -- and one -- and a
15 cashier.  At that point a cashier would be there, would
16 get there, so.
17 Q.  When does the grocery manager get there?
18 A.  Around 10:00, 10:30.
19 Q.  Okay.  So can you grab -- when it's time to
20 break down groceries and stock shelves, can you grab
21 any of the employees and say hey, we need to do this,
22 come help me?
23 A.  I mean, I can if they're willing.  And
24 oftentimes, you know, you got like the cashier people
25 are, you know, pretty willing to help.  Definitely not

Page 40

1  anyone out of like the deli or the bakery or anything.
2  Q.  Okay.  But whoever was -- whoever's there and
3  whoever's not busy, you can -- you can grab and say
4  hey, I need to you do this, I need you to do that.  Is
5  that -- is that accurate?
6  A.  If they're not busy, they can help, yeah.
7  Q.  Okay.
8  A.  I can -- I can't pull someone away to do --
9  to like stock shelves with me.  If, you know, if
10 they're -- if they're a cashier, they can just stay at
11 the cashier and say I'm a cashier.
12 Q.  Well, I mean, your job as assistant manager
13 is to make sure the whole store is operating; correct?
14 A.  In theory, yeah, that's what --
15 Q.  Okay.  And so if a cashier is busy with a
16 customer, obviously you're not going to pull them off
17 of that to come help you with something else.  Is
18 that -- is that fair?
19 A.  Correct.
20 Q.  Okay.
21 A.  One time I tried to exercise what I thought I
22 had authority to have someone who wasn't busy, they
23 weren't doing their task or helping a customer, to come
24 help on a register, and she refused and said if I tried
25 to make her, she'd quit.  And I said well, that's your

Page 41

1  options.  You're not doing anything with a customer, so
2  you can come up here or, in your words, if you want to
3  quit, then you can quit.
4      She's like well, I'm not going up there.  I
5  said great, let's go fill out your termination papers.
6  And I was -- I was told clearly that I couldn't do
7  that, she didn't lose her job, and she went back to
8  stand in the back room.
9  Q.  Who told you that you couldn't do that?
10 A.  Justin White.  We had to clear -- we had --
11 we had to clear -- we had to clear any terminations
12 through Mark Ridley.  I said well, I said well, I'm not
13 terminating her.  Her own words were she'd quit if --
14 if she was, you know, being told that she had to do
15 this task, she was quitting.
16     And he says yeah, but -- but, you know, but
17 you can't let her go.  I was like okay, I guess -- I
18 guess I don't then.  So I went and -- I went and
19 started bagging the groceries.  That was, you know,
20 that the job I needed help with at the time, it was
21 busy, and so I stopped loading food on the shelves and
22 I went and started bagging.
23 Q.  And was that the last time you ever asked an
24 employee for help?
25 A.  It was the last time that I pressed the

STANTON MEATS vs RIDLEY'S FAMILY MARKETS
JARED WHITAKER - 02/13/2023
Pages 42..45

Page 42

1  issue. If it wasn't an immediate yes, it was like
2  okay.
3     Q.   Okay. But after that you still asked
4  employees for help and, I mean --
5     A.   Well, yeah, of course.
6     Q.   Of course.
7     A.   You can ask for help.
8     Q.   Okay. Do you know what I mean when I say
9  center store employees?
10    A.   No.
11    Q.   You never heard that -- you never heard that
12 term center store employees?
13    A.   I'm guessing you're referring to like people
14 who are specifically assigned to grocery?
15    Q.   Yes.
16    A.   Like the grocery aisles? Sure.
17    Q.   I mean, did you ever use that term as an
18 assistant manager?
19    A.   No.
20    Q.   Okay. Did you ever have an understanding
21 that Assistant Manager was kind of over the center
22 store employees over the grocery and what have you?
23    A.   Yeah. In the sense that I needed to make
24 sure that if it -- if it -- if it needed -- if a job
25 needed to be done at, you know, it was -- it stopped

Page 43

1  with me. I had to make sure it was done.
2     Q.   Okay. So that was kind of the assistant
3  manager's realm if you have -- realm, if you understand
4  that. Is that -- is that fair? The center store
5  employees?
6     A.   I mean, that can be, but I spent as much time
7  in the grocery aisles as I spent in amongst the deli
8  and the produce and the bakery.
9     Q.   Was it part of your job to make sure the deli
10 and the bakery were running smoothly as well?
11    A.   My job was to do what I was told to do and
12 that was made very clearly to me.
13    Q.   Okay. So you never exercised independent
14 judgment saying hey, these guys are shorthanded, I need
15 to go help them?
16    A.   Again, that was told to do, so that's what I
17 did when there was -- when they were shorthanded. I
18 was -- I went because that was -- that was made clear
19 to me that that is what I was supposed to do.
20    Q.   But part of your responsibility is to make
21 sure that these other departments are smooth and -- and
22 running like they should be and if you need to help,
23 then you need to step up and help. Is that -- is that
24 fair?
25    A.   Right.

Page 44

1     Q.   Okay. So were you able to give instructions
2  to employees?
3     A.   Yeah. Basic instructions.
4     Q.   That's certainly something that was in
5  your -- in your duties and responsibilities?
6     A.   Right. If someone didn't know how to do
7  something like turn on the fryer, I was obviously going
8  to show the kid how to turn a fryer on so he didn't
9  burn himself.
10    Q.   Okay.
11    A.   There was a lot of that. I was always having
12 to show someone how to use the fryer.
13    Q.   Certainly there's some training opportunities
14 for employees. It sounds like you can assign tasks
15 then as well?
16    A.   Well, to, you know, mitigate my time, right,
17 get off a fryer so that I could go and, like, start
18 making the sandwiches or go finish my order on the
19 groceries, you know, go back and forth.
20    Q.   Okay.
21    A.   Plus, we never could keep any deli employees,
22 so it was constant.
23    Q.   That was a high turnover area?
24    A.   The whole store was.
25    Q.   Why?

Page 45

1     A.   Yeah. It's tough. You have to do a lot
2  there. I mean, you don't have -- there's not that many
3  people in the store, so, you know, these -- these --
4  these kids would get burnt out pretty bad, you know,
5  constantly trying to go from the register to go to the
6  aisle to help with groceries to go find this price for
7  this customer to, hey, come help me in the deli wash
8  dishes, hey, come to the bakery, help me sweep up while
9  I wash dishes, and you just -- you burn these -- you
10 burn these people out.
11         You know, they -- they get hired on thinking
12 they're going to be -- I'm only going to be stocking
13 milk, and then you're trying to like, you know,
14 negotiate with them to help do other stuff so much.
15 And people are really willing to help in the beginning,
16 but no one's being paid any extra or any differently.
17    Q.   Sure.
18    A.   So yeah. It was -- it's tough. I mean,
19 there's a reason I'm -- there was a reason why so many
20 of those stores have pulled out of Utah I'm sure, but.
21    Q.   So you -- you personally had difficulties
22 motivating some of these other employees to -- to
23 broaden their work experience and --
24    A.   No, that's not what I said, but.
25    Q.   You just finished telling me that there was a

Page 46

1  lot of turnover and --
2      A.   Correct.
3      Q.   -- employees didn't want to -- want to go and
4  do what they're told to go and do.
5      A.   They didn't want to do extra outside of their
6  job title without being compensated more.
7      Q.   Okay.  And who's telling them to go do these
8  extra tasks?
9      A.   Me, Justin, the grocery manager, the closing
10 manager, the head cashier.  Everyone -- everyone asking
11 everyone to come help them do their, you know, their
12 stuff, they're overloaded.  It's, yeah.
13     Q.   Okay.  Did you ever plan work schedules, do
14 any scheduling for employees?
15     A.   No.  That's the -- the store manager has
16 that.
17     Q.   Even for center store employees?
18     A.   Yeah, no.
19     Q.   Okay.
20     A.   He would -- he would bring it down and put it
21 on a clipboard in the customer service booth and then
22 the customer service, we call them like the customer
23 service manager.  It's just -- it's the gal that sits
24 in the booth and does balloons and stuff.  She, you
25 know, she keeps track of, you know, who's on the

Page 47

1  schedule and then who's up next for lunches, and she
2  kind of messes with that.
3           Justin would give the schedule to her to kind
4  of, you know, facilitate lunch breaks and things like
5  that.
6      Q.   Okay.  What about employee complaints?  Did
7  employees ever complain to you?
8      A.   Yes.
9      Q.   Tell me about that.
10     A.   I think we just did.
11     Q.   Complaints about not wanting to do extra work
12 or anything?
13     A.   Yeah.
14     Q.   Okay.  Any other topics of complaint?
15     A.   Yeah.  The typical stuff, you know.  The boss
16 is a jerk kind of -- kind of stuff.  Pretty typical
17 workplace complaints.
18     Q.   How did you resolve those complaints?
19     A.   Um, sorry.  Sorry, we're all stretched thin
20 here, it's not fair, but, you know, life is not
21 sometimes.
22     Q.   So you would try to -- to basically talk them
23 down.  Is that fair?
24     A.   Yeah.
25     Q.   Okay.

Page 48

1      A.   Pass it on.  Pass it on to Justin.
2      Q.   Okay.  If it was a significant complaint, you
3  would escalate it up to Justin?
4      A.   Well, yeah.  If it's anything meaningful
5  like, I don't know, breaking a rule or something, then
6  obviously it would have to go to somebody who could do
7  something.
8      Q.   Okay.  Did you ever report rule breaking to
9  Justin?
10     A.   Well, the one time I thought she was breaking
11 a rule.
12     Q.   Okay.  What about any other time or is that
13 the only time?
14     A.   That's the only time that sticks out in my
15 head right now.  I don't --
16     Q.   Okay.
17     A.   -- recall so much of that era now as far as,
18 like, the specifics of who said or did what.
19     Q.   Okay.  Did you ever coach employees, provide
20 feedback for them on -- on tasks or how to do a task or
21 anything like that?
22     A.   Sure.  There was plenty of times, you know,
23 if someone was, you know, ready, willing to help.  And,
24 you know, and I asked Becca to, you know, help with the
25 fryer or make a salad or something, right.  And she

Page 49

1  would, you know, in the beginning it might be, well,
2  where's the knives or what bread can I use, do I just
3  get it off the shelf.  And it's like okay, we'll do it
4  like this.  Come over here, grab something out of the
5  bakery, come over here.  You know, that kind of
6  coaching was a daily really.
7      Q.   All right.  And certainly something that's
8  not uncommon to do?
9      A.   Right.
10     Q.   What about -- I know Ridley's does written
11 performance evaluations.  Did you ever participate in
12 those?
13     A.   You know, I want to say I never sat in
14 because those are -- they're private, so it would be
15 the employee with Justin.  And then, you know, if it
16 was a manager like the grocery manager who's a salary
17 guy, it would be him with Justin and then with Dave
18 Peterson or Mark Ridley.
19          Same thing went with the department heads.
20 So like the deli manager would sit in with Justin and
21 there's like a corporate deli person that would be in
22 on that, s.o I would be involved sometimes.  I can't
23 give a specific, but I recall being asked, well, how do
24 you think like, you know, something like a cashier or a
25 grocery stocker, you know, well, what do you think.  Do

Page 50

1  you see -- what have you seen when you're down there
2  with them. And I'd give them my opinion or give them,
3  you know, what I think I -- what I see how they work.
4      Q.  Sure.
5      A.  So.
6      Q.  Were those employees that you regularly
7  interacted with that they asked for feedback on or --
8  or just everybody?
9      A.  I mean, it's in general and it's not every
10 evaluation. It's not every time.
11     Q.  Sure.
12     A.  Every now and again -- the most common
13 scenario would be because someone in being -- being
14 evaluated would say something to the effect of oh, you
15 know, ask Jared. I -- I do -- I do a lot in the store,
16 I help out a lot. You know, ask Jared, he sees me do
17 that. And then it would be like hey, Jared, what do
18 you think Tyler did, you know. How does Tyler work.
19 And I would -- and I would, you know, give my -- my
20 feedback on that.
21     Q.  Okay. Did you ever prepare written
22 evaluations for any employee?
23     A.  No.
24     Q.  Okay. Did you ever participate in any formal
25 employee discipline meetings or providing feedback,

Page 51

1  anything like that?
2      A.  No. He did have me present. He let someone
3  go, it was a female employee, and he had me and a --
4  and a girl who was normally the cashier. I think she
5  had just gotten promoted to the booth or closing
6  manager was present when he -- he asked an employee to
7  clear out her locker.
8      Q.  Okay. Other than that, did you participate
9  in any other disciplinary meetings or anything?
10     A.  No. Nothing I could -- nothing that I recall
11 is specifically a disciplinary thing.
12     Q.  Okay. You told me earlier on that you very
13 occasionally sat in on employee interviews. Is that
14 accurate?
15     A.  Yeah.
16     Q.  Okay. How frequently?
17     A.  Not frequently, but, I mean, enough to know
18 that he kind of had a list of questions he would ask,
19 and it was pretty straightforward. And then usually
20 right there he'd then ask them, you know, when they
21 wanted to start.
22     Q.  Okay. Did he ever have any followup with you
23 if he didn't hire them right away to say did you like
24 this person, what do you think?
25     A.  No. But, I mean, it would be -- if it was a

Page 52

1  thing where he didn't hire someone, you know, and we
2  just happen to be still sitting around, he would say
3  something like, you know, this sounded fishy or duh,
4  duh, duh, and that's why I didn't hire him.
5      Q.  You told me that you recommended at least one
6  person for hiring; is that correct?
7      A.  Yeah. The whole time I -- the whole time I
8  worked at Ridley's, all the years there, one person.
9      Q.  One person, okay.
10     A.  Yeah.
11     Q.  Did you ever review applications, anything
12 like that in the hiring process?
13     A.  No, not the hiring process. I -- I obviously
14 have seen them, right, if some kid walks in and hands
15 me an application, you know, because I'm behind the
16 booth or I look like a grownup. We had a lot of kids
17 there, you know, and you'd get a high school kid come
18 in and hand me an application and say hey, I'd like to
19 work here, and I'd say great, we'll have a look at this
20 and get back to you, and I would just go put it on
21 Justin's desk or his box or something, so.
22     Q.  Did you ever conduct any informal interviews
23 of kids that walked in?
24     A.  No. Nothing that was I wouldn't even call
25 informal. I'm a talkative guy, so if I recognized the

Page 53

1  kid from the neighborhood doing a scouts project, I
2  inquired about that. But I'm a pretty friendly guy and
3  nothing -- nothing as far as like interviewesque type
4  questions, no.
5      Q.  What about setting pay for any employees?
6  Were you involved in any of that?
7      A.  No.
8      Q.  Okay. Did you have a budget for groceries
9  that you had to follow? Anything like that?
10     A.  No, I don't think so. I don't -- I was just
11 told to order if we're low, you know.
12     Q.  Okay. Did you have any -- any reporting
13 responsibilities for -- for budgetary items?
14     A.  No. That doesn't -- that language doesn't
15 sound familiar to me.
16     Q.  Okay. Did you ever participate in any
17 discussions about budgets or anything like that for the
18 store?
19     A.  No.
20     Q.  What about employee promotions? Were you
21 involved in that process at all?
22     A.  Again, that would be something like, you
23 know, does this person stay on task at night kind of a
24 thing because at night he doesn't see what they're
25 doing, he's at home, right, so it's just what have I

Page 54

1 observed from this employee.
2  Q.  Okay.  Providing feedback?
3  A.  Sometimes.
4  Q.  Okay.  Did you fill out any reports or any
5 forms as an assistant manager?
6  A.  No.  I mean, like, there's special item forms
7 if I'm going to order a -- if we needed a product that
8 we didn't typically have right there or it was at
9 another store, you'd fill out a transfer form.  So if
10 you're referring to forms like that, then I've done --
11 I've done a few of those.
12  Q.  Okay.
13  A.  Like store-to-store transfers.
14  Q.  Okay.  Other than that, no employee forms, no
15 accounting forms, anything like that?
16  A.  Well, accounting, I've made bank deposits
17 before.
18  Q.  Okay.
19  A.  Count that as --
20  Q.  How often would you make bank deposits?
21  A.  Fairly often.  Maybe a couple times a month
22 or something.  I mean, every other -- like every other
23 week.  If, you know, if the money got too much in the
24 safe or something or we ran out of coin and Justin was
25 off or unavailable, he would ask me to go down to Zions

Page 55

1 and grab, you know, a box of pennies or a box of
2 quarters or something.
3  Q.  Okay.
4  A.  And we had -- and Ridley's had their account
5 there and he had, you know, so I could just walk in and
6 get it, right.
7  Q.  Okay.  You already talked to me about
8 ordering product and special orders.  You mentioned
9 that you would look at ads and kind of decide, you
10 know, we're going to need more potato chips or more
11 ketchup or something for a special holiday.  Is that --
12 is that fair?
13  A.  Yes.
14  Q.  Okay.  Did you have any input on
15 merchandising?  Any displays?  Anything like that?
16  A.  No.  Not -- not with Justin.  Not with my
17 time there.
18  Q.  Okay.  What about with Clint?
19  A.  Yeah.  You know, he had a general idea of
20 what he wanted to be on ad or displayed, and he would,
21 you know, put this together, you know, make a -- make a
22 s'mores display, right.  So put some marshmallows on a
23 shelf, some chocolate bars on the next shelf, and
24 graham crackers on the rest, right.
25  Q.  So you'd do that with Clint, not so much

Page 56

1 Justin?
2  A.  Not so much.  Justin, you know, he always had
3 a pretty good idea or a plan how he wanted it done or
4 what to be done, and we just went and did.
5  Q.  Okay.  Let me -- let me tie this off with the
6 employees.  Was your involvement with employees greater
7 or less under Clint than it was under Justin?
8  A.  The involvement's different.  I was with -- I
9 was with, you know, employees a lot in Highland with
10 Justin because I was side by side in everything --
11  Q.  Okay.
12  A.  -- working with him.  Like doing what they
13 were doing every day, day in and day out.
14   With Clint the involvement with employees was
15 less in that respect, but -- but, I mean, I was still
16 in the store with him.  I just didn't have the -- the
17 store's -- the Orem store wasn't very busy at all.  I
18 mean, it was almost a ghost town.  So it was, you know,
19 way more relaxed in not a good way if you want to run a
20 business.
21  Q.  So there's not as much -- would it be fair to
22 say that there was not as great a need to find
23 employees to go do tasks to help out in special
24 situations, that it was just a little easier to --
25 well, a little easier for the employees to just stay on

Page 57

1 task in their own individual areas?  Is that fair?
2  A.  Yes.
3  Q.  Okay.
4  A.  So my duties there were to continue to
5 merchandise and stock the shelves and it was pretty --
6 I didn't really always need much more help at all --
7  Q.  Okay.
8  A.  -- to stock the shelves with me.
9  Q.  Did you -- did you still, I mean, provide
10 feedback and --
11  A.  No.
12  Q.  -- coaching?
13  A.  No.
14  Q.  Did you do any coaching of employees?
15  A.  No.  It was -- I'm telling you it was pretty
16 slow in that store.
17  Q.  Pretty slow?
18  A.  Yeah.  We had the one, you know, the one
19 person standing at the register.
20  Q.  Yeah.
21  A.  You know, you had the meat guy there part of
22 the day, you know, that would -- so he would cut up
23 stuff.  And he showed me how to package -- package up
24 the meat and use the sticker machine.  If he just so
25 happened to sell what was on the shelves, I could go

STANTON MEATS vs RIDLEY'S FAMILY MARKETS
JARED WHITAKER - 02/13/2023                                                Pages 58..61

Page 58
1  back and get, you know, package another one if a
2  customer wanted another six-pack of chicken or
3  something, right.  So, I mean, it was -- it was pretty
4  laid back.
5      Q.   So as Assistant Manager, were you have any
6  responsibilities with regard to employee safety?
7  Anything like that?
8      A.   I'm going to say not specifically.  That was
9  not a -- like not -- there was no specific safety forms
10 or safety seminars or something.  I mean, we all common
11 sense wanted to not get hurt at work.
12     Q.   Right.  So if there's a dangerous condition
13 that you see, I mean, is it within your area of
14 responsibility to say hey, wait a minute, you need to
15 do this safer or, you know, clean up or find someone to
16 help clean up a spill or something like that?
17     A.   If I saw a spill, yeah, I would ask someone
18 to go clean that up if I wasn't in the ready position
19 to be able to go do that.
20     Q.   Okay.
21     A.   Yes.
22     Q.   Did you ever fill out any safety forms?  Any
23 injury reports?  Anything like that?
24     A.   You know, I don't recall.  I don't really
25 recall there being injuries on the job when I was there

Page 59
1  anyways.
2      Q.   That's a good thing.
3      A.   Yeah.
4      Q.   What about building security?  I assume you
5  had keys?
6      A.   Yeah.
7      Q.   Okay.  Would you lock up at night, unlock in
8  the morning?  Tell me about that.
9      A.   If I was -- if I was the person to open the
10 store, I unlocked it.  Usually I didn't have to
11 because, again, the bakers, they had keys to the store
12 they were already there.
13     Q.   Get there early?
14     A.   But occasionally they would lock the door
15 behind them, so then I would have unlocked it, right.
16 If I closed the store, then I would lock it behind me.
17 But the closing manager also had a key and, he or she,
18 we had a couple different ones over there, you know,
19 more often locked it up than I did or especially more
20 than Justin did.
21     Q.   Okay.  Is there an alarm system?
22     A.   No.
23     Q.   No alarm system?  Did you ever have to call
24 the police?
25     A.   On a shoplifter a couple times.  One time

Page 60
1  there was a fire in the bathroom and police got called
2  for that.  I didn't -- that one I didn't make the call,
3  but I was out front of the store to point the way, so.
4      Q.   Who made the call?
5      A.   You know, I think they received several
6  calls.
7      Q.   From employees or customers or both?
8      A.   Both.  Both I'm assuming.
9      Q.   Okay.  Interesting.  Okay.  As assistant
10 manager did you have access to a policy manual, a
11 handbook of any sort?
12     A.   Yeah, I'm sure I did.  They handed me one
13 when I first got hired at Ridley's.  We all had one.
14     Q.   Okay.  So there's an employee handbook?
15     A.   Yeah.
16     Q.   Okay.  I'm talking about policies and
17 procedures that may be in the office.  Did you ever
18 have access to those?
19     A.   Different than the regular Ridley's policies?
20     Q.   Yes.
21     A.   I don't -- I don't know that we actually had
22 something different for office work.
23     Q.   Okay.  Were you ever involved in any
24 management calls or anything to talk about store
25 success or longterm planning or anything like that?

Page 61
1      A.   No.  Not -- no calls on that kind of stuff.
2      Q.   Okay.  Is that something that Justin or Clint
3  would have handled?
4      A.   Yeah.  There was -- there was -- there was
5  weekly or biweekly meetings that I know would take
6  place because, you know, he would have to shut his
7  office door so it was quiet because he was on -- it
8  would be a conference call.  So yeah.
9      Q.   Did he ever report to you as to what was
10 discussed and involve you in disseminating the
11 information to the employees?
12     A.   I don't know all that was discussed like -- I
13 do know that there would be separate meetings.  There
14 were some that were specific with Mark Ridley and the
15 store managers, but I wasn't ever in those ones.  And
16 then there would be in the same day, either before or
17 after, there would be like department heads.  So you'd
18 have the deli manager, like all the deli managers
19 around the company on the phonecall along with the
20 corporate deli person, right.
21     Q.   Uh-huh.
22     A.   And there were times that I would sit in on
23 those, like a big holiday kind of event to, you know,
24 because it would -- it's clear that the assistant
25 managers, grocery managers, everyone was going to have

Page 62
1  to be in there helping --
2     Q.   Right.
3     A.   -- you know, those different departments get
4  ready for that, right.  Extra help dipping strawberries
5  during Valentine's kind of deal.
6     Q.   Sure.  So those are the meetings that you'd
7  be involved in when it was a big event or something
8  that involved everybody?
9     A.   Yeah.
10    Q.   Okay.  So I've exhausted my knowledge of
11 possible job duties for an assistant manager.  Are
12 there any others that you can think of that you -- that
13 you had that we haven't talked about?
14    A.   I had to clean the bathrooms.  I don't know
15 if we talked about that.
16    Q.   Okay.
17    A.   We can get -- we can get real specific on
18 everything I did, yeah.
19    Q.   Okay.  Anything else that comes to mind?
20    A.   Gather grocery carts, pick up loose trash in
21 the parking lot, clean the back room, throw the
22 mousetraps away, set new mousetraps, yeah.
23    Q.   It sounds like you were -- you were, I mean,
24 one of your responsibilities was -- is basically making
25 sure the store -- the store runs, I mean, whatever it

Page 63
1  takes.  Is that fair?
2     A.   That's fair.  But we're all in on that.
3     Q.   Sure.  So there were times that you were the
4  only manager on site.  Is that -- well, the senior
5  manager on site, is that -- is that correct, when the
6  store director was not there?
7     A.   Title wise, yeah.
8     Q.   Okay.  Why do you say title wise?
9     A.   Well, you got like pharmacist and pharmacy
10 guys, people there, and my title in the store, you
11 know, is one thing, but I, you know, I don't have
12 any -- there's nothing to say or that I could say for
13 them to do or how they manage their department.
14         The meat guy and his -- and his apprentice,
15 the meat cutters, you know, they were -- they were like
16 their own separate entity.  They, you know, they didn't
17 involve me in anything.  If there was something wrong
18 back there, they would, you know, deal with it or they
19 would just walk away from it and then that was that.
20    Q.   And then that would become your problem?
21    A.   Yeah.  If it was something I knew how to
22 troubleshoot, then I would give it a go.  Luckily I had
23 this farm boy who was pretty handy with stuff, that
24 kind of machinery, and, you know, more often than not
25 I'd send him back there to help me figure out how to,

Page 64
1  you know, run a hamburger machine, how to grind beef.
2     Q.   But at least -- at least title wise, and I'll
3  use your words, title wise you would agree with me that
4  there were, you know, at least a half a day a week, if
5  not more, and an hour or two at each night where you
6  were the senior manager on site.  Is that accurate?
7     A.   Yeah.  My title -- that happened way more
8  than that, but yeah.  I mean, I've had to sleep in the
9  store because there was no one else, so yeah.
10    Q.   How often did you have to sleep in the store?
11    A.   Oh, I spent the night in the conference room
12 four or five times because I was the one that -- I
13 would be there and then Justin would go home, and then
14 I'd be there and the night person would call in sick,
15 so I would work through it, and the next day I would
16 have to be there bright and early.
17         And given the drive I would have to do to go
18 home, I was banking on like three or four hours of
19 sleep, so I would set up in the conference room after
20 I'd close the store, go to sleep, get up, open the
21 store.
22    Q.   So it sounds like all the problems kind of
23 flowed down to you to -- to solve?
24    A.   Labor problems, yeah.  Anything else was sent
25 to, you know, Justin would then take over.  But if it

Page 65
1  was ever -- if it was ever a situation where there
2  wasn't enough people to help or people called in, then
3  it was, well, that's why you're salary, so.
4     Q.   If you're alone without the store director
5  and somebody needs to be sent home, you could do that,
6  couldn't you?
7     A.   Oh, no.
8     Q.   No?
9     A.   I don't -- I don't know what you're asking as
10 far as why someone would be sent home.
11    Q.   Well, let's say they steal money from the
12 till or something like that.
13    A.   Well, that's a hypothetical.  It never
14 happened with me there.  I imagine if someone stole,
15 then I would just call the police.
16    Q.   Okay.  What if somebody got in a fight?
17 Could you send somebody home there?
18    A.   Again, that's a law.  I would probably just
19 call the police I'm sure.  I would also call Justin, I
20 could imagine myself doing that, but, again, that
21 didn't happen while I was there.
22    Q.   I assume when you're the only manager there
23 you'd have to direct center store employees; no?
24    A.   When I was the only manager there, I was -- I
25 was running it around all the store.

STANTON MEATS vs RIDLEY'S FAMILY MARKETS
JARED WHITAKER - 02/13/2023
Pages 66..69

Page 66
1  Q.  Running around the store looking for what?
2  Doing --
3  A.  I was what you said, you know, running around
4  or taking care of the center store.  It was --
5  Q.  Okay.
6  A.  If I was the only manager there I was running
7  all -- and, yeah, literally running, but all over the
8  store, all -- all sorts of departments.  Getting price
9  checks for customers because there wasn't, you know,
10 any available staff.
11 Q.  Okay.
12 A.  Go ring someone up in the deli because they
13 want a burrito and the deli girl would be on lunch or
14 something, so yeah.
15 Q.  One second.
16     Okay.  Let me just make sure we've covered
17 all the assistant manager duties and responsibilities.
18 Is there anything else that comes to mind that we
19 haven't covered as far as duties and responsibilities
20 of Assistant Manager?
21 A.  Nothing at the time, no.
22 Q.  So let me show you this document.  One
23 second.
24     Did you ever -- have you ever described your
25 duties and responsibilities as an assistant manager in

Page 67
1  writing like a résumé, for example, after you left
2  Ridley's?
3  A.  Yeah, of course I have.
4  Q.  Okay.  What -- how have you described it?
5  A.  Don't know off the top of my head, but I
6  don't have my --
7  Q.  Is it a résumé?
8  A.  I don't have a résumé.
9     I don't know.  I try -- try and -- try to
10 embellish, you know, as well as one can.  So I'm sure
11 my résumé is fine to me.
12 Q.  Is that something you'd be willing to produce
13 a copy of?
14 A.  Yeah.  Actually, probably just -- I could get
15 it to the lawyers or just get on a public profile,
16 right, like a LinkedIn.  I got the various jobs I
17 worked on there.
18 Q.  That was my next question.  On any social
19 media.  So you said LinkedIn.  Have you described it
20 anywhere else?
21 A.  No, I don't think so.
22 Q.  Okay.  As an assistant manager, did you keep
23 a day planner, a journal, a calendar, or anything like
24 that?
25 A.  No.

Page 68
1  Q.  Okay.  Did you keep any notes related to your
2  work as an assistant manager?
3  A.  No.
4  Q.  And we talked about you ordering groceries,
5  particularly for special events.  Beyond that, did you
6  have any authority to commit Ridley's financially?
7  A.  Commit them?
8  Q.  Yes.
9  A.  I don't understand what that means.
10 Q.  Enter into purchase agreements, contracts,
11 anything that --
12 A.  Oh.
13 Q.  -- commits Ridley's to pay money.
14 A.  No.
15 Q.  Okay.
16 A.  Oh.  Like fundraiser-type stuff?  Like
17 donations to city things or scouts kind of things?
18 Q.  Sure.  Tell me about that.
19 A.  Oh, I don't know.  That's not that I've -- I,
20 you know, would see Justin kind of interacting with.
21 I'm just trying to clarify if that's the kind of -- if
22 that's what you mean by like committing or donating.
23 Q.  Well --
24 A.  I know Ridley's -- I know Ridley's kind of
25 did that stuff.  I've never been able to -- yeah, I

Page 69
1  was -- I've never, like, set anything up like that.
2  Q.  Okay.  You told me about -- about how you
3  would go and look at ads and would subsequently say
4  okay, we need this much ketchup or we need this much of
5  some other product.  Beyond that, we don't need to
6  cover that, beyond that did you spend money on behalf
7  of Ridley's?
8  A.  No.
9  Q.  Okay.  Did you ever do any travel for
10 Ridley's to go to any business meetings or --
11 A.  No.
12 Q.  -- other stores or anything?
13 A.  No.
14 Q.  Okay.
15 A.  I've gone to other stores to help out.
16 Q.  What stores have you helped out at?
17 A.  I went and helped at -- there's like --
18 there's an event that happens in Midway, like a city
19 days kind of thing, and so a number of people from
20 various stores will go out there because it's kind of a
21 real big deal.  There's a ton of people and it's a
22 small store.  And so, you know, like one year I went
23 out there and helped cook hotdogs outside, you know,
24 for the -- all the traffic, all the crowds walking by.
25 I was one of, you know, many from other stores who came

Page 70

1  to help that year.
2    Q.  Sure.  Other than your attorney, have you
3  communicated with anyone else about this lawsuit?
4    A.  I asked a former colleague of mine who I was
5  working at the time in a different company with, I had
6  asked him if he had been notified by the -- because I
7  received a thing in the mail, a class action title
8  thing, and I'd asked him if he'd received one and he
9  said that he hadn't.  That was it.
10   Q.  Okay.  Besides that --
11   A.  And I don't work there anymore and I hadn't
12 heard anything from them, from that, you know, that
13 original lawsuit or class action thing, lawyer, that
14 firm, and so, you know, that was -- that's all that
15 we'd had.
16   Q.  Okay.  Beyond that have you talked to anybody
17 else about the lawsuit?
18   A.  No.
19   Q.  Okay.
20   A.  I mean, my wife knows that this is happening,
21 but that's about it.
22   Q.  Sure.  Have you posted anything online about
23 the lawsuit?  Facebook or Twitter or anything like
24 that?
25   A.  No.

Page 71

1    Q.  Give me one second, let me go through my
2  notes, I think we're just about done.
3           (Pause in the proceedings.)
4    THE WITNESS:  I don't think I've ever had a lunch
5  break this long.
6    Q.  (BY MR. WILLIAMS)  Are you on a lunch break?
7    A.  That's what I called it.
8    Q.  Okay.  Your employment with Ridley's -- just
9  one second.  Okay.  Let me -- sorry.  Let me show you a
10 document.  Are we up to Exhibit 4?
11        Amanda, do you know if we're on Exhibit 4?
12 Jared, let me show you a document marked as Exhibit 4
13 to your deposition.
14   THE REPORTER:  I'll search the . . .
15   THE WITNESS:  I can't hear anything you're saying,
16 Amanda.
17   THE REPORTER:  Oh, sorry.  I was saying I have to
18 look in the document if you want to give me a minute,
19 but I think we've done 4.  I think we're on 5.
20   MR. WILLIAMS:  Okay.
21   THE REPORTER:  Let me just -- let me just do a
22 real quick search here and see; okay?
23   MR. WILLIAMS:  Okay.  Thank you.
24   THE REPORTER:  No, it's okay.  Okay.  No, it's --
25 you're right.  It's Exhibit 4.

Page 72

1    MR. WILLIAMS:  Okay.
2           (Exhibit 4 marked.)
3    Q.  (BY MR. WILLIAMS)  Jared, let me show you a
4  document marked as Exhibit 4 to your deposition.  This
5  shows down here, it says a demotion and transfer from
6  ASD, I assume that's Assistant Store Director, to
7  something clerk.
8    A.  It looks like GM Clerk.
9    Q.  Is that -- what is GM Clerk?  What does that
10 mean to you?
11   A.  It's like the, uh, it's like the non-grocery
12 stuff.  Toothpaste, shampoo, hygiene stuff.
13   Q.  Gotcha, okay.  Effective 9-2 of '18.
14   A.  Yes.
15   Q.  Tell me what led to this change in status.
16   A.  I was transitioning to a different job
17 outside of Ridley's and they were super short staffed
18 and so I agreed to -- to stay on and help in that
19 department.  You know, once or twice a week I'd come in
20 and stock their -- stock that particular product.
21   Q.  Okay.  What store was that?
22   A.  The Orem store.
23   Q.  Okay.  And according to my records -- well,
24 let me show you.  One second.
25           (Pause in the proceedings.)

Page 73

1    MR. WILLIAMS:  Okay.  Let me show you a document
2  that we'll mark as Exhibit 5 to your deposition.
3           (Exhibit 5 marked.)
4    Q.  (BY MR. WILLIAMS)  This is your payroll report
5  starting with the pay period ending on September 3rd of
6  2016 and going through pay period ending October 13th
7  of 2018.  So with your transfer to this store the
8  beginning of September of 2018 it looks like you only
9  worked maybe another month.  Is that -- is that fair?
10   A.  Yeah.  After I took the demotion?
11   Q.  Yeah.
12   A.  Yeah.  I had started working for another
13 company already and I was coming in part-time.
14   Q.  Okay.  What -- what job did you take after
15 Ridley's?
16   A.  As -- it was doing stuff with bread, with
17 delivering bread.
18   Q.  Delivering bread?
19   A.  Yeah.
20   Q.  Who was that for?
21   A.  United States Bakery.
22   Q.  United States Bakery?  Would you deliver to
23 grocery stores or what?
24   A.  Yes.
25   Q.  Okay.  How long did you work there?

Page 74

1   A.  Oh, a couple years.
2   Q.  How did you come to get that job?
3   A.  Aaron Watson.
4   Q.  Who is Aaron Watson?
5   A.  He was named as one of my bosses -- or
6   someone I worked with in Ridley's.  He was working at
7   that company, so was Don, one of the original store
8   directors with Ryan Rasmussen.
9   Q.  Right.
10  A.  They worked there and they'd come into the
11  store one time and saw that I was in Orem and they're
12  like dude, you're still here, and we got to talking.
13  They told me to apply, they had a sales position open,
14  sales delivery kind of guy, so I did.
15  Q.  I didn't ask you this at the beginning.
16  Where do you currently live?
17  A.  You did ask me.
18  Q.  Oh, did I?  Did I get an address?
19  A.  No.  I told you Springville.
20  Q.  Springville.  What's your current address?
21  A.  1007 West 1500 South.  Is it important to
22  have my address?
23  Q.  Just making a complete record.
24  A.  Oh.  All right.
25  Q.  Okay.  I don't think I have any other

Page 75

1   questions.
2       MR. SHORT:  We will reserve our questions for
3   trial.
4       MR. WILLIAMS:  Fair enough.
5       (The proceedings ended at 3:10 p.m.)
6                   - - -

Page 76

1   STATE OF UTAH      )
                       ) ss.
2   COUNTY OF SALT LAKE )
3              REPORTER'S CERTIFICATE
4       I, Amanda Richards, certified shorthand reporter
5   for the State of Utah, certify:
6       That the deposition of the witness herein was
7   taken before me at the time and place herein set forth,
8   at which time the witness was by me duly sworn to
9   testify the truth; that the testimony of the witness
10  and all objections made and all proceedings had of
11  record at the time of the examination were
12  stenographically reported and transcribed by me.
13      That the foregoing transcript, as transcribed by
14  me, is a full, true and correct record of my
15  stenographic notes so taken; that review of the
16  transcript by the witness was not requested pursuant to
17  Rule 30(e) of the Utah Rules of Civil Procedure.
18      I further certify that I am neither counsel for
19  nor related to any party to said action, nor in anywise
20  interested in the outcome thereof.
21      IN WITNESS WHEREOF, I have subscribed my name
22  below this 22nd day of February 2023.
23              *Amanda Richards*
24
                Amanda Richards, CSR
25