```
                                                                    Page 1
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF COLORADO

 3

 4   JONATHAN ESPARSEN, individually)
     and on behalf of all others   )   CERTIFIED COPY
 5   similarly situated,           )
                                   )
 6                  Plaintiffs,    )
                                   )
 7            v.                   )   No. 1:18-cv-01556-RM-GPG
                                   )
 8   RIDLEY'S FAMILY MARKETS, INC., )
                                   )
 9                  Defendant.     )
     _____)
10

11

12        VIDEOTAPED DEPOSITION OF KRESTINA COOMBS

13                  Salt Lake City, Utah

14             Wednesday, January 19, 2022

15

16

17

18

19

20

21

22

23

24

25     Reported by:   Daren S. Bloxham, RPR No. 000335
```

Page 2

```
1            Deposition of Krestina Coombs, taken at Snell &
2    Wilmer, located at 15 W. South Temple, Ste. 1200, Salt
3    Lake City, Utah, on January 19, 2022, at 1:00 p.m.,
4    before Daren S. Bloxham, Certified Court Reporter, in and
5    for the State of Utah.
6
7                  A P P E A R A N C E S
8    FOR THE PLAINTIFF:
9        April Rheaume, Esq.
         SANFORD LAW FIRM
10       10800 Financial Centre Parkway
         Kirkpatrick Plaza, Suite 510
11       Little Rock, Arkansas 72211
         800-615-4946
12       april@sanfordlawfirm.com
13
14   FOR THE DEFENDANTS:
15       David P. Williams
         SNELL & WILMER
16       15 W. South Temple, Ste. 1200
         Salt Lake City, Utah 84101
17       801.257.1900
         dawilliams@swlaw.com
18
19   ALSO PRESENT:  Lance Harrison (videographer)
20
21
22
23
24
25
```

Page 3

```
1                   I N D E X
2    WITNESS: Krestina Coombs
3    EXAMINATION                                       PAGE
4        By: Mr. Williams                                 4
5
6
7                E X H I B I T S
8    NUMBER          DESCRIPTION                        PAGE
9    EXHIBIT 1  Consent to Join Collective Action         6
10   EXHIBIT 2  Performance Evaluation of Krestina Allen  28
11   EXHIBIT 3  1/10/17 Payroll Status Change            31
12   EXHIBIT 4  10/29/17 Payroll Status Change           68
13   EXHIBIT 5  8/10/18 Job Offer                        70
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1                   P-R-O-C-E-E-D-I-N-G-S
2                         --oOo--
3            THE VIDEOGRAPHER:  We're on record.  My name is
4    Lance Harrison.  I'm the videographer.  The court
5    reporter is Daren Bloxham.  We represent JD Legal Support
6    located in Lehi, Utah.  The time and date indicated on
7    the video screen is 1:00, January 19, year 2022.
8            This is the case of Jonathan Esparsen,
9    individually and on behalf of all others similarly
10   situated, v. Ridley's Family Markets, Inc., Civil Action
11   No. 1:18-cv-01556-RM-GPG in the United States District
12   Court for the District of Colorado.
13           Counsel will now introduce themselves, and the
14   court reporter will swear in the witness.
15           MS. RHEAUME:  This is April Rheaume for the
16   plaintiff, Esparsen and the collective.
17           MR. WILLIAMS:  And David Williams on behalf of
18   Ridley's Family Markets, Inc.
19                         --oOo--
20                  KRESTINA COOMBS,
21   having been first duly sworn to tell the
22   truth, was examined and testified as follows:
23                     EXAMINATION
24   BY MR. WILLIAMS:
25       Q.   Can you please state your full name for the
```

Page 5

```
1    record.
2        A.   Krestina Coombs.
3        Q.   Can I call you Krestina?
4        A.   Yeah.
5        Q.   Whatever you prefer?
6        A.   Most people call me Kristina because they don't
7    know how to say it, but you're fine to say it correctly.
8        Q.   Okay.  Fair enough.  Krestina, what is your
9    current address?
10       A.   11 North Main, Millville, Utah 84321.
11       Q.   Do you understand that you're under oath today?
12       A.   Uh-huh (affirmative).
13       Q.   And you're represented by Ms. Rheaume as your
14   counsel; is that correct?
15       A.   Yes.
16       Q.   Okay.  Any reason why you can't give truthful
17   answers to my questions today?
18       A.   No.
19       Q.   What did you do to prepare for this deposition?
20       A.   Nothing.
21       Q.   Did you meet with counsel?
22       A.   I talked to -- I talked to her yesterday -- two
23   days ago.
24       Q.   Okay.  Other than your discussions with
25   counsel, have you done anything else?
```

JONATHAN ESPARSEN vs RIDLEY'S FAMILY MARKETS
KRESTINA COOMBS on 01/19/2022                                    Pages 6..9

Page 6

1   A.   No.

2   Q.   Haven't reviewed any documentation?

3   A.   No.

4   Q.   Okay.

5        (Exhibit 1 marked.)

6   Q.   (By Mr. Williams) I've handed you what has been

7   marked as Exhibit 1 to your deposition.  Is that your

8   signature on this document?

9   A.   Yes.

10  Q.   And for the record, would you read what this

11  document is?

12  A.   "Consent" --

13  Q.   Under -- there you go.

14  A.   Right?  You just want me to read that?

15  "Consent to Join Collective Action."

16  Q.   Okay.  This is the document that you signed to

17  become part of this lawsuit?

18  A.   Uh-huh (affirmative).

19  Q.   Okay.

20  A.   Yes.

21  Q.   Before you -- before you signed this document,

22  had you ever heard about this case?

23  A.   No.

24  Q.   Before you signed this document, you never

25  considered that you were treated unfairly by Ridley's,

Page 7

1   did you?

2   A.   Yes.  But --

3   Q.   You did?

4   A.   -- I wasn't going to do anything about it,

5   myself personally.

6   Q.   Tell me -- tell me what you felt.

7   A.   I just -- the hours they worked me, what I had

8   to do for them, how they ran the store practically.

9   Q.   Okay.  You never complained to anyone, did you?

10  A.   Well, yeah.

11  Q.   Who did you complain to?

12  A.   Anybody who would listen.

13  Q.   Anyone in particular?

14  A.   Friends.  I mean, we became a family there, so

15  I complained to whoever was nearest me or we were talking

16  in the back room.

17  Q.   Okay.  Did you ever complain to anybody -- any

18  member of management?

19  A.   To Clint, I did.

20  Q.   And who is Clint?

21  A.   I don't even remember his position at the time.

22  He was --

23  Q.   Was he your store director?

24  A.   No.  No.  So like they had them separated, like

25  Ramiz had some, Clint had some, and I cannot remember the

Page 8

1   other guy's name.  And so like Clint was over the stores

2   like in Utah, somebody was over Colorado and Wyoming, and

3   someone was over Idaho or something like that.

4   Q.   And do you remember any specific complaints to

5   Clint --

6   A.   No.

7   Q.   -- other than just general complaints?

8   A.   General complaints.

9   Q.   Okay.  How frequently would you make those

10  complaints?

11  A.   Whenever he showed up at the store.  I mean,

12  it's just offhanded stuff.  It was just the hours that I

13  would have to work.

14  Q.   Didn't like the long hours?

15  A.   The -- how we didn't have a bakery manager at

16  the time.  We lost -- we didn't have a grocery manager,

17  so it was just -- well, at the time I was store director,

18  and I had an assistant.  And that was it.

19  Q.   Okay.  So the complaints you made to Clint were

20  while you were acting as store director?

21  A.   Yes.  Because if I had any other complaints

22  when I was assistant, it would be to the other store

23  directors.  And one -- I don't know if he got fired

24  because I don't know what happened, but that's how I

25  became store director.  And the other one was a -- I

Page 9

1   didn't like him, so I would never complain to him.

2   Q.   What complaints would you make as an assistant

3   store director to your store director?

4   A.   Just always the -- always having to be there,

5   having to come in.  They -- the roof at one point had

6   pretty much fell in.  We have to work while customers

7   were in the store.  Just stupid stuff.

8   Q.   Did he know about the -- the roof that had

9   fallen in before you told him?

10  A.   Who?

11  Q.   Your store director.

12  A.   He had to come and help because I told

13  everybody to leave the store because the water had went

14  clear up to the front.  And he came in because he was on

15  the phone with Mark because Mark was upset I told

16  everybody to leave.

17  Q.   Okay.  So you told all the employees to leave

18  why?

19  A.   Not the employees.

20  Q.   Who?

21  A.   The patrons.

22  Q.   The patrons.  Okay.  Why did you tell the

23  patrons to leave?

24  A.   Because all of the rest of us were back there

25  trying to clean up the mess.

Page 10

1    Q.   Did you direct any employees to leave or be
2 careful around the --
3    A.   No.
4    Q.   -- the incident?
5    A.   Well, yeah.
6    Q.   Okay.  Who -- who directed the cleanup efforts?
7    A.   Me.  And then when Dan came, he was my store
8 director at the time, he came and helped, and then he
9 took over.
10   Q.   So you and Dan directed the cleanup efforts of
11 that?
12   A.   Uh-huh (affirmative).
13   Q.   When was that?
14   A.   Four years ago, five years ago.  No, because
15 this has been three years now, so -- if I had to guess,
16 it was probably about eight years ago maybe, if you're
17 including from now until when it happened.  I'm not --
18   Q.   It was during the time that you were assistant
19 director?
20   A.   Correct.
21   Q.   Any other specific complaints that you
22 remember?
23   A.   Not specific.
24   Q.   Okay.  What made you decide to be part of this
25 litigation?

Page 11

1    A.   Because if it was true that they were not
2 paying us the way they were supposed to and I was working
3 all those hours and having somebody else raise my kids,
4 then they should pay for it.  They should be accountable
5 for what they've done.  We as an assistant or anything in
6 management, you would think they would know the laws.  So
7 you went with it.
8    Q.   Prior to this litigation, did you ever consider
9 that you were unfairly paid?
10   A.   Well, yeah.  Who isn't?  But not specifically
11 as far as -- I didn't know the law as far as what
12 overtime was or not.
13   Q.   Okay.  Other than general feelings like
14 everyone gets that we're unfairly paid, we should be paid
15 more --
16   A.   Well --
17   Q.   -- did you voice any complaints?
18   A.   What do you mean, like as far as not having a
19 bakery manager and couldn't find one and had to run a
20 bakery?
21   Q.   Any complaints about your pay.
22   A.   No.  The -- I mean, no.  Just that the --
23 the -- no.
24   Q.   What is your ideal outcome?
25   A.   They be held accountable if they're in the

Page 12

1 wrong.
2    Q.   And for you, what does that mean?
3    A.   That maybe that the people who are left there
4 still to work are treated fairly.
5    Q.   Okay.  Do you have an amount in mind that you
6 are seeking?
7    A.   No.  I -- wouldn't even know how to calculate
8 that.  It's probably whatever the law would probably
9 allow me to have, but I'm not here for that reason alone.
10 I would like to see them -- the people left there --
11 because I still have friends there and have them
12 treated -- treated the way they should be for the work
13 that they do there.
14   Q.   Okay.  Let's get some background information.
15 Let's talk about your education.  Did you graduate from
16 high school?
17   A.   Yes.
18   Q.   Okay.  What high school?
19   A.   Ogden High.
20   Q.   Okay.  Post-high school education, if any?
21   A.   I went to Stevens-Henagar, I think, and did
22 a -- nine months or a year for data entry.
23   Q.   For data entry?
24   A.   Uh-huh (affirmative).
25   Q.   Any other vocational-type education?

Page 13

1    A.   No.  Unh-uh (negative).
2    Q.   Any certifications that you've -- that you've
3 received?
4    A.   No.
5    Q.   Okay.  Any management courses that you've
6 taken?
7    A.   Nope.
8    Q.   When were you first employed by Ridley's?
9    A.   So when I left, I was almost hitting 12 years.
10 And I've been gone for almost three, so...
11   Q.   Okay.  According to my records --
12   A.   2008, 2007?
13   Q.   According to my records, you were hired as a
14 deli clerk --
15   A.   Yep.
16   Q.   -- in July --
17   A.   Yes.
18   Q.   -- of '08; is that correct?
19   A.   Yes.
20   Q.   Okay.  What year did you graduate from high
21 school?
22   A.   '89.
23   Q.   Okay.  So let's start at your -- that's a big
24 gap.  So we're going to go backwards from -- from your
25 first hire at -- at Ridley's.  What was your job before

Page 14

1  Ridley's?
2     A.   Actually, I worked two jobs when I was working
3  for Ridley's.  I worked from home.  I was data entry for
4  Thrive.  They did -- I worked from home, and they did
5  billing for health clubs.  So I was in data entry.
6     Q.   And when did you work?  What years did you work
7  for Thrive?
8     A.   I worked there 11 years.  And let's see, I had
9  my middle son there, so 20-something years ago.  So I
10  worked 11 years before I came to Ridley's, but I was
11  working there and at Ridley's at the same time.
12     Q.   Okay.  Fair enough.
13          How -- when -- I assume you're not working for
14  Thrive anymore?
15     A.   No.  No.
16     Q.   When did you terminate your employment with
17  Thrive?
18     A.   When I moved from deli manager to night
19  manager.  Closing manager is what they called it.  And
20  that was probably a year maybe after I started Ridley's.
21     Q.   So --
22     A.   I don't know.
23     Q.   '09, '10?
24     A.   Yeah.
25     Q.   2010 period?

Page 15

1     A.   Yeah.  I mean --
2     Q.   Approximately?
3     A.   Approximately.
4     Q.   I'm not going to hold you to exact dates.
5     A.   Yeah, because I -- I mean, when I started
6  working more for Ridley's, then I had quit that home job.
7  So...
8     Q.   And data entry, you were entering data for
9  health clubs, spas?
10     A.   Uh-huh (affirmative).  From their contract,
11  yes.
12     Q.   Okay.
13     A.   Receiving correspondence.  If they wrote a
14  letter, I would have to put it in there and alert
15  somebody that they can call or whatever.
16     Q.   Okay.  What was your title?
17     A.   Data entry I would assume.  I don't really
18  remember.
19     Q.   Worked part-time?
20     A.   Full-time.
21     Q.   Full-time.  How many hours per week?
22     A.   Well, 30 to 40.
23     Q.   30 to 40?
24     A.   You worked from home, so I just worked wherever
25  I got a chance.  I mean, I had three kids, so...

Page 16

1     Q.   Okay.  Did you work full-time while you were
2  working at Ridley's as well, full-time for Thrive?
3     A.   Well, the closing one -- the closing manager
4  started at 5, but that wasn't -- I mean, I didn't work
5  every day as a closer.
6     Q.   And my question is about Thrive.  Did you
7  continue to work full-time at Thrive while you worked at
8  Ridley's?
9     A.   I started -- I started working less and less
10  because I was working more at Ridley's.
11     Q.   And at some point you decided it was no longer
12  good?
13     A.   Yeah.  I just didn't want to work from home
14  anymore.
15     Q.   Okay.  Did you have any management
16  responsibility at Thrive?
17     A.   No.  I worked from home by myself.
18     Q.   Prior to Thrive, where did you work?
19     A.   I think it was GS Foundries.  Yeah, it was
20  GS -- GSF Foundries or something like that.  It's in
21  Ogden.  They make steel airplane parts.
22     Q.   And what did you do for GF Foundries?
23     A.   Shipping.  When the part was done, it was my
24  responsibility to get all the paperwork together and get
25  the parts shipped.

Page 17

1     Q.   Okay.  Any management authority there?
2     A.   No.
3     Q.   Any jobs before Ridley's that you've had a
4  management-type title or authority?
5     A.   Nope.
6     Q.   So let's talk about Ridley's.  The first
7  position was deli clerk?
8     A.   Uh-huh (affirmative).  Yes.
9     Q.   How did you learn about the deli clerk
10  position?
11     A.   I was looking for a part-time job.  I was
12  having -- my relationship with my ex-husband was not
13  wonderful, so I was trying to earn more money.  I think I
14  saw it in the paper or somebody told me.  I don't even
15  recall how I found out.
16     Q.   You don't know whether somebody told you or not
17  possibly?
18     A.   No, because I didn't know anybody who would --
19  who worked at Ridley's.  So I would assume I seen it in
20  the paper, or maybe it was on the -- on the store -- the
21  store door.  I don't know.
22     Q.   Did you shop at Ridley's at the time?
23     A.   Yes.
24     Q.   And did you submit an application?  How did you
25  come to be employed?

JONATHAN ESPARSEN vs RIDLEY'S FAMILY MARKETS
KRESTINA COOMBS on 01/19/2022

Pages 18..21

---

Page 18

1     A.   I went in.  They were having a store meeting --
2  an employee meeting thing that they do.  I don't know if
3  they still do or not.  I went and talked to Dee, who was
4  the manager at -- the deli manager and said, I'm looking
5  for a job.  And I don't think I did an application, but I
6  could have.
7     Q.   But you know you at least spoke to Dee?
8     A.   Yeah.
9     Q.   Dee was the deli manager?
10     A.   Yes.
11     Q.   And what did Dee tell you?
12     A.   She -- I think she told me the hours.  She went
13  and talked to somebody, and I came in to work.
14     Q.   Okay.  Who told you that you had the job?
15     A.   I would believe it would be either Paul, or Dee.  I
16  because he was the store director at the time, or Dee.  I
17  don't recall which one.
18     Q.   Paul or Dee.  Okay.
19          Did you have any interactions with the
20  assistant manager?
21     A.   No.  Oh, no.  That's Gaylene that was at the
22  time.  I didn't know her though, but...
23     Q.   When did you first meet Gaylene?
24     A.   When -- I think they approached me pretty much
25  for the closing manager because the closing manager at

Page 19

1  the time was pregnant, was having a kid.
2     Q.   So you worked for some time as a deli clerk and
3  never interacted with the assistant manager?
4     A.   Well, I mean, I would assume I did, but I don't
5  recall like --
6     Q.   Okay.
7     A.   -- every day to day talks to her.
8     Q.   And the deli manager, I assume the deli manager
9  directed your work as the deli clerk?
10     A.   Yes.  She's the one who told me what to do,
11  yes.
12     Q.   Okay.  Did you interview with anyone to get the
13  job?
14     A.   Just Dee.
15     Q.   Just Dee?  Was it an informal interview?  Did
16  she take you to an office?  Describe that.
17     A.   I believe we just did it in the deli area.  I
18  don't really recall going anywhere to do it.
19     Q.   Do you know how long it took?
20     A.   5-10 minutes.  It wasn't very long.
21     Q.   How long between the interview and receiving
22  notice that you got the job?
23     A.   I think it was that day.  It might have been
24  the next day.  I don't recall.
25     Q.   Okay.  Do you remember what you were paid as a

Page 20

1  deli clerk?
2     A.   No.
3     Q.   Were you paid on an hourly basis?
4     A.   Yes.
5     Q.   Why were you interested in that position?
6     A.   In the deli?
7     Q.   Yeah.
8     A.   Because I wanted to get out of the house.  I
9  worked from home for 11 years.
10     Q.   You were ready to get into the workplace?
11     A.   Yeah.  My kids were getting older and just
12  wanted a change, I guess.  I don't know.
13     Q.   Were there any other jobs at Ridley's at the
14  time that you considered?
15     A.   Don't even recall.
16     Q.   What training did you receive for your
17  position?
18     A.   She told me what to do, and I did it.  There
19  was no training.  I mean, I'd go in, watch her, and told
20  me what needed to be done, how it needed to be done, and
21  I did it.
22     Q.   I assume working around some dangerous
23  equipment, deli slicers and --
24     A.   Right.
25     Q.   -- other equipment?  I assume they taught you

Page 21

1  how to use that?
2     A.   Well, yeah.  That's part of making a sandwich
3  is the deli -- the meat slicer.
4     Q.   Okay.  I assume they taught you how to use the
5  scale and ring up purchases?
6     A.   It -- they didn't have a -- they didn't have a
7  till up there in the deli.  I didn't ring nothing up.  I
8  knew how to weigh it, get a price, get a sticker, and put
9  it on.
10     Q.   And Dee taught you how to do that?
11     A.   Uh-huh (affirmative).
12     Q.   Okay.  And other than just day-to-day
13  interactions like with other employees, you didn't have
14  any direct interactions with the assistant manager at the
15  time?
16     A.   Well, the assistant manager, I don't -- didn't
17  really have much interaction with her until I became a
18  closing night manager.
19     Q.   Okay.  When did you become a closing night
20  manager?
21     A.   Probably six months to a year after I was a
22  deli clerk.
23     Q.   Okay.  Was that a title separate -- a job
24  separate from deli clerk, or did you continue to be a
25  deli clerk plus closing?

JONATHAN ESPARSEN vs RIDLEY'S FAMILY MARKETS
KRESTINA COOMBS on 01/19/2022                                    Pages 22..25

Page 22

1   A.   No, I just went to closing.
2   Q.   Okay.  What was your title then?
3   A.   What -- what was it?  Closing manager.
4   Q.   Closing manager?
5   A.   Yeah.
6   Q.   Okay.  Was that a promotion?
7   A.   Yeah.
8   Q.   Okay.  Did you get a bump in pay?
9   A.   I believe I did.
10  Q.   Still paid hourly?
11  A.   Yes.
12  Q.   Okay.  Describe your interactions with the
13  assistant manager as the closing manager.
14       A.   She was usually the one that was there when I
15  had to leave, and she would tell me what was going on or
16  what tills needed to be done or stuff like that.
17       Q.   Okay.  So the assistant manager would direct
18  you as far as your work was concerned --
19  A.   Right.
20  Q.   -- as the closing manager?
21  A.   Right.  She would tell me what needed to be
22  done on the floor or in the back.
23       Q.   Is that -- is that consistent with your
24  interactions with any other assistant managers?
25       A.   Let's see.  When -- I don't even remember who

Page 23

1   came after Gaylene.  But, yes, there's -- I -- I caught
2   on quick, so I knew what had to go on.  But it was
3   usually -- it was usually the assistant that I would see
4   the most of.
5   Q.   Why is that?
6   A.   Because usually the store director is out
7   making displays or doing other things.
8   Q.   Okay.  And you were paid hourly as the closing
9   manager?
10  A.   Yes.
11  Q.   What were your duties and responsibilities
12  besides closing?
13       A.   Had to make sure all the checkers were -- tills
14  were done, the safe was counted, make sure -- the
15  customers, make sure everybody left the -- like the deli
16  left.  Make sure the back room was locked.  Make sure all
17  the lights are off.
18            Because we'd have to -- well, all the doors
19  have to be shut.  There was one in hardware that we would
20  have to make sure.  Hardware closed early, so we would
21  have to make sure nobody was back there.  We had to do
22  floor -- go around the -- make sure there was nobody in
23  the store.
24  Q.   Make sure you don't lock somebody in?
25  A.   Yeah.  Check the bathrooms.  The fishing store

Page 24

1   was up at the time, make sure nobody was upstairs.  Just
2   secure the building before we left.
3   Q.   Okay.  What was your next job after closing
4   manager?
5   A.   I believe it was grocery -- grocery manager.
6   Q.   Okay.  When did you become grocery manager?
7   A.   Dan was still there, so --
8   Q.   Does November of '14 seem about right?
9   A.   Yes.
10  Q.   Okay.  That's what I have in my --
11  A.   Okay.  Well, then you -- okay.  Thank you.
12  Because like I said, it -- they -- I went from one after
13  another, and I wouldn't know the dates to be exact.  So
14  thank you for telling me.
15  Q.   Okay.  So how did your -- your -- how did you
16  become grocery manager?
17  A.   Dan asked me if I would want to be one.
18  Q.   Was that considered a promotion over closing
19  manager?
20  A.   Yes.
21  Q.   Okay.  What were your duties and
22  responsibilities as grocery manager?
23       A.   Make sure the shelves are being stocked, make
24  sure the back room's clean, ordering, helping with
25  displays.  A lot of times, though, it's mostly checking,

Page 25

1   getting carts.  Whatever needed to be done in the store
2   was basically what I did.
3   Q.   Okay.  That was an hourly position?
4   A.   No.  I believe that was a salaried position.
5   Q.   You think you were paid salary as a grocery
6   manager?
7   A.   Maybe.
8   Q.   Do you know one way or the other?
9   A.   I believe that's when I went -- I was -- I
10  believe it is.  There was a 50 -- I think that's when I
11  started the 50-60 hours.
12  Q.   Okay.  Do you understand what I mean when I say
13  "center store"?
14  A.   The floor.
15  Q.   Okay.  And it's my understanding that a grocery
16  manager is part of the center store.  Is that -- is that
17  an accurate statement?
18       A.   We're -- working there.  Your job may say
19  grocery manager, but you're not just a grocery manager.
20  You're a checker.  You're a bagger.  You're filling the
21  dairy.  You're stocking shelves.  You're shoveling.  You
22  do everything.  But, yes, that's considered the center
23  store.
24  Q.   Okay.  And -- and to be fair, I mean, as an
25  employee at the store, you're expected to pitch in where

Page 26

1  help is needed?
2      A.   Correct.
3      Q.   From the store director on down?
4      A.   Correct.  Yeah.
5      Q.   If something needs to be done --
6      A.   You did it.
7      Q.   A director may be doing it, an assistant
8  director may be doing it, grocery manager may be doing
9  it, deli manager, whatever needs to be done?
10     A.   Not usually the deli/meat because they have
11  their own areas.
12     Q.   Their own little kingdoms?
13     A.   Right.  But the rest of them, yes, the store
14  was your domain.
15     Q.   Okay.  So besides that as the grocery manager,
16  you are -- you're part of the center store, as opposed to
17  the deli, as opposed to hardware, as opposed to some
18  other discrete department.  Is that -- is that a fair
19  statement?
20     A.   Yes.  I mean -- yes.  That was what you were
21  supposed to be in, but it could be anywhere, but yes.
22     Q.   Okay.  It's also my understanding that the
23  assistant manager kind of directs the center store.  Is
24  that accurate?
25     A.   Again, any -- like I said, I learned quick.  So

Page 27

1  pretty much people would come to me and ask me for
2  directions.
3      Q.   Okay.  Did the assistant manager direct any of
4  your work as grocery manager?
5      A.   They told me stuff that -- on occasion that I
6  would have to do or what they were expected to do.  Then
7  I would have to follow up with them, yes.
8      Q.   Okay.  What other interactions did you have
9  with the assistant manager?
10     A.   Well, I don't know what kind of specific
11  interaction you're looking for, but it was a daily with
12  them to find out what we were doing, we had to do a big
13  display, the check stands were down.  I mean, it was a
14  daily thing with them.
15     Q.   So daily interaction with the assistant
16  managers --
17     A.   Yeah.
18     Q.   -- to figure out what you needed to do to
19  confirm that what you've done was acceptable --
20     A.   Yes.
21     Q.   -- what have you?
22     A.   Uh-huh (affirmative).
23     Q.   Did assistant managers ever participate in your
24  reviews?
25     A.   I'll be honest, I don't think I've ever had a

Page 28

1  review there.
2      Q.   You don't think you've ever had a review?
3      A.   I might have had one with Paul, and I might
4  have had one with Dan.
5           (Exhibit 2 marked.)
6           THE WITNESS: Oh, yeah, these.
7      Q.   (By Mr. Williams) Okay.  I'm going to hand you
8  what's been marked as Exhibit 2 to your deposition.  Can
9  you identify that?
10     A.   Oh, that's Curtis.  Yeah.  Yes.
11     Q.   Okay.  Is that a performance review?
12     A.   Yeah.
13     Q.   How frequently would you get these performance
14  reviews?
15     A.   If you mean -- I mean, I see where he's going
16  with this now.  But it was pretty much I went in there,
17  they already had them circled, I agreed to it or not
18  agreed to it.
19     Q.   Look on the second page.  There's some printed
20  handwriting?
21     A.   Uh-huh (affirmative).
22     Q.   Do you know whose handwriting that is?
23     A.   That's Curtis, I believe.
24     Q.   Is that Curtis?  And what was Curtis's
25  position?

Page 29

1      A.   He was store director at the time, after Paul,
2  I think.
3      Q.   Okay.  And is that your signature under
4  "employee signature"?
5      A.   Yes.
6      Q.   Dated 12/19/11; is that correct?
7      A.   Yes.
8      Q.   Were you the deli clerk at this time?
9      A.   No, I don't think so.
10     Q.   What do you think you were?
11     A.   I would probably believe I was the closing
12  night manager.  With Curtis, I think I was the closing
13  night manager.
14     Q.   Okay.  Closing night manager?
15     A.   Was I?  Oh.
16     Q.   I don't know.  I'm asking you.
17     A.   Sorry.  I believe so.  But like I said, it's --
18  it's been a minute.
19     Q.   Okay.  If you'll look under "Action Plan" on
20  the second page, it says, "Employee discipline - keep all
21  employees busy & on task.  Increase team productivity."
22          Do you know what he's referring to there?
23     A.   Just that night when I was on -- when I was on,
24  he didn't want nobody sitting around on their phones or
25  talking.  I mean, up front, he wanted people to be busy,

JONATHAN ESPARSEN vs RIDLEY'S FAMILY MARKETS
KRESTINA COOMBS on 01/19/2022

Pages 30..33

Page 30

1  stocking gum or doing candy or -- sometimes I would have
2  them rotate stock or face.
3      Q.  And so he's telling you as the grocery manager
4  to keep track of employee discipline, make sure
5  everybody's busy and doing what needs to be done?
6      A.  Correct.
7      MS. RHEAUME:  Can we go back?  Because you said
8  "grocery manager," but I thought we just agreed this was
9  closing?
10         THE WITNESS:  Oh, yeah.
11     MR. WILLIAMS:  Sorry.  Closing manager.
12         THE WITNESS:  Sorry.  Yeah.
13     MR. WILLIAMS:  Thank you.
14     Q.  (By Mr. Williams) So -- and let me restate the
15 question then.
16         So he is telling you as the closing manager
17 that you were to keep the employees that you were working
18 with busy, make sure there are staying on task, not
19 wasting their time, what have you?
20     A.  Right.
21     Q.  Is that fair?
22     A.  Correct.  Uh-huh (affirmative).
23     Q.  Okay.  After grocery manager, what was your
24 next position at Ridley's?
25     A.  Assistant.

Page 31

1      Q.  Assistant.  Okay.  How did you come to be
2  employed as the assistant manager?
3      A.  Again, I believe it was Dan again because I
4  was -- I had started to work a second job again for
5  Associated Foods and there, and I couldn't keep working
6  the -- going down to North Ogden and then working there.
7  So the assistant came up, and he asked me if I wanted to
8  be assistant.
9      Q.  Okay.  The current assistant manager asked you
10 if you wanted to be assistant?
11     A.  No, store director.
12     Q.  Oh, the store director.  Okay.
13     A.  The assistant was leaving, I think.
14     Q.  The assistant was leaving.
15         (Exhibit 3 marked.)
16         THE WITNESS:  At least I got Dan right.
17     Q.  (By Mr. Williams) Hand you a document marked
18 Exhibit 3.  This is a "Payroll Status Change for
19 employee, Krestina Allen," effective date of 1/10 of
20 2016.  Did I read that correctly?
21     A.  Yes.
22     Q.  And from looking at this document, it looks
23 like you were being promoted from grocery manager to
24 assistant manager.  Is that accurate?
25     A.  Yes.

Page 32

1      Q.  And the effective date of June 10 --
2  January 10th, 2016, is that the date you became assistant
3  manager?
4      A.  The effective -- down here he signed on the
5  15th, but yes, on the 16th.
6      Q.  Okay.  So Dan asked you if you wanted to be an
7  assistant manager?
8      A.  Correct.
9      Q.  Do you know when that was?
10     A.  I would assume before this, but --
11     Q.  Sometime shortly before that?
12     A.  Correct.
13     Q.  Was it on a telephone call, in person?
14     A.  In person.
15     Q.  At the store?
16     A.  Yes.
17     Q.  And what did Dan tell you about the position?
18     A.  Well, pretty much doing -- most of it with
19 being the grocery manager, but it's the same thing.  They
20 say they have different titles and different job, but you
21 pretty much did the same thing.
22         Only as an assistant, I had to work more with
23 like people's times, make sure their times were put in or
24 their -- at the time it wasn't the finger thing, it
25 was -- I can't remember how we clocked in back then.

Page 33

1      Q.  But regardless of how it was --
2      A.  But it pretty much was the same thing, only the
3  title came with it.
4      Q.  Okay.  So --
5      A.  So it was still running around, still taking
6  care of ordering.  If somebody like in receiving wasn't
7  there, I would have to run back and do receiving.  Still
8  shoveling snow.
9      Q.  Okay.  Like all employees did?
10     A.  Right.
11     Q.  Okay.  Ordering?
12     A.  Ordering.
13     Q.  Okay.  Tell me about that.
14     A.  Well, every -- I think we did it -- there was
15 three days a week, Monday, Wednesday, and Friday, I
16 think.  So the day before, you have to order.  You had to
17 have it done by 11:00, I think.
18     Q.  Okay.
19     A.  I can't remember the time that you'd have to
20 have it done.  If there -- if we had holidays, you'd have
21 to make sure your -- the holiday stuff was ordered extra.
22 But you'd just look on a shelf, and if it was empty, you
23 ordered it, or if you didn't know it was in the back
24 room, you order it.  If you had it in the back room, then
25 you wouldn't order it.

Page 34

1    Q.   Okay.  That was one of the duties and
2  responsibilities of a grocery manager and an assistant
3  manager, they both did that?
4    A.   Whoever was available, yes, to do it.
5    Q.   Okay.  That was considered a promotion, was it
6  not?
7    A.   Yes.
8    Q.   Okay.  Was it more money?
9    A.   Yes.
10    Q.   Similar responsibilities with the addition of
11  maybe a couple more.  Is that fair?
12    A.   Yeah, pretty much.
13    Q.   What were you told about pay and hours?
14    A.   Well, I already kind of figured out they would
15  be long hours.
16    Q.   Okay.  Because you had been working there, you
17  had worked with assistant managers, you knew what they
18  did?
19    A.   Correct.
20    Q.   Okay.  You thought that would be a good -- a
21  good jump in your career?
22    A.   I didn't have a career, but it would feed my
23  kids, yes.
24    Q.   Okay.  And who was your direct supervisor as
25  assistant store manager?

Page 35

1    A.   I believe it was Dan -- Dan is the one who
2  hired me as the assistant, so it was first Dan.
3    Q.   Dan, the store director?
4    A.   Yes.
5    Q.   Okay.  What additional training did you get as
6  an assistant store manager?
7    A.   None.
8    Q.   You already knew what to do?
9    A.   I already knew what to do, yes.
10    Q.   Okay.  Describe your pay as an assistant store
11  manager.
12    A.   If you're asking me the amount, I do not recall
13  that.
14    Q.   Okay.  Other than the amounts, how were you
15  paid?  How were you compensated?
16    A.   What do you mean?
17    Q.   Was it a base salary?  Did you get anything in
18  addition?
19    A.   Nothing in addition, no.
20    Q.   Okay.  You got a salary?
21    A.   Right.
22    Q.   Okay.  Any bonuses?
23    A.   If Dan -- if the store met the bonus criteria,
24  which I don't even -- I don't even know what or how that
25  bonus came about, but I think we got bonuses if all the

Page 36

1  departments met their bonus and overtime for the center
2  store.  I was never really in the know of that.  Dan knew
3  how to make sure our numbers were up.
4    Q.   Just applying the bonus program that Ridley's
5  had established.  Is that fair?
6    A.   Yes.  I think it was different at the time, but
7  it may not have been.  I think they changed it when
8  they -- I can't remember.
9    Q.   Do you remember ever asking anyone about the
10  bonus program?
11    A.   No.
12    Q.   You just worked, put your time in, got paid.
13  And if there was a bonus in it, great?
14    A.   Correct.
15    Q.   Okay.  Were you eligible for benefits?  Did you
16  participate in any benefits?
17    A.   I --
18    Q.   Health insurance, 401K, anything like that?
19    A.   I don't remember if I did insurance through
20  them.  I -- I don't remember.  I may have done insurance
21  through them.  I don't remember.
22    Q.   Okay.  One way or the other, you don't
23  remember?
24    A.   No.
25    Q.   Okay.  Do you know what I mean when I say

Page 37

1  classified as exempt under the Fair Labor Standards Act?
2    A.   No.
3    Q.   Don't understand what that means?
4    A.   No.  What do you mean?
5    Q.   I'm simply asking you the law has different
6  classifications, and one is exempt and one is non-exempt.
7  I'm wondering if anybody ever told you that you were
8  going to be classified as an exempt employee?
9    A.   No.
10    Q.   Okay.  They did tell you that you would be paid
11  on a salary; is that correct?
12    A.   Yes.
13    Q.   Regardless of how many hours that you worked?
14    A.   No.  If I took any time off, they would put my
15  vacation in for me.
16    Q.   Okay.  But you still received the same amount
17  of salary?
18    A.   As long as I put my -- they did my -- if I had
19  to leave early one day, he would change my hours and then
20  put my PTO in for me.
21    Q.   And account for that -- for that time away?
22    A.   Correct.
23    Q.   Other than making adjustments for time that you
24  took off early and -- and putting in vacation time, you
25  still received the same amount of salary for the hours

Page 38

1  that you put in each week.  Is that -- is that accurate?
2      A.  Right, if I had PTO.
3      Q.  Okay.
4      A.  But I didn't get paid for extra hours, no,
5  just -- just to my 50 hours if I worked that week, as
6  long as I had PTO.
7      Q.  Okay.  Do you know what your salary was as an
8  assistant manager?
9      A.  I did not.
10     Q.  Let's say, for example, it was a thousand
11 dollars, thousand dollars a week.
12     A.  Okay.
13     Q.  You worked 30 hours plus your PTO, you're still
14 going to make that thousand dollars; is that correct?
15     A.  Right.
16     Q.  Okay.  If you worked 50 hours, you're still
17 going to make that thousand dollars; is that correct?
18     A.  No, because that's 10 more hours than my 40
19 that you just said.
20     Q.  And I'm asking you what your understanding was
21 as an assistant manager as to your pay for that extra
22 time?
23     A.  I was told -- if I was scheduled 50 hours one
24 week, I had to work 50 hours.  And that didn't include
25 times I had to come in at night to take over for checking

Page 39

1  or not.  So I'm not sure what your question is.
2      Q.  My question is your salary stayed the same
3  regardless of the hours that you put in; is that correct?
4      A.  As long as I worked them.
5      Q.  Fair enough.
6      A.  If I didn't work them, then no, but I always
7  worked mine.
8      Q.  Okay.  Did you keep track of your time?
9      A.  No.
10     Q.  You just had a schedule?
11     A.  They showed me a schedule, seen it, and I came
12 in, which when you work five days a week, you pretty much
13 know you're there every day.
14     Q.  Okay.  If -- if you're not keeping track of
15 your time, then how does your store director know if
16 you're leaving three hours early?  Do you just tell them?
17     A.  The only time I would have to leave is if I had
18 to leave to go get a kid or something.
19     Q.  Okay.
20     A.  But there was no -- we didn't write it down, we
21 didn't punch in or nothing.
22     Q.  Okay.  So how would your store director know to
23 apply your vacation time, your PTO?
24     A.  Because he's usually there with -- well,
25 sometimes they were with me, but I guess the honorary

Page 40

1  system.  I don't know.
2      Q.  Okay.  What was your work schedule, if you
3  remember, as assistant store manager?
4      A.  It varied.  I could work Monday, have Tuesday
5  off, work Wednesday, Thursday, Friday, Saturday.  I mean,
6  it would just vary.
7      Q.  Okay.  Who determined your schedule?
8      A.  The store director is the one who usually would
9  write the schedule.
10     Q.  Did you have any say in that?
11     A.  If I had -- have to have a certain day off, he
12 would try to rearrange it so I could.
13     Q.  Okay.
14     A.  But he would put me on a different day.
15     Q.  Okay.  What about hours, did those vary as
16 well, or did you have set schedule?
17     A.  Depends if I opened the store or if I closed
18 or -- when there was two of us, one would have to open
19 and one would stay until 8, I believe, at night.  So it
20 would be the 10 hours before and then...
21     Q.  Okay.  Generally 10-hour days?
22     A.  Yeah.
23     Q.  You would generally work 10-hour days?
24     A.  Yes.  Yes.
25     Q.  Is that correct?

Page 41

1      A.  Yes.  Sorry.
2      Q.  You only worked at the store in Highland; is
3  that correct?
4      A.  Yes.
5      Q.  Okay.  As assistant store manager, did you
6  have -- other than the store itself where you're out
7  working, did you have a personal workspace, an office, a
8  desk?
9      A.  The desk was just for -- just a little
10 cubbyhole.  It was pretty much a closet.
11     Q.  Did you share that desk with anyone?
12     A.  There was a store director.
13     Q.  Okay.  So that was the store director's and the
14 assistant --
15     A.  And the closing manager and the grocery
16 manager.
17     Q.  So that was the manager's desk?
18     A.  Yes.
19     Q.  Okay.  Did you have any -- any locker, any --
20     A.  No.
21     Q.  -- drawers or anything that were used?
22     A.  I think they had lockers upstairs, but I never
23 used them.
24     Q.  Okay.  Any drawers in the desk that you used?
25     A.  No.

JONATHAN ESPARSEN vs RIDLEY'S FAMILY MARKETS
KRESTINA COOMBS on 01/19/2022

Pages 42..45

Page 42

1    Q.   Okay.  What would you do at the desk?
2    A.   Never hardly in there.
3    Q.   But when you were, what did you do?
4    A.   If I was in there when -- if I had to do --
5  like you had to look up what holiday is coming up to
6  see -- like if it's Easter, and a couple months before
7  you can go in there and order things.  What else did I do
8  there?  As closing night manager, you count the money
9  there.
10   Q.   Okay.  Anything -- I want to limit it to your
11 time as an assistant manager.  Anything besides ordering
12 that you would do at the desk?
13   A.   If I was opening the store, I'd count the money
14 there.  If I was on -- I can't remember when they did
15 pay -- the time thing, but in the morning, I would make
16 sure everybody's hours were correct in the system.
17 Looked through emails to see if there was any customer
18 complaints.  That's -- if we had a shoplifter, we would
19 be in there.
20   Q.   If you had a shoplifter?
21   A.   Yeah.
22   Q.   Describe that.  Did that ever happen on your
23 watch as an assistant manager?
24   A.   Yes.
25   Q.   What would you do?

Page 43

1    A.   Call the cops.  I had to go chase one out --
2  well, I didn't chase them.  I went out in the parking lot
3  because she was leaving.  And then there was some kids
4  that had candy and stuff, pop.
5    Q.   And you did that because you were the assistant
6  manager?
7    A.   I seen it, so I would -- it's my duty as an
8  employee to report that type of stuff.
9    Q.   Okay.  Who did you report it to?
10   A.   If I was the only one there, it would be me.  I
11 would make -- make the -- make the call to call the cops
12 or --
13   Q.   Okay.  You say when you were the only one
14 there.  So there were times that you were the only
15 manager on site other than the other department managers?
16   A.   Towards the end of my time there, probably
17 90 percent of the time I was by myself.
18   Q.   90 percent of the time you say?
19   A.   Uh-huh (affirmative).  Because we didn't
20 have -- we didn't have a closing night manager.  She got
21 let go.  At the same time, the store director got let go.
22 So then they came to me, Mark did, said, You're going to
23 have to hold the fort down until we can get a store
24 director.  And then there was the -- we were two
25 assistants at the time.  So the other assistant, it was

Page 44

1  just me and her.
2    Q.   How long -- how long a time as an assistant
3  manager were you in charge as Mark said?
4    A.   Before they gave me the title?
5    Q.   Well, let me back up.  You said Mark said,
6  You're going to be the only one, you're going to be in
7  charge?
8    A.   He didn't say, You're going to be only one in
9  charge.  He says, You're going to have to hold the fort
10 down until --
11   Q.   You're going to have to hold the fort down?
12   A.   -- until I can find a store director.
13   Q.   Okay.  How long did you have to hold the fort
14 down?
15   A.   Probably two months.
16   Q.   Two months.  And during that time, it was you
17 and one other assistant manager?
18   A.   Uh-huh (affirmative).  Yes.
19   Q.   And you would trade off?
20   A.   Yes.
21   Q.   Okay.  And during that time, you were basically
22 managing the store?
23   A.   Yes.
24   Q.   Okay.  You were directing employees?
25   A.   Yes.

Page 45

1    Q.   Taking care of problems that popped up?
2    A.   Yes.
3    Q.   Okay.  Were you doing the scheduling at the
4  time?
5    A.   My assistant manager was more familiar with
6  that, so she kind of tried -- she's the one who kind of
7  helped do that.
8    Q.   Okay.  Were you an assistant manager at this
9  time, or were you a store director at this time?
10   A.   I was an assistant at the time.
11   Q.   Okay.  So the other assistant handled the
12 scheduling?
13   A.   Well, when --
14   Q.   You just -- let me back up.  You just told me
15 that -- I asked if you handled the scheduling, and you
16 said, No, my assistant handled that.
17   A.   Well, we would try to do it together at the
18 same time because we weren't trained how to -- we knew we
19 had to have a checker from 8 to this time, a checker from
20 this time to this time, and we just tried to fill in the
21 places that we could.
22   Q.   Were you in charge of resolving employee
23 complaints during that time?
24   A.   Yes.  Well, I don't remember any specific
25 complaints, but if there was one, they would come to me.

Page 46

1    Q.   Okay.  If there was a disciplinary matter that
2  came up, you would be it, you would have to take care of
3  it?
4    A.   Well, I wouldn't just arbitrarily say, Oh,
5  you're fired.  I couldn't do that, no.  I couldn't say,
6  Oh, you're suspended.  No.
7    Q.   Okay.  Couldn't suspend an employee, couldn't
8  send them home?
9    A.   No.
10   Q.   Okay.  You could call somebody and say, Hey,
11 this person's a problem, they need to -- they need to be
12 disciplined?
13   A.   So if I had a problem with an employee, it
14 would -- I would ask Clint or whoever was over -- Ramiz
15 and talk to them about it, and then obviously they would
16 go to whoever, I would assume Mark.  And then they would
17 come back, and they would handle them.
18   Q.   Okay.
19   A.   Like the store director before me, he was doing
20 something shady.  So I called -- I cannot remember the
21 guy's name.  I wish I could remember his name.  But I
22 called him and told him, and then him and Mark and I
23 think Clint showed all up at one night and let -- and
24 they did whatever they did, but neither one of them came
25 back the next day.

Page 47

1    Q.   Okay.  That was based on a report that you had
2  given them?
3    A.   To -- I cannot remember the guy's name.  Yes, I
4  had called him because I didn't think it was --
5    Q.   Okay.
6    A.   -- it was above -- I think he was doing
7  something he wasn't supposed to be doing.
8    Q.   Okay.  Let's -- I want to create a list of your
9  duties and responsibilities as an assistant manager,
10 things that you did as assistant manager.  So we've --
11 we've talked about ordering?
12   A.   Checking, bagging.
13   Q.   Checking --
14   A.   Packaging meat.
15   Q.   Okay.
16   A.   Organizing the back room, stocking shelves.
17   Q.   All the stuff that needs to be done on a
18 day-to-day basis?
19   A.   Yeah.
20   Q.   Okay.  You are checking emails for customer
21 complaints.  You're making sure time entries are correct.
22 Okay.
23        Did you -- I assume -- I mean, as the grocery
24 manager, center store, you interacted with the assistant
25 manager.  I assume that you, as the assistant manager,

Page 48

1  interacted with the center store employees and directed
2  them.  Is that fair?
3    A.   They would come to me if they needed direction
4  to go as far as like what needed to be filled, what aisle
5  was left off or whatnot, yeah.
6    Q.   Okay.  And you would -- would you walk around
7  and make sure things were getting done?
8    A.   Yes.
9    Q.   And --
10   A.   Well, when I had the time.  But yes, I would
11 try to check their work.
12   Q.   That was part of your -- that was part of your
13 job?
14   A.   Right.
15   Q.   Okay.  If they weren't, if they weren't doing
16 it, you could direct them to do it?
17   A.   Well, yeah, you can.
18   Q.   Okay.  What about discipline, if somebody
19 wasn't performing and they refused, did you have the
20 authority to discipline them?
21   A.   No, not -- I was never told like -- I've never
22 run into the problem but -- to where I would have to say,
23 Oh, you need to take care of this person, other than the
24 store director that was there.
25        And I noticed the closing night -- night

Page 49

1  manager that I took the spot from, she came back, and the
2  dairy manager were doing something weird, but I went to
3  Paul for that.
4    Q.   Okay.  You had authority to give instructions
5  to employees?
6    A.   Yes.
7    Q.   Okay.  You had authority to plan work for the
8  center store employees?
9    A.   Yes.
10   Q.   Okay.  Did you ever train employees?
11   A.   To check?  Yeah.
12   Q.   Okay.
13   A.   How to face, yeah.
14   Q.   Any other training that you would do?
15   A.   Well, if they were new to it, then whatever
16 they were doing, I would help them, like stock the dairy
17 or -- but, yeah, I would show them.  I don't necessarily
18 mean train them, but I would show them what to do and
19 move on.
20   Q.   Sure.  Okay.  Were you ever involved in
21 performance evaluations?
22   A.   If this is what -- if that's the employee
23 evaluation you're talking about, then yes, I have.
24   Q.   You were involved in those as assistant
25 manager?

JONATHAN ESPARSEN vs RIDLEY'S FAMILY MARKETS
KRESTINA COOMBS on 01/19/2022                                          Pages 50..53

Page 50

1    A.   Oh, you mean to give them?
2    Q.   Yeah.
3    A.   Usually the store director would do them.
4    Q.   Okay.  Did you ever provide input to the store
5    director, say, Hey, this was really good --
6    A.   If he would ask me -- he would ask me if he
7    wanted my opinion.
8    Q.   As an assistant store manager, do you remember
9    the director asking your opinion as to employees?
10   A.   Not a specific one, no.  I do not recall.
11   Q.   And that's fair.  But it certainly wouldn't
12   have been unusual if they had?
13   A.   No, it would not have.
14   Q.   Would you agree with that?  Okay.
15   You told me previously that you didn't have
16   authority to terminate employees?
17   A.   No.
18   Q.   Okay.  But you told me about the experience
19   where you reported the conduct --
20   A.   Right.
21   Q.   -- and they didn't show up again?
22   A.   Right.
23   Q.   So we assume they were terminated; is that
24   fair?
25   A.   Right.  I was never told what happened to them.

Page 51

1    Q.   Okay.  Did you ever interview any applicants as
2    assistant manager?
3    A.   Store direct -- well, I guess when the time
4    that I was going from -- when they didn't have a store
5    director, I think I did a checker.
6    Q.   You interviewed a checker?
7    A.   Uh-huh (affirmative).
8    Q.   Was this during that time that Mark told you --
9    A.   I believe so.  I believe so.  But I can't be
10   100 percent, but --
11   Q.   But regardless, you remember interviewing at
12   least one employee, one applicant?
13   A.   Yeah.
14   Q.   Was that applicant eventually hired, do you
15   remember?
16   A.   Yes, I believe so.
17   Q.   And that was a checker, do you think?
18   A.   Yes.
19   Q.   Okay.
20   A.   Yeah.  She was a checker.
21   Q.   Okay.  Beyond interviewing, did you ever make
22   any recommendations to your store director or anybody
23   else about hiring applicants?
24   A.   No, because I wouldn't know -- what do you
25   mean?  Like if somebody came in, I would say, Oh, no, not

Page 52

1    her?  Is that what you're talking about?
2    A.   Sure.
3    A.   No.
4    Q.   Did you ever make recommendations about, Hey,
5    we have a vacancy here, you need to fill this position?
6    A.   Well, they would already know that.
7    Q.   They would already know that?  How would they
8    know that?
9    A.   They were there every day.  They would know if
10   we're missing a checker.
11   Q.   Did anybody ever come to you and say, Hey, we
12   need to hire -- hire an employee for this position?
13   A.   The bakery manager was one of the big ones.
14   Q.   Would come to you?
15   A.   Well, wouldn't come to me, but they're picking up
16   the slack.  We're -- we're sending stuff out to get
17   baked, and we're wrapping stuff, and they're complaining
18   we need a bakery manager.  But I don't know what you mean
19   by -- I didn't have any say in who was going to be the
20   bakery manager.
21   Q.   Okay.  Did you ever report upward to say, Hey,
22   we need this position filled, you need to hire somebody
23   as a bakery manager or in the bakery?
24   A.   Well, Clint already knew we needed one.
25   Q.   Okay.  You don't remember ever telling Clint or

Page 53

1    anybody else that, Hey, you need to hire an employee for
2    this department?
3    A.   No.  I don't understand the whole question
4    because like they would know if we don't have a bakery
5    manager.  So I don't understand --
6    Q.   I'm not trying to be tricky.  Clint's not there
7    on a day-to-day basis, is he?
8    A.   No, but if the -- the bakery manager put her
9    two weeks in, so like I don't understand the question.
10   You mean like what if I showed up one day and the produce
11   manager wasn't there?  Then I would go tell somebody.
12   Q.   No.  I mean if the produce manager comes up to
13   you and says, Hey, we are really short-staffed, can you
14   see about hiring some more help for grocery?
15   A.   No, I couldn't go and say, Okay, I'm going to
16   go hire you five new people, no.
17   Q.   Okay.  But did anybody ever ask you to get the
18   process started that you then reported up to Clint or
19   whoever?
20   A.   I would say something to Clint or whoever was
21   there.  There was Clint, there was Ramiz.  There was a
22   few of them.  One guy's name I cannot remember.
23   Q.   Okay.  Fair enough.  What about setting rates
24   of pay, did you ever have any involvement in that --
25   A.   No.

JONATHAN ESPARSEN vs RIDLEY'S FAMILY MARKETS
KRESTINA COOMBS on 01/19/2022

Pages 54..57

Page 54

1    Q.    -- for employees?
2    A.    No.
3    Q.    Any input from your store director?
4    A.    They had a pay scale.  So if you worked there
5    so many hours, you were entitled to the raise, which I
6    believe they had every -- does it say it on here?  No.
7    There's a pay rate scale that they had.  So if you worked
8    5,000 hours, you could get a 10-cent raise.
9    Q.    Okay.
10   A.    And they did evaluations, and I don't know if
11   they had a schedule on it or not.  But the store
12   directors were supposed to go through them and find out
13   who's met hours or not.
14   Q.    Okay.  You mentioned previously that you
15   participated in verifying time.  Did you ever participate
16   in any of the pay verifications?
17   A.    I had one.  Her name was Jennifer.  And this is
18   when I was in the store director's position.  And I
19   wanted to give her, I think, a 25-cent raise, and Mark
20   vetoed it.
21         He called me, he said, No, that's not --
22   because she was a produce manager.  She hurt herself.  I
23   wanted her to -- because she was helping me so much.  He
24   said -- I think he eventually gave in to it, but I had to
25   plead my case for it.

Page 55

1    Q.    So you pleaded the case to Mark Ridley?
2    A.    Uh-huh (affirmative).
3    Q.    And he was reluctant, but at some point gave
4    in?
5    A.    I think he did.  I'm not 100 percent sure
6    because I never really followed up on it.
7    Q.    Okay.
8    A.    And she never complained to me, so I would
9    assume he did.
10   Q.    Okay.
11   A.    And I don't even know if it was 25 cents, but I
12   wanted to give a certain amount, and he said no.
13   Q.    Fair enough.  And this is while you were an
14   assistant manager but acting as the director; is that
15   correct?
16   A.    Could have been when I became the store
17   director, but it could have been acting.  I don't
18   remember the -- because it was two months probably before
19   Clint came to me and asked -- was it Clint?  No, it
20   wasn't Clint.  It was Ramiz.  He came and said they
21   couldn't find nobody.  Anyways, it was during that time.
22   Q.    We've been going about an hour.  Do you want to
23   take a break?
24   A.    I just need some water.
25         (Recess taken at 2:04, resuming at 2:12.)

Page 56

1    Q.    (By Mr. Williams) Before we took a break, we
2    were talking about duties and responsibilities as an
3    assistant manager, and I want to continue that line.
4         Did you -- you told me that you had some duties
5    and responsibilities with ordering?
6    A.    Yes.
7    Q.    Did you have any input into what items would be
8    ordered or what would be sold or how it would be
9    displayed?  Is that within your duties and
10   responsibilities?
11   A.    Well, if it was Thanksgiving, then yes.  I
12   mean, usually it was standard for holidays.  Like --
13   well, say Thanksgiving, make sure you have enough
14   marshmallows, make sure you have enough yams.
15         You go to departments to make sure they knew
16   Thanksgiving is coming up, to prepare for it.  To order,
17   it would be -- if there was a display up, you want to
18   keep that display filled.
19   Q.    Okay.  Would you actually fill out the purchase
20   orders and send them in, or how did that work?
21   A.    It was done with a gun, like an ordering gun.
22   Q.    An ordering gun?
23   A.    As soon as you hit sent, it sent.
24   Q.    Did anybody review it before you did it?
25   A.    Not that I know of.  Once you send it, you send

Page 57

1    it.  I mean, you get a printout from it.
2    Q.    Sure.
3    A.    From the Associated's website.  But for the
4    most part, no.  I would just send -- I would ask the --
5    whoever, if it was the store director by me or whoever
6    was by me, Do you think you've got enough?  I ordered 10
7    cases.  Yeah, that sounds about right.  Okay.  10 cases
8    it is.
9    Q.    So you would be the one to decide, you know,
10   how much of something that you would need to order?
11   A.    Yeah.
12   Q.    And if you had too much or too little, that
13   fell on your shoulders?
14   A.    Fell on my shoulder, yes.
15   Q.    Okay.  Fair enough.
16         You told me about the incident where the roof
17   caved in.  Did you have any responsibility for employee
18   safety as assistant manager?
19   A.    Well, yeah.
20   Q.    Tell me about that.
21   A.    Just didn't want nothing to fall on them.
22   There was no protocol, if that's what you're asking.
23   There's no protocol.  It was -- the ceiling was falling
24   through.  We were grabbing what we could to catch the
25   water.

JONATHAN ESPARSEN vs RIDLEY'S FAMILY MARKETS
KRESTINA COOMBS on 01/19/2022                                                          Pages 58..61

Page 58

1    Q.   Okay.
2    A.   There was no protocol like, no, you, can't do
3    that, no, you can't mop.  Everybody came hands in with
4    mops and stuff.
5    Q.   So besides catastrophic incidents like the roof
6    caving in, there are other safety issues in a grocery
7    store.  There can be spills.  There can be dangerous
8    equipment, what have you?
9    A.   Yeah, you're supposed to walk the store.  I
10   think you were supposed to be seen out on the floor once
11   an hour or something like that I think it was.  So --
12   whether you did or not, I guess that's what it was.  But
13   you're supposed to be seen out on the floor so you can
14   inspect the floors.
15   Q.   And that's what you're doing, you're inspecting
16   to make sure things are running smoothly?
17   A.   Well, for spills and whatnot, yes.
18   Q.   And if you find a spill, what do you do, do you
19   direct somebody to come clean it up?
20   A.   I cleaned it up.
21   Q.   Okay.  You would clean it up?
22   A.   Yes.
23   Q.   Okay.  If you had to go do something else,
24   could you?
25   A.   I would radio and say, Hey, I'm right doing

Page 59

1    something, can you come help me?
2    Q.   Okay.
3    A.   But we were told never to leave the spill.
4    Q.   Could you grab a stocking clerk and say, Hey,
5    go get a mop and clean this up?
6    A.   Well, I could, yes, but I did a lot of things
7    on my own.  I don't know if that was what's gone for
8    everybody.
9    Q.   Sure.
10   A.   But I would just clean it up.  But, yes, I
11   could if I wanted to say, Hey, come over here and do
12   that.
13   Q.   Would you -- trying to come up with a statement
14   that, you know, that kind of describes an assistant
15   manager.  Would you agree with me that a fair statement
16   would be assistant manager is in charge of helping manage
17   the store, making sure everything gets done?  Is that --
18   is that fair?
19   A.   I guess what you mean by "managing," but we did
20   everything.  No small -- no task was too small.
21   Q.   Sure.  And you either did it yourself or you --
22   you directed somebody to do it, as long as it got done?
23   A.   If I wasn't willing to do it, then I would see
24   if somebody else could help me then because I don't
25   know --

Page 60

1    Q.   Okay.
2    A.   If that's managing, then that's what I did.  I
3    don't know what you're --
4    Q.   I'm just trying to get your -- just trying to
5    get your description of it.
6    A.   I wasn't a soldier and said, You do this, you
7    do this, and that's not my job.
8    Q.   You pitched in with employees?
9    A.   Everything, yes.
10   Q.   Okay.  You wanted to set an example?
11   A.   I pulled pallets every freight day.  I threw
12   freight every freight day.
13   Q.   Okay.  What else did you do?
14   A.   Every -- cleaned the back room.  I mean, the
15   list could go on.  Anything that needed to be done.  It
16   wasn't like I had a babysitter.  I had to do what I had
17   to do.  But most of my time was spent running around the
18   store, make sure everything was the way it should be.
19   Q.   Looking for problems and solving them?
20   A.   Right.
21   Q.   Okay.  As assistant manager, were you involved
22   in any budgeting discussions or programs?
23   A.   No.
24   Q.   Okay.  Did you ever review store finances,
25   store productivity?

Page 61

1    A.   Well, I could review them, but I had no idea
2    what they meant.  But yes, I could review them.
3    Q.   Okay.  That was within your -- your area of
4    responsibility, you just didn't do it?
5    A.   Well, there -- we didn't -- I don't even know
6    if there was a budget to be honest.
7    Q.   Okay.  Were you involved in -- in, for lack a
8    better word, sounds very academic, strategic planning?
9    A.   No.
10   Q.   You weren't involved in that?  Any discussions
11   for future growth or anything else for the store?
12   A.   Maybe when they came for evaluations, like --
13   I'm not talking these evaluations, I'm talking about when
14   Mark and all them would come to the store and meet
15   individually with their employees, like the manager,
16   bakery manager, deli, whoever was a manager at the time.
17   They may have said, What do you think could grow the
18   store?  And I wouldn't -- I think I was in two of those
19   meetings.
20   Q.   Okay.  How frequently were those meetings held?
21   A.   I think they're done once a year, but I don't
22   recall.
23   Q.   Okay.  And during your time, you think maybe
24   you participated in two of those?
25   A.   Most of them I think were when I was with Dan.

Page 62

1  So I know I didn't do ones with Curtis, and I don't think
2  I did one -- I know I didn't do one with Paul.  Maybe
3  Justin.  During the Justin -- see, I'm not trying to do a
4  background.  I really don't want you to spend much more
5  time here.  But like it went from Curtis to Dan to --
6  wait.  There was another one between there.  There had
7  probably been -- I probably went through five store
8  directors.
9      Q.   Okay.
10     A.   And each one had their own little quirks of how
11 they wanted things ran.  So some wanted to take control,
12 and some wanted you to take control.
13     Q.   Wanted you to do everything?
14     A.   Yeah.  So I mean, the ones that I did not like,
15 I made -- I mean, I did not hold back and say I did not
16 like them.
17     Q.   Who did you tell?
18     A.   Who would I tell?
19     Q.   Yeah?
20     A.   I would tell them, I don't like you.  I mean,
21 when you're supposed to be a store director, you know,
22 you should have at least -- I guess what I wanted them to
23 do is what I was doing, which was everything.  And some
24 of them did not want to do everything.  They wanted other
25 people to do stuff.

Page 63

1      Q.   They wanted to sit back and --
2      A.   Right.
3      Q.   -- steer the ship?
4      A.   Yes.
5      Q.   Okay.
6      A.   There was two of them, but...
7      Q.   Okay.  So besides these -- these two strategic
8  planning meetings, I'm not even sure what to call them.
9      A.   I think they were called evaluations, but I
10 don't -- I don't know if that's the true word for them or
11 not either.
12     Q.   Beyond these two evaluation meetings that
13 you've described, any other meetings with upper
14 management that you were ever involved in as an assistant
15 manager?
16     A.   No.  I mean, they would come with -- not with
17 higher-ups, but like with the store directors, Hey, do
18 you think we should move these tables?  That type of
19 thing, yes, but not like how are we going to set the
20 store apart from other stores, no.
21     Q.   Okay.  So go back to your earlier comment about
22 setting the tables.  Is that arranging the store and --
23     A.   Yes.  They wanted it a certain way, and they
24 had to flow correctly.  If I were to set it a certain way
25 and they came in during one of their inspections or

Page 64

1  surprise visits, I was told to move them.
2      Q.   Okay.  Did you ever push back and --
3      A.   Yeah.
4      Q.   -- say, Hey, I think this is a better way?
5      A.   Yeah, but -- I just ended up doing it.
6      Q.   Did they ever listen to you and say, Hey,
7  you're probably right?
8      A.   Can't think of a time they did.  I mean,
9  there -- Clint was easier to work with I'll admit.  He
10 would come in and say -- you know, the one store director
11 before me -- he wasn't the store director.  I was his
12 assistant still.
13          But I still did everything because that's just
14 the way it was.  But he made a big mess of the front, and
15 I rearranged everything, and he liked it.  So he had --
16 you know, Maybe you should do this or maybe you should do
17 that, but...
18     Q.   You told me about the time that you didn't have
19 a store director for that two-month period, that
20 basically you were doing everything.  There were times as
21 an assistant manager when you did have a store director
22 that you were also the only manager at the store; isn't
23 that right?
24     A.   Yes.
25     Q.   Okay.  And during those times, was that

Page 65

1  similar, you were kind of in charge of everything?
2      A.   Yes.
3      Q.   Okay.  As an assistant manager, did you keep a
4  planner or a journal or a diary or anything that
5  described what you did?
6      A.   No.
7      Q.   Okay.
8      A.   If I had known this, but yes.  But, no, I did
9  not foretell this.
10     Q.   Hindsight is 20/20.
11     A.   Yeah, so I did not.
12     Q.   Fair enough.
13          So at some point you became a store manager; is
14 that correct?
15     A.   Yes.  Store director you mean?
16     Q.   Store director.
17     A.   Okay.
18     Q.   I want to say December of 2018; is that right?
19     A.   If that is what the record says.
20     Q.   Does that sound -- sound right?
21     A.   Because I quit about February of 2019, so yes.
22     Q.   I have March 23, 2019, you resigned.
23     A.   Okay.  So March then, yes.
24     Q.   You think that's accurate?
25     A.   Well, yes.

Page 66

1    Q.   Okay.  So you became store director December of
2  2018, and you're coming off the period of being an
3  assistant manager where you didn't have a store director.
4    Did anything really change between being a
5  store director and assistant manager?
6    A.   There was more to do.  You had to do -- I
7  was -- okay.  So I was not trained properly.  And before
8  I go into all these things, the reason why I did leave
9  Ridley's, one was the hours I was spending.  I was tired
10 of having somebody raise my kids.  I wanted to be home.
11   But the second one was I asked for training
12 because as a store director, you think you would be
13 properly trained to figure out how to keep your bonuses
14 to where you get them and help your entire store, your
15 management -- grocery -- not grocery, deli.  Deli was on
16 the bonus program, the meat department was on the
17 program, and I think Ace was on the program.  Oh, and
18 produce.
19   Q.   Okay.
20   A.   They pretty much told me that they would
21 eventually get to me to help me.
22   Q.   As a store director?
23   A.   So -- yes, as a store director.  So I didn't
24 get too much further into the store director, but I
25 had -- I think I've done some of these.  I think that's

Page 67

1  how I got Jennifer to fight with for the 25 cents.  But I
2  don't know all of the store director's responsibilities
3  because I wasn't there for very long, but I was never
4  trained.
5    Q.   Okay.  As you sit here today, was there
6  anything that you know of that a store director could do
7  that you couldn't do as an assistant manager?
8    A.   He -- they did most of the interviewing.  I
9  didn't sit around and ask exactly what their details
10 were, but we were always out on the floor.  So like
11 whatever they did, they did -- I don't know what they --
12 I mean, I don't know -- I don't know what all their job
13 duties were.
14   Q.   I'm just asking you.  You worked both as an
15 assistant manager and as a store director.  I
16 understand --
17   A.   At the time that I was store director, I did
18 nothing different than try to keep the ship above water.
19   Q.   Okay.  So you basically did the same thing as a
20 store director that you did as an assistant manager?
21   A.   For the time I was there, yes.
22   Q.   Okay.
23   A.   Because at the time, I was only me and her, and
24 we only had -- I mean, I worked from 5:30 in the morning
25 until 5:30 at night with no lunch because she wasn't

Page 68

1  there because she was the closing manager because we
2  didn't have a closing manager.  So I kept my head above
3  water is what I did.
4    Q.   Okay.  I have in my records that in October of
5  '17, you left your job as an assistant manager and went
6  to freight boss.  Is that accurate?
7    A.   Freight boss?  Oh, I'm wondering if that's --
8  I'm wondering if that's when I went to work for
9  Associated Foods.  No, that couldn't have been.  Freight
10 boss?  Not entirely impossible, but I don't remember.
11   (Exhibit 4 marked.)
12   THE WITNESS:  Oh, yeah.
13   Q.   (By Mr. Williams) Okay.  So --
14   A.   I remember this.
15   Q.   Give me one second.  Let me make the record.
16   A.   Okay.
17   Q.   I've handed you a document marked as Exhibit 4
18 to your deposition called a "Payroll Status Change"
19 showing a change from assistant manager to freight boss,
20 with the hourly rate of $13.95?
21   A.   Right.
22   Q.   Tell me what's going on here.
23   A.   First of all, I want you to know I know the
24 guy's name - David Peterson.  That's the guy that I could
25 never remember his name, David Peterson.  But I went to

Page 69

1  him because I was getting tired of the hours.
2    So I guess when I went to be -- is there
3  another one in there that says me going back to assistant
4  when Luis was under my thing?  Because I was getting
5  tired of working hours, so he agreed to let me be freight
6  boss, which is not technically a -- those were of the
7  ones that have freight at night.  That's what -- that's
8  the name of freight boss is --
9    Q.   (By Mr. Williams) So what did you do as freight
10 boss?
11   A.   The same exact same thing, only I didn't work
12 the hours.
13   Q.   Okay.  And you were paid on an hourly rate?
14   A.   Yes.
15   Q.   Paid overtime if you worked over 40?
16   A.   I would assume so, yes.
17   Q.   You were on a 40-hour work week though, so you
18 may not have worked overtime; is that true?
19   A.   Probably -- I don't -- I don't recall.
20 Actually, I didn't even recall this part.  So if it says
21 I did, then I did.  But --
22   Q.   Okay.
23   A.   -- I don't recall.
24   Q.   And to close the loop --
25   A.   Did I go back to assistant?

JONATHAN ESPARSEN vs RIDLEY'S FAMILY MARKETS
KRESTINA COOMBS on 01/19/2022

Pages 70..73

Page 70

1    Q.   You did.
2    A.   Okay.  Now it's all making sense, but yeah --
3    Q.   Give the reporter one second to catch up to
4 mark this.
5         (Exhibit 5 marked.)
6    Q.   (By Mr. Williams) Okay.  I've handed you a
7 document marked as Exhibit 5 to your deposition titled
8 "Job Offer."
9        Krestina, I note that they've misspelled your
10 name. August 10th, 2018.
11    A.   Yes.
12    Q.   Does this reflect when you went back to being
13 assistant manager?
14    A.   Yes, because the store director at the time
15 wasn't -- I think this was Luis, who was my store
16 director at the time.  Let's see.  I can't remember why I
17 went back to assistant because I think we had two
18 assistants at that time, me and Tenesha.  And I think it
19 had something to do with store director, either I didn't
20 like him and he wasn't doing things that he should have
21 been.  I think I got mad, and I think I went back.
22    Q.   Went back to being assistant director?
23    A.   Yeah.  But I cannot remember who the store
24 director -- I think it could have been Justin.  2000
25 what?  Hold on.  2018.  No that was Luis.

Page 71

1    Q.   Was this after Dan?
2    A.   There's two after Dan, I think.
3    Q.   Okay.  So just to summarize, you're not quite
4 sure why you came back, but you thought it had something
5 to do with the director that you didn't like?
6    A.   Yes.
7    Q.   And you wanted to come back and help make it
8 better?
9    A.   My -- yes, my -- I always looked out for -- we
10 all became friends.  When you work there for so long, you
11 become friends.
12    Q.   Okay.
13    A.   When they started struggling with them, that's
14 when I decided to go back, I believe.
15    Q.   You thought you were in a better position to
16 help your employees as an assistant manager than as a
17 freight boss?
18    A.   No.  In his eyes, I had more pull if I was
19 assistant, which you don't.  But --
20    Q.   In whose eyes?
21    A.   The store director.
22    Q.   Okay.
23    A.   That's why this is by Ramiz.  And it's not the
24 store director, it's because I went to him.
25    Q.   You went to Ramiz?

Page 72

1    A.   Uh-huh (affirmative).
2    Q.   What did you say to Ramiz?
3    A.   I don't like him, and I want to come back.
4    Q.   Did you tell him what you expected to do as
5 assistant manager to come back?
6    A.   Unh-uh (negative).  He said, Are you sure?  I
7 said yes.  There's no discussion of why I wanted to come
8 back per se.  He knew I did not like Luis.
9    Q.   Okay.  But the expectation was from someone,
10 either your employees or the director, that you would be
11 able to help the employees more as an assistant director;
12 is that accurate?
13    A.   I didn't think about if I had more pull with
14 them.  I just felt like -- I guess it's the title.  I
15 think it's a title thing.  Ridley's a title.  They
16 think if -- well, I don't know -- I don't know what they
17 think.
18    But you keep -- you try and separate assistant
19 from grocery.  It's by title only, not job duties.
20 Nobody was ever in -- nobody ever was just sitting around
21 bossing somebody around.  We was all in the thick of it.
22    So Luis -- I believe it was Luis, it could have
23 been Luis or Justin, it's one of those two, and I can't
24 remember -- I did not like either one of them, but I
25 wanted to come back to help them because as a freight

Page 73

1 boss, I was only there during freight time and stuff like
2 that.
3    Q.   So if you couldn't see what was going on,
4 couldn't help solve the problems that were coming up?
5    A.   They would come to me anyhow, so why not?  Why
6 not go back?
7    Q.   Might as well go back?  You accepted the
8 position, it wasn't forced on you?
9    A.   No.
10    Q.   You understood that you were going back to --
11    A.   The long hours, yes.  Uh-huh (affirmative).
12    Q.   And the long hours?
13    A.   Yes.
14    Q.   Okay.  You're not claiming that Ridley's did
15 not pay you what they agreed to pay you; is that right?
16    A.   Correct.  Whatever was on this paper is --
17 there should be one for store director too.
18    Q.   You told me that you didn't keep track of --
19 you didn't punch a clock, you didn't keep track of the
20 hours that you worked?
21    A.   No.
22    Q.   Is there any way to tell how many hours you
23 actually worked there?
24    A.   If I were to guess an average without lunch, 11
25 to 12 hours a day I would work.

Page 74

1  Q.  Do you have any documentation to support that?
2  A.  No.
3  Q.  Okay.  As an assistant manager, did you ever
4  perform work during off hours from home, people call you
5  with problems or issues that you had to solve at home?
6  A.  If somebody would text me and say, Hey, I can't
7  make my shift, I'd have to call in and say, Hey, so and
8  so is not going to be there, or I would have to text them
9  and say, Hey, you need to work.  We don't have nobody.  I
10  mean, I didn't do a lot.
11  Q.  Okay.  Besides people texting you and saying
12  they couldn't come in, do you recall any other contact
13  after hours?
14  A.  Sometimes I would have to go in -- this was
15  earlier -- earlier when Ridley's was really busy on
16  holidays and stuff.  If checking got behind, they would
17  have to call me.  And I'd come in, check, and then go
18  home.
19  Q.  Okay.  Any other times that you remember?
20  A.  The leak in the ceiling, there was a bad storm,
21  I had to come in.  The roof didn't fall in that time.
22  But the prior one, the big storm came through, I had to
23  go there and help mop up.
24  Q.  Is it a flat roof that was prone to cave-ins?
25  A.  The little sheathing underneath it, I guess,

Page 75

1  had a -- some leaks, and one of the pipes -- the time
2  that the roof caved, a pipe had burst, and that's what
3  caused that.  If somebody didn't show up on time and it
4  was time for me to go, I would have to help and stay and
5  check.  But I wasn't at home, I was already there.
6  Q.  Okay.
7  A.  So I don't know if that counts.
8  Q.  Other than your attorney, have you communicated
9  with anyone about this lawsuit?
10  A.  Just my husband knew I was coming here.
11  Q.  Okay.  Posted anything on social media --
12  A.  No.
13  Q.  -- or anything like that?
14  A.  No.  My mom doesn't even know.
15  Q.  Your mom doesn't even know?
16  A.  No.
17  Q.  Where does your mom live?
18  A.  Sioux Falls, South Dakota.
19  Q.  She's busy staying warm?
20  A.  Right.
21  Q.  Yeah.  Do you have any -- I think I may have
22  asked you this earlier, but I don't remember.  Do you
23  have any ideas, ballpark figures of how much money you
24  think you're owed by Ridley's?
25  A.  I have no ballpark.  Like I said, if the law

Page 76

1  says anything over this amount of hours, then that's what
2  it is.  But I couldn't go and say, Oh, I worked this and
3  this and this, and I'm entitled to this no, I do not
4  know.
5  Q.  Just depends on what the law says?  So if the
6  law says you're not entitled to anything, you're okay
7  with that?
8  A.  Then I've just come down here for nothing.
9  Q.  Fair enough.  It's a nice drive.
10  A.  No, it's not.  Especially -- no.  I just got a
11  brand new car.  You can see it going down the freeway.
12  No, it's not.  But I -- I -- I didn't come in here
13  thinking, oh, I'm going to come out a millionaire, no.
14  That's not how it was.
15  Q.  Okay.
16  MR. WILLIAMS:  I have nothing further.
17  MS. RHEAUME:  I don't have any questions
18  either.
19  THE REPORTER:  Do you want a copy of these,
20  April?
21  MS. RHEAUME:  I'd like to not decide right now.
22  (A discussion was had off the record.)
23  MR. MORRIS:  I just wanted to go on the record
24  briefly at the end here.  While you weren't here this
25  morning -- so this morning, Mr. Jackson didn't appear.

Page 77

1  And in your absence, I made a brief record of the fact
2  that we noticed it up, he didn't show.
3  MS. RHEAUME:  Uh-huh (affirmative).
4  MR. MORRIS:  Obviously the court reporter and
5  videographer were here.  I think your firm ought to bear
6  the freight for that this morning, but that's my opinion.
7  If you disagree, I'm probably going to ask -- I'm going
8  to make sure they get paid, but I think it's on your firm
9  to cover for Mr. Jackson's failure to appear today.  So
10  we still want to depose him if he intends to be an opt-in
11  plaintiff.  If he's changed his mind, just let us know.
12  MS. RHEAUME:  Uh-huh (affirmative).
13  MR. MORRIS:  And that's the only record I
14  wanted to make, in addition to what I put on the record
15  this morning.
16  Is there anything on your end?
17  MS. RHEAUME:  No.  I assume we'll have plenty
18  of conversations about this later.  We'll get there.
19  MR. MORRIS:  Okay.  But you haven't had any
20  contact with him at all?
21  MS. RHEAUME:  I've had no contact with him.
22  That's correct.
23  MR. MORRIS:  Okay.  Well, we noticed it up in
24  reliance on your saying you could produce him this
25  morning, but I understand he hasn't been in touch with

JONATHAN ESPARSEN vs RIDLEY'S FAMILY MARKETS
KRESTINA COOMBS on 01/19/2022

Page 78

```
 1   you.
 2            MS. RHEAUME:  Okay.
 3            MR. MORRIS:  Okay?  That's it.
 4            (The proceedings concluded at 2:44 p.m.)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 79

```
 1            CERTIFICATE OF DEPONENT
 2   PAGE    LINE    CHANGE
 3   _____
 4   _____
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19            --oOo--
20        I, Krestina Coombs, deponent herein, do hereby
     certify and declare under penalty of perjury the within
21   and foregoing transcription to be my deposition in said
     action; that I have read, corrected, and do hereby affix
22   my signature to said deposition.
23
24        _____
25            Krestina Coombs, Deponent
```

Page 80

```
 1            REPORTER'S CERTIFICATE
 2   STATE OF UTAH )
 3   COUNTY OF UTAH )
 4
 5        I, Daren S. Bloxham, a Certified Shorthand
 6   Reporter, Registered Professional Reporter, hereby
 7   certify:
 8        THAT the foregoing proceedings were taken
 9   before me at the time and place set forth in the caption
10   hereof; that the witness was placed under oath to tell
11   the truth, the whole truth, and nothing but the truth;
12   that the proceedings were taken down by me in shorthand
13   and thereafter my notes were transcribed through
14   computer-aided transcription; and the foregoing
15   transcript constitutes a full, true, and accurate record
16   of such testimony adduced and oral proceedings had, and
17   of the whole thereof.
18        I have subscribed my name on this 19th day of
19   January, 2022.
20        _____
21            Daren S. Bloxham
             Registered Professional Reporter #335
22
23
24
25
```