Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF COLORADO

 3

 4    JONATHAN ESPARSEN, individually)
      and on behalf of all others   )      CERTIFIED COPY
 5    similarly situated,            )
                                     )
 6                  Plaintiffs,      )
                                     )
 7            v.                     ) No. 1:18-cv-01556-RM-GPG
                                     )
 8    RIDLEY'S FAMILY MARKETS, INC., )
                                     )
 9                  Defendant.       )
      _____)

10

11

12          VIDEOTAPED DEPOSITION OF CAMERON HARRIS

13                  Salt Lake City, Utah

14                Tuesday, January 18, 2022

15

16

17

18

19

20

21

22

23

24

25      Reported by:   Daren S. Bloxham, RPR No. 000335
```

JONATHAN ESPARSEN vs RIDLEY'S FAMILY MARKETS
CAMERON HARRIS on 01/18/2022

Pages 2..5

Page 2

```
 1        Deposition of Cameron Harris, taken at Snell &
 2   Wilmer, located at 15 W. South Temple, Ste. 1200, Salt
 3   Lake City, Utah, on January 18, 2022, at 12:57 p.m,
 4   before Daren S. Bloxham, Certified Court Reporter, in and
 5   for the State of Utah.
 6
 7              A P P E A R A N C E S
 8   FOR THE PLAINTIFF:
 9        April Rheaume, Esq.
          SANFORD LAW FIRM
10        10800 Financial Centre Parkway
          Kirkpatrick Plaza, Suite 510
11        Little Rock, Arkansas 72211
          800-615-4946
12        april@sanfordlawfirm.com
13
14   FOR THE DEFENDANT:
15        Mark O. Morris, Esq.
          SNELL & WILMER
16        15 W. South Temple, Ste. 1200
          Salt Lake City, Utah 84101
17        801.257.1900
          mmorris@swlaw.com
18
19   ALSO PRESENT:  Gavin Bohne (videographer)
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2   WITNESS: Cameron Harris
 3   EXAMINATION                               PAGE
 4     By: Mr. Morris                          4, 103
 5     By: Ms. Rheaume                         100
 6
 7           E X H I B I T S
 8   NUMBER          DESCRIPTION               PAGE
 9   EXHIBIT 1  2/6/18 U.S. Department of Justice letter   11
10   EXHIBIT 2  Payroll Status Change          12
11   EXHIBIT 3  Performance Evaluation of Cameron Harris   14
12   EXHIBIT 4  Consent to Join Lawsuit        54
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              P-R-O-C-E-E-D-I-N-G-S
 2                   --oOo--
 3        THE VIDEOGRAPHER:  We're going on the record.
 4   My name is Gavin Bohne.  The court reporter is
 5   Daren Bloxham.  We represent JD Legal Support.  The time
 6   and date indicated on the video screen is January 18th,
 7   2022, at 12:57 p.m. in the matter of Esparsen v. Ridley's
 8   Family Markets, Inc., Case No. 1:18-cv-01556-RM-GPG in
 9   the United States District Court for the District of
10   Colorado.
11        Counsel will now state their appearances for
12   the record.  The court reporter will swear in the
13   witness, Cameron Harris.
14        MS. RHEAUME:  This is April Rheaume for
15   plaintiff, Esparsen, and the collective.
16        MR. MORRIS:  This is Mark Morris.  I represent
17   the defendant.
18                   --oOo--
19              CAMERON HARRIS,
20        having been first duly sworn to tell the
21        truth, was examined and testified as follows:
22              EXAMINATION
23   BY MR. MORRIS:
24   Q.   Mr. Harris, please tell us your full name.
25   A.   Full name is Cameron Mark Harris.
```

Page 5

```
 1   Q.   Okay.  Did you grow up here in Utah?
 2   A.   No.  I spent most of my time in New Mexico.
 3   Q.   Okay.  When did you come to Utah?
 4   A.   When I was 16 years of age.
 5   Q.   And then where did you live?
 6   A.   I lived in Saratoga Springs, Utah.
 7   Q.   Okay.  And how old are you now?
 8   A.   I am 31.
 9   Q.   I've had a chance to review some of your
10   personnel reviews.  You got consistently high marks from
11   Ridley's during the time that you worked there.  Is that
12   how you perceive your time there?
13   A.   I would say yes.
14   Q.   Okay.  You didn't want to sue Ridley's for any
15   reason at any time, did you?
16   A.   Other than this case, no.
17   Q.   Okay.  But you didn't file a complaint against
18   Ridley's, right?
19   A.   No.
20   Q.   Why not?
21   A.   I don't know.
22   Q.   Have you had a chance to meet with April?
23   A.   We spoke, yes.
24   Q.   Okay.  Just over the phone or --
25   A.   Correct.
```

JONATHAN ESPARSEN vs RIDLEY'S FAMILY MARKETS
CAMERON HARRIS on 01/18/2022
Pages 6..9

Page 6

```
1      Q.   -- Zoom?
2      A.   Just over the phone.
3      Q.   Okay.  To prepare you for the deposition today?
4      A.   Correct.
5      Q.   Okay.  And when was that?
6      A.   That was last evening.
7      Q.   How long was that call?
8      A.   I'd say between 30 and 40 minutes.
9      Q.   Okay.  Have you looked at any documents to
10  refresh your memory about anything about your time at
11  Ridley's?
12     A.   No, I have not.
13     Q.   Okay.  Tell me what you understand this case to
14  be about.
15     A.   From what I understand, it's generally about
16  overtime wages and how they were paid.
17     Q.   Okay.  And do you have a dollar amount in your
18  mind today that you think that you should have been paid,
19  but you were not paid by Ridley's?
20     A.   No, I do not.
21     Q.   When is the first time that you ever thought
22  you should be getting paid overtime for your time at
23  Ridley's?
24     A.   I don't recall if there was a moment in time
25  that I had that thought.
```

Page 7

```
1      Q.   So your duration at Ridley's, you were hired on
2  December 20th, 2013, in the Highland store?
3      A.   I was hired into a different store, but that
4  date sounds correct.
5      Q.   Okay.  Your first job there was a hardware
6  clerk?
7      A.   Correct.
8      Q.   And tell me what store you first worked at.
9      A.   I started at the Eagle Mountain store.
10     Q.   Okay.  And within a year, you were promoted to
11  hardware manager, correct?
12     A.   At a different location, yes.
13     Q.   Still at Eagle Mountain?
14     A.   No.  It was in Wyoming.
15     Q.   Okay.  So after you were hired in December of
16  '13 and you worked at the Eagle Mountain Ridley's store,
17  what is the next Ridley's store you went to work at?
18     A.   After that, I went to the Pinedale, Wyoming
19  store.
20     Q.   Okay.  And when was that?
21     A.   That was around September of 2014.
22     Q.   Okay.  And when you made that move, it was a
23  promotion to a manager of the hardware department,
24  correct?
25     A.   That is correct.
```

Page 8

```
1      Q.   And at that point you became a salaried
2  employee at Ridley's?
3      A.   Yes.
4      Q.   And then while you were in Pinedale, you were
5  promoted to be an assistant store manager in November of
6  2015?
7      A.   Yes.
8      Q.   Okay.  And you got a promotion -- I mean, a
9  raise with that?
10     A.   Yes, I did.
11     Q.   Okay.  And so between December of 2013 and
12  November of 2015, it never occurred to you that you
13  should have been getting paid for overtime, did it?
14     A.   Not that I recall.
15     Q.   Okay.  Do you think you would recall it if you
16  had been unhappy about not getting paid?
17     A.   It's possible.
18     Q.   So you were an assistant store manager in the
19  Pinedale, Wyoming, store from November of 2015 to August
20  of '18?
21     A.   I believe there was a period of time where I
22  was the store manager in -- I think officially around the
23  beginning of 2018 -- I'm sorry -- the beginning of 2017
24  through late summer 2018.
25     Q.   Okay.  So for all of 2017 and most of 2018, you
```

Page 9

```
1  were actually the store manager at Pinedale?
2      A.   Correct.
3      Q.   And during that time, were you the only store
4  manager in Pinedale?
5      A.   The only store director, yes.
6      Q.   Okay.  Do you prefer "director" over "manager"?
7      A.   Either way is fine.
8      Q.   Different -- different places have different
9  terminology on that.  Is that internally how Ridley's
10  people refer to themselves?
11     A.   Yeah.  The store director, if you were the
12  store director.
13     Q.   And assistant store director then?
14     A.   That was, I think, more like assistant store
15  manager depending on where you were at.
16     Q.   Okay.  So if you're the sole person in charge,
17  you're director, but there are assistants beneath that
18  are called managers?
19     A.   I believe so.
20     Q.   Okay.  Have you ever been deposed before like
21  this?
22     A.   I have not.
23     Q.   Have you ever testified in court for any
24  reason?
25     A.   Not testify, no.
```

Page 10

1    Q.   Okay.  Spectated?
2    A.   I -- I can say I went on behalf of a company I
3  worked for one time.  But the way the law was written,
4  they couldn't speak to me directly, so it was a short
5  session.
6    Q.   Got it.  The company wasn't Ridley's, was it?
7    A.   It was.
8    Q.   Oh, it was.  So what -- where were you in court
9  representing Ridley's?
10   A.   In the -- it was in Pinedale, and I believe it
11  was the Sublette County Court.
12   Q.   Was this the ATF issues you had up there?
13   A.   No.
14   Q.   Okay.  Different.  Okay.
15       So when Ridley's needed to make an appearance
16  in court in Pinedale, you were the person that Ridley's
17  sent to the court to represent Ridley's?
18   A.   When I was the store director, yes.
19   Q.   Okay.  What kind of case was it?
20   A.   It was a -- generally about -- if I remember,
21  some kind of fine they had accrued, the store accrued,
22  for some kind of local sewer violation or something like
23  that.
24   Q.   All right.  While you were the store director
25  in Pinedale, there were some issues with Wyoming Game &

Page 11

1  Fish Department up there.  Do you remember those?
2    A.   I can't quite recall, no.
3    Q.   Do you remember the Department of Justice
4  complaining to Ridley's about some violations of their
5  policies that you committed while you were the store
6  manager?
7    A.   Could you be more specific?  I don't recall.
8    Q.   Sure.  Well, let me help you.
9       (Exhibit 1 marked.)
10   Q.   (By Mr. Morris) So Mr. Harris, I'm showing you
11  what we marked for your deposition as Exhibit 1.  This is
12  a letter from the U.S. Department of Justice to
13  Jerry Ridley's at Ridley's Family Markets on it looks
14  like February 6, 2018.  So that would have been shortly
15  after you became the store manager?
16   A.   I believe so, yes.
17   Q.   Okay.  Have you ever seen this Exhibit 1
18  before?
19   A.   Yes, I have.
20   Q.   Okay.  Did you understand that the Department
21  of Justice had concerns with some of your conduct while
22  you were working for the Ridley's in Pinedale?
23   A.   Yes.
24   Q.   Okay.  It looks to me like this letter was sort
25  of a warning, and that nothing -- no kind of fines or --

Page 12

1  or proceedings were initiated against you or Ridley's as
2  a result of this.
3       Does that jive with your memory of events?
4    A.   Yes, it does.
5    Q.   Okay.  Were you disciplined in any way for the
6  violations that are mentioned in Exhibit 1?
7    A.   Not that I recall, no.
8    Q.   So you didn't have your pay docked by Ridley's?
9    A.   I don't recall.
10   Q.   Do you think you would recall if they whacked
11  your salary because of this stuff?
12   A.   I -- I think there's a chance I would, yes.
13   Q.   Okay.  And you don't remember that happening?
14   A.   I don't.
15   Q.   And you were not demoted from store -- your
16  store manager position because of the violations
17  mentioned in Exhibit 1, were you?
18   A.   I was not.
19       (Exhibit 2 marked.)
20   Q.   (By Mr. Morris) Let me show what we marked as
21  Exhibit 2 for your deposition.  Take a minute to have a
22  look at it and familiarize yourself with it.  Have you
23  done that?
24   A.   Yes, sir.
25   Q.   Okay.  Have you seen this document before?

Page 13

1    A.   Yes, I have.
2    Q.   And on the second page -- the third page, is
3  that your signature that appears next to the July 5,
4  2014, date?
5    A.   It appears so.
6    Q.   Okay.  And is that your handwriting under the
7  "employees' comments" there?
8    A.   It appears so.
9    Q.   Okay.  In July of 2014, you were not yet a --
10  well, wait a minute.  Let's see.  You were not yet a
11  manager at Ridley's, were you?
12   A.   I was not.
13   Q.   But you wrote here that you wanted to learn
14  more about manager functions and to move up in the
15  company.  Is that a correct statement when you wrote
16  that?
17   A.   I would agree, yes.
18   Q.   Okay.  Did you feel that even before you were
19  promoted to be an assistant manager -- well, actually,
20  the promotion that followed this was becoming the
21  hardware manager in Pinedale; is that right?
22   A.   That is correct.
23   Q.   Okay.  Based on Sue McNeil's comments down
24  below, it appears that you were already exhibiting some
25  management prowess in your role at Ridley's.  Would agree

Page 14

1  with that?
2      A.   If that's what they considered to be management
3  prowess, then yes.
4      Q.   Well, wouldn't you consider it to be management
5  prowess if you go above and beyond to help customers and
6  multitask and solve problems as they arise?
7      A.   Yes.
8           (Exhibit 3 marked.)
9      Q.   (By Mr. Morris) Let me show you what we've
10  marked as Exhibit 3 for your deposition.  Have you seen
11  this document before?
12     A.   Yes, I have.
13     Q.   Is that your signature in the middle of the
14  second page?
15     A.   Yes, it appears so.
16     Q.   And above that under "Employee's Comments," is
17  that your handwriting?
18     A.   That is not my handwriting, no.
19     Q.   Do you know who wrote that?
20     A.   Judging on who signed it and who I remember
21  working with it, it looks like the store director at the
22  time.  His name is Val Ercanbrack or was Val Ercanbrack.
23     Q.   Okay.  Can you help the reporter on spelling?
24     A.   Yes.  First name is just V-A-L.  The lame name
25  is E-R-C-A-N-B-R-A-C-K.

Page 15

1      Q.   So in January of 2016, you were an assistant
2  manager in the Pinedale store?
3      A.   I don't recall in that time period if I was or
4  not --
5      Q.   Okay.
6      A.   -- that exact month.
7      Q.   I thought we established earlier that in
8  November of '15, you were promoted from hardware manager
9  to store assistant manager?
10     A.   That is correct.
11     Q.   So three months later, two months later in
12  January of '16, at the time you got this review where you
13  got all exceeding expectations on the first page of
14  Exhibit 3, you were an assistant store manager at that
15  time; is that right?
16     A.   Yes.
17     Q.   I didn't ask you before.  What's your address
18  currently?
19     A.   Currently I'm -- do you need the full address?
20     Q.   Please.
21     A.   1003 Mount Loafer Circle in Spanish Fork, Utah.
22  84660 is the ZIP code.
23     Q.   And where are you working now?
24     A.   I work for a company in Springville called
25  PetIQ.

Page 16

1      Q.   Pet?
2      A.   PetIQ.
3      Q.   What do you do there?
4      A.   I'm a level 1 help desk technician, IT support.
5      Q.   Are you paid hourly?
6      A.   Yes, I am.
7      Q.   Do you have any management responsibility
8  there?
9      A.   I do not, no.
10     Q.   Would you like some?
11     A.   No.
12     Q.   Why not?
13     A.   I'm just happy with working in my department in
14  the position I am now.
15     Q.   You were transferred from Pinedale to Highland
16  in August of '18.  Do you remember that?
17     A.   Yes, I do.
18     Q.   Was that your choice?
19     A.   Yes.
20     Q.   So you asked to be transferred to the Highland
21  store or just anywhere else?
22     A.   Pretty much anywhere in Utah.
23     Q.   Okay.  Who did you make that request of?
24     A.   I don't recall exactly who that was.
25     Q.   Were there openings in Utah that you were

Page 17

1  looking to fill, or was this just a desire to move back
2  to Utah?
3           MS. RHEAUME:  Object to the form.
4           THE WITNESS:  It was just a desire to move back
5  to Utah.
6      Q.   (By Mr. Morris) When you -- and was it the
7  Highland Ridley's store that you moved to?
8      A.   That is the store I ended up working at, yes.
9      Q.   Okay.  Was it a Macey's?
10     A.   At the time, no.
11     Q.   And what was your position in the Highland
12  store when you moved there in August of '18?
13     A.   I was an assistant store manager.
14     Q.   Did you feel that was a demotion from a store
15  director in Pinedale to an assistant store manager in
16  Highland?
17     A.   I did not.
18     Q.   Your pay wasn't reduced, was it?
19     A.   It was, yes.
20     Q.   It was?
21     A.   Uh-huh (affirmative).
22     Q.   Okay.  Why didn't you feel that was a demotion?
23     A.   Because it was my choice to want to move back,
24  and that was the avenue I chose.
25     Q.   Okay.  You don't know Mr. Esparsen, do you?

Page 18

1    A.   I don't.
2    Q.   Did you ever interact with him during your time
3  at Ridley's?
4    A.   Not that I recall, no.
5    Q.   Did you even hear the name ever?
6    A.   Not that I remember, no.
7    Q.   Do you know who he is now?
8    A.   Not exactly, no.
9    Q.   You don't have any understanding today who
10  Mr. Esparsen is?
11   A.   Correct.  I do not.
12   Q.   Okay.  Before you heard about this case, you
13  had never felt like you were being unfairly treated at
14  Ridley's, had you?
15   A.   Before I had heard this case?
16   Q.   Yeah.
17   A.   Maybe on occasion.
18   Q.   What's the first time in your employment at
19  Ridley's that you felt like, hey, I'm not getting treated
20  fairly here?
21   A.   Probably partway through 2016.
22   Q.   So you were the store director in Pinedale,
23  correct?
24   A.   2016?  No, I was not.
25   Q.   Oh, no.  Okay.  Sorry.  You were the hardware

Page 19

1  manager in Pinedale in 2016?
2    A.   I was not.  I was the assistant store manager
3  at that point.
4    Q.   Okay.  Thanks for helping me here.
5         MS. RHEAUME:  I think we need a timeline.
6    Q.   (By Mr. Morris) So what's the first thing that
7  you can recall occurring at Ridley's that you thought,
8  hey, this isn't fair?
9    A.   Probably on several occasions having to work
10  outside my scheduled hours.  Say the closing manager
11  didn't come in.  I had to stay late then to make sure
12  there was a manager there to close.  Probably when I was
13  assistant store manager, around that time is when that
14  happened.
15   Q.   So sometimes the manager that was supposed to
16  close the store didn't show up, and you had to stick
17  around?
18   A.   That is correct.
19   Q.   Okay.  How many times do you think that
20  happened in 2016?
21   A.   I -- I couldn't tell you a figure.  It happened
22  occasionally.  I couldn't tell you an exact figure.
23   Q.   Is occasionally more than once a month?
24   A.   Yeah, I would agree to that.
25   Q.   So it happened more than once a month?

Page 20

1    A.   Yes.
2    Q.   You never complained to anyone about it, did
3  you?
4    A.   Not at the time, no.
5    Q.   Did you ever complain about that to anyone?
6    A.   Not that I recall.
7    Q.   Okay.  So not only did you complain -- did you
8  not complain at the time this was happening, but you
9  never did that you can recall?
10   A.   Not that I can recall, no.
11   Q.   Okay.  And did this keep happening in 2017?
12   A.   As far as the --
13   Q.   Apparently once or twice a month, you had to
14  stick around a little longer than you had planned on to
15  close the store?
16   A.   Yes.  Yes.
17   Q.   Yes?
18   A.   Yes, I did.
19   Q.   Okay.  And when you became the store director
20  at the beginning of 2018, did that continue to happen,
21  that the assistant manager that was supposed to close the
22  store wouldn't show up?
23   A.   Not necessarily that in particular, but there
24  were times where I've had to stay late for various other
25  reasons.

Page 21

1    Q.   As the store director?
2    A.   Correct.
3    Q.   Okay.  That's not surprising -- or it wasn't
4  surprising to you then, was it, that as the store
5  director, circumstances would arise where you'd have to
6  stick around longer than you had planned?
7    A.   No, not terribly surprising.  No.
8    Q.   Comes with the territory, doesn't it?
9    A.   I would agree at that point, yeah.
10   Q.   And while you were the store director and you
11  had to stay at the store longer than you had planned
12  sometimes, you never complained to anyone about that, did
13  you?
14   A.   No.
15   Q.   Okay.  Other than having to stick around when
16  someone didn't show up on occasion, what else do you
17  recall happening at any time you worked for Ridley's in a
18  management position that you thought was unfair?
19   A.   I don't recall.  Other than outside of having
20  to stay late, is that your question?
21   Q.   Yeah.
22   A.   Nothing comes to mind at the moment.
23   Q.   When you say "having to stay late," give me an
24  example.  Having to stay from 5 to 6, from 8 to 10?
25   A.   More like -- for example, if you were to close

Page 22

1  the store, you'd state until midnight beyond your
2  scheduled 6 p.m. quit time.  There were other times -- I
3  can recall another instance where we had to stay -- me
4  and another manager had to stay to unload some equipment
5  off of a truck because there was nobody else to do it,
6  and that was probably until 8 p.m. or so after the 6:00
7  quit time.
8      Q.   Who set your hours when you were the assistant
9  store manager at Pinedale?
10     A.   That would have been the store director,
11 Val Ercanbrack at the time.
12     Q.   Okay.  Did he also set your hours when you were
13 the hardware manager?
14     A.   I don't recall.
15     Q.   Okay.  And so when you first became an
16 assistant store manager of the Pinedale Ridley's, what do
17 you recall your hours being?
18     A.   As far as how many I worked or what the shifts
19 were?
20     Q.   Well, both.
21     A.   So we would do one week of 50 hours scheduled,
22 and the next week would be 60.  And they rotate that way
23 every other week.  As far as shifts go, we'd work -- I'd
24 work a varying shift from either 9 a.m. to 8 p.m. or the
25 closing shift, which I believe was 1 p.m. to midnight,

Page 23

1  something along that line.  And when the store director
2  wasn't there, I would work a 7 to 6 shift.
3      Q.   Looks like they're all 11-hour shifts in total?
4      A.   Correct.
5      Q.   And you were given time for breaks and lunch or
6  dinner?
7      A.   Yeah.  We were allotted time for lunch when we
8  were able to take it, yes.
9      Q.   So when in 2016 was the first time you remember
10 having to stay later than you were scheduled?
11     A.   I would say sometime in the -- I honestly -- I
12 don't exactly remember a timeline on that.
13     Q.   Okay.  Middle of the year, end of the year,
14 beginning of the year?
15     A.   Probably sometime in the middle.
16     Q.   Okay.  All of these -- on all of these
17 occasions that you stayed later than you were scheduled,
18 you didn't write down your hours, did you?
19     A.   No, I did not.
20     Q.   There's no way that we could determine with any
21 degree of accuracy how many hours beyond your scheduled
22 shift you actually did work?
23          MS. RHEAUME:  Object to the form.
24          THE WITNESS:  That I don't know.
25     Q.   (By Mr. Morris) Well, you never in 2016, 2017,

Page 24

1  2018, you never kept track of the occasions when you had
2  to stay later than you were scheduled for whatever
3  reason, did you?
4      A.   Not that I recall, no.
5      Q.   And no one else was keeping track of that for
6  you, were they?
7          MS. RHEAUME:  Object to form.
8          THE WITNESS:  No.
9      Q.   (By Mr. Morris) So I infer from your testimony
10 that as long as you adhered to the schedule that was
11 given to you, you show up at 7 and you leave at 6, you
12 show up at 9, you leave at 8, as long as that occurred,
13 you thought you were being treated fairly?
14     A.   That's what I agreed to, yes.
15     Q.   Did you enjoy being a manager at Ridley's?
16     A.   Not really, no.
17     Q.   Why not?
18     A.   It was a lot of stress that came with the job
19 and took a lot of time from my family.
20     Q.   Were you married -- well, tell me when you got
21 married.
22     A.   I got married in December of 2013.
23     Q.   Okay.  You quit in November of '18 from the
24 Highland store?
25     A.   That sounds right.

Page 25

1      Q.   Okay.  How come?
2      A.   That's just a business I didn't want to work in
3  anymore.  I wanted to pursue other -- other things.
4      Q.   Did you have another job lined up?
5      A.   Yes, I did.
6      Q.   Okay.  So you didn't just quit not knowing what
7  you were going to do?
8      A.   Correct.
9      Q.   Okay.  And did you make the move to PetIQ then?
10     A.   No, I did not.
11     Q.   Where did you go after Ridley's?
12     A.   I ended up working for a company called Papa
13 Pita Bakery out of West Jordan, Utah.
14     Q.   Can you spell that for me?
15     A.   P-A-P-A, and the second word is Pita, P-I-T-A.
16     Q.   I wonder what they bake there.
17     A.   You could probably take a guess.
18     Q.   Did you have management responsibilities at
19 Papa Pita?
20     A.   No, I did not.
21     Q.   During the whole time that you -- well, so when
22 you asked to come back to Utah, you were willing to take
23 a reduction in pay and a reduction in management
24 responsibility, correct?
25     A.   Correct.

Page 26

1    Q.   When did you first hear about this lawsuit?
2    A.   I don't exactly remember.
3    Q.   Did you get a post card or a letter from
4  somebody?
5    A.   I believe I received something in the mail.
6    Q.   Okay.  Did you -- after you got it in the mail,
7  did you seek advice from anyone about whether you should
8  throw in with this lawsuit or not?
9    A.   No, I did not.
10   Q.   Not even your wife?
11   A.   I don't recall if I did or not with my wife.
12   Q.   Okay.  And so I assume whatever you got in the
13 mail in some fashion indicated to you that you had an
14 opportunity to opt into this case as a plaintiff suing
15 Ridley's?
16   A.   Yes.
17   Q.   How long did it take you to make the decision
18 to sue your former employer?
19   A.   Maybe about a week.
20   Q.   And in that week's time, you didn't call the
21 lawyers to ask some questions about it?  You didn't seek
22 advice from anyone?
23        MS. RHEAUME:  Object to form.
24        THE WITNESS:  No, I did not.
25   Q.   (By Mr. Morris) How did you communicate your

Page 27

1  interest in becoming a part of the litigation?
2    A.   I believe there was a form I had filled out,
3  sent it in.
4        MR. MORRIS:  Okay.  Do you know, April, if
5  those forms from the 20-odd opt-ins have been provided to
6  us?
7        MS. RHEAUME:  Yeah, they were filed.
8        MR. MORRIS:  They're all filed?
9        MS. RHEAUME:  Yeah.
10       MR. MORRIS:  All right.
11   Q.   (By Mr. Morris) So in a perfect world, you
12 could dictate the outcome of this lawsuit, what would you
13 like to see happen with you as a result of this
14 litigation against Ridley's?
15   A.   Whatever I'm entitled to within the bounds of
16 the law.
17   Q.   And you understand that whatever that is is
18 going to be more than what you agreed to be paid by
19 Ridley's?
20   A.   That I don't know.
21   Q.   Well, earlier I asked you if what you got paid
22 for your 11-hour shifts was fair, and your answer was
23 that's what you agreed to, correct?
24       MS. RHEAUME:  Object to form.
25       THE WITNESS:  I don't believe we discussed what

Page 28

1  I was actually being paid.
2    Q.   (By Mr. Morris) Okay.
3        MS. RHEAUME:  Can I butt in?  I thought when he
4  said that, he was saying he agreed with you for an answer
5  from the last question.  That's what I took away from it.
6  So it might just be that we need more questions on that.
7    Q.   (By Mr. Morris) I'll try to start over and
8  clear it up.
9        You quit in December of 2018, right?
10   A.   No.
11   Q.   I'm sorry.  November of 2018?
12   A.   It was November.  Yes, November 2018.
13   Q.   And you knew the whole time you were working
14 for Ridley's that you could quit at any time you wanted?
15   A.   Yes.
16   Q.   And you always knew what you were getting paid,
17 right?
18   A.   Yes.
19   Q.   And any time that that pay wasn't enough for
20 you, you could leave and go do something else, right?
21   A.   Technically, yes.
22   Q.   And Ridley's paid you 100 percent of the money
23 that you expected to be paid by Ridley's, didn't it?
24   A.   Yes, I would agree.
25   Q.   Tell me about your education.  Where did you go

Page 29

1  to high school?
2    A.   I graduated from Lehi High School here in Utah.
3    Q.   What year?
4    A.   I graduated in 2008.
5    Q.   What did you do after that?
6    A.   I believe I attended -- at the time it was Utah
7  Valley University.
8    Q.   Okay.  Did you get a degree?
9    A.   No, I did not.
10   Q.   How long did you attend UVU?
11   A.   At that time, maybe two semesters.  But I've
12 attended off and on over the course of the next few
13 years.
14   Q.   Were you working at the same time you were
15 going to college?
16   A.   Yes.
17   Q.   What kind of work did you do while you were in
18 college?
19   A.   I worked at the college as a custodian at night
20 I do recall.
21   Q.   My son did that.  He liked it.
22       What were you hoping to graduate in while you
23 were in college?
24   A.   At the time I -- I had a few different majors,
25 but the first one I chose was computer science.

Page 30

1    Q.   When did you last attend any college classes?
2    A.   That I don't remember exactly.
3    Q.   Did you take any time off of college for any
4  volunteer work of any kind?
5    A.   No, I did not.
6    Q.   Why did you decide not to pursue a degree in
7  college -- I mean get a degree?
8    A.   That's a good question.
9    Q.   All my questions are good, Cameron.
10   A.   I think I was focused on -- I had just been
11 married, focused on, you know, bringing home the money
12 and starting a family and building my home life.
13   Q.   Do you have any kind of training certificates
14 of any kind?
15   A.   Currently, yes, I have one technical
16 certification from CompTIA.
17   Q.   From where?
18   A.   It's an organization called CompTIA.  They deal
19 in IT certifications and the like.  I have the A+
20 certification currently, yes.
21   Q.   Is that what you're doing at PetIQ, working
22 with computers?
23   A.   Yes.
24   Q.   And did you study for and get that
25 certification after you left Ridley's?

Page 31

1    A.   Yes.
2    Q.   Do you understand what it means to be an exempt
3  employee versus a non-exempt employee?
4    A.   I do not.
5    Q.   Have you ever heard those terms before I just
6  mentioned them?
7    A.   I've heard them, yes.
8    Q.   If I were to say -- how would you define an
9  exempt employee?  Could you tell me anything?
10   A.   I have no idea, to be honest.
11   Q.   Okay.  I don't blame you.
12        Before you became the hardware manager in
13 Pinedale, did you ever work any overtime for Ridley's and
14 get paid overtime?
15   A.   Before moving to Pinedale?
16   Q.   Yeah.
17   A.   With Ridley's?  I -- I don't recall exactly.
18   Q.   Did you have an understanding before you went
19 to Pinedale and became a hardware manager that if you
20 worked overtime, you were entitled to additional money?
21   A.   Most jobs do, yes.
22   Q.   So that was your understanding?
23   A.   Yes.
24   Q.   Before you became a hardware manager for
25 Ridley's in Pinedale, did you understand that people in

Page 32

1  management got a fixed salary rather than being paid by
2  the hour?
3    A.   Yes.
4    Q.   Who -- how did you gain that understanding?
5    A.   That was when I was offered my job on a weekly
6  pay rate --
7    Q.   Okay.
8    A.   -- to move to Pinedale, the official.
9    Q.   Okay.  So before then, the store director or
10 the assistant store managers in Highland, did you assume
11 they were getting hourly too?
12   A.   I did not know.
13   Q.   Okay.  Who explained to you what would change
14 when you became a hardware manager for Ridley's in
15 Pinedale?
16   A.   I spoke with -- well, it's really a couple of
17 different people.  I had conversations with one of their
18 corporate supervisors, who was like a district manager,
19 so to speak, David Peterson, as well as Mark Ridley
20 directly.
21   Q.   Did you like Mark?
22   A.   He was okay.  Nothing bad to say.
23   Q.   So was this something you were seeking, or did
24 they just knock on your door and say, Cameron, we'd like
25 to promote you and have you move to Pinedale?

Page 33

1    A.   It was more that they approached me about it.
2    Q.   Okay.  The performance evaluation we saw
3  indicated that you wanted to learn more about management
4  and to move up in the company, right?
5    A.   Correct.
6    Q.   That had to be a happy thing when they came to
7  you and said, We want to promote you and put you in
8  charge of hardware up in Pinedale?
9    A.   You know, it was a promotion.  Who wouldn't be
10 happy with a promotion?
11   Q.   Okay.  And so what else do you remember being
12 told would change about the way you worked other than
13 being now paid weekly?
14   A.   Mostly -- I believe that was about it that I
15 can recall.
16   Q.   Were you full time at Highland before that, 40
17 hours a week?
18   A.   Well, when I was at -- Eagle Mountain was the
19 store I was in before.
20   Q.   I keep saying Highland.  Sorry.
21   A.   That's okay.  I was hourly there, yes, and full
22 time.
23   Q.   Okay.
24   A.   Up to 40 hours.
25   Q.   So when the job duties were explained to you

JONATHAN ESPARSEN vs RIDLEY'S FAMILY MARKETS
CAMERON HARRIS on 01/18/2022                                      Pages 34..37

Page 34

1  about what would change in going to Pinedale, you were
2  told that your pay would change to weekly, right?
3       A.   Correct.
4       Q.   You were told that the number of hours you were
5  going to work each week would be more?
6       A.   That I don't remember.
7       Q.   Okay.  When is the first time you learned that
8  a week on the job as a hardware manager would be more
9  than the 40 hours you had been working before?
10      A.   After I had arrived in Pinedale, I believe.
11      Q.   Okay.  And so Val assigned your hours to you?
12      A.   That I -- I don't recall.
13      Q.   Somebody did though?
14      A.   I -- I would think so, yes.
15      Q.   How would you learn what your schedule was?
16      A.   I -- I believe we were given a certain
17 guideline on how to write a schedule for that department.
18 And I think if it fell within the certain shifts we were
19 required to work, then I think I -- I believe I wrote the
20 schedule for the hardware department.
21      Q.   Okay.  So one of the first duties you had as a
22 manager in the hardware department is you were setting
23 the hours for other employees in the hardware department,
24 correct?
25      A.   I was writing what times they -- they were

Page 35

1  scheduled, but not necessarily calculating what we could
2  schedule and hours required and all that.
3       Q.   How many employees did you supervise as the
4  manager of the hardware department in Ridley's?
5       A.   It varied.  I don't exactly remember.
6       Q.   What was the smallest number?  What was the
7  biggest number?
8       A.   Probably anywhere between three to five.
9       Q.   Okay.  And so in terms of when they would work,
10 you would determine when those people would come in to
11 work and cover shifts in the hardware department in
12 Pinedale?
13      A.   In the hardware department, yes.
14      Q.   Okay.  Was there anyone -- once you got trained
15 in how to do that job, was there anyone that would look
16 over your shoulder and say, Hey, this person needs to
17 work more, work less?
18      A.   The store director, yes, if there was conflicts
19 with how the schedule was written.
20      Q.   So when you would write out a schedule for a
21 given week, would you turn it over to somebody to review
22 and approve?
23      A.   Yes.  That would be the store director.
24      Q.   Okay.  And so you reported -- while you were
25 the hardware manager, you reported directly to the store

Page 36

1  director?
2       A.   Yes.
3       Q.   Okay.  You didn't have an assistant store
4  manager in between you and the director?
5       A.   Correct.  I did not.
6       Q.   Okay.  Did you start working a 50-hour week
7  from day one in Pinedale?
8       A.   Yes, from what I can recall.
9       Q.   And that was okay with you?
10      A.   At the time, I had just moved out there, and I
11 had no choice.  If I wanted to keep that job, yes.
12      Q.   And whatever they were paying you for the time,
13 you agreed that's what you would be paid for the time you
14 were putting in?
15      A.   Correct.
16      Q.   Other than getting a letter and a week later
17 saying you wanted to be a part of this lawsuit, have you
18 ever complained to any employer for working overtime and
19 not being paid?
20      A.   Not that I can recall, no.
21      Q.   What are your hours at PetIQ?
22      A.   I work a 40-hour work week Monday through
23 Friday.
24      Q.   When you were working at Ridley's, were there
25 postings -- I mean, was there a bulletin board in the

Page 37

1  break room or something that would say there's a job
2  opening in the Twin Falls store or something like that?
3       A.   I can remember on occasion there were job
4  postings outside the manager's office.
5       Q.   So those wouldn't be emailed or done
6  electronically, you would just see a physical posting on
7  a bulletin board of some kind?
8       A.   Depends on when I was the store manager versus
9  another type of employee there.  Most of the time it was
10 just posted, printed on the wall for most employees.
11      Q.   I can't remember the name of the other person.
12 You say before moving to Pinedale and becoming the
13 hardware manager, you talked to Mark Ridley, and there
14 was another person?
15      A.   His name was David Peterson.
16      Q.   Peterson?
17      A.   Yes, sir.
18      Q.   You liked working at Ridley's enough to move
19 to -- your family to Pinedale?
20      A.   Yeah.  At the time I had only worked for them
21 for a few months.  I liked what I was doing at the time,
22 yes.
23      Q.   Okay.  When -- so what happened that led to a
24 promotion from managing hardware to becoming an assistant
25 store manager in Pinedale?

Page 38

1   A.   I don't know the exact details.  That was a job
2  that was offered to me, and a position had opened up
3  because they were planning on moving another manager to a
4  different store from what I understand, so that position
5  needed to be filled.
6       Q.   So that's my question.  There was an opening
7  and you applied for it, or someone tapped you on the
8  shoulder and said, Hey, we'd like you to get a promotion?
9       A.   It was more of an informal conversation.  I
10 never applied, put in an application or anything that I
11 can recall.
12      Q.   Okay.  So when you first heard someone -- well,
13 what was the chronology?  You heard someone was being
14 transferred, and then you expressed an interest in being
15 promoted, or they just came to you and said, Someone's
16 leaving, we want to promote you?
17      A.   That was more the case, that they had just come
18 to me and said, Hey, we've got a position that's going to
19 open up, we want you to learn more of the grocery
20 business side of things.  And it all happened pretty much
21 the same time.
22      Q.   Okay.  Did you get any kind of letters or forms
23 in being promoted from hardware manager to assistant
24 store manager in Pinedale?
25      A.   That I don't recall.

Page 39

1       Q.   Were you paid twice a month while you were a
2  manager for Ridley's?
3       A.   Yes.
4       Q.   And so when you changed from hardware manager
5  to assistant store manager, how much say did you have in
6  your personal schedule?
7       A.   Moving up to an assistant, how much say did I
8  have?
9       Q.   Yeah.
10      A.   Not very much at all.
11      Q.   The store director would just decide what shift
12 you were going to work?
13      A.   Yes, sir.
14      Q.   Are there any shifts that you remember working
15 more than another?  I've got the 7 to 6, 9 to 8, and 1 to
16 12.
17      A.   As an assistant store manager?
18      Q.   Yes.
19      A.   Probably -- mostly 9 to 8.
20      Q.   And during that 9-to-8 timeframe in Pinedale
21 while you were an assistant store manager, was there
22 another assistant store manager working at the same time?
23      A.   In a typical week, yes, I believe so.
24      Q.   There were times when you were at the store as
25 the only manager -- well, let me start that over.

Page 40

1            While you were an assistant store manager in
2  Pinedale, there were occasions when you were the only
3  manager in the store, weren't there?
4       A.   I believe so, yes.
5       Q.   So there wouldn't be another assistant manager,
6  and the store director wouldn't be there either, correct?
7       A.   Correct.
8       Q.   So there were times when you were the only
9  manager.  What's the biggest number of management people
10 you can remember ever being in the Pinedale store?
11      A.   At any given time?
12      Q.   At any given time.
13      A.   Three.  Three or four.
14      Q.   Are you including hardware manager among those?
15      A.   Yes.
16      Q.   Okay.  Were there other department managers
17 besides hardware?
18      A.   There were other department supervisors, yes.
19      Q.   So now you're using the term "supervisor."
20 Tell me the difference.
21      A.   Well, those -- I guess -- really, the term was
22 "department head."
23      Q.   Okay.  So hardware, you were the hardware
24 department head?
25      A.   I was -- that position was the hardware

Page 41

1  manager.
2       Q.   Okay.  And then produce would have a department
3  head?
4       A.   Correct.
5       Q.   Do you know if they were being paid hourly?
6       A.   Yes, they were paid hourly.
7       Q.   Were those department heads scheduling other
8  employees like you were doing in hardware?
9       A.   Yes, they were.
10      Q.   How many department heads were there in
11 Pinedale at any one time, not physically in the store,
12 but just had that role?
13      A.   Just on staff?  I would say there were three.
14      Q.   Hardware and what?
15      A.   Well, besides the hardware, there were three --
16      Q.   Okay.
17      A.   -- is what I mean to say.  There was produce
18 department head, meat department -- and I guess there was
19 four.  You've got produce, meat, deli, and bakery.
20      Q.   When you were store director in Pinedale, how
21 many employees were you responsible for total?
22      A.   I don't remember the number.
23      Q.   Do you remember what the range would have been?
24      A.   I'd say anywhere -- as the store director, over
25 50 to 60 employees maybe.

Page 42

1  Q.  How many employees at any one time would you
2  expect to see in the Pinedale store, everyone included,
3  managers and hourly employees?
4  A.  Maybe around 30 to 40.
5  Q.  30 or 40?
6  A.  Yeah, to be in store at that time.
7  Q.  That's how many people it takes to operate a
8  Ridley's grocery store?
9  A.  That's what we had at the time in Pinedale.
10  Q.  Okay.  On the occasions when you were the only
11  manager at the store, no store director, no other
12  assistant manager, you knew that you were responsible for
13  those 30 to 40 employees in the store, didn't you?
14  A.  At the moment, yes.
15  Q.  Going back to hardware manager, how many
16  employees would you say you hired to work in your
17  department while you were at Ridley's?
18  A.  That I hired as the hardware manager?
19  Q.  Yeah.
20  A.  I did not hire any of them as the hardware
21  manager.
22  Q.  I'm sorry.
23  A.  As the hardware manager, I did not hire any of
24  them.
25  Q.  Okay.  So if I wanted to go and work in the

Page 43

1  hardware department at Ridley's, I would never talk to
2  you?
3  A.  Not directly, no, as far as the hiring process
4  goes.
5  Q.  Okay.  How many employees did you let go while
6  you were the hardware manager at Pinedale?
7  A.  Personally, I did not let anybody go.  That was
8  not my decision.
9  Q.  Did you want to let someone go, and someone
10  wouldn't let you fire them?
11  A.  Not that I can recall.
12  Q.  So if someone in your department -- while you
13  were the hardware manager, if one of your employees you
14  learned was stealing, you didn't think you had the
15  ability to say, You're gone?
16  MS. RHEAUME:  Object to form.
17  THE WITNESS:  I did not have the ability to,
18  no.
19  Q.  (By Mr. Morris) Did someone tell you that you
20  didn't have the right to hire or fire?
21  A.  Yes.
22  Q.  Who?
23  A.  That would have been the store director.
24  Q.  So Val told you, Cam, you're the hardware
25  manager, but no matter what, you can't let anybody go,

Page 44

1  and it's not your position to hire anyone?
2  A.  Correct.
3  Q.  Okay.  Did he tell you that more than once?
4  A.  There might have been an occasion or two, but
5  it was generally understood that all the hirings and
6  firings went through him.
7  Q.  So assistant store manager, now you're ASM
8  instead of a hardware manager, is it still your testimony
9  that as an assistant store manager, you couldn't let
10  anybody go?
11  A.  That is correct.
12  Q.  No matter how bad they behaved?
13  A.  Without permission from the store manager, no.
14  Q.  Did that ever happen where you got permission
15  and you let somebody go because they were a bad employee?
16  A.  As an assistant store manager?
17  Q.  Yes.
18  A.  No, not that I recall.
19  Q.  Do you ever remember going to the store
20  director and saying, This person needs to be gone, and he
21  just said, No, we're going to keep him or her?
22  A.  Not that I remember, no.
23  Q.  So you never tested your ability to hire and
24  fire?
25  A.  I can't think of an instance.

Page 45

1  Q.  Do you think if you had gone to Val and said, I
2  can't work with this person anymore, you need to let them
3  go, that Val would have overruled your decision and kept
4  that person on?
5  MS. RHEAUME:  Object to form.
6  THE WITNESS:  He might have.  I don't know.
7  Q.  (By Mr. Morris) Did you get along with Val?
8  A.  I did, yes.
9  Q.  He trusted you, didn't he?
10  A.  He did.
11  Q.  Tell me about the additional responsibilities
12  you did get when you became an assistant store manager in
13  Pinedale.
14  A.  I was to write grocery orders for the store,
15  unload the grocery trucks two or three times a week, fill
16  in as a cashier when needed, work the customer service
17  booth, for example, Western Union services and other
18  things that couldn't be done on the cash register,
19  throwing freight to the shelf, stocking the items,
20  organizing the stockroom, assist the hardware department
21  in filling propane bottles when they couldn't get out
22  there for customers, assisting them unload -- to unload
23  their truck when there wasn't somebody who could do that,
24  assist customers in that department, be responsible for
25  the money at closing time, counting the safe.

JONATHAN ESPARSEN vs RIDLEY'S FAMILY MARKETS
CAMERON HARRIS on 01/18/2022

Pages 46..49

Page 46

1       Another duty to fill in for the store director
2 on the mornings he was off as far as filling in the books
3 and the paperwork bill for that day.  That's about all I
4 can think of for the moment.
5      Q.  Were there opening responsibilities too for an
6 assistant manager?
7      A.  Not typically, unless the store director was
8 gone.
9      Q.  Was it typically the store director that would
10 show up at 7:00 to open the store?
11     A.  Yeah.
12     Q.  So when you were store director in Pinedale,
13 were your hours typically 7 to 6?
14     A.  Yes.
15     Q.  Okay.  When you were an assistant store manager
16 in Pinedale, did you -- you scheduled other employees,
17 didn't you?
18     A.  As an assistant?
19     Q.  Yeah.
20     A.  Not that I can recall.
21     Q.  You never set a schedule for anyone while you
22 were an assistant store manager in Pinedale?
23     A.  Not as an assistant store manager, no.
24     Q.  Okay.  Who trained you to become an assistant
25 store manager in Pinedale?

Page 47

1     A.  The -- the other -- at first it was the other
2 manager who was leaving.  His name was Scott Christensen.
3 And then beyond that, it was the store director, Val.
4     Q.  Was there a third assistant store manager?
5     A.  That I don't remember.  I believe it was just
6 Val, Scott, and I.
7     Q.  So before you became assistant store manager,
8 it was Val and Scott as the managers?
9     A.  As I recall, yes, I believe so.
10    Q.  Okay.  Was it necessary that an assistant
11 manager be there at closing at midnight?
12    A.  That I don't remember.
13    Q.  Did Ridley's have a policy about that, that
14 there has to be at least one ASM there when we close to
15 take care of the cash and all that?
16    A.  No, I don't remember a policy stating such.
17    Q.  So before you were an assistant store manager,
18 there was Val who typically worked 7 to 6?
19    A.  Uh-huh (affirmative).
20    Q.  Scott would work a different shift presumably?
21    A.  Uh-huh (affirmative).
22    Q.  But he didn't always work until midnight,
23 right?
24    A.  Not always, no.
25    Q.  So whose responsibility would it be to get the

Page 48

1 cash out of the cash registers and put it in the safe and
2 lock up if neither Val nor Scott were there?
3     A.  There was a closing -- closing manager, I
4 believe, that would do that.
5     Q.  You don't know if that person was hourly or
6 salaried?
7     A.  That I don't know for sure.
8     Q.  And was that a job title people had, I'm the
9 closing manager?
10    A.  I believe so.  I don't remember the specifics
11 of it.
12    Q.  Do you remember what your -- when you first
13 became assistant -- well, let's start with hardware
14 manager.
15       Do you remember what your opening salary was
16 when you moved to Pinedale?
17    A.  Oh, gosh, I -- I don't recall.  I don't know.
18    Q.  Okay.  Was it an annual salary just divided by
19 52 weeks, or was it a weekly -- how did you understand
20 it, your salary?
21    A.  The way it was described was on a weekly basis.
22    Q.  Okay.  Did you get any raises before you became
23 an assistant store manager?
24    A.  I don't -- I don't recall if I did or not.
25    Q.  Do you remember what your first salary was when

Page 49

1 you became an assistant store manager?
2     A.  I don't remember that either.
3     Q.  Okay.
4     A.  It's been a while.
5     Q.  Was that weekly as well?
6     A.  Yes, it was explained to us as a weekly figure
7 as well.
8     Q.  Okay.  And you just did the math in your head
9 times 52, and that's -- that's your annual salary?
10    A.  Generally, yes, that's --
11    Q.  Okay.  Were there set vacation hours for you?
12    A.  Not specific vacation time, no.
13    Q.  So you didn't know when you became the hardware
14 manager if you would get a week off or two weeks off a
15 year?
16    A.  Not that I remember.
17    Q.  Okay.  Did you take any vacations?
18    A.  I'm sure I've taken some time off, but I don't
19 recall exactly when that was.
20    Q.  You don't remember ever being told this is how
21 much you're going to get paid a week no matter how many
22 hours you work?
23    A.  Yes, I was told what we were going to be paid
24 no matter what.
25    Q.  No matter how many hours you worked?

Page 50

1    A.   Correct.

2    Q.   Okay.  Were there ever weeks where you didn't
3  work 50 hours?

4    A.   In a typical week, no.

5    Q.   When you went on vacation, I assume you took
6  some vacations while you were working in Pinedale?

7    A.   Yeah.  That's fair to assume.

8    Q.   And you got paid while you were on vacation
9  too, didn't you?

10    A.   If I had the time off, the paid time off for
11  it, yes.

12    Q.   Okay.  So one of the perks of being a manager
13  at Ridley's was there would be time off, and you would
14  still get paid, right?

15    A.   Correct.

16    Q.   And that wasn't the case for people working
17  hourly, right?

18    A.   I believe the hourly employees had paid time
19  off as well that accrued.

20    Q.   Was that in writing?  Was it just
21  catch-as-catch-can?

22    A.   I don't remember how that was recorded.  I
23  couldn't exactly tell you.

24    Q.   Okay.  Were you eligible for bonuses as the
25  hardware manager in Pinedale?

Page 51

1    A.   That I don't remember.

2    Q.   Were you eligible for bonuses as an assistant
3  store manager in Pinedale?

4    A.   As an assistant?  I don't recall what -- what
5  bonus schedule there was, if any, as an assistant.

6    Q.   You don't remember ever getting a bonus of any
7  kind?

8    A.   I do as a store director.  I remember having
9  different sets of performance pay and things like that.
10  But as far as the other two management positions, I don't
11  recall.

12    Q.   Okay.  Did you get salary increases while you
13  were the assistant store manager in Pinedale?

14    A.   During the period that I was the assistant
15  manager, did I get a salary increase?

16    Q.   Yeah.

17    A.   I don't -- I don't remember if I did.

18    Q.   Do you remember being told that there were any
19  criteria that you could meet in order to get a raise in
20  salary?

21    A.   I don't recall that either.

22    Q.   Could have happened, but you just don't
23  remember?

24    A.   It's possible.  Yes.

25    Q.   Okay.  Other than your salary as an assistant

Page 52

1  store manager at Ridley's, was there any other
2  compensation that you received?

3    A.   I don't recall that.

4    Q.   Health benefits?

5    A.   There were health benefits offered, and -- I
6  believe that I did have health benefits, yes, when I was
7  an assistant manager.

8    Q.   That you didn't have as an hourly?

9    A.   I'm sorry?

10    Q.   That you did not have as an hourly employee?

11    A.   Yeah, I -- that is correct.  I never received
12  benefits as an hourly.  They were offered, but I never
13  elected to choose.

14    Q.   Okay.  As an assistant store manager, you were
15  offered benefits on top of your salary, and you elected
16  to receive them?

17    A.   Correct.

18    Q.   Okay.  Tell me what other benefits you can
19  remember receiving.

20    A.   I -- I don't remember anything besides that,
21  besides the health benefits.

22    Q.   Paid vacation, you wouldn't consider that a
23  benefit?

24    A.   Well, yes, that would be -- a benefit would be
25  the paid time off.

Page 53

1    Q.   Okay.  Do you remember ever signing an
2  acknowledgment that you had been informed that you were
3  an exempt employee?

4    A.   I would have to see the document.  I don't
5  recall.

6    Q.   Could have happened, you just don't remember?

7    A.   I don't recall.

8    Q.   Could it have happened though?

9    A.   It's possible.

10    Q.   I mean, there's two kinds of "I don't recall."
11  I don't recall being in China.  Well, I've never been
12  there, so --

13    A.   Okay.

14    Q.   -- that makes it easy.  But I don't recall what
15  I had for dinner last Thursday.  I know I had dinner last
16  Thursday, I just don't remember what it was.

17         So this kind of "I don't recall," is it
18  something you don't think could have happened, or you
19  know it didn't, and that's why you don't recall it?

20    A.   It could have happened, yes.

21    Q.   Okay.  You understood, too, when you became a
22  salaried employee as a hardware manager and as an
23  assistant store manager that you were going to get the
24  same amount of money, even if you worked less than 50
25  hours a week?

Page 54

1    A.   Yes, I did.

2    Q.   Do you have any personal records of the
3  compensation you got while you were at Ridley's?

4    A.   Not that I can think of, no.

5    Q.   W-2s, tax returns from those years, did you
6  hang on to any of that?

7    A.   They -- they could be somewhere, but I can't
8  recall at this time where they would be if in my
9  possession.

10       MR. MORRIS:  We've been going a while.  Let's
11 take a break.

12       (Recess taken at 2:16, resuming at 2:28.)

13       (Exhibit 4 marked.)

14    Q.   (By Mr. Morris) Cameron, let me show you what
15 we've marked as Exhibit 4 for your deposition.  Have you
16 seen this document before?

17    A.   Yes, I have.

18    Q.   Is that your signature there?

19    A.   It appears so.

20    Q.   So do you think it was about a week before
21 April 15, 2020, that you first learned about this
22 lawsuit?

23    A.   That's what I think, yeah.

24    Q.   Okay.  Again, just to confirm, before you
25 signed this agreement or this Consent to Join Lawsuit,

Page 55

1  you hadn't spoken to anyone about whether you should or
2  shouldn't do it?

3    A.   No, I have not.

4    Q.   Okay.  You've described -- as an assistant
5  store manager in Pinedale, you described that there were
6  three daily shifts that you would work.  What about
7  hours -- I mean, days of the week.  Was there anything
8  typical about what days of the week you would work?

9    A.   Not really typical.  It could vary, any day of
10 the week.  It was a seven-day-a-week operation.

11    Q.   But in any one week, you wouldn't work more
12 than five, would you?

13    A.   It depended on the situation, but typically
14 five or six.

15    Q.   Five to six days?

16    A.   Uh-huh (affirmative).

17    Q.   And you'd be scheduled for that many?

18    A.   Yes.  So it would be five days one week and six
19 the next.

20    Q.   I see.  Okay.  And did those days usually run
21 consecutively, or would you --

22    A.   Sometimes they did.

23    Q.   So in any -- in any Sunday-to-Sunday week, you
24 would start on one day, and you'd work five consecutive
25 or six consecutive days, and then you'd have a day off?

Page 56

1    A.   It was possible, yes.

2    Q.   But you wouldn't work Monday, Tuesday, skip
3  Wednesday, and then Thursday, Friday, Saturday?

4    A.   That would happen on occasion.  It just
5  depended on how the store director wrote the schedule
6  that week.

7    Q.   When you were store director, that's how you
8  would run things for the 60 employees under you?

9    A.   That's what I tried to do, yes.

10    Q.   Okay.  You requested shifts of Val, didn't you,
11 when you were the assistant store manager?

12    A.   On occasion if there was something I needed
13 time off for, yes.

14    Q.   He would accommodate you, wouldn't he?

15    A.   For the most part, yes.

16    Q.   Your last answer implied there might be one
17 week where you had a doctor's appointment or something,
18 and it would change just for that week.

19       Did you ever go to Val and say, I really would
20 just prefer to work the 9-to-8 shift?

21    A.   Not that I recall doing.

22    Q.   You would just let Val dictate your hours then?

23    A.   Correct.

24    Q.   Okay.  Did you ever go to him and say, I don't
25 want to work the midnight shift, I don't want to work the

Page 57

1  early morning shift?

2    A.   No, I don't remember doing that to him.

3    Q.   Do you feel that if you had done that, he would
4  have tried to accommodate you?

5    A.   He may have tried, yes.

6    Q.   There's no reason why he wouldn't that you're
7  aware of, is there?

8    A.   Not that I'm aware of, no.

9    Q.   As an assistant store manager on a typical
10 shift, let's say the 9-to-8 shift, when would you expect
11 to get breaks and for how long?

12    A.   Generally, I would expect an hour lunch kind of
13 midway through the day, so maybe 4:00 if you're working 9
14 to 8.  And that was just kind of taken when you could.

15    Q.   What about rest breaks?

16    A.   There's restroom breaks.  As far as 10- or
17 15-minute breaks, we never really took those that I can
18 recall.

19    Q.   No one was keeping track of that, were they?

20    A.   No.  Other than the lunch breaks were scheduled
21 in -- in the timecard system, but there wasn't an actual
22 record of when we went, an exact time.

23    Q.   So if you had the 9-to-8 shift, you would be
24 told this is the hour when you're going to go on your
25 lunch break?

Page 58

1    A.   Generally, yes.
2    Q.   But that didn't always happen, right?
3    A.   Correct.
4    Q.   You were free to break earlier or later?
5    A.   If the opportunity arose.
6    Q.   That was your call, right?
7    A.   It depended on what was going on. Sometimes
8    the store director would say, Hey, we have to have you
9    stay until this time. If not, you can go to him and ask
10   him if you could take a break at a certain time.
11   Q.   So was 4:00 to 5:00 the usual meal break you
12   would get on a 9-to-8 shift?
13   A.   Typically, yes, if I recall.
14   Q.   Okay. And if you wanted to take a break at 3
15   instead of 4, you felt you could do that as long as your
16   job was getting done?
17   A.   If -- if it was approved by the store director,
18   yes.
19   Q.   Did you feel that you had to go to Val if you
20   wanted to break for lunch at 3:30 or 3 instead of 4?
21   A.   Yes.
22   Q.   Did you ever do it without asking him?
23   A.   I can't think of a particular time, no.
24   Q.   Do you ever remember Val being upset with you
25   because of your taking breaks of any kind at times he

Page 59

1    didn't think were right?
2    A.   Not specifically, no.
3    Q.   How about generally?
4    A.   Generally? It's possible. I -- I don't have
5    any knowledge of it.
6    Q.   Okay. As an assistant store manager in
7    Pinedale sitting here today, you don't recall how many
8    weeks a year you could take off?
9    A.   I don't remember specifically how it was
10   calculated.
11   Q.   Could have been four weeks, could have been
12   three weeks, two weeks? You just don't know?
13   A.   I don't recall how it was calculated, no.
14   Q.   As an assistant store manager, if employees
15   working under you wanted to take a break at a different
16   time than what was in their schedule --
17   MS. RHEAUME: Object to form.
18   MR. MORRIS: Pardon?
19   MS. RHEAUME: I said "object to form."
20   MR. MORRIS: I'm not done yet.
21   MS. RHEAUME: Oh.
22   MR. MORRIS: Let me start over.
23   Q.   (By Mr. Morris) As an assistant store manager,
24   if any of the employees working under you wanted to take
25   a break different from what was in their schedule, did

Page 60

1    you -- I mean, you had the ability to say, Sure, you can
2    take off for lunch an hour early, if that's what they
3    wanted?
4    MS. RHEAUME: Now I'll object to form.
5    MR. MORRIS: Okay.
6    THE WITNESS: That was more the store
7    director's final say in that.
8    Q.   (By Mr. Morris) So your -- you're working at
9    3:00 in the afternoon. Val's in the store, and you're
10   the assistant store manager. And a cashier comes to you
11   who's supposed to go to lunch at 4:00, and the cashier
12   comes to you and says, It's really dead, I'm going to be
13   hungry, can I go to lunch at 3 instead of 4?
14   As the assistant store manager, could you look
15   around, see it was dead, and say, Sure, you can take off
16   earlier for lunch?
17   MS. RHEAUME: Object to form.
18   THE WITNESS: I would not do that. I would --
19   it would be more of a "let me run that by the store
20   director" kind of situation where I did not have that say
21   to say yes, go ahead, or no.
22   Q.   (By Mr. Morris) Okay. So now it's 6:00. Same
23   scenario, only Val's gone home. Now you're the only
24   manager in the store. Same question.
25   You had the discretion to tell an employee they

Page 61

1    could leave for a meal break an hour earlier than
2    scheduled, didn't you?
3    A.   If the store director were not there, then we
4    had the authority to, yes.
5    Q.   If Val were to testify that, Of course, Cam
6    could have let a cashier take an earlier break without
7    talking to me, would you think he was not being truthful?
8    MS. RHEAUME: Object to form.
9    THE WITNESS: If he were to testify that I had
10   the ability to, that he would not be truthful, was that
11   your question?
12   Q.   (By Mr. Morris) Yeah, let me ask it again so
13   we're clear.
14   If Val were to testify, Well, of course,
15   Cameron could let a cashier take an earlier meal break
16   without having to talk to me, even if I'm in the store,
17   would you say that wouldn't be truthful if he said that,
18   if he testified to that?
19   A.   If he testified to that, I would say that would
20   not be truthful.
21   Q.   So you think he ran a really tight ship, and
22   everything had to be run by him as long as he was in the
23   store?
24   A.   Yes. I would agree.
25   Q.   Was there any kind of personal time-off policy

Page 62

1    that was different from vacation time at Ridley's while
2    were you the assistant store manager at Ridley's?
3         A.   Not that I recall.  I think it was all lumped
4    into one policy.
5         Q.   How about sick leave, were there sick days that
6    would accumulate during the year?
7         A.   Not that I recall, no.
8         Q.   Do you remember not working because you were
9    sick while you were the assistant store manager at
10   Ridley's?
11        A.   I'm sure it did happen.
12        Q.   And you still got paid on those days when you
13   didn't work and stayed home sick?
14        A.   Only if I had elected to use my personal time
15   off for that, my paid time off for that.
16        Q.   So paid time off is an umbrella that covers
17   vacation, sick, personal?
18        A.   From the way I understood it, yes.
19        Q.   And you don't remember if it was three days a
20   year or 30?
21        A.   I don't recall exactly how it was calculated,
22   no.
23        Q.   Did you have a desk of any kind or like a
24   personal workspace when you were an assistant store
25   manager?

Page 63

1         A.   Not in particular.  Wherever you could lean in
2    the stockroom.  Other than when the store director was
3    gone, you would use his desk to do those tasks that he
4    normally would if he were there.
5         Q.   Okay.  When you were an assistant store
6    director in -- was it Highland you went to?
7         A.   That was the last store I worked in, yes.
8         Q.   Yeah.  Who was your store director in Highland?
9         A.   His name was Justin White.
10        Q.   And all the things that you've told me about
11   how Val ran Pinedale, did Justin run Highland any
12   differently?
13        A.   In some regards, he may have.
14        Q.   How?
15        A.   He was a little more relaxed on things as far
16   as who had the authority to give breaks and that sort of
17   thing.  That would be one difference between the two
18   managers.
19        Q.   So you felt you had more discretion with Justin
20   to dictate, you know, work times and break times for
21   employees under you?
22        A.   Not necessarily -- well, yeah.  I would say I
23   had a little bit more discretion, but that was more on a
24   day-to-day basis.  Typically he would handle all the
25   scheduling and when people took breaks and that sort of

Page 64

1    thing.
2         Q.   No, I understand.  Store director sets the
3    schedules.  But in terms of when he's on site and an
4    employee comes to you as the assistant store manager, it sounds
5    like you didn't feel as obligated to go to Justin to get
6    approval for a discretionary decision like you did with
7    Val?
8         A.   Maybe on occasion, but most of the time I would
9    refer to him.
10        Q.   Did you have a set of keys for the store in
11   Pinedale when you were an assistant store manager?
12        A.   Yes, I did.
13        Q.   Were there any keys to anything that the store
14   director had that you did not have as an assistant store
15   manager?
16        A.   That I don't know.
17        Q.   As far as you know, you had an identical set?
18        A.   Yes.
19        Q.   To do your job as an assistant store manager in
20   Pinedale, did you need any -- anything that was the --
21   the company provided to you, like a laptop or a computer
22   or workstation of any kind?
23        A.   Not that I can think of, no.
24        Q.   Other than a set of keys and maybe a name tag
25   that identified you as a manager, were you given anything

Page 65

1    to perform your job as an assistant store manager that
2    you didn't have before?
3         A.   I don't believe so.
4         Q.   While you were an assistant store manager and
5    you had employees working under you in Pinedale, you felt
6    like you could direct their work, didn't you?
7              MS. RHEAUME:  Object to form.
8              THE WITNESS:  It depended on the task.  I mean,
9    if -- if it pertained to grocery, then I might be able to
10   tell them or ask them to do a certain thing.  But they
11   were primarily scheduled to do the job they were hired
12   for through Val.
13        Q.   (By Mr. Morris) Well, I understand Val set the
14   schedule, but if someone was stocking shelves and they
15   were doing a horrible job of it, you didn't run and tell
16   Val, did you?
17        A.   Not generally, no.
18        Q.   You would tell that employee, Look, this is how
19   you've got to do it, right?
20        A.   Yes.
21        Q.   Is there anyone in the store that was working
22   below people in management, like you, Scott, and Val,
23   whose activities you felt you had no right to direct?
24   Oh, no.  I'm sorry.  I can't tell you how to stock those
25   shelves or how to display things in the deli or display

JONATHAN ESPARSEN vs RIDLEY'S FAMILY MARKETS
CAMERON HARRIS on 01/18/2022                                           Pages 66..69

Page 66

1  things in hardware, that's Val's job, not mine?
2      A.   There were department heads where generally I
3  had no say in really on how they ran their departments.
4      Q.   Okay.  So if a department head -- let's use
5  your old job as hardware manager.  Who replaced you as
6  the hardware manager?
7      A.   There was another employee on site that was
8  promoted up.
9      Q.   Who was that?
10     A.   Her name was -- I don't remember her last name,
11  but it was Ashley.
12     Q.   Okay.  Can you remember anything that Ashley
13  did differently from you that you didn't think was the
14  right way to run hardware?
15     A.   I can't think of anything specifically, but
16  there could have been.
17     Q.   As the hardware manager, was it your job to
18  display things in hardware?
19     A.   Yes.
20     Q.   Val didn't tell you how to display things?
21     A.   He would, yes.
22     Q.   Well, obviously if Val comes to you and says, I
23  want hammers here and saws here, you would feel like you
24  had to follow his directions, right?
25     A.   Yes.

Page 67

1      Q.   But if you were to go to Ashley as an assistant
2  store manager and say, Ashley, I think the hammers should
3  be here and the saws should be there, you had the ability
4  to do that as an assistant store manager, didn't you?
5      A.   Not necessarily.  I -- I don't believe so, no.
6      Q.   Why not?
7      A.   That was more the store director's job to
8  oversee each department.
9      Q.   No one knew more about hardware than you did,
10  did they?
11     A.   Well, Val did.  I know he did.
12     Q.   You think Val knew more about hardware than you
13  as the hardware manager knew about hardware?
14     A.   Remembering his experience in another store,
15  yes, I do.
16     Q.   Okay.  Because he had worked in hardware
17  before?
18     A.   He had worked in a store that had a hardware
19  store, yes.
20     Q.   But do you know if he had ever been a hardware
21  manager?
22     A.   That I don't know.
23     Q.   So was your deference to Val on all matters
24  hardware because Val had had experience doing that or
25  just because he was store director?

Page 68

1      A.   Because he was the store director.
2      Q.   So your testimony is even though you had just
3  left the hardware department as the manager, you're now
4  an assistant store manager --
5      A.   Uh-huh (affirmative).
6      Q.   -- you didn't feel like you could direct Ashley
7  at all at doing the job that you just left?
8      A.   I could voice my opinion, but it wasn't my
9  place to -- to direct her on how to do things.
10     Q.   Did you ever go to Val and say, Hey, Ashley
11  isn't doing her job right?
12     A.   Not that I can remember, no.
13     Q.   Did you ever go to Ashley directly and say,
14  Ashley, you need to do better at X, Y, or Z?
15     A.   Not that I can remember, no.
16     Q.   You had the right to do that though, didn't
17  you?
18     A.   Not officially, no.  I could voice my opinion,
19  but it wasn't really my place to dictate how those other
20  departments ran.
21     Q.   If you were the only manager on site, so Val's
22  gone home, is there anything that a store director has
23  the right to do in your view that you couldn't do if you
24  were the only manager there?
25     A.   So -- yeah, I would say really the hiring and

Page 69

1  firing and discipline, even if he wasn't there, that
2  would have to wait for another time.  I did not have the
3  authority to make those decisions.
4      Q.   Anything else?
5      A.   Not that I recall, no.
6      Q.   So if Val took a two-week vacation and an
7  employee was caught stealing, you felt you had no ability
8  to discipline that employee?
9      A.   Not without getting permission from somebody
10  above Val.
11     Q.   Okay.  So an employee is stealing, you catch
12  them red-handed, you try -- Val's on vacation.  You try
13  calling in.  He doesn't answer.  You try calling a
14  regional manager or Mark Ridley, can't get ahold of
15  anyone.  You just -- that employee just keeps right on
16  working?
17     A.   From what I remember, yes.
18     Q.   And as assistant store manager, you didn't
19  think you had the right to stop the employment of an
20  employee that you had caught red-handed stealing?
21     A.   That is correct.
22     Q.   No one ever told you you didn't have that
23  authority, did they?
24     A.   I don't recall if they did or did not.  Well, I
25  do recall that any sort of termination of employment had

Page 70

1  to have Mark's final approval on it to make sure
2  everything was in order.  But it wasn't my -- my
3  understanding that I could just as an assistant manager
4  make that call right then and there.
5       Q.   How about just sending someone home, saying, I
6  can't get ahold of anyone, but you're not -- you're not
7  working here for the rest of the day, you could do that,
8  couldn't you?
9       A.   Yes, I believe so.
10      Q.   As an assistant store manager, you've got 30 or
11 40 people in the store, you would tell employees to do
12 things, wouldn't you?
13      A.   Maybe on occasion if they would ask, but they
14 knew their position and their roles, and they had things
15 to do, so I generally did not have to.
16      Q.   Well, a customer drops a jar of peanut butter
17 on aisle 3, and someone -- Jim is stocking the shelf
18 down, you know, a few feet away.  You had the right to
19 say, Jim, could you clean this up, please?
20           MS. RHEAUME:  Object to form.
21           THE WITNESS:  I suppose I could, yes.
22      Q.   (By Mr. Morris) You knew you could -- as an
23 assistant store manager, you knew you had the ability and
24 the right to say, Jim, please clean up this mess?
25      A.   Yes.

Page 71

1       Q.   You didn't have to run to Val and say, Hey, I
2  want Jim to clean up that mess on aisle 3?
3       A.   That's correct.
4       Q.   And there were other mundane typical tasks that
5  employees in a grocery store do that you felt you had the
6  ability to direct as an assistant store manager, right?
7       A.   As long as they weren't tasked by their
8  department head or the store director, then if I was the
9  only manager there, I could assign those tasks.
10      Q.   But even if the store director were there,
11 if -- if something comes up, a dropped -- you know, a
12 broken jar of something or -- I mean, too many shopping
13 carts in the parking lot, you look outside and there's
14 all these carts out there, as an assistant store manager,
15 you could go to any one of your employees and say, Could
16 you go out and get all the carts in?
17      A.   Yes, I could.
18      Q.   You knew you could?
19      A.   Yes.
20      Q.   Can you think of anything that you did not
21 think -- so we've talked about hiring and firing.  I
22 understand you didn't feel like could you hire people and
23 fire people as an assistant store manager, correct?
24      A.   Correct.
25      Q.   Okay.  You also said you couldn't discipline

Page 72

1  them, right?
2       A.   Correct.
3       Q.   You could send them home --
4       A.   Yes.
5       Q.   -- in a -- you know, I mean, there are
6  different circumstances.
7       A.   In certain circumstances.
8       Q.   Because that's an example I gave you, right?
9       A.   Yes.
10      Q.   Can you think of anything else that you felt
11 that you could not do as an assistant store manager
12 without having the store manager's approval?
13      A.   Nothing comes to mind at the moment, no.
14      Q.   In fairness, you said you didn't think you
15 could direct the heads of departments?
16      A.   Yes.  That is correct.
17      Q.   Okay.  So hire, fire, discipline, directing
18 department heads?
19      A.   Correct.
20      Q.   Everything else that a store director is
21 entitled to do you felt, as an assistant store manager,
22 you had the right to do?
23      A.   Yes, other than what we just discussed.
24      Q.   Did employees ever come to you and complain
25 about anything?

Page 73

1       A.   I'm sure they did.
2       Q.   You didn't feel like you had to go to Val every
3  single time to resolve that employee complaint, did you?
4       A.   Maybe not every single time, no.
5       Q.   Can you give me an example of an employee
6  complaint that you ever got where you felt, oh, I've to
7  take this to Val, I can't handle this on my own?
8       A.   Yes, I can think of an instance where our deli
9  department head had a complaint about another department
10 head in the way that they shared the cooler space.  And I
11 went ahead and just took that to Val.  That's not
12 something that I really can make a final call on.
13      Q.   Okay.  But resolving a dispute between
14 department heads seems consistent with your idea that you
15 couldn't direct them?
16      A.   Correct.
17      Q.   If two employees were on an aisle stocking
18 shelves, and one thought peanut butter should go this far
19 and the other one thought that peanut butter should only
20 have three feet of space instead of four, you could
21 resolve that dispute among hourly employees without
22 having to go to Val to resolve it, couldn't you?
23      A.   As it pertained to the grocery department, yes.
24      Q.   Is that because it was not deli, not meat, not
25 produce, and not hardware?

Page 74

1    A.   In the example you gave, yes, that it was part
2  of the grocery department.
3    Q.   Is it fair to say that as an assistant store
4  manager, grocery was sort of your department, like
5  hardware was the hardware manager's department?
6    A.   That's fair to say, yes.
7    Q.   Okay.  I get it.
8         How much of your job as an assistant store
9  manager was training new employees their jobs?
10   A.   I -- I don't recall training -- I don't really
11 recall training any of the grocery employees or any other
12 employees that I can think of personally.
13   Q.   Whose job was it?
14   A.   There were -- we had like a customer service
15 manager who would -- who would train the cashiers.  She
16 was like the head cashier.  As far as stockers and that
17 thing go, they kind of had a lead on that team.  That
18 wasn't really an official title, but the most experienced
19 person would show them how do that.  But I don't
20 recall -- well, do I recall training maybe a grocery
21 manager.
22   Q.   While you were an assistant store manager?
23   A.   Yes.
24   Q.   When did you first get your training as -- to
25 work cash register?

Page 75

1    A.   I believe it was just kind of as the days went
2  on when I was -- well, I learned to work the register
3  when I was first hired with Ridley's as a hardware clerk.
4    Q.   Who trained you?
5    A.   My supervisor, the hardware manager.
6    Q.   When you were the hardware manager, did you
7  train new employees in the hardware department?
8    A.   Yes, I suppose I did.  I did.
9    Q.   Okay.  And so when you were promoted from being
10 the hardware manager to assistant store manager, did you
11 train less?
12   A.   Yeah.  Yes.
13   Q.   Okay.  Did you ever provide written evaluations
14 of employees?
15   A.   As assistant manager?
16   Q.   Yes.
17   A.   Not that I recall.
18   Q.   So we're not going to find any forms like this
19 where -- like Exhibit 2 where Cameron Harris is
20 evaluating an employee that worked under you as an
21 assistant store manager?
22   A.   I don't recall.  I may have filled one of those
23 out, but I can't think of a particular instance or
24 person.
25   Q.   Any reason why you couldn't fill one out?

Page 76

1    A.   It was mostly the store director's position to
2  evaluate job performance.
3    Q.   Did he ever ask you for input?
4    A.   He -- he's -- yeah.  He's -- I'm sure he's
5  asked me for input.
6    Q.   So your testimony is you don't recall actually
7  performing an evaluation of any employees while you were
8  an assistant store manager?
9    A.   Not that I can recall, no.
10   Q.   I can't remember if I asked you this earlier.
11 I'm sorry if I'm repeating a question.
12        Did you ever recommend to Val, We've got to
13 fire this person?
14   A.   I can't recall if I have or not.
15   Q.   Could have happened, but you just don't
16 remember?
17   A.   Correct.
18   Q.   Okay.  How about hiring, did you ever interview
19 anyone before they became a Ridley's employee?
20   A.   I may have been in the room while they were
21 being interviewed by the store director, but I've never
22 conducted them as an assistant store manager that I can
23 remember doing.
24   Q.   Okay.  So you never -- in all your time as an
25 assistant store manager, you never said, You're hired?

Page 77

1    A.   No.
2    Q.   What involvement did you have as an assistant
3  store manager in how much people got paid?
4    A.   That was not my place.  It was a payment
5  schedule put forth by corporate.  That was up to the
6  store director to work with them on.
7    Q.   So you never recommended that Susan get a raise
8  because she's just been outstanding the last three
9  months?
10   A.   I may have recommended, yes.
11   Q.   Did Val follow your recommendation?
12   A.   I'm sure on occasion.
13   Q.   Did you know what the people working under you
14 were paid?
15   A.   Not particularly, no.
16   Q.   There were times when you were involved in
17 determining whether someone gets a raise or a pay cut?
18   A.   It wasn't my decision, no.
19   Q.   I know it wasn't your decision.  My question
20 was you were involved with decisions about whether to
21 give someone a raise or a pay cut because of poor
22 performance?
23   A.   I may have been in the room to voice an opinion
24 to the manager after being in that situation where they
25 were talking to the employee, yes.

JONATHAN ESPARSEN vs RIDLEY'S FAMILY MARKETS
CAMERON HARRIS on 01/18/2022

Pages 78..81

Page 78

1    Q.  Okay.  Did you ever have any involvement in
2  whether an employee would be transferred?
3    A.  No.
4    Q.  How about merchandising?
5    A.  If you mean, you know, setting the displays and
6  setting up the department, yes, then as an assistant
7  manager, that was one of my responsibilities.
8    Q.  How about -- so as an assistant store manager,
9  you did have responsibility for how product was
10  displayed?
11    A.  To a certain degree, yes.
12    Q.  Okay.  How about what product was purchased,
13  did you have a role over grocery, for example, of
14  customers would come in and they -- they like -- you
15  know, they keep asking me about this product that we
16  don't have.  Did you have a role in deciding what
17  products would be purchased and put on display for sale?
18    A.  Yes, I could -- I could make that call within
19  reason.
20    Q.  Okay.  What's a product that you're proud you
21  brought in that wasn't there before?
22    A.  There was a lot of call for organic and
23  gluten-free items, just, for example, some salad dressing
24  that was gluten free that people had, that certain diet
25  restriction that they --

Page 79

1    Q.  Salad dressing has gluten in it?
2    MR. MORRIS:  Did you know this, April?
3    MS. RHEAUME:  Uh-huh (affirmative).
4    THE WITNESS:  There is a lot of things that do.
5    MR. MORRIS:  I'm shocked.  I had no idea.
6    THE WITNESS:  Yes.  When you live in a small
7  town and there's a small percentage of people that have
8  that restriction, it really -- really makes them happy.
9    Q.  (By Mr. Morris) Huh.  Any other things that you
10  did on your own in terms of ordering product?
11    A.  As an assistant manager, other than the
12  day-to-day grocery orders, what we were low on, out of,
13  what we needed to prepare for, that was primarily a
14  decision made with Val when there was big purchases for
15  upcoming seasonal items, or Halloween candy, for example,
16  would be one that comes to mind.
17    Q.  So when you wanted to order gluten-free
18  product, what was the process you went through?
19    A.  Generally I would run it by Val, and it was --
20  if it was just one item that was something I could cut
21  into the section, then I wouldn't receive a lot of
22  pushback on it.
23    Q.  So how does that happen?  So, you know,
24  customers are saying, Hey, you don't have gluten-free
25  salad dressing, I mean, what -- what does Cameron do in

Page 80

1  response to numerous customer requests like that?
2    A.  Well, I'd bring it up to -- bring it up to
3  management, the store director.  And then I would have
4  access to a product catalog from our food distributor and
5  find something comparable or something exactly what
6  they're looking for if they mention it by name and order
7  a case in and cut it into the set.
8    Q.  And you -- you made the determination where to
9  display it?
10    A.  Yes.
11    Q.  What department it would go into?
12    A.  The only things I had access to were
13  grocery-specific department.  For example, the food
14  distributor had different categories of departments, like
15  deli and produce, that I wouldn't order from.  But if it
16  pertained to the dry groceries and the freezer, then I
17  could, yes.
18    Q.  Employee safety, if you saw an unsafe practice
19  by an employee, you wouldn't wait to tell Val about it
20  before stopping it, would you?
21    A.  Correct.  I would not.
22    Q.  Do you recall fashioning or creating any safety
23  protocols at the store in Pinedale while you were an
24  assistant store manager?
25    A.  Not me, no.

Page 81

1    Q.  Just to be clear, so if you ever saw any of the
2  60 employees in a store -- I mean, total, any of the 30
3  or 40 that were there at any one time doing anything that
4  you thought was not safe, as an assistant store manager,
5  you had the right to direct them to stop whatever it was
6  they were doing that you thought wasn't safe?
7    A.  As it pertained to safety, yes.
8    Q.  Or to do something to be more safe?
9    A.  Yes.
10    Q.  If you ever saw a hazard in the store, you knew
11  that you had the right to correct that condition as an
12  assistant store manager?
13    A.  Correct.
14    Q.  Do you know if -- do you recall if Ridley's had
15  a written safety policy?
16    A.  There may have been something at hiring that
17  you signed.  I -- I believe there -- there could have --
18  I'm pretty sure there was.
19    Q.  And, again, if someone were violating a safety
20  protocol, you didn't think you had the right to fire
21  them?
22    A.  Correct.
23    Q.  Was there an alarm system in Pinedale?
24    A.  I don't believe there was, other than a couple
25  of emergency exits.  There wasn't an entire system.

Page 82

1  Q.   Like when you opened the store at 7:00, you
2  didn't have to turn off an alarm or turn it on when you
3  left at midnight?
4  A.   Not that I remember, no.
5  Q.   As an assistant store manager, how much
6  responsibility did you have for making sure proper
7  notices were posted, things that the law requires you to
8  put up for employees to see on bulletin boards and things
9  like that?
10  A.   As far as I knew, I did not have any
11  responsibility to make sure those were posted.
12  Q.   Who was -- who was responsible in your mind for
13  making sure that happened?
14  A.   That would have been the store director from
15  what I understand.
16  Q.   Okay.  Did the Pinedale store, when you were
17  assistant store manager, have a budget of some kind?
18  A.   As I was an assistant?  I mean, that's --
19  that's hard to answer because I know as a store director,
20  there was.  But when I was an assistant, I don't recall
21  really being privy to any of those -- those budgets or
22  anything like that.
23  Q.   So Val never consulted with you when he was
24  trying to figure out a store budget?
25  A.   Not -- not that I recall, no.

Page 83

1  Q.   And when you were store director, you didn't
2  get input from your assistant store managers when you set
3  a budget for the Pinedale store?
4  A.   Not that I remember, no.
5  Q.   Were you ever involved in any kind of
6  investigations, an employee complained about being
7  harassed, for example?
8  A.   The only investigations I remember are -- the
9  one brought to us from the Department of Justice.  But as
10  far as other investigations, I don't remember of any
11  right offhand.
12  Q.   When you became assistant store manager, were
13  you given any sort of handbook or written materials that
14  were different from what you had been given as a hardware
15  manager?
16  A.   No.
17  Q.   How many management meetings weekly would you
18  attend typically as an assistant store manager?
19  A.   As an assistant, I don't remember -- there may
20  have been one weekly meeting with the department heads,
21  that I believe once a week we met.
22  Q.   When you were store director, how many times a
23  week did you call your management people together?
24  A.   Probably the same.  Just that one weekly
25  meeting.

Page 84

1  Q.   Okay.  And where would that take place
2  typically in Pinedale?
3  A.   Either in our break room or the adjacent
4  manager's office.  It wasn't a very big store.
5  Q.   And those meetings took place during regular
6  workdays?
7  A.   Correct.
8  Q.   You didn't track your time while you were an
9  assistant store manager at Pinedale, did you?
10  MS. RHEAUME:  Hold on.  I missed the question.
11  Will you say that one more time?
12  MR. MORRIS:  Sure.
13  Q.   (By Mr. Morris) You didn't track your time
14  while you were an assistant store manager in Pinedale,
15  did you?
16  A.   Not personally.  Just whatever was presented on
17  the schedule.
18  Q.   Yeah.  I mean, if you had the 9-to-8 shift, you
19  would show up at 9, you'd leave at 8, you'd take your
20  breaks in between?
21  A.   Correct.
22  Q.   You weren't punching in or out?
23  A.   I was not.
24  Q.   Was someone tapping their foot on the floor
25  waiting at 5 after 9 if you were five minutes late?

Page 85

1  A.   In a typical week, probably not.  But if it was
2  habitual, then yes.
3  Q.   Yeah.  I mean, if you're habitually not showing
4  up on time, I imagine someone would notice eventually?
5  A.   Yes.
6  Q.   Same thing with clocking out early?
7  A.   We never clocked in or out.
8  Q.   Right.
9  A.   So...
10  Q.   But if you left at 5 every day instead of at 6,
11  how long before Val would catch that, do you think?
12  A.   Wouldn't take him long, maybe a week.
13  Q.   During any of the meetings that you had among
14  management, did you take a leadership role in any of
15  those and say, you know, I've got some observations, and
16  I think we ought to change this or that?
17  A.   No, not me personally as an assistant.  I was
18  more concerned about the grocery department.  That was
19  my -- my responsibility.
20  Q.   A typical work week as assistant store manager
21  in Pinedale, what percentage of your time was directing
22  the work of others versus just doing stuff on your own?
23  A.   If I had to ballpark it, maybe 10 percent as
24  the occasion arose.
25  Q.   So 90 percent of the time as an assistant store

Page 86

1   manager, you were just doing things on your own and not
2   involving any other employees?
3        A.   I would say so, yes.
4        Q.   What would you do for that 90 percent of the
5   time where it was just --
6        A.   All kinds of things.
7        Q.   -- Cameron?
8        A.   It was working out any extra stock we had from
9   the back to the shelves to make sure they were filled,
10  facing up the aisles so they were presentable.  Cashiers
11  get backed up, you jump in a cash register.
12            Somebody needs help at the customer service
13  desk, you go do whatever service they needed, money
14  orders, Western Union.  Somebody needed a propane fill.
15  I mean, you can imagine between everything I told you I
16  was responsible for, it fills your time pretty easily.
17       Q.   And Val didn't have to tell you to do any of
18  that, did he?
19       A.   Not after I was trained and was -- was aware of
20  what my duties were.  Not generally, no.
21       Q.   And you always had the discretion to decide if
22  it was more important to work on a propane or get this
23  aisle more presentable or head to the back room and get
24  stock out of there and out on the shelves, right?
25       A.   If it pertained to me doing it, yes, unless I

Page 87

1   was told otherwise.
2        Q.   And if you needed help, you had the right to
3   ask an employee to come in the back room with you and
4   help move product out to the shelves, didn't you?
5        A.   If they were willing to, yes.
6        Q.   If they what?
7        A.   If they were willing to, yes.
8        Q.   Did you ever have an employee just say, Screw
9   you, Cameron, I'm -- I'm busy, I'm not going to come help
10  you stock?
11       A.   You know, there -- there have been times I can
12  recall employees doing that.  That's when you would have
13  to take it to the director who had the authority.
14       Q.   Well, when you did take it to Val that an
15  employee was not complying with your request to perform a
16  task, was it, Val, will you please tell this person to do
17  it because I don't have the authority to do it, or would
18  it be, Val, tell this person when I ask them to do
19  something, they need to do it?
20       A.   It was more under the -- the authority of it
21  saying, Hey, could you ask them to help me with this?
22  I'm behind on X, Y, or Z, whatever I was doing at the
23  time.  He had the authority to reassign them.
24       Q.   Well, I understand pulling someone out of
25  hardware to come and do grocery tasks, you might have to

Page 88

1   run it by the head of hardware and maybe even the store
2   director.
3        A.   Uh-huh (affirmative).
4        Q.   But you're really not testifying, are you, that
5   if an employee tells you, No, I'm not going to come in
6   the back room with you, Cameron, and move stock out to
7   the empty shelves, you're really not testifying that --
8   that when you went to Val, you said, I don't have
9   authority to tell him to do this, Val, will you please
10  tell him to do it?  That was not your conversation, was
11  it?
12       A.   Generally, yes.
13       Q.   So you felt -- you never felt like you had the
14  authority to direct an employee to come in the back room
15  and help you stock shelves?
16       A.   I --
17       Q.   Excuse me.  Let me finish -- let me rephrase
18  the question.
19            As an assistant store manager, it's your sworn
20  testimony today that you didn't feel like you could go to
21  someone who was stocking shelves on aisle 3 and say,
22  There's some empty shelves on 4, you need to come back in
23  the stockroom with me and get product and help me put it
24  out on aisle 4?  Your sworn testimony is you didn't feel
25  you had the right to ask that person to do it as an

Page 89

1   assistant store manager?
2        A.   As an assistant store manager, I did have the
3   right to ask them.  Now, whether they complied or not, I
4   could not force them to.
5        Q.   Well, could Val force them to do it?
6        A.   I guess at the end of it, no.  You can't --
7        Q.   No.
8        A.   -- be physically forced to do anything, no.
9        Q.   Of course not.  But did you have the authority
10  to direct them -- as an assistant store manager, you had
11  the authority to tell someone who's stocking on aisle 3
12  they need to go and help you on aisle 4.  You had that
13  authority, didn't you?
14       A.   Yes, for the grocery department.
15       Q.   Okay.  Were you ever disciplined in all the
16  time that you worked for Ridley's?
17       A.   Not that I can think of, no.
18            MS. RHEAUME:  Can I pause for a second?  It
19  seems like that light is in your eyes.
20            THE WITNESS:  It is.
21            (A discussion was had off the record.)
22       Q.   (By Mr. Morris) As an assistant store manager,
23  were there any meetings in the store that you were
24  required to attend other than the weekly management
25  meeting?

JONATHAN ESPARSEN vs RIDLEY'S FAMILY MARKETS
CAMERON HARRIS on 01/18/2022                                                Pages 90..93

Page 90

1    A.   Not that I remember, no.
2    Q.   Do you have any social media accounts?
3    A.   I think I have a few that I use occasionally.
4    Q.   When you were assistant store manager, do you
5    remember ever describing what you did at Ridley's in
6    social media, emails to friends?
7    A.   Not that I remember, no.
8    Q.   Did you keep a personal journal or diary during
9    the time you were an assistant store manager for
10   Ridley's?
11   A.   No, I did not.
12   Q.   Did you keep any notes or records of any kind
13   of day-to-day activities, weekly while you were an
14   assistant store manager?
15   A.   As far as did I keep them until now or at --
16   Q.   Well, the first question is did you ever keep
17   any while you were working there?
18   A.   Day-to-day stuff, to-do tasks, things like
19   that, but nothing long term.
20   Q.   And they're gone now?
21   A.   Yes.
22   Q.   Did you ever need to drive as an assistant
23   store manager, ever need to get in a vehicle and drive
24   anywhere?
25   A.   Occasionally.  There were times when I was an

Page 91

1    assistant store manager where I went to a couple of trade
2    shows for the company.  There was some travel involved
3    there.
4    Q.   Like where would the trade show be?
5    A.   They held the shows in -- there's one in Reno,
6    Nevada, one in Vegas for Ace Hardware, that sort of
7    thing.
8    Q.   And Ridley's would pay for your travel and
9    hotel stays?
10   A.   Yes, they would.
11   Q.   Do you remember any hourly employees being
12   brought along on those?
13   A.   I -- I don't recall.
14   Q.   What did you understand your purpose in being
15   there at these trade shows for Ridley's?
16   A.   It was for merchandising our hardware store.
17   Q.   So it was -- were these trade shows while you
18   were the hardware manager?
19   A.   There were some while I was the hardware
20   manager, yes.
21   Q.   But there were others while you were the
22   assistant store manager?
23   A.   That is correct.
24   Q.   Would you travel with the store director and
25   the other assistant store manager?

Page 92

1    A.   It was usually people from the corporate
2    hierarchy so to speak.
3    Q.   It would be unusual to send all three managers
4    from a store to one of these?
5    A.   Yes.
6    Q.   And leave Pinedale undefended?
7    A.   Very unusual.
8    Q.   Okay.  How many of those would there be a year?
9    A.   Upwards of two or three between the two
10   different events.
11   Q.   So during your duration as hardware manager,
12   assistant store manager, or store director, how many of
13   those do you think you attended?
14   A.   Oh, gosh.  I'd say upwards of maybe five to
15   six.
16   Q.   Five to six?
17   A.   Yes.
18   Q.   Okay.  You got paid while you were doing that?
19   A.   Yes.
20   Q.   You had the ability to authorize some
21   expenditures as an assistant store manager, didn't you?
22   A.   Other than the ordering grocery, I don't -- I
23   can't think of any other expenditures that I could
24   authorize.
25   Q.   Okay.  So what would you do when you ordered

Page 93

1    groceries for the store, is that a form you'd fill out,
2    you get online?
3    A.   You use an ordering gun that connects to a
4    digital server of all their products, and you scan the
5    tags.  Basically it catalogs any product ID and how many
6    you wanted to order and sends it off to the food
7    distributor.
8    Q.   So you click on Cocoa Puffs and say, We need --
9    A.   Two cases or --
10   Q.   -- two cases?
11   A.   Yes.
12   Q.   Okay.  How often would you do that?
13   A.   Usually around two to three times a week.
14        MR. MORRIS:  I'm learning stuff.  Are you?
15        MS. RHEAUME:  I've worked in, you know,
16   wholesale club before.  I'm very familiar.
17        MR. MORRIS:  I was a busboy.  I never worked in
18   a grocery store.  I worked in restaurants.
19   Q.   (By Mr. Morris) Did Ridley's have a
20   time-keeping policy?
21   A.   As far as like using a time clock?  Is that
22   what you're asking about?
23   Q.   Yeah.
24   A.   For hourly employees, yes.  And manager
25   schedules, store directors, assistant store managers were

JONATHAN ESPARSEN vs RIDLEY'S FAMILY MARKETS
CAMERON HARRIS on 01/18/2022

Pages 94..97

Page 94

```
 1  also input into that as far as what shifts they were
 2  scheduled for.  But, yeah, there was -- there was an
 3  attendance policy.
 4       Q.   So if you were -- I understand an attendance
 5  policy.  I mean -- but there was a clock for hourlies,
 6  right?
 7       A.   Yes.
 8       Q.   But not for hardware manager or assistant store
 9  manager or store director?
10       A.   Correct.  There was not.
11       Q.   Okay.  And you were not -- I'm sorry if I've
12  asked this before.  You weren't required to track your
13  time in any official way?
14       A.   No.
15       Q.   Show up on time, leave on time?
16       A.   Correct.
17       Q.   Okay.  During the time you worked for Ridley's
18  as an assistant store manager, were you provided with a
19  cellphone?
20       A.   No, I was not.
21       Q.   How about store director?
22       A.   No, I was not.
23       Q.   Were you given a laptop to use to perform your
24  work for Ridley's?
25       A.   There was a -- there was a desktop computer
```

Page 95

```
 1  that remained at the store but was not mine to take.
 2       Q.   If you weren't in the store -- I understand
 3  there were -- once or twice a month, you might have to
 4  stay longer because someone didn't show up.  If you
 5  weren't in the store or at a trade show, you weren't
 6  working for Ridley's, were you?
 7       A.   As an assistant store manager, no, I was not.
 8       Q.   How about as a store director?
 9       A.   There were times where I would work --
10       Q.   You'd be at home and you get a phone call?
11       A.   Yes, all the time.
12       Q.   Sure.  Okay.  Not surprising.
13            Were there any corporate meetings that you
14  attended while you were an assistant store manager?
15       A.   No, I don't think so.
16       Q.   So the only travel were these trade shows?
17       A.   Trade shows, and then I remember having to
18  travel -- well, as an assistant store manager, just the
19  trade shows, yes.
20       Q.   What other travel do you remember doing at any
21  time you worked for Ridley's?
22       A.   I remember going to the Wyoming Capitol to meet
23  with the ATF agents that were handling our investigations
24  and things and having kind of a refresher course, I guess
25  you could call it, or just kind of a here's what you need
```

Page 96

```
 1  to fix in your paperwork to avoid any more violations.
 2            And I remember another trip where -- I had
 3  taken out to Cheyenne to meet with the Game & Fish for
 4  other mistakes that were being made on those.
 5       Q.   Okay.  And you got paid to do that?
 6       A.   Yes.
 7       Q.   You never complained to anyone about the number
 8  of hours you worked at Ridley's, did you?
 9       A.   Not that I can remember, no.
10       Q.   Can you remember a single complaint that you
11  ever lodged with anyone at Ridley's for any reason?
12       A.   Not that I remember, no.
13       Q.   Other than talking with April, have you talked
14  to anyone else about this lawsuit?
15       A.   Briefly, yes.
16       Q.   Who?
17       A.   My wife.
18       Q.   Okay.  Before last night, had you ever spoken
19  with April?
20       A.   No.
21       Q.   Have you spoken with any of the lawyers
22  representing the plaintiffs in this case other than last
23  evening with April?
24       A.   No.
25       Q.   Have you emailed anyone other than April about
```

Page 97

```
 1  this case?
 2       A.   Yes.
 3       Q.   Who?
 4       A.   One of the other lawyers in the Sanford Law.
 5       Q.   Okay.  Do you remember the name?
 6       A.   I don't remember the gentleman's name, no.
 7       Q.   Okay.  So in terms of people you have
 8  communicated with about this litigation, sounds like
 9  there's only three - your wife and two lawyers at the
10  Sanford Law Firm?
11       A.   I believe so, to the best of my recollection.
12       Q.   You haven't talked to any other former
13  colleagues, people you used to work with at Ridley's
14  about this case?
15       A.   Not that I recall, no.
16       Q.   Do you have any people that you used to work
17  with that you still consider friends that you socialize
18  with or do anything with?
19       A.   I've got a friend who's in Wyoming who works
20  for Ridley's, yes.
21       Q.   Does he know you're suing Ridley's?
22       A.   I don't think so.
23       Q.   Okay.  Doesn't sound like you posted anything
24  online about your being in this lawsuit?
25       A.   No.
```

Page 98

1    Q.   Is that true?
2    A.   I don't believe so, no.
3    Q.   Just a couple more questions, and I think I'm
4  done.
5         Do you really think Ridley's owes you some
6  money today?
7    A.   Whatever they're required to within the bounds
8  of the law.
9    Q.   Okay.  But other than that statement that
10 everyone in the world can make, of course, I'm owed what
11 the law requires people to pay me, you really think today
12 that Ridley's owes Cameron Harris money?
13   A.   Yes, I would agree so.
14   Q.   Why?
15   A.   Because of all the extra time spent beyond the
16 scheduled hours just to make sure the store ran that was
17 kind of expected of you.  Mostly that.
18   Q.   So you only think that you should be paid for
19 hours that you worked outside of your scheduled hours,
20 right?
21   A.   Not necessarily.
22   Q.   Well, so there are things that you claim that
23 you did during your shifts that you think you should be
24 paid for on top of what you already got paid to do during
25 those shifts?

Page 99

1    A.   No.  I guess I should say really it is just the
2  outside of what I was scheduled to work.
3    Q.   Okay.  So -- I understand that.  I understand
4  if you had to -- if you were on the 9 to 8 and you had to
5  stay until midnight because someone didn't show up,
6  that's an extra four hours that you didn't get
7  compensated for.  And you think you ought to be paid for
8  that, right?
9    A.   Correct.
10   Q.   But in terms of the work that you did during
11 the scheduled shifts, if you started and ended when you
12 were supposed to, you don't think you're owed any extra
13 money for that, do you?
14   A.   No, I don't believe so.
15   Q.   And you never asked for more money while you
16 worked at Ridley's saying, I'm entitled to more money,
17 did you?
18   A.   Not that I recall, no.
19   Q.   When you quit Ridley's, did you give them a
20 two-week notice?
21   A.   Yes.
22   Q.   Okay.  And did they pay you for unused personal
23 time or vacation or sick or anything like that?
24   A.   I believe so, yes.  There was a payout of the
25 PTO.

Page 100

1    Q.   And once you got paid out your final salary and
2  for unused time, you didn't say to Ridley's, You owe me
3  even more than this, did you?
4    A.   Not at that time, no.
5    MR. MORRIS:  I think that's all the questions I
6  have for you.  Thanks for making yourself available
7  today, Cameron.
8    THE WITNESS:  Okay.
9    MS. RHEAUME:  I have a couple of follow-up
10 questions, but I'd like to use the restroom first, if
11 that's okay with everyone.  If we could just take a quick
12 break.  Sorry.
13        (Recess taken at 3:44, resuming at 3:47.)
14                   EXAMINATION
15 BY MS. RHEAUME:
16   Q.   Cam, did you have any human resources training
17 at any point during your employment with Ridley's?
18   A.   No.
19   Q.   Did you have any training related to employees
20 with disability needs or sexual harassment or
21 discrimination?
22   A.   Not that I recall, no.
23   Q.   Were you expected, as an assistant manager, to
24 take formal employee complaints regarding disability
25 needs, sexual harassment, or discrimination?

Page 101

1    MR. MORRIS:  Excuse me.  Could I hear that
2  again?
3    MS. RHEAUME:  Yes.
4    MR. MORRIS:  Do you want him to read it back,
5  or do you want to give it to me again?
6    MS. RHEAUME:  Probably do that.
7    Q.   (By Ms. Rheaume) Were you expected, as
8  assistant store manager, to take formal employee
9  complaints about disability needs, sexual harassment, or
10 discrimination?
11   MR. MORRIS:  Foundation, state of mind of third
12 persons.  Go ahead.
13   THE WITNESS:  No, I was not.
14   Q.   (By Ms. Rheaume) Who did employees go to if
15 they had a formal work complaint?
16   A.   It would be the store director.
17   Q.   And if they needed an accommodation of some
18 sort, would they also go to the store director?
19   A.   Yes.
20   Q.   As a director, did you schedule employee breaks
21 in a rotation for maximum coverage?
22   A.   When I was the store director?
23   Q.   Yes.
24   A.   Yes, I did.
25   Q.   As an assistant manager, were you ever required

Page 102

1  to fill in for those hourly employees so they could take
2  breaks?
3      A.  Yes.
4      Q.  Did any other assistant store managers do that?
5          MR. MORRIS:  Foundation.
6          THE WITNESS:  Typically that came with the job,
7  yes.
8      Q.  (By Ms. Rheaume) You had said earlier there
9  were 30 to 40 people in the store that you'd see in a
10  store in a day.  That wasn't from 7 a.m. to midnight,
11  right?
12      A.  Correct.
13      Q.  I want to go back to the spill of peanut butter
14  example.  If you were assistant store manager and a glass
15  shattered somewhere, what would actually happen?
16      A.  Any employee could see that, bring it to the
17  attention of whoever was managing the front end, so the
18  customer service manager.  Most likely they would get
19  what's called a bagger or courtesy clerk to go clean that
20  up and take care of that, follow up with that.
21      Q.  So there was a process for that already in
22  place?
23          MR. MORRIS:  Leading.
24          THE WITNESS:  Yes.
25      Q.  (By Ms. Rheaume) Would it be unusual for you to

Page 103

1  ask Jim in -- one aisle over to clean it?
2      A.  Yes, it would be.
3      Q.  Cameron, you did not file this lawsuit, right?
4      A.  No, I did not.
5      Q.  Did you receive a notice that explained what
6  the lawsuit was about?
7      A.  Yes, I believe I did.
8      Q.  And then you joined with the Consent to Join,
9  which I believe is Exhibit 4, right?
10      A.  Yes, I did.
11      Q.  And -- and it's your understanding that the
12  lawsuit, as it states there, is about unpaid overtime
13  wages, correct?
14      A.  That is correct.
15      Q.  And what is -- well, one note -- let me change
16  that question.
17          As an assistant store manager, were you ever
18  paid time and a half for any of your hours over 40?
19      A.  No, I was not.
20          MS. RHEAUME:  I have no other questions.
21          MR. MORRIS:  Just a couple follow-up.
22                    EXAMINATION
23  BY MR. MORRIS:
24      Q.  You didn't keep track of your hours to
25  determine whether you would get paid time and a half, did

Page 104

1  you?
2      A.  I never kept track of my hours, no.
3      Q.  Okay.  You testified you never got any training
4  on disability or harassment?
5      A.  That is correct.  Not that I can recall.
6      Q.  And then you were asked whether you were
7  ever -- ever provided for any accommodations given to
8  employees.  Do you remember that question?
9      A.  I'm sorry.  The question asking if I were ever
10  provided accommodations or that I were the one handling
11  the request?
12      Q.  The latter.
13      A.  Okay.
14      Q.  Do you remember April asked you if you had ever
15  handled a request for an accommodation?
16          MS. RHEAUME:  I did not ask that.
17      Q.  (By Mr. Morris) Okay.  Do you know what an
18  accommodation is?
19      A.  Yes, I think I generally do.
20      Q.  How do you know what an accommodation is
21  without training?
22      A.  Experience, other places other than Ridley's.
23      Q.  Okay.  So what's an accommodation?
24      A.  The way I understand it, if somebody has a
25  special need that they've -- are protected under law,

Page 105

1  that they are accommodated appropriately, whether it's
2  how long they can stand or -- that's the best example I
3  can think of.
4      Q.  And so in all your years in a management
5  position at Ridley's, you were never involved in an
6  employee asking for what you've just characterized as an
7  accommodation?
8      A.  Not that I can remember, no.
9      Q.  If someone had come to you, if an employee had
10  come to you and said, you know, I've got a temporary
11  disability, I was in an accident, I've -- I can't stand
12  for long periods of time, you would just say, Not my
13  problem because I'm only an assistant store manager?
14          MS. RHEAUME:  Object to form.
15          THE WITNESS:  Not necessarily.  I would run it
16  by the store director and most likely accommodate them
17  under his direction.
18      Q.  (By Mr. Morris) So there's a cashier who has
19  pain because they were in an accident or something and
20  they say, I can't stand here anymore.  You wouldn't say,
21  Take a seat, take a break, you would have to go back and
22  find Val --
23          MS. RHEAUME:  Object to form.
24          MR. MORRIS:  Excuse me.
25      Q.  (By Mr. Morris) -- and leave her standing there

JONATHAN ESPARSEN vs RIDLEY'S FAMILY MARKETS
CAMERON HARRIS on 01/18/2022                                            Pages 106..109

1   at the cash register in pain?
2           MS. RHEAUME:  Now object to form.
3           THE WITNESS:  No.  I -- I would probably
4   accommodate them for the time being until the situation
5   was understood by the store manager.
6       Q.   (By Mr. Morris) Of course you would, right?
7       A.   Yes.
8       Q.   I didn't understand the testimony you gave
9   about the 30 to 40 employees at the store.  So maybe not
10  at any one time, but during the course of a day, there
11  would be that many employees.  Is that what you meant to
12  say?
13      A.   That's -- that's what I would mean, yes.
14      Q.   Okay.  I get that.
15      A.   Different shifts.
16      Q.   Okay.  At any one time -- I mean, there are
17  peak hours.  I mean, you're going to need more employees
18  there at 3 in the afternoon, I assume, than you would at
19  7 in the morning.  Is that fair to say?
20      A.   Yes.
21      Q.   What time or times of day are typically -- were
22  typically the busiest in Pinedale?
23      A.   I would say generally the evening about
24  people's quit time for work, 5:00 and on.  And then
25  probably more so in the afternoon around lunchtime,

1   probably the peak hours.
2       Q.   So it's not a bell curve.  Kind of goes like
3   this, and then goes --
4       A.   Yes, sir.
5       Q.   Okay.  That's going to be a really poor record.
6   So let me try to say it so that someone reading this is
7   going to understand what I meant.
8           So 7 in the morning, you don't need as many
9   employees.  Later in the morning, close to noon, you
10  should have more employees because there are more
11  customers?
12      A.   Correct.
13      Q.   And then it will wane until maybe quitting
14  time, 5 to 6:00 in the evening, and it will bump up
15  again?
16      A.   Yes.
17      Q.   Okay.  And is that -- as the store director,
18  when you were doing that, that's how would you try to
19  schedule?
20      A.   Yes.  That sounds about right.
21      Q.   Okay.  You're not testifying that you got no
22  training when you became an assistant store manager, are
23  you?
24      A.   Correct.  I'm not testifying that I received no
25  training.

1       Q.   Okay.  If someone felt they were being sexually
2   harassed at work, that's something that you would
3   naturally send to the store director?
4       A.   Yes.
5       Q.   Right?
6       A.   That is correct.
7           MR. MORRIS:  That's all I have.
8           MS. RHEAUME:  I'm good too.
9           THE VIDEOGRAPHER:  Do you want to put read and
10  sign on the record?
11          MS. RHEAUME:  Read and sign, yes.  Thank you.
12          (The proceedings concluded at 3:57 p.m.)

1                   CERTIFICATE OF DEPONENT
2   PAGE     LINE      CHANGE
3   _____
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19                  --oOo--
20      I, Cameron Harris, deponent herein, do hereby
    certify and declare under penalty of perjury the within
21  and foregoing transcription to be my deposition in said
    action; that I have read, corrected, and do hereby affix
22  my signature to said deposition.
23
24          _____
25              Cameron Harris, Deponent

JONATHAN ESPARSEN vs RIDLEY'S FAMILY MARKETS
CAMERON HARRIS on 01/18/2022

Page 110

```
 1                    REPORTER'S CERTIFICATE
 2   STATE OF UTAH )
 3   COUNTY OF UTAH )
 4
 5            I, Daren S. Bloxham, a Certified Shorthand
 6   Reporter, Registered Professional Reporter, hereby
 7   certify:
 8            THAT the foregoing proceedings were taken
 9   before me at the time and place set forth in the caption
10   hereof; that the witness was placed under oath to tell
11   the truth, the whole truth, and nothing but the truth;
12   that the proceedings were taken down by me in shorthand
13   and thereafter my notes were transcribed through
14   computer-aided transcription; and the foregoing
15   transcript constitutes a full, true, and accurate record
16   of such testimony adduced and oral proceedings had, and
17   of the whole thereof.
18            I have subscribed my name on this 25th day of
19   January, 2022.
20            _____
21            Daren S. Bloxham
             Registered Professional Reporter #335
22
23
24
25
```