```
                                                                    Page 1
 1
                IN THE UNITED STATES DISTRICT COURT
 2
                    FOR THE DISTRICT OF COLORADO
 3

 4   STANTON MEATS, JASON CARILLO, ET    )    CERTIFIED COPY
     AL.,                                )
 5                                       )
              Plaintiffs,                )
 6                                       )
          v.                             ) Civil No.
 7                                       ) 1:22-CV-1070-PAB
                                         )
 8                                       )
     RIDLEY'S FAMILY MARKETS, INC.,      )
 9                                       )
              Defendants.                )
10   _____)

11

12

13                  DEPOSITION OF STANTON MEATS

14                       Salt Lake City, Utah

15               February 28, 2023, at 8:30 a.m.

16

17

18

19

20

21

22

23      Reported by:   Mary R. Honigman, RPR No. 972887

24                         Job#8438

25
```

Page 2

```
 1         Zoom deposition of STANTON MEATS, taken in
 2   Salt Lake City, Utah, on February 28, 2023, at 8:30
 3   a.m., before Mary R. Honigman, Certified Court
 4   Reporter, in and for the State of Utah.
 5
 6              A P P E A R A N C E S
 7      FOR THE PLAINTIFF:
 8              Sean Short, ESQ.
                SANFORD LAW FIRM, PLLC
 9              10800 Financial Centre Parkway, Suite 510
                Little Rock, AR 72211
10              (866) 926-4434
                sean@sanfordlawfirm.com
11
12      FOR THE DEFENDANTS:
13              David P. Williams, ESQ.
                SNELL & WILMER
14              15 W. South Temple, Suite 1200
                Salt Lake City, Utah 84101
15              (801) 257-1914
                dawilliams@swlaw.com
16
17      Videographer: Tyler Larsen
18
19
20
21
22
23
24
25
```

Page 3

```
 1                  I N D E X
 2   WITNESS:  STANTON MEATS
 3   EXAMINATION                                      PAGE
 4   By: MR. WILLIAMS                                    5
 5
 6
 7
 8                  E X H I B I T S
 9   NUMBER           DESCRIPTION                     PAGE
10
11   EXHIBIT 1   Ridley's Family Markets Employee       10
                 Information
12
     EXHIBIT 2   Ridley's Family Markets Employee       11
13               Termination Report
14   EXHIBIT 3   Ridley's Family Markets Employee       12
                 Information
15
     EXHIBIT 4   Ridley's Family Markets Payroll Status 12
16               Change, 12/24/06
17   EXHIBIT 5   Ridley's Family Markets Payroll Status 13
                 Change, 5/20/07
18
     EXHIBIT 6   Ridley's Family Markets Employee       15
19               Termination Report, 9/8/07
20   EXHIBIT 7   Ridley's Family Markets Employee       16
                 Information
21
     EXHIBIT 8   Ridley's Family Markets Employee       16
22               Termination Report, 6/5/08
23   EXHIBIT 9   Ridley's Family Markets Employee       17
                 Information, 10/13
24
     EXHIBIT 10  Payroll Status Change, 4/6/14          19
25
     EXHIBIT 11  Payroll Status Change, 4/20/15         24
```

Page 4

```
 1
     EXHIBIT 12 Payroll Status Change, 9/25/16          30
 2
     EXHIBIT 13 Payroll Status Change, 1/22/17          33
 3
     EXHIBIT 14 Stanton Meats Resignation Letter, 4/19/19  63
 4
     EXHIBIT 15 Employee Termination Report, 5/3/19     64
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1                     PROCEEDINGS
 2            VIDEOGRAPHER:  We're going on the
 3   record.  My name is Tyler Larsen.  The court
 4   reporter is Mary Honigman.  We represent JD legal
 5   Support.  The time and date indicated on the video
 6   screen is February 28, 2023, at 8:32 a.m.  This is
 7   in the matter of Stanton Meats, et al., versus
 8   Ridley's Family Markets, Inc., case number
 9   122-cv-1070-PAB in the US District Court for the
10   District of Colorado.  Counsel will now state their
11   appearance for the record and the witness will be
12   sworn.
13            MR. SHORT:  Sean Short on behalf of
14   Plaintiffs.
15            MR. WILLIAMS:  David Williams on
16   behalf of the defendant, Ridley's Family Markets.
17               STANTON MEATS,
18     having been first duly sworn to tell the truth, was
19            examined and testified as follows:
20       Q    (BY MR. WILLIAMS)  Good morning,
21   Mr. Meats.
22       A    Good morning.
23       Q    Have you ever had your deposition taken
24   before?
25       A    No.
```

STANTON MEATS vs RIDLEY'S FAMILY MARKETS
STANTON MEATS - 02/28/2023
Pages 6..9

Page 6

1  Q   Okay.  The court reporter is taking down
2  everything we say, so it's important that you respond
3  audibly, and it's important that we don't talk over
4  each other.  So if you'll wait until I finish my
5  question, and I'll wait until you finish your answer
6  before we proceed.
7  A   Okay.
8  Q   Do you understand that you're under oath
9  today?
10 A   Yes.
11 Q   And it's the same as giving sworn testimony
12 in court?
13 A   Okay.
14 Q   You're represented by counsel today?
15 A   I am.
16 Q   Any reason why you can't give truthful
17 answers to my questions today?
18 A   No.
19 Q   What did you do to prepare for this
20 deposition?
21 A   I spoke with my lawyer.
22 Q   Okay.  Other than discussions that you had
23 with counsel, did you review any documents or do any
24 other preparations?
25 A   Just the Notice of Deposition.

Page 7

1  Q   Okay.  What made you decide to become part of
2  this litigation?
3  A   When I was presented with the offer, I
4  thought I fell within the scope of what they were
5  seeking.
6  Q   And so the notice that you received from
7  Mr. Short's firm, is that what you're referring to?
8  A   Yes.
9  Q   Prior to that time, did you have any
10 discussions with anyone about filing a lawsuit against
11 Ridley's?
12 A   No.
13 Q   Did you ever consider it?
14 A   No.
15 Q   What are your expectations in this
16 litigation?
17 A   To be able to get what needs to -- or what
18 I'm -- sorry, to be compensated for the overtime
19 that I had worked.
20 Q   Do you have an amount in mind that you feel
21 that you should be compensated?
22 A   Whatever the court decides is just.  I
23 don't have a fixed amount in mind, no.
24 Q   Okay.  You haven't calculated the -- any
25 amounts or anything?

Page 8

1  A   No.  I haven't.
2  Q   Okay.  I want to talk about your background a
3  little bit.  We'll start with your education.  Did you
4  attend high school?
5  A   Yes.
6  Q   And where was that?
7  A   Mountain Crest High in Hyrum, Utah.
8  Q   Okay.  What year did you graduate?
9  A   2007.
10 Q   Okay.  After high school, did you attend any
11 college or vocational school or apprenticeship
12 programs?
13 A   Utah State University.
14 Q   Okay.  What did you study at Utah State
15 University?
16 A   I was studying history.
17 Q   Okay.  Did you graduate from Utah State
18 University?
19 A   I did not.
20 Q   How -- how many years did you attend?
21 A   Eighteen months.  Just shy of two years.
22 Q   Other than 18 months at Utah State, did you
23 take any other courses outside of a university or any
24 professional certifications, anything like that?
25 A   I recently obtained my CDL.

Page 9

1  Q   Okay.  Commercial driver's license?
2  A   Correct.
3  Q   Okay.  Are you driving for any company?
4  A   I am.
5  Q   Where?
6  A   In Pinedale, Wyoming.
7  Q   Okay.  You currently reside in Pinedale?
8  A   Correct.
9  Q   What is your -- what is your current address?
10 A   382 South Colter Loop; Pinedale, Wyoming
11 82941.
12 Q   Okay.  So we have a CDL; attended about 18
13 months of college.  Any other post-high school
14 education that you've received or you've attended?
15 A   No.
16 Q   Okay.  Let's talk about your employment
17 background -- I have my records show that you were
18 first employed by Ridley's in June of 2005, as a bagger
19 in Hyrum, Utah; does that sound right?
20 A   Yes.
21 Q   Okay.  Prior to that time, did you have a
22 job?
23 A   No.  That was my first job.  I believe I
24 was 16.
25 Q   Okay.  One second.  You have a fairly

STANTON MEATS vs RIDLEY'S FAMILY MARKETS
STANTON MEATS - 02/28/2023                                              Pages 10..13

Page 10
1  extensive work history with Ridley's; is that correct?
2     A    I suppose.
3     Q    Okay.  I want to introduce some exhibits here
4  that just, kind of, track your -- your employment with
5  Ridley's.
6     A    Okay.
7     Q    Okay.  I'm showing you a document that we'll
8  mark Exhibit 1 to your deposition.
9               (Exhibit No. 1 marked.)
10    Q    (BY MR. WILLIAMS)  This is a document
11 entitled Ridley's Family Markets Employee
12 Information, and it shows what -- I believe your
13 hiring as a bagger in Hyrum, Utah, on June 15 of
14 2005; is that correct?
15    A    I don't recall when I initially was hired,
16 but if that's what the date says, then, yeah.
17    Q    Any reason to believe that that's not an
18 accurate date?
19    A    No.
20    Q    Okay.  How did you come to be hired as a
21 bagger in 2005?
22    A    I was looking for part-time work to get,
23 you know, pocket money while I was going to high
24 school.
25    Q    What year -- what year were you in high

Page 11
1  school?
2     A    I believe it was 2000 -- or 2004 to 2007.
3     Q    Did you -- did you tell me that you were 16
4  when you were first employed by Ridley's?
5     A    Yes.
6     Q    Okay.  According to my records, you worked as
7  a bagger for approximately -- approximately five or six
8  months; is that correct?
9     A    I believe so.
10    Q    Let me show you a document that we'll mark
11 Exhibit 2 to your deposition.
12              (Exhibit No. 2 marked.)
13    Q    (BY MR. WILLIAMS)  A document entitled
14 Ridley's Family Markets Employee Termination Report.
15 It shows a voluntary quit as of October 2nd of 2005,
16 with the explanation, Work interfered with school;
17 did I read that correctly
18    A    I believe so.  I don't recall this,
19 though.
20    Q    Any reason to believe that this document
21 doesn't accurately reflect your employment history as
22 of October 2005?
23    A    I know I worked with them until about
24 2008, but, I mean, I have no reason to say no.
25    Q    Okay.  And I'm just trying to get an accurate

Page 12
1  history of your employment leading up to your position
2  as assistant manager.
3     A    Okay.
4     Q    And then I'll show you a document that we'll
5  mark as Exhibit 3 to your deposition.
6               (Exhibit No. 3 marked.)
7     Q    (BY MR. WILLIAMS)  A document entitled
8  Ridley's Family Markets Employee Information.  It
9  shows that you were rehired again at the Hyrum store
10 in August of 2006.  Does this accurately reflect
11 your rehire with Ridley's in 2006?
12    A    Yeah.
13    Q    According to my records, in December of 2006,
14 you were promoted to a checker; do you remember that?
15    A    Yeah.  Yes.
16    Q    Let me show you a document that we'll mark as
17 Exhibit 4 to your deposition, which shows the status
18 change from bagger to checker; do you see that?
19    A    Yes.
20              (Exhibit No. 4 marked.)
21    Q    (BY MR. WILLIAMS)  And is that consistent
22 with your recollection?
23    A    It is.
24    Q    How did you come to be employed as a checker?
25 Was that considered a promotion?

Page 13
1     A    It was an increase in pay, but I wouldn't
2  say it was necessarily a promotion.
3     Q    Okay.  Change in job duties?
4     A    Yeah.
5     Q    Is that something that you sought out, or was
6  that just the natural progression of going from bagger
7  to checker?
8     A    I don't recall seeking it out.  It may
9  have just been the natural progression.
10    Q    Okay.  I assume as a bagger, you're -- you're
11 watching and learning and figuring out how the other
12 jobs are done and at some point, you know enough to
13 move up and become a checker; is that -- is that fair?
14    A    That is fair.
15    Q    Okay.  According to my records, you were then
16 moved from checker to stocker in May of 2007.  Do you
17 remember that?
18    A    I believe so.
19    Q    Let me show you a document that we'll mark as
20 Exhibit 5 to your deposition.
21              (Exhibit No. 5 marked.)
22    Q    (BY MR. WILLIAMS)  This document is a
23 payroll status change, effective date May 20 of
24 2007, showing a change from checker to stocker,
25 again, at the Hyrum store, along with a pay

Page 14

1  increase. Do you see that reflected on Exhibit 5?
2    A    Yes.
3    Q    And does Exhibit 5 accurately reflect your
4  employment situation with Ridley's at -- in May of
5  2007?
6    A    Yes.
7    Q    And I'll ask you the same questions. How did
8  you come to be a stocker?
9    A    That's right around when I would have been
10 graduating from high school, so I imagine it was
11 just a full-time position that was available.
12   Q    Okay. The -- the title, stocker, seems to be
13 intuitive, but tell me what your duties and
14 responsibilities were.
15   A    Processing freight coming in, putting it
16 on the shelves, facing aisles, putting up displays.
17   Q    Okay. And who did you report to?
18   A    Whoever the grocery manager was at the
19 time.
20   Q    Okay. So it was the grocery manager at the
21 time who would instruct you as to breaking down the
22 freight and where to put it and such?
23   A    More or less. I'd been working in the
24 building for quite a while. I knew where things
25 went.

Page 15

1    Q    Okay. And, according to my records, you were
2  a stocker until -- and you quit to go to school full
3  time in September of 2007; do you remember that?
4    A    Yes.
5    Q    For the record, let me show you an exhibit
6  that we'll mark -- or a document that we'll mark as
7  Exhibit 6 to your deposition, a document entitled
8  Employee Termination Report, showing a last day worked
9  for you of September 8, 2007, with the explanation,
10 Quit to go to school full time.
11        (Exhibit No. 6 marked.)
12   Q    (BY MR. WILLIAMS) Does Exhibit 6
13 accurately reflect your employment status as of
14 September 7, 2007?
15   A    Yes.
16   Q    Is this when you went to Utah State?
17   A    Yes.
18   Q    According to my records, you had a fairly
19 short break and were rehired again in November of 20 --
20 of 2007; is that correct?
21   A    I believe so.
22   Q    Let me show you a document that we'll mark as
23 Exhibit 7 to your deposition, a document entitled
24 Employee Information, showing your rehire for the Hyrum
25 store with the title, Stocker, as of November 29, 2007.

Page 16

1        (Exhibit No. 7 marked.)
2    Q    (BY MR. WILLIAMS) Does Exhibit 7
3  accurately reflect your employment situation as of
4  November 2007 with Ridley's?
5    A    Yes.
6    Q    What made you decide to come back while still
7  in school?
8    A    I don't recall. That was almost 20 years
9  ago.
10   Q    Fair enough. And then, next, I show,
11 according to my records, that you left Ridley's again
12 in June of 2008, to serve a mission; is that correct?
13   A    Yes.
14   Q    I'll just show you this real quick. I'll
15 show you a document marked as Exhibit 8 to your
16 deposition, Employee Termination, showing a date of
17 June 5 of 2008.
18        (Exhibit No. 8 marked.)
19   Q    (BY MR. WILLIAMS) Does Exhibit 8
20 accurately reflect your employment situation with
21 Ridley's in June of 2008?
22   A    Yes.
23   Q    Okay. I show a break, according to my
24 records, of approximately five years. Rehire in
25 October of 2013; is that -- is that correct?

Page 17

1    A    Yes.
2    Q    Okay. So what did you do in the interim?
3    A    Two of -- two of those years were on my
4  mission, and then the next three years after that, I
5  was working for Walmart.
6    Q    Okay. What did you do at Walmart?
7    A    I unloaded the truck, and then I worked in
8  the meat department, and then I was the bakery
9  manager for a time and then the produce manager for
10 a time.
11   Q    Okay. As bakery manager or produce manager,
12 did you supervise any employees?
13   A    Yes.
14   Q    How many?
15   A    I don't recall.
16   Q    More than one?
17   A    More than one.
18   Q    Let me show you a document that we'll mark as
19 Exhibit 9 to your deposition, Employee Information,
20 showing a rehire in October of 2013, in the Hyrum
21 store, with a title, Frozen Manager. Do you remember
22 that?
23   A    Yes.
24        (Exhibit No. 9 marked.)
25   Q    (BY MR. WILLIAMS) Does this accurately

STANTON MEATS vs RIDLEY'S FAMILY MARKETS
STANTON MEATS - 02/28/2023
Pages 18..21

Page 18
1  reflect your employment with Ridley's in October of
2  2013?
3       A    Yes.
4       Q    How did you come to be rehired by Ridley's in
5  2013?
6       A    I was seeking new employment from Walmart,
7  and the -- the person who I thought was the manager
8  at the time had worked with me before I went on my
9  mission, and so I thought I'd reach out to him.
10      Q    Who was that?
11      A    Curtis -- I can't recall his last name.
12      Q    Okay.  What was Curtis's title; do you
13 remember?
14      A    He was the store director.
15      Q    He was the store director?  Okay.  Did you
16 interview for the position of frozen manager?
17      A    I did.
18      Q    And did you interview with Curtis?
19      A    No.  That would have been Dan Smith.
20      Q    Dan Smith.  Was he the store director at the
21 time?
22      A    Yes.
23      Q    Okay.  What did Dan Smith tell you about the
24 job of frozen manager?
25      A    That I would be ordering and stocking the

Page 19
1  freezer aisles.
2       Q    Okay.  Did you have any employees working
3  under you as frozen manager?
4       A    No.
5       Q    Let me show you a document we'll mark as
6  Exhibit 10 to your deposition, a document entitled
7  Payroll Status Change, showing a change from frozen
8  manager to grocery manager, effective April 6 of 2014.
9            (Exhibit No. 10 marked.)
10      Q    (BY MR. WILLIAMS)  Do you see that?
11      A    Yes.
12      Q    Were you promoted to grocery manager in 2014?
13      A    Yes.
14      Q    How did you come to be promoted to grocery
15 manager?
16      A    If I recall correctly, I expressed
17 interest in it.
18      Q    Do you remember who you expressed interest
19 to?
20      A    Dan Smith.
21      Q    Okay.  Did you have to interview for the
22 position?
23      A    I don't believe so.
24      Q    Who was your assistant manager at the time?
25      A    I don't recall his name.

Page 20
1       Q    Did you report to the assistant manager as
2  the grocery manager?
3       A    No.  I reported to Dan.
4       Q    Okay.  Did you have interactions with the
5  assistant manager?
6       A    Yes.  Just in the course of our daily
7  duties.
8       Q    Describe -- describe those interactions in
9  the course of your daily duties.
10      A    Stocking shelves, zoning, ordering.
11 That's what it was.
12      Q    Okay.  So the assistant manager worked with
13 you to stock shelves?
14      A    Yes.
15      Q    Okay.  And ordering, tell me about that?
16      A    Ordering, just showing me how to order.
17 He probably looked over my shoulder for a week,
18 maybe.  I don't really recall too much.
19      Q    Okay.  It's -- my understanding -- do you
20 understand what I mean when I say center store
21 employees?
22      A    Yes.
23      Q    Okay.  It's my understanding that the
24 assistant manager was, kind of, over the center store
25 employees; is that your recollection?

Page 21
1       A    Yes.
2       Q    Okay.  And so as the grocery manager, you
3  would have interacted on a daily basis with the
4  assistant manager; is that accurate?
5       A    Yes.
6       Q    And the assistant manager would -- would
7  direct you, instruct you, answer whatever questions you
8  had; is that -- is that fair?
9       A    Partially.  I more interacted with Dan
10 than the assistant manager.
11      Q    Even days where Dan wasn't there?
12      A    If Dan wasn't there, it was the assistant
13 manager.
14      Q    Okay.  You described the duties, stocking and
15 ordering.  Any other duties and responsibilities as a
16 grocery manager?
17      A    Not that I recall.
18      Q    Okay.  As a grocery manager, did you have a
19 set amount of decision-making authority for ordering up
20 to a set amount without permission, or tell me how that
21 worked?
22      A    So typically, I would order to fill the
23 shelf unless if there was specific ad items that Dan
24 wanted me to order more of.  But for the most part,
25 it was just filling the shelf.

STANTON MEATS vs RIDLEY'S FAMILY MARKETS
STANTON MEATS - 02/28/2023   Pages 22..25

Page 22
1   Q   Okay.  Did you ever have to order for special
2   events, anything like that?
3   A   No.
4   Q   Any special orders for holidays?
5   A   No.
6   Q   What about the case lot sale?
7   A   No.
8   Q   Okay.  Did you participate in the case lot
9   sale?
10  A   Yes.
11  Q   Okay.  Who did the ordering for that?  Was
12  that the assistant?
13  A   I believe it was Dan.
14  Q   Okay.  As the grocery manager, did you have
15  any stockers working under you?
16  A   I would say more with, not necessarily
17  under.
18  Q   Okay.  How many stockers did you work with?
19  A   I don't recall a specific amount, but more
20  than three.
21  Q   Okay.  On any given day, did you have one or
22  two stockers, at least?
23  A   On freight days.
24  Q   On freight days, you would have how many?
25  A   However many stockers there were.  I don't

Page 23
1   recall a -- a number.
2   Q   Okay.  You're working with the stockers.
3   You're the grocery manager.  I assume you can direct
4   them, if needed, as to what to do, and where to put
5   things, and what to do first; is that -- is that fair?
6   A   Yes.
7   Q   Did you ever do any scheduling for the
8   stockers?
9   A   No.
10  Q   Did you have a set of keys as the grocery
11  manager?
12  A   Yes.
13  Q   What were those for?
14  A   They were a key to the front door, the
15  receiving door, and the office.
16  Q   Okay.  Did you occasionally have to open
17  and/or close the store?
18  A   Never opened.
19  Q   Never opened?
20  A   Never opened.
21  Q   Okay.  Just closed?
22  A   Yes.
23  Q   Okay.  Was that a -- a fairly common
24  occurrence for you as a grocery manager?
25  A   No.

Page 24
1   Q   How often would you have to do closing?
2   A   Maybe once or twice a month, if I recall.
3   Q   Okay.  And what would you do to close the
4   store down?  I assume there's some, kind of, procedure
5   that you would follow?
6   A   Yes.  Primarily, it was keeping an eye
7   over the -- the cashier running customer service and
8   then counting tills and preparing a deposit.
9   Q   And you would oversee that entire operation
10  when it was your turn to close?
11  A   Yeah.
12  Q   Any other significant duties and
13  responsibilities that you recall as a grocery manager?
14  A   No.
15  Q   According to my records, you were a grocery
16  manager for approximately a year until you were
17  promoted to assistant manager in April of 2015; do you
18  remember that?
19  A   Yes.
20  Q   And let me show you a document that we'll
21  mark as Exhibit 11 to your deposition.
22          (Exhibit No. 11 marked.)
23  Q   (BY MR. WILLIAMS)  The document is
24  entitled Payroll Status Change, Employee,
25  Stanton Meats April 20, 2015, showing a promotion

Page 25
1   from grocery manager to assistant manager from the
2   Hyrum store to store 1171, which I believe is the
3   Midway store; is that correct?
4   A   Correct.
5   Q   And do you remember this promotion?
6   A   I do.
7   Q   Okay.  How did you come to be promoted to
8   assistant manager in Midway?
9   A   I was seeking a promotion, and then it was
10  offered to -- to go out.
11  Q   Who offered you the position?
12  A   I believe it was Ramiz Ahbed.
13          THE COURT REPORTER:  Can you repeat
14  that?
15          THE WITNESS:  Ramiz.
16          THE COURT REPORTER:  Can you spell
17  that?
18          THE WITNESS:  Yeah.  R-a-m-i-z
19  A-h-b-e-d, Ahbed.
20          THE COURT REPORTER:  Thank you.
21  Q   (BY MR. WILLIAMS)  You say you asked for
22  this promotion.  Who did you -- who did you ask?
23  Who did you talk to?
24  A   Well, I expressed interest to Dan that,
25  you know, I was looking to advance within the

STANTON MEATS vs RIDLEY'S FAMILY MARKETS
STANTON MEATS - 02/28/2023
Pages 26..29

Page 26

1  company.
2    Q    Okay.
3    A    And -- yeah.
4    Q    And you interviewed with Ramiz?
5    A    No.  I did not interview.
6    Q    Okay.  You didn't interview with anyone for
7  the position?
8    A    No.
9    Q    Okay.  You -- you -- I mean, you had been
10 working at Ridley's for quite a while.  You understood
11 what an assistant manager did; is that correct?
12   A    By this point, more or less, yes.
13   Q    Okay.  And you were transferred to the Midway
14 store, correct?
15   A    Correct.
16   Q    Who was your store director at the Midway
17 store?
18   A    Luis, L-u-i-s, Lemus, L-e-m-u-s.
19   Q    Did you train with Luis when you went to
20 Midway to be the assistant manager?
21   A    I did.
22   Q    What did you train on?
23   A    What did I train on?  Things that were
24 store specific.  There was a gas station.  There was
25 a Subway, and we also had a pizzeria and a

Page 27

1  short-order deli that I would occasionally have to
2  help in.
3    Q    And what did you have to train on with the
4  gas station?
5    A    Where -- primarily, it was where to pull
6  reports from.
7    Q    What kind of reports?
8    A    Fuel usage and U-Haul reports.
9    Q    Did you have a rental center for U-Haul
10 vehicles there as well?
11   A    We did.
12   Q    Okay.  And was that part of your
13 responsibilities to pull those reports for the gas
14 station and the U-Haul?
15   A    If Luis wasn't there.
16   Q    Okay.  And what about Subway?  What did you
17 have to train on there?
18   A    Making sandwiches and pulling reports from
19 there as well.
20   Q    Okay.  And same question:  Pulling reports,
21 that would be part of your responsibilities if Luis
22 wasn't there?
23   A    Correct.
24   Q    Okay.  Is that the same with the pizzeria and
25 the deli?

Page 28

1    A    No.
2    Q    Okay.  Tell me about the pizzeria.  What did
3  you train on there?
4    A    Making pizzas, serving ice cream.
5    Q    Okay.  Any reports or anything that you had
6  to do with the pizzeria?
7    A    No.
8    Q    Okay.  What about the deli?
9    A    Deli, if I helped out there, it was either
10 cutting meats and cheese or running the register.
11   Q    Okay.  Were those four areas of the store
12 considered center store?
13   A    No.
14   Q    Okay.  I assume that as assistant manager,
15 that the center store, kind of, fell under your
16 purview; is that correct?
17   A    Yes.  I wasn't the final say on -- on
18 anything, but, yes.
19   Q    Okay.  How many -- how many employees in the
20 center store on any given day?
21   A    At that particular store?
22   Q    Yes.
23   A    Three.
24   Q    Three?
25   A    Including myself.

Page 29

1    Q    Okay.  What positions would those be?
2    A    Cashiers.
3    Q    Cashiers?  And what would your interactions
4  with the cashiers be as assistant manager in Midway?
5    A    Primarily, it was going up to help them,
6  as we only had single coverage for cashiers at that
7  particular store --
8    Q    Okay.
9    A    -- until about 4:00.
10   Q    What happened at 4:00?
11   A    Our high school workers were available.
12   Q    Okay.  So more people would be available to
13 come in and work?
14   A    Yes.
15   Q    So your stockers and your baggers and what
16 have you?
17   A    No.  Cashiers.
18   Q    More cashiers?  Okay.  With the cashiers, I
19 assume you're watching over them, making sure that they
20 have what they need, answering whatever questions they
21 have; is that fair?
22   A    That's fair.
23   Q    Stepping in to help when needed?
24   A    Correct.
25   Q    Okay.  I assume, as an assistant manager,

Page 30

1  you're walking around the store looking for problems,
2  solving problems, helping customers, basically doing
3  whatever needs to be done; is that fair?
4      A    That's fair.
5      Q    Looks like you were in Midway for about a
6  year and a half; is that accurate?
7      A    Yes.
8      Q    I'll show a document to you that we'll mark
9  as Exhibit 12 to your deposition, showing the transfer
10 from Midway to store 1167, which, I believe, is the
11 Highland, Utah store; is that correct?
12     A    Correct.
13              (Exhibit No. 12 marked.)
14     Q    (BY MR. WILLIAMS)  Okay.  And were you
15 transferred to the Highland store in September of
16 2016?
17     A    Yes.
18     Q    Who is your store director in Highland?
19     A    I had two.
20     Q    You had two store directors?
21     A    One at a time, but two over the course
22 that I was there.
23     Q    Okay.  Who was your first store director?
24     A    His first name is Dale.  I don't recall
25 his last name.

Page 31

1      Q    Can you spell the first name, please?
2      A    D-a-l-e.
3      Q    Dale.  Thank you.  And how long was Dale your
4  assistant manager in Highland?
5      A    Store director.
6      Q    Or store director.  I'm sorry.
7      A    Three months, until December.
8      Q    Okay.  And then who became your store
9  director after that?
10     A    Justin White.
11              THE COURT REPORTER:  Did you say
12 "white," like the color white?
13              THE WITNESS:  Yes.
14     Q    (BY MR. WILLIAMS)  And was Justin your
15 store director until you transferred to Pinedale in
16 January of 2017?
17     A    Correct.
18     Q    Okay.  Anything unique about the Highland
19 store?  Was there -- was there a gas station?  Was
20 there a Subway, pizzeria, or deli?
21     A    Post office.  There was a post office.
22     Q    Okay.  So did you have to train on the post
23 office duties and responsibilities when you got there?
24     A    A little bit, yeah.
25     Q    Okay.  What did you have to train on?

Page 32

1      A    I trained on processing packages.
2      Q    And reports that you had to pull or prepare
3  with regard to the post office?
4      A    There was a report, but I don't recall
5  ever printing it off.
6      Q    Did you train on how to do that?
7      A    I don't recall.
8      Q    Other than a post office, I assume -- I mean,
9  you were assistant manager in Midway and you moved to
10 be assistant manager in Highland.  I assume your duties
11 and responsibilities were largely the same, other than
12 the change of the post office?
13     A    Yes.
14     Q    How did you come to be transferred to
15 Highland?
16     A    I requested a transfer.  I was commuting
17 from Pleasant Grove to Highland through a canyon,
18 and between long hours and short sleep returns, I
19 was falling asleep in the canyon too frequently
20 while I was driving.
21     Q    Commuting up Provo Canyon?
22     A    Correct.
23     Q    Okay.  And who did you ask -- who did you
24 request a transfer from?
25     A    Mark.

Page 33

1      Q    Mark Ridley?
2      A    Correct.
3      Q    Let me show you a document that we'll mark as
4  Exhibit 13 to your deposition, a document entitled
5  Payroll Status Change, Stanton Meats, effective date
6  January 22 of 2017, showing a transfer from Highland to
7  store 1153, which I believe is Pinedale, Wyoming; is
8  that correct?
9      A    Yes.
10              (Exhibit No. 13 marked.)
11     Q    (BY MR. WILLIAMS)  And you were
12 transferred to Pinedale in January of 2017 and given
13 a raise; is that correct?
14     A    It wasn't so much a raise as Wyoming
15 doesn't have state taxes pulled out.
16     Q    According to this document, you were making
17 950 -- I assume that's a week -- per week and moved up
18 to 1087.50 per week on a 5/6 schedule; is that correct?
19     A    Yeah.
20     Q    How did you come to be transferred to
21 Pinedale?
22     A    I was asked.
23     Q    Asked by whom?
24     A    David Petersen.
25     Q    And you were willing to move to Pinedale?

Page 34

1  A   Yeah.
2  Q   Were you excited to go or a little hesitant
3  to go?
4  A   Hesitant.
5  Q   Just because of upending your life and making
6  a significant change?
7  A   Yes.
8  Q   Who was your store director in Pinedale?
9  A   I had a couple.
10 Q   Okay.  Who were they?
11 A   Cameron Harris.
12 Q   Cameron Harris?
13 A   Able Hernandez, and Marciel (phonetic)-- I
14 forget her last name.
15 Q   Okay.  How long was Cameron Harris your store
16 director?
17 A   Eighteen months, maybe.
18 Q   So the majority of the time that you were in
19 Pinedale?
20 A   Correct.
21 Q   Okay.  And Able Hernandez, how long was
22 Able Hernandez your store director?
23 A   A couple of months.
24 Q   And Marciel, last name unknown, about how
25 long?

Page 35

1  A   About the same.  A couple of months.
2  Q   As assistant manager, did you have a regular
3  work schedule?
4  A   Patterns, but --
5  Q   Okay.
6  A   -- more or less, yeah.
7  Q   As best you can, describe the patterns for
8  me.  I know they fluctuated every couple of few weeks,
9  and particularly with the 5/6 schedule.  So describe
10 for me, as best you can, your schedule.
11 A   So the first week, I'd work five days.
12 Second week, I would work six days, and then on the
13 five-day week -- well, no.  If the store director
14 was there, I would typically work either 9:00 to
15 8:00, 11:00 to 10:00, or 1:00 to 11:00.
16 Q   And you say, "when the store director was
17 there."  What about when the store director wasn't
18 there?
19 A   Then I would work 7:00 to 6:00.
20 Q   Okay.  It's my understanding that you
21 didn't -- your schedule with the store director
22 overlapped but wasn't identical, so there would be some
23 days or hours first thing in the morning or last time
24 at night that you would be there without the store
25 director; is that correct?

Page 36

1  A   Yes.
2  Q   Okay.  So one to two days a week plus, you
3  know, two or three hours a day; is that -- is that
4  fair?
5  A   Yes.
6  Q   Okay.  And during those times, the assistant
7  manager was the senior manager on-site, correct?
8  A   Correct.
9  Q   Okay.  Now, Pinedale, did it have any unique
10 aspects?  Did it have a gas station or Subway or
11 anything like that?
12 A   It had a hardware store and a liquor
13 store.
14 Q   Hardware and liquor.  I understand it also
15 sold firearms?
16 A   Correct.
17 Q   Okay.  Was that part of the hardware
18 department or sporting goods?  I guess it would be
19 sporting goods?
20 A   They were basically the same.
21 Q   So the schedule that you described in the
22 overlapping hours with the store director, did you have
23 any say into scheduling, or was that the times and days
24 just given to you?
25 A   If I needed a particular day off, I could

Page 37

1  request that day.
2  Q   Okay.  You just request that to your store
3  director?
4  A   Yeah.
5  Q   And you were able to take time off
6  occasionally, PTO?
7  A   Occasionally, I used PTO, but it was more
8  often than not to save hours on our
9  sales-per-manhour metric.
10 Q   At the store in Pinedale, did you have a
11 personal workspace, office, anything like that for
12 managers?
13 A   For the -- every store had an office for
14 the store director.
15 Q   Okay.
16 A   Every store had an office for the store
17 director.
18 Q   Okay.  And I understand that the assistant
19 managers would share that office with the store
20 director; is that correct?
21 A   Yes and no.  We didn't work primarily in
22 the office.  We were primarily on the sales floor.
23 Q   Okay.  You had access to the office?
24 A   I had access to the office.
25 Q   There was a computer in the office, correct?

STANTON MEATS vs RIDLEY'S FAMILY MARKETS
STANTON MEATS - 02/28/2023
Pages 38..41

Page 38

1  A   Correct.
2  Q   And as part of your duties and
3  responsibilities, you would occasionally have to access
4  the computer, correct?
5  A   Correct.
6  Q   Okay.  What would you do on the computer?
7  A   If I was opening the store, I would enter
8  in sales reports from the previous day.
9  Q   And how long -- I'm sorry, go ahead.
10  A   I would make the cash deposit to deliver
11  to the bank, and then check the EML to see if there
12  was any communication that needed to be known.
13  Q   Okay.  And how often would you open?
14  A   On the store director's days off.
15  Q   Okay.  So once or twice a week?
16  A   Correct.
17  Q   You weren't provided with a cell phone or any
18  other equipment, were you?
19  A   No.
20  Q   I assume you used the order gun for ordering?
21  A   Correct.
22  Q   We'll talk about that in a second.  In
23  Pinedale, how many center store employees did you have?
24  A   A handful of cashiers, a bagger, and three
25  overnight freight employees.

Page 39

1  Q   Okay.  On any given day, how many would be
2  there in the store?
3  A   For the center store?
4  Q   Yeah.
5  A   Over the course of my shift, maybe ten.
6  Q   Okay.  And consistent with your duties as an
7  assistant manager, I mean, you're -- you're walking
8  around interacting with these, directing them as
9  needed, answering whatever questions they may have; is
10  that fair?
11  A   That's fair.
12  Q   Did you ever do schedules for these
13  employees?
14  A   On occasion.
15  Q   Okay.  How would you do the scheduling?
16  A   What do you mean?
17  Q   You said that you would do the scheduling on
18  occasion.  I'm just wondering the process that you
19  would go through to do that?
20  A   I would -- I had a spreadsheet that was
21  broken down into hour blocks for each day.  And then
22  I would fill out coverage for cashiers, and then I
23  would make sure that it was okay with the store
24  director if I had to write one.
25  Q   Okay.  And would you do that on the computer?

Page 40

1  A   It was handwritten.
2  Q   Okay.
3  A   Primarily, with scheduling, the store
4  director would have the schedule written out, and he
5  may delegate me to enter in the schedule into the
6  time clock management system.
7  Q   Okay.  And on these occasions where you're
8  doing the scheduling, if somebody wanted some time off,
9  would they ask you for that, or a special day, how
10  would that work?
11  A   They would need to clear it with the store
12  director.
13  Q   Okay.  And then the store director would tell
14  you this person needs this day off, and you would enter
15  that into the schedule?
16  A   Yeah.
17  Q   Okay.  I assume in your interactions, in your
18  walking around, you're giving employees, these center
19  store employees, instructions as needed?
20  A   Yeah.
21  Q   Did these employees ever come and complain to
22  you about any workplace issues, interactions with other
23  coworkers, anything like that?
24  A   From time to time.
25  Q   Okay.  How would you resolve those?

Page 41

1  A   Usually, tell them to go to the store
2  director.
3  Q   Okay.  Did you ever have to intercede and
4  work between employees, have people come and talk with
5  you?
6  A   No.
7  Q   Okay.  What about when the store director is
8  not there?  What -- what would you do in that case?
9  A   I don't recall that that ever happened
10  when the store director wasn't there.
11  Q   Okay.  So --
12  A   It wasn't a normal thing.  Like, people
13  would come and gripe about usual workplace gripes.
14  Q   Sure.
15  A   Venting.  That was mostly the extent of
16  it.
17  Q   Okay.  And, I mean, to be fair, venting is a
18  pretty common occurrence and it's not necessarily
19  something you have to resolve; it's just something you
20  have to listen to; is that fair?
21  A   That is fair.
22  Q   Okay.  And that's something you certainly did
23  as an assistant manager; is that correct?
24  A   Yes.  Quite a bit.
25  Q   Okay.  What about training?  Did you ever --

STANTON MEATS vs RIDLEY'S FAMILY MARKETS
STANTON MEATS - 02/28/2023
Pages 42..45

Page 42

1  did you ever train any of these employees on their
2  duties and responsibilities?
3     A   Occasionally.  If it was, it was usually
4  on how to order or stock freight, or how to face
5  shelving.  Sometimes, I would work with the cashier.
6     Q   I assume this is primarily new employees
7  coming in or what?
8     A   Primarily new employees.
9     Q   Okay.  I assume as you're walking around and
10 interacting with these employees, you know, if you see
11 something that needs addressing, you're providing
12 feedback as necessary; is that fair?
13    A   If it was applicable.  Most times, it was
14 me that would be correcting whatever issues were on
15 the -- the sales floor that would normally otherwise
16 be delegated.
17    Q   Okay.  You certainly had the power to
18 delegate if you -- if you needed to and if people were
19 available?
20    A   If people were available.
21    Q   Okay.  And your job as the assistant manager
22 is just to make sure the store is functioning and
23 stepping in wherever needed; is that -- is that fair?
24    A   Yeah, that's fair.
25    Q   But were you involved in the performance

Page 43

1  evaluation process?
2     A   If I could be.
3     Q   Okay.  For the employees that you knew, I
4  assume?
5     A   Yeah, and if the store director allowed me
6  to be a part of it.
7     Q   Okay.  Your involvement, what would that
8  entail?  Would that be giving feedback?  Would that be
9  preparing the forms?  Tell me how that would work.
10    A   Primarily, it was observation.  If I had
11 anything to contribute, I could.  It was typically
12 praise that was given.  I don't recall ever having
13 to give, like, this is what you could do better.
14    Q   Any negative feedback?
15    A   Yeah.  That's the word I was looking for.
16    Q   Okay.  Did you ever prepare or review the
17 performance evaluations, the written forms?
18    A   Occasionally.  Sometimes, I would be asked
19 to print them off and have them ready to go for the
20 store director.
21    Q   Okay.  Would you sit in on the evaluation
22 meetings, occasionally?
23    A   If I was invited in.
24    Q   Okay.  How -- under what circumstances would
25 you be invited in?

Page 44

1     A   If the store director wanted me in.
2     Q   Okay.  Would that be with -- I assume that
3  would be with employees that you had worked with and
4  had experience with?
5     A   Not necessarily.  Occasionally, I was
6  there just to be a witness if the store director was
7  available and evaluating, you know.
8     Q   So -- so, when the store director wanted to
9  meet with employees and needed another set of eyes or
10 someone to take notes or be a witness, you would do
11 that on occasion?
12    A   Yes.
13    Q   Okay.  You said you didn't ever -- or didn't
14 frequently give negative feedback.  Did you ever have
15 to formally discipline any employees?
16    A   No.
17    Q   Did you ever have to send an employee home?
18    A   On occasion.
19    Q   Okay.  Tell me the circumstances of that.
20    A   In Hyrum, Dan had a policy that he had
21 that was if someone came to work not in proper
22 uniform, to send them back home and change and come
23 back in.  And so if I noticed someone wasn't in
24 their uniform, I'd ask them to go home, to clock
25 out, go home, change, come back in and clock in.

Page 45

1     Q   So that's when you were a grocery manager?
2     A   Yeah.
3     Q   Okay.  Did you ever have to do that as an
4  assistant manager?
5     A   Not that I recall.
6     Q   Is it just because it never happened, or -- I
7  mean, you certainly -- you certainly could have if you
8  needed to, correct?
9     A   I suppose.
10    Q   Okay.
11    A   But most of the time, the store director
12 was there and if he wanted to send someone home, he
13 would do it himself.
14    Q   Okay.  Did you ever sit in on termination
15 meetings?
16    A   Not that I recall.
17    Q   What about new hires?  Were you involved in
18 the -- the -- the hiring process?  Reviewing
19 applications, interviewing, anything like that?
20    A   Reviewing applications, printing off
21 applications, and then if the store director would
22 allow it, like, I tried to be involved, at least,
23 sitting in in the interview.
24    Q   Okay.  And would you participate in the
25 interview?  Would you take notes?  What would you do in

Page 46

1  the interview?
2      A   If I had a question, I would -- I was able
3  to ask.
4      Q   I assume that after the interview, you would
5  talk about the applicant with the store director?
6      A   Correct.
7      Q   Did you ever do any interviews on your own?
8      A   I believe so.
9      Q   Okay.  Under what circumstances would you do
10 that?
11     A   If the -- there was a lapse in the store
12 director being -- having a store director at that
13 particular store and if there was a need.
14     Q   Okay.  Would you ever conduct interviews with
15 the grocery manager?
16     A   No.  Primarily because the office space
17 for the interview was confined.  Like, three bodies
18 was more than comfortable.
19     Q   And, I'm sorry, that wasn't a good question.
20 Without -- without the store director there, did you
21 ever do interviews like that with the grocery manager?
22     A   I -- I don't recall.
23     Q   Okay.  Is it possible that you did and you
24 just don't remember, or is that not something --
25     A   It's a possibility.  I just don't recall.

Page 47

1      Q   Okay.  Now, you mentioned that you reviewed
2  applications.  Tell me about that process.
3      A   Primarily, it was looking at their
4  availability.
5      Q   Would you sort them through and say, you know
6  this is a good pile here, and these are the people we
7  don't want to interview or anything like that?
8      A   If I was asked to, yeah.
9      Q   Okay.  How often would you do that?
10     A   Not often.  Like I said, if I was asked
11 to.  It wasn't a super common occurrence.
12     Q   Okay.  But it's certainly something that you
13 have done before as assistant manager?
14     A   Yes.
15     Q   Did you have any input into setting pay
16 rates, raises, anything like that?
17     A   No.
18     Q   I'd assume the feedback that you would
19 provide would all go into pay considerations; is that
20 fair?
21     A   I don't know what the store director --
22 you know, whether or not he took my advice into
23 consideration when doing that.
24     Q   Okay.  But you certainly provided advice to
25 the store director in that regard?

Page 48

1      A   If he asked.
2      Q   Okay.  Did he ever ask?
3      A   Occasionally.
4      Q   Okay.  Same question for promotions.  Were
5  you involved in the promotion process of employees as
6  assistant manager?
7      A   No.
8      Q   Okay.  And, again, I assume that your
9  feedback would be considered as part of the promotion
10 process; is that fair?
11     A   Again, if -- if I was asked.  If my
12 opinion was asked.
13     Q   And -- and during your tenure as assistant
14 manager, was your opinion asked in that regard?
15     A   A couple of times.
16     Q   Okay.  We talked about -- I want to talk
17 about forms that you would fill out and use as part of
18 your duties and responsibilities as assistant manager.
19 You talked about when you would open, you would enter
20 the sales on the computer and you'd work out the cash
21 deposit.
22         We talked about the handwritten schedules.
23 Are there any other forms -- well, and occasionally,
24 the -- the evaluation forms.  Are there any other
25 forms that you remember using or filling out as

Page 49

1  assistant manager?
2      A   No.
3      Q   Okay.  How about -- how about logs?  Did you
4  have any logs, like, temperature logs, anything like
5  that, as part of your walking around the store and
6  looking for problems?
7      A   We had a temperature log for the freezers
8  and refrigerated cases.
9      Q   Okay.  Was that part of your duties and
10 responsibilities to check those temperatures?
11     A   No.  That usually was the grocery
12 manager's responsibility.  If I was walking by, I
13 would check to make sure that there was air flow and
14 that it was cold, but --
15     Q   And -- and were you making sure that the
16 grocery manager was doing those checks?  I assume that
17 was part of your responsibilities?
18     A   Yeah.
19     Q   Any other reports or forms that you recall?
20     A   Not that I recall.
21     Q   So we talked about your duties and
22 responsibilities as a grocery manager of ordering the
23 product.  What was the assistant manager's -- what was
24 your input as an assistant manager in that process?
25     A   Looking over the ad with the grocery

Page 50

1  manager.
2  Q   Okay.
3  A   And then the grocery manager and I working
4  with the store director to decide what displays he
5  wanted, where they wanted them. After a certain
6  amount of time, there -- for a short while, there
7  was a program right before I left where displays
8  were decided at corporate level. And so it would be
9  passing off information to the grocery manager to
10 order product for the displays that we were told to
11 set.
12 Q   Okay. Before that time, before it came down
13 from corporate, it was up to you as assistant manager
14 to supervise that process?
15 A   I was involved in it. I wasn't
16 necessarily supervising it.
17 Q   Okay. What was your involvement in it?
18 A   Typically, help building it. The store
19 director would make a lot of those decisions.
20 Q   Okay. I assume you could make
21 recommendations and had input into that if you thought
22 something looked silly or looked better someplace else
23 or something like that?
24 A   Yeah, I could have input.
25 Q   Okay. Did you have any say in the amount of

Page 51

1  products to be ordered for any particular event or
2  display?
3  A   Only if I thought it was ordering too
4  heavy.
5  Q   Okay.
6  A   That particular item would end up creating
7  excessive back stock.
8  Q   Did you ever do any of the ordering yourself?
9  A   In what regards?
10 Q   Getting all the (inaudible) and making the
11 purchases from Associated Foods, anything like that?
12 A   Yeah, I wrote grocery orders quite
13 frequently.
14 Q   Okay. And, I mean, that's something that
15 fell -- fell within your purview, correct?
16 A   Yeah.
17 Q   Okay. Did you have a dollar amount that you
18 could commit Ridley's to, or was that -- tell me about
19 that?
20 A   I don't think I ever explicitly said there
21 was a dollar amount.
22 Q   Okay.
23 A   You wanted to keep your purchases low
24 compared to your sales, so that way, you're making
25 money.

Page 52

1  Q   Okay. And that's something that you
2  monitored as an assistant manager?
3  A   Occasionally, yeah.
4  Q   Okay. What about non-grocery financial
5  commitments? You know, a front window gets shattered,
6  or a door needs to be replaced, or something like that.
7  Did you have authority to -- to do that?
8  A   No.
9  Q   Okay. Who would do that?
10 A   If a repair was needed, I would usually
11 reach out to Ken Fultz, who was in charge of the
12 property, and then he would line up whoever needed
13 to come out to -- to do it.
14 Q   Okay. As part of your walking around the
15 store, I assume you're looking for problems and
16 reporting issues as needed?
17 A   Yes.
18 Q   Okay. And those reports would go to
19 Ken Fultz; is that what you said?
20 A   If it was a facilities issue. If it was a
21 housecleaning issue, it would usually go to the
22 store director or me assigning someone to do it.
23 Q   Okay. I mean, if there was a broken bottle
24 of pickles someplace, you can send somebody there to
25 clean it up, correct?

Page 53

1  A   Yeah. But, additionally, cashiers could
2  as well.
3  Q   Okay.
4  A   So...
5  Q   Okay. Did you have any input or involvement
6  as to where products would be displayed or what
7  products would be put on the shelves and where on the
8  shelves, anything like that?
9  A   Yeah. Before we had assigned displays for
10 the (inaudible) if, you know, we had ten cases of
11 beans, like, build an aisle stack --
12         THE COURT REPORTER: I'm sorry, I
13 didn't understand your sentence. You had ten cases
14 of beans --
15         THE WITNESS: An aisle stack is just
16 a display midway in the aisle that --
17         THE COURT REPORTER: Okay. Aisle
18 stack. That's what I didn't understand. Thank you.
19 Q   (BY MR. WILLIAMS) And you mentioned that
20 the direction from corporate was just during the
21 last two or three months of your employment; is that
22 correct?
23 A   More than that. Probably the last year.
24 Q   Last year. Okay. What about signage? Did
25 you have input into signage?

Page 54

```
 1    A    If signage was missing, I would go and
 2  speak with the scan coordinator.
 3    Q    Okay.  Did you ever help or have input into
 4  the creation of any signage for any special events or
 5  anything else?
 6    A    If the scan coordinator wasn't there and
 7  there was a missing sign, if I had time, I would
 8  print out a sign.
 9    Q    Okay.  I assume as an assistant manager and
10  being on the floor walking around, you had
11  responsibilities for employee and customer safety; is
12  that fair?
13    A    That's fair.
14    Q    Okay.  Did you conduct formal safety
15  investigations, or is that just something you were
16  always, kind of, doing as part of your walking around
17  the store?
18    A    It was just as I was walking around the
19  store, yeah.
20    Q    Do you remember any time any employees or
21  customers getting injured in the store?
22    A    Yeah, it happened occasionally.
23    Q    Okay.  What would you do?
24    A    I would need to fill out an accident
25  report, notify the store director, and notify
```

Page 55

```
 1  Mark Ridley.
 2    Q    Okay.  Do you remember filling out accident
 3  reports?
 4    A    A couple of them.
 5    Q    Okay.  I assume if you see a hazard, it's
 6  your responsibility to remove it or assign someone to
 7  remove it; is that correct?
 8    A    Yeah.
 9    Q    Did you have safety policies that you were in
10  charge of enforcing?
11    A    The -- the only thing that sticks out is
12  making sure that the deli and meat department were
13  using cut gloves.
14    Q    And would you check on that when you would
15  walk past, or how would that work?
16    A    I would just -- if I was walking past, I
17  would look to see, if they were using a knife and
18  the slicer, that they had it on.
19    Q    And if they weren't, you would tell them to
20  put it on?
21    A    Yeah.
22    Q    Okay.  Any other safety policies you remember
23  enforcing?
24    A    No.
25    Q    Okay.  Store security.  I assume you had a
```

Page 56

```
 1  set of keys as well?
 2    A    Yes.
 3    Q    Okay.  Did you ever open and/or close as an
 4  assistant manager?
 5    A    Yes.
 6    Q    Okay.  So you were in charge of making sure
 7  the building was secure and doors were shut and the
 8  building was secure?
 9    A    Yes.
10    Q    Okay.  How often would do that?
11    A    If it fell within an opening or closing
12  shift.
13    Q    So on any given week, you know, two or three
14  times a week, maybe?
15    A    Maybe.
16    Q    Okay.  Is there an alarm system at the store?
17    A    Not that I recall.
18    Q    Okay.  What about the safe?  You had access
19  to the safe?
20    A    Correct.
21    Q    Okay.  Tell me what you would do with the
22  safe, what your responsibilities were in that regard?
23    A    If I was opening the store, I would verify
24  the count from the closing manager, whoever that
25  was, and then take tills out and put them in the
```

Page 57

```
 1  registers.  If I was closing, I would be counting
 2  down the tills, preparing a deposit for the next
 3  morning, and having a final count for the safe for
 4  the day.
 5    Q    Okay.  How much time would these tasks take
 6  when you were doing them?
 7    A    Maybe three minutes for a till and, like,
 8  a minute or two to count the cash.
 9    Q    So something you can do fairly quickly?
10    A    Fairly quickly, yeah.
11    Q    Okay.  Would you do that in the office, or
12  where would you do that?
13    A    Wherever the cash room was.  Sometimes,
14  the cash room was the office.  Other times, there
15  was a separate cash room.
16    Q    Okay.  Where was it in Pinedale?
17    A    In Pinedale?  It was a separate room for
18  all but the last six months I was there.  And then
19  there was a remodel, and then it was attached to the
20  office.
21    Q    As part of your closing duties and securing
22  the store, I assume -- well, tell me, did you have any
23  special responsibilities for securing the firearms or
24  anything like that?
25    A    To make sure that they were locked.
```

Page 58

1  Q   Okay. And was there -- was there a sporting
2  goods or hardware manager that you would interact with
3  to make sure those things were being done?
4  A   Yes, there was.
5  Q   Okay. Did you have to fill out any OSHA
6  forms?
7  A   Not that I recall.
8  Q   What about workers' compensation forms, first
9  reports of injuries, anything like that?
10  A   Those, yeah.
11  Q   Okay. How often would you fill those out?
12  A   If someone got hurt.
13  Q   Did you have responsibilities for legal
14  complaints issues? For example, making sure that the
15  required employment posters are posted or -- or
16  anything like that?
17  A   Not that I recall.
18  Q   Okay. You told me previously about ordering
19  and making sure you're not ordering too much so that
20  you're not exceeding sales. Did you have any other
21  responsibilities into store finances, into budgets,
22  anything like that?
23  A   No.
24  Q   Okay. What about labor budgets? Did you
25  have any input in that?

Page 59

1  A   No.
2  Q   As an assistant manager, were you involved in
3  any internal investigations, employee investigations,
4  anything like that?
5  A   Not that I recall.
6  Q   Okay. Did you attend the weekly conference
7  calls with corporate?
8  A   If I was able to.
9  Q   Okay. And that was -- I mean, that's a
10  fairly frequent occurrence?
11  A   They were weekly.
12  Q   Okay. And you participated as often as you
13  could?
14  A   Yeah.
15  Q   Okay. And what would your -- what would your
16  participation be in that meeting?
17  A   Listening. It was over the phone and
18  taking down notes.
19  Q   Okay. Did you ever provide input into any
20  areas of your responsibilities?
21  A   No.
22  Q   Did you ever take the information that you
23  got from those meetings and disseminate it to employees
24  in your work area?
25  A   We -- with the meetings that are each

Page 60

1  week, one of the separate departments would have a
2  meeting first on those meetings, and they would
3  receive that information and take it back to their
4  departments. If there was anything storewide and
5  the store director asked me to, I would.
6  Q   Did you participate in any meetings within
7  the store with department managers, employees, anything
8  like that?
9  A   We were supposed to have a department head
10  meeting.
11  Q   Okay.
12  A   I can't recall how frequently those were
13  supposed to be.
14  Q   Okay. But you had them on occasion?
15  A   Yeah.
16  Q   And you would participate in those as well?
17  A   Correct.
18  Q   Okay. And what would your participation be
19  in those meetings when you had them?
20  A   Being there. They were typically
21  conducted by the store director.
22  Q   Okay. I assume you provided input into areas
23  that you had knowledge of?
24  A   Yeah.
25  Q   We talked about a lot about various duties

Page 61

1  and responsibilities. Are there any others that jump
2  out at you that we haven't covered?
3  A   Not any that stick out.
4  Q   And you would agree with me that assistant
5  manager did a lot of different things and interacted
6  with a lot of people and basically just trying to make
7  sure that the store is functioning; is that fair?
8  A   That's fair.
9  Q   As assistant manager, did you keep any day
10  planners or diaries or calendars in written form?
11  A   No.
12  Q   Did you keep any other notes or records
13  related to your work as an assistant manager?
14  A   Not any that are in my possession.
15  Q   Okay. Other than the forms that you
16  completed, are there any that would be not in your
17  possession?
18  A   Maybe a little notebook that I kept in my
19  pocket for tasks that I needed to set for myself for
20  that day.
21  Q   Okay. Was it just, basically, a daily to-do
22  list?
23  A   Yeah.
24  Q   Okay. As assistant manager, were you
25  involved in any business planning for the Pinedale

STANTON MEATS vs RIDLEY'S FAMILY MARKETS
STANTON MEATS - 02/28/2023
Pages 62..65

Page 62
1  store for tracking growth, setting goals, anything like
2  that?
3      A    No.
4      Q    Did you ever attend any meetings or trainings
5  off-site?
6      A    No.
7      Q    Okay.  Other than your attorney, have you
8  communicated with anyone else about this lawsuit?
9      A    Yes.
10     Q    Who?
11     A    My spouse, my parents.
12     Q    Okay.  And what have you talked to them
13 about?
14     A    With my spouse, you know, just feelings.
15 My parents, just that it was going on.
16     Q    Okay.  How often do you talk to your spouse
17 about this lawsuit?
18     A    Not frequently.  If it comes up.
19     Q    Okay.  When was the last time you talked to
20 her about the lawsuit?
21     A    Last night.
22     Q    Okay.  What did you tell her?
23     A    That I had a deposition this morning.
24     Q    Okay.  It sounds like you were just, kind of,
25 telling her what the schedule would be and what you're

Page 63
1  involved with; is that correct?
2      A    Yeah.
3      Q    Okay.  Have you ever posted anything about
4  the lawsuit on social media?
5      A    No.
6      Q    Do you participate in social media?
7      A    Yes.  Everyone does.
8      Q    Do you have a Facebook page?
9      A    I do.
10     Q    Okay.  Do you have a LinkedIn profile?
11     A    No.
12     Q    Okay.  Anywhere online that you have
13 described your duties and responsibilities as an
14 assistant manager?
15     A    No.
16     Q    You haven't posted a resume or anything that
17 described it?
18     A    No.
19     Q    Okay.  Did you ever work in Colorado?
20     A    No.
21     Q    Let me show you a document that we'll mark as
22 Exhibit 14 to your deposition.
23              (Exhibit No. 14 marked.)
24     Q    (BY MR. WILLIAMS)  For the record, this
25 is -- appears to be your letter of resignation to

Page 64
1  Mark Ridley, dated April 19 of 2019; do you remember
2  that?
3      A    Yes, I do.
4      Q    And you resigned effective May 3rd of 2019;
5  is that correct?
6      A    I believe so.
7      Q    Okay.  Why did you resign?
8      A    It's in the letter.
9      Q    Okay.  The third paragraph says, Allow you
10 more time with your family to focus on things in my
11 life that have unfortunately fallen to the wayside.  Is
12 that an accurate reflection as to why you quit?
13     A    Yes.
14     Q    Let me show you a document that we'll mark as
15 Exhibit 15, Employee Termination Report.  It says the
16 last date worked of May 2nd, 2019; is that correct?
17              (Exhibit No. 15 marked.)
18     A    Yes.
19     Q    (BY MR. WILLIAMS)  And here, it indicates
20 you were going to work for American Fuel; is that
21 accurate?
22     A    Correct.
23     Q    Okay.  What did you do for American Fuel?
24     A    I drive a fuel truck and I deliver fuel.
25     Q    Okay.  Is that what you got your CDL for?

Page 65
1      A    Correct.
2      Q    And are you currently employed by American
3  Fuel?
4      A    I am.
5           THE COURT REPORTER:  Hey, David,
6  we've been going almost two hours.  Do you think --
7  can you just let me know when it's a good time for a
8  little break?
9           MR. WILLIAMS:  If you give me a
10 second, I think we're wrapping.
11          THE COURT REPORTER:  Yeah.  Of
12 course.  Certainly.  I just didn't know how much
13 longer we were going to be.
14          MR. WILLIAMS:  Okay.  Mr. Meats,
15 thank you for your time.  I have no further
16 questions.
17          THE WITNESS:  Okay.
18          MR. SHORT:  No questions at this
19 time.
20          VIDEOGRAPHER:  We are going off the
21 record.  The time is 10:20.
22       (The deposition concluded at 10:22 a.m.)
23
24
25

```
                                                              Page 66
 1                    REPORTER'S CERTIFICATE
 2   STATE OF UTAH     )
 3   COUNTY OF SUMMIT  )
 4
 5         I, Mary R. Honigman, a Registered Professional
 6   Reporter, hereby certify:
 7         THAT the foregoing proceedings were taken before me
 8   at the time and place set forth in the caption hereof; that the
 9   witness was placed under oath to tell the truth, the whole
10   truth, and nothing but the truth; that the proceedings were
11   taken down by me in shorthand and thereafter my notes were
12   transcribed through computer-aided transcription; and the
13   foregoing transcript constitutes a full, true, and accurate
14   record of such testimony adduced and oral proceedings had, and
15   of the whole thereof.
16         I have subscribed my name on this 15th day of March,
17   2023.
18              Mary Honigman
19              _____
                    Mary R. Honigman
20         Registered Professional Reporter #972887
21
22
23
24
25
```