Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF COLORADO

 3

 4   STANTON MEATS, JASON CARILLO, ET          )
     AL.,                                       )  CERTIFIED COPY
 5                                              )
                 Plaintiffs,                    )
 6                                              )
             v.                                 )  Civil No.
 7                                              )  1:22-CV-1070-PAB
                                                )
 8                                              )
     RIDLEY'S FAMILY MARKETS, INC.,             )
 9                                              )
                 Defendants.                    )
10   _____)

11

12              DEPOSITION OF ANDREZ RIOS

13               Salt Lake City, Utah

14            March 2, 2023, at 8:30 a.m.

15

16

17

18

19

20

21

22      Reported by:  Mary R. Honigman, RPR No. 972887

23                 Job#8438

24

25
```

STANTON MEATS vs RIDLEY'S FAMILY MARKETS
ANDREZ RIOS - 03/02/2023                                                    Pages 2..5

---

Page 2

```
 1              Zoom deposition of ANDREZ RIOS, taken in Salt
 2   Lake City, Utah, on March 2, 2023, at 8:30 a.m., before
 3   Mary R. Honigman, Certified Court Reporter, in and for
 4   the State of Utah.
 5
 6              A P P E A R A N C E S
 7        FOR THE PLAINTIFF:
 8           Sean Short, ESQ.
             SANFORD LAW FIRM, PLLC
 9           10800 Financial Centre Parkway, Suite 510
             Little Rock, Arkansas 72211
10           (866) 926-4434
             sean@sanfordlawfirm.com
11
12        FOR THE DEFENDANTS:
13           David P. Williams, ESQ.
             SNELL & WILMER
14           15 W. South Temple, Suite 1200
             Salt Lake City, Utah 84101
15           (801) 257-1900
             dawilliams@swlaw.com
16
17
18        Videographer: Chad Potts
19
20
21
22
23
24
25
```

---

Page 3

```
 1              I N D E X
 2   WITNESS: ANDREZ RIOS
 3   EXAMINATION                                    PAGE
 4   By: MR. WILLIAMS                                  4
 5
 6              E X H I B I T S
 7   NUMBER          DESCRIPTION                    PAGE
 8   EXHIBIT 1  5/14/19 Employee Information Sheet    12
 9   EXHIBIT 2  8/9/19 Employee Termination Report    53
10   EXHIBIT 3  Andrez Rios Pay Report                54
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 4

```
 1              PROCEEDINGS
 2        VIDEOGRAPHER:  Good morning.  We are
 3   going on the record.  My name is Chad Potts, and the
 4   court reporter is Mary Honigman.  We represent JD
 5   Legal Support, and the time and date indicated on
 6   the video screen is approximately 8:46 a.m. mountain
 7   time, on March 2nd, 2023, in the matter of Stanton
 8   Meats, et al., v. Ridley's Family Markets, Inc., et
 9   al. case -- or civil number 1:22-cv-1070-PAB, in the
10   United States District Court for the District of
11   Colorado.  Now, if counsel can please state their
12   appearance for the record and then we will swear in
13   the witness and begin the deposition.
14        MR. SANFORD:  Sean Short on behalf of
15   the plaintiffs.
16        MR. WILLIAMS:  David Williams on
17   behalf of the defendant, Ridley's Family Markets.
18              ANDREZ RIOS,
19   having been first duly sworn to tell the truth, was
20        examined and testified as follows:
21        Q    (BY MR. WILLIAMS)  Good morning, Mr. Rios.
22   Would you state your full name for our record,
23   please?
24        A    Yes.  It's Andrez Saul Rios.
25        Q    And what's your current address?
```

---

Page 5

```
 1        THE COURT REPORTER:  I'm sorry.  I
 2   apologize, what was the middle name?
 3        THE WITNESS:  Saul.
 4        THE COURT REPORTER:  Can you spell
 5   it?
 6        THE WITNESS:  S-a-u-l.
 7        THE COURT REPORTER:  S-a-u-l.  Thank
 8   you.  Sorry, David.
 9        Q    (BY MR. WILLIAMS)  Your full address,
10   please?
11        A    656 Eagle Drive, Loveland, Colorado,
12   80537.
13        Q    Okay.  You understand that you're under oath
14   here?
15        A    Yes.
16        Q    Okay.  It's like you're in court giving sworn
17   testimony.
18        A    Okay.
19        Q    Okay.  And you're represented by counsel
20   today?
21        A    Yes.  Which one is that?  Where is --
22        Q    Mr. Short.
23        A    Are you it?  I still have never seen any
24   of your faces, so...
25        Q    Fair enough.  Have you ever had your
```

---

Page 6

1   deposition taken before?

2      A    No.

3      Q    Okay.  We have a court reporter who is taking

4   down everything that we say, so it's important for you

5   to answer audibly.  And it's hard for the reporter

6   especially over Zoom, to record a nod of the head or a

7   shake of the head.

8      A    Okay.

9      Q    And it's also important that we don't speak

10  over one another.  So if you'll -- if you'll wait for

11  me to finish my questions, I will wait for you to

12  finish your answers and, hopefully, we'll get a cleaner

13  transcript that way.

14     A    Okay.  Sounds good.

15     Q    Any reason why you can't give truthful

16  answers to my questions today?

17     A    No, sir.

18     Q    Well, what did you do to prepare for this

19  deposition?

20     A    I just spoke briefly with an attorney.

21     Q    Okay.  Other than discussions with your

22  attorney, have you reviewed any documentation with

23  regard to this lawsuit?

24     A    No.  Not really, no.

25     Q    Okay.  What made you to -- what made you

Page 7

1   decide to become part of this case?

2      A    I think originally, I was part of a

3   different case, which, I don't think -- I don't

4   remember clearly, but then they, kind of, put me

5   into this case.  And I had just asked the attorney,

6   like, Hey, I noticed -- I thought maybe you guys

7   were (inaudible) get paid correctly and I wasn't

8   quite sure.

9      Q    Stop right there.  Mr. Short was going to

10  make an objection, and I think he was going to object

11  on attorney/client privilege.  I don't want you to tell

12  me anything that your attorney told you.

13     A    Oh, okay.

14     Q    I assume you got notification through the

15  mail from Mr. Short's firm inviting you to join the

16  lawsuit?

17     A    Yes, yeah.  That's exactly it, yeah.

18     Q    And you may have had discussions with counsel

19  but, at some point, you made the decision to join the

20  lawsuit?

21     A    Yes.  Yeah, because I definitely back it

22  up, for sure.

23     Q    Okay.  Prior to that time, had you ever

24  considered a lawsuit against Ridley's?

25     A    Yeah.  Yes, I did.

Page 8

1      Q    Did you consult an attorney in that regard?

2      A    No, sir.  I just talked to the labor

3   board.

4      Q    Okay.  And what was the nature of your

5   discussions with the labor board?

6      A    It was based on the salary -- the salary

7   amount that I was getting, and then Colorado law,

8   and the right amount that I was supposed to be

9   getting.  So it was just a discrepancy of pay,

10  basically.

11     Q    Okay.  And in that discrepancy of pay, it's

12  my understanding that you were claiming they paid you

13  the wrong amount; is that -- is that right?

14     A    Yeah.  So it's a -- it's a ask for wages.

15  It's a paper you write.  It's ask for wages.  It's

16  very, like -- very not, like -- it's not formal, I

17  guess you would say.  It's just a piece of paper you

18  fill out, and it's a request of wages.

19          And after that, they didn't want to give

20  me any more money so then, at that point, you know,

21  I went from there.  The store manager just totally

22  ignored what was going on, so...

23     Q    Okay.  And you filed that during -- while you

24  were still employed by Ridley's?

25     A    Yeah.  Well, I was still employed.  I had

Page 9

1   this conversation with the guy.  You know, once

2   again, it was just a form.  But he says, You can try

3   that and if not, you have to seek a lawyer.  So I

4   did not seek a lawyer after that, though.

5      Q    Okay.  So in this litigation, what are your

6   expectations?  What do you hope to accomplish?

7      A    I'd like to -- I'd like to acquire some of

8   the wages that I feel are owed me.

9      Q    Okay.  Do you have an amount in mind that you

10  feel is owed to you?

11     A    Absolutely not.  No, I don't.

12     Q    You worked just short of three months; is

13  that correct?

14     A    Yeah, very short.  Short amount of time.

15     Q    So we're talking probably less than a

16  thousand dollars total?

17     A    Yeah.  That's right.  Yeah, absolutely.

18     Q    Fair enough.  Let's talk about your

19  educational background, first of all.  Did you attend

20  high school?

21     A    Yeah.

22     Q    Did you graduate?

23     A    Yes, I did.

24     Q    What high school?

25     A    Boulder Creek.

Page 10

1    Q    And what year did you graduate?
2    A    2010.
3    Q    Following high school, did you attend any
4  college, university, or vocational school?
5    A    Yeah.  I went to -- I was a medical
6  assistant.  I went to Everest College and then I
7  took -- there's someone talking.
8    Q    I think you're just picking up some
9  interference.
10   A    You're good.  And then I did business
11  management certification so just a -- kind of, like,
12  a year-course-type deal you get through college,
13  so...
14   Q    Okay.  So the first one, the medical
15  assistant, you went to Everest College; is that
16  correct?
17   A    Everest College, yeah.
18   Q    And when did you do that?
19   A    I did that -- jeez, man, pretty short
20  after getting out of high school, so probably 2011.
21   Q    Okay.  And did that result in a certificate,
22  or what did you get at the end?
23   A    Yeah, yeah.  I'm a certified medical
24  assistant.
25   Q    Okay.  And then after that, you say you

Page 11

1  attended business classes?
2    A    Yeah.  Wells Fargo business classes, yeah.
3    Q    Through Wells Fargo Bank?
4    A    Yes.
5    Q    Okay.  Did you work at Wells Fargo?
6    A    No, I did not.  I took it through Safeway.
7  So Safeway has a connection through them.  So I was
8  working at Safeway at the time as an assistant
9  manager.
10   Q    Okay.  We'll talk about your employment in
11  just a second.  So after business classes, when did you
12  take those?
13   A    After business classes?  I took,
14  probably -- so that was two years, so probably 2013,
15  around there.  I have no exact date.
16   Q    Fair enough.  Anything after those business
17  courses?  Any other education, certificates, anything
18  like that?
19   A    No.
20   Q    Okay.  It's my understanding you were first
21  employed by Ridley's May 15 of 2019; does that sound
22  right?
23   A    Yes.
24   Q    Okay.  And let me -- to make a complete
25  record, let me show you a document that we will mark as

Page 12

1  Exhibit 1 to your deposition.
2                    (Exhibit No. 1 marked.)
3    Q    (BY MR. WILLIAMS)  Are you on an iPhone?
4    A    Yes.
5    Q    Okay.  If you need to zoom in, let me
6  know?
7    A    Okay.
8    Q    For the record, Exhibit 1 is Ridley's Family
9  Markets Employee Information, showing a date of hire of
10  May 14th, 2019; do you see that?
11   A    Yeah, I do.
12   Q    Does this accurately reflect your hiring by
13  Ridley's in 2019?
14   A    Yeah.  I want to say the rate of pay is
15  incorrect.  And I think it's by -- I think I was
16  getting paid $908.  I'd have to look.
17   Q    Go ahead.  Sorry?
18   A    But it is correct.  Everything else is
19  correct.
20   Q    And is that the nature of your -- your wage
21  complaint was this discrepancy?
22   A    No.  Uh-uh.  Not at all, I think maybe he
23  just put it on there wrong or something, because
24  there was different wages.  So, yeah.
25   Q    Okay.  Okay.  So I want to talk about your

Page 13

1  job -- your work history, starting from when you
2  started at Ridley's and working backwards.  So what was
3  the job that you had right before Ridley's?
4    A    I was an assistant manager at Walmart.
5    Q    And where was that?
6    A    Timnath.  So it was Colorado, pretty much
7  Fort Collins, Colorado.
8    Q    Okay.  And you were the assistant manager?
9    A    Yes.
10   Q    How long were you the assistant manager at
11  Walmart?
12   A    I was working there probably six years, so
13  probably about -- let's see.  Yeah -- yeah.
14   Q    2013, 2014ish?
15   A    Yeah, yeah.
16   Q    Okay.  And what were your duties and
17  responsibilities as an assistant manager at Walmart?
18   A    That list is endless.  Okay.  Let's see.
19  So I think the main things were payroll, hiring,
20  firing, kind of deal.  Training, developing
21  associates, just working side by side with them,
22  like, stocking, cashier, you know, the basics;
23  ordering, receiving, and then, basically, open and
24  close store, which would be, like, reconcile, which
25  is, you know, basically, like -- jeez, man, I

STANTON MEATS vs RIDLEY'S FAMILY MARKETS
ANDREZ RIOS - 03/02/2023                                                Pages 14..17

Page 14

1  haven't done it in so long.
2      Q     Sure.
3      A     What do they call it?  But, yeah, I did
4  the end of the day reconciliation so, like, count
5  the money, I guess.
6      Q     Okay.  Were you hired as an assistant manager
7  at Walmart?
8      A     Yeah.
9      Q     Didn't have any other positions there other
10 than assistant manager?
11     A     No.
12     Q     Okay.  I mean, the list of duties and
13 responsibilities, as you say, is -- is extensive.  I
14 assume it's, you know, traditional assistant manager
15 duties where you're expected to help run the store,
16 make sure --
17     A     Yeah.
18     Q     -- it's running and functioning; is that
19 correct?
20     A     Absolutely.  If someone doesn't show up,
21 I'm in the game, man.  So any area of the store --
22 every job, I knew how to do, you know.
23     Q     And, in fact, were expected to step in if
24 needed?
25     A     Exactly.  The joy of being a salaried

Page 15

1  member of management.
2      Q     Okay.  And I heard you mention Safeway at
3  some point.  Did you work at Safeway before Walmart?
4      A     Yeah.  Safeway was my first retail job
5  and, so, yeah.  I started as a head clerk there and
6  worked my way up to assistant manager, and then they
7  sent me through all those courses and
8  certifications, so it was really cool.
9      Q     Okay.  So it was while you were at Safeway
10 that you did those business management courses?
11     A     Yeah, yeah.  About the same time.
12     Q     As an assistant manager for Safeway, I assume
13 your responsibilities were similar to what you did at
14 Walmart?
15     A     Yes.  Very similar.  Yep.
16     Q     Okay.  So you had a series of jobs as
17 assistant manager.  How did you -- how did you come to
18 get the job at Ridley's?
19     A     I think I just was on -- jeez, it's one of
20 the job sites.  It starts with an I.  I forget the
21 name of it.
22     Q     Indeed?
23     A     Yeah.  Yes, Indeed.  Yes, sir.
24     Q     And you submitted an application through
25 Indeed?

Page 16

1      A     Yes.
2      Q     Okay.  And did you interview with anyone?
3      A     Yes.  I probably got an interview with the
4  store manager.
5      Q     Do you remember who the store manager was?
6      A     I don't remember his name, no.  I want to
7  say -- no, I don't remember his name.
8      Q     Does the name Kelly Neil ring a bell?
9      A     Absolutely.  That's his name.
10     Q     Okay.  Fair enough.  Thank you.  So you
11 interviewed with Kelly Neil; is that correct?
12     A     Yes.  Yes, sir.
13     Q     Was that in person or was that over the
14 telephone?  How was that?
15     A     In person.  I think -- well, actually we
16 talked over the phone and then we did an in-person
17 interview, yeah.
18     Q     Okay.  What did Kelly Neil tell you about the
19 assistant manager job?
20     A     I think he started, kind of, the
21 conversation, like, it's not a glorious position,
22 you know, and, you know, it's going to be rough and
23 pretty much every assistant manager position like
24 that, you know, you're going to be here for a while.
25 You're going to work hours and, you know, kind of,

Page 17

1  just be ready because the store is in need of a
2  manager, desperately so, or assistant manager
3  desperately.
4          Let me close this.  I'm sorry.  Sorry
5  about that.
6      Q     No worries at all.  It will make for a better
7  video.
8      A     Yeah, it was getting bad there for a
9  second.
10     Q     So you spoke with Mr. Neil.  He told you
11 about the job.  I assume nothing he said really
12 surprised you.  I mean, you had been an assistant
13 manager before?
14     A     Yeah.  Nothing -- nothing out of the
15 ordinary as far as that went, yeah.
16     Q     Did he give you a similar description of the
17 duties and responsibilities as what you had already
18 done at Walmart and Safeway?
19     A     Yeah.  Yeah.  No.  Well -- to the most of
20 the -- yeah.  So we didn't -- he didn't get in depth
21 of, like, that I would be doing these, like, more
22 important positions.  It was more, like, you know,
23 the store is empty.  You know, they need stuff on
24 the shelves.  Kind of, like, floor kind of work, you
25 know.  And so I, kind of, understood it was almost

STANTON MEATS vs RIDLEY'S FAMILY MARKETS
ANDREZ RIOS - 03/02/2023

Pages 18..21

Page 18

1  like I was cleaning out a back room for the company.
2         So that was the difference of, like, what
3  the requirements and what he's asking me, kind of,
4  were, you know.  So he never really mentioned
5  anything as far as, like -- like, like, I think -- I
6  guess the only way to say it is it was less
7  professional than Walmart, for sure, you know.  And
8  I think it's because it was a smaller market, and I,
9  kind of, expected that, so...
10  **Q    So size-wise, I mean, Ridley's Family Markets**
11  **as compared to Walmart is a pretty stark difference,**
12  **isn't it?**
13  A    Oh, yeah, absolutely.  Profitability-wise,
14  you know, business metrics in total are totally
15  different, you know.  So expectations are going to
16  be different, and I did expect that, so...
17  **Q    Okay.  Did he tell you about hours,**
18  **expectations?**
19  A    He -- no.  I think that happened more when
20  I actually signed, you know, the paperwork to be the
21  manager.  But, no, he didn't really talk about,
22  like, hours or go into, like, depth.  He did talk
23  about when they opened and when they closed, kind of
24  deal, but that's about it.
25  **Q    Okay.  Assistant managers work long hours**

Page 19

1  **throughout the industry, don't they?**
2  A    Yes.  Yeah.  So that's why they put us on
3  salary, I believe.
4  **Q    I mean, you certainly went in understanding**
5  **that you would be expected to work typical assistant**
6  **manager hours?**
7  A    Oh, yeah.  Yeah, the holidays, you know,
8  any hours beyond there, kind of deal, you know.
9  **Q    Training-wise, I assume you didn't need much**
10  **training to be an assistant manager?**
11  A    No.  I think I was pretty solid there.
12  Maybe just some, you know -- you know, just, kind
13  of, how Ridley wants to do it, just policies I had
14  to brush up on.  That's about it.
15  **Q    Just understanding Ridley's particular**
16  **procedures?**
17  A    Yeah.  The processes and just
18  understanding how they want certain things, you
19  know.
20  **Q    Okay.  And did Mr. Neil -- I assume he's the**
21  **one that trained you on those processes?**
22  A    No.  So there was another manager, and he
23  was -- his name was Zack, and he -- he did a lot of
24  training with me.  He was working with me more, but
25  I didn't really train.  There wasn't much training.

Page 20

1  Then I worked with the bookkeeper.  Then I worked
2  with the bookkeeper, so, just to train on, like,
3  back office stuff, so...
4  **Q    Okay.  What back office stuff did you have to**
5  **train on?**
6  A    Just cash handling.  I would reconcile at
7  the end of night.  I would count the money.
8  **Q    Okay.  As assistant manager, did you have a**
9  **regular schedule that you followed?**
10  A    At Ridley's?
11  **Q    Yes.**
12  A    Yes.
13  **Q    What was your schedule?**
14  A    Five days on, and I was on a rotating
15  five-day-on schedule/six-day schedule.  So five days
16  and then the next week would be six days, and then
17  the next week would be five days, and then the next
18  week would be six days.  It was a rotating
19  five-day/six-day schedule.
20  **Q    And what about times in the day?  Did you**
21  **open?  Did you close?  What did you usually do?**
22  A    I worked -- most of the time, I was
23  working open to close.  I was supposed to be working
24  a mid to close, so, basically 10:00 a.m. to the end
25  of day, which -- I can't remember.  I think it was

Page 21

1  10:00 or 11:00.
2  **Q    So it's my understanding that assistant**
3  **managers and the store directors, their schedules**
4  **overlapped but not exactly.  So, in other words, there**
5  **would be days that the store director would be off that**
6  **you would be covering, and two to three hours each day,**
7  **either in the morning or in the evening where the store**
8  **director would not be there and you would be; is that**
9  **accurate?**
10  A    Yeah.  More than that, though.  I mean,
11  but, yeah.  I guess five hours because he'd probably
12  get off at 4:00.
13  **Q    Okay.  So five hours a day and at least one**
14  **day a week, sometimes two; is that fair?**
15  A    Yeah.  He was pretty much on the same
16  schedule I was, so, yeah.
17  **Q    Okay.  So during those times that you were**
18  **the only manager, or during the times when he wasn't**
19  **there, you were the senior manager on-site, correct?**
20  A    Yes.  Yeah.  I would be the one to refer
21  to, yeah.
22  **Q    Okay.  So during those times, you're --**
23  **you're handling whatever problems come up, addressing**
24  **the needs of the employees?  I mean, basically running**
25  **the store; is that correct?**

STANTON MEATS vs RIDLEY'S FAMILY MARKETS
ANDREZ RIOS - 03/02/2023

Pages 22..25

Page 22

1   A    Yes.
2        Q    Okay.  So based on your numbers, you know, up
3   to maybe five hours a day, we're talking 20 to
4   30 percent of the time you were there without the store
5   director; is that fair?
6        A    Yes.  Yeah.
7        Q    At the Wellington store, did you have a -- a
8   workspace where you did your back office stuff?
9        A    Yes.  I had -- yeah, there was only one
10  space back there behind the main counter or the
11  register, yeah.
12       Q    Okay.  One that you would share with the
13  store director and maybe the grocery manager?
14       A    No.  I did not have a specific office, no.
15  How did they do it?  Yeah.  No, I didn't have a
16  specific office or anything, and I hardly ever was
17  in there.  But, yeah, we would just share one.  It
18  was, like, a cash office and we just shared the same
19  office, kind of deal.
20       Q    Okay.  Where was -- where was the computer
21  located?
22       A    The computer for emailing or, like, cash
23  reconciliation, or what are we talking?
24       Q    Did you have separate computers for emails
25  and one for cash reconciliation?

Page 23

1   A    Yes.  Yes, we did.
2        Q    Okay.  I -- I did not know that.  So tell me
3   about -- tell me about --
4        A    There was -- one would be in the cash
5   office.  There was one in the cash office, and then
6   there was one, kind of, like, directly to the
7   opposite or just the regular office.
8        Q    Are you all good?  Do we need to take a
9   break?
10       A    Yeah, we're all good.  I'm sorry.
11       Q    Okay.  No worries.  So there's a computer in
12  the cash office, and where was the other computer?
13       A    Yeah.  Sorry, yeah.  Go ahead.  One more
14  time.
15       Q    There was a computer in the cash office.
16  That's where you did reconciliations?
17       A    Yes.
18       Q    And where was the email computer?
19       A    There was another email computer.  It was,
20  like, a separate email computer, like, I believe in
21  that office.  I can't remember specifically where
22  those computers were.  I know that I had to check
23  emails every now and then.  But, man, that's so rare
24  that I was on the computer.  The only time that I
25  ever did any type of computer work was with the cash

Page 24

1   office computer, and there was also a computer at
2   the customer service desk for, like, Western Union
3   and money transfers.
4        Q    Okay.  Other than occasionally accessing the
5   computer, was there any other equipment that you used
6   as part of your job as an assistant manager?
7        A    No.  I mean, there's, like, heavy
8   equipment, like, pallet jacks and stuff like that.
9   That's about it.  Maybe cards.
10       Q    They didn't provide you a cell phone or
11  anything else?
12       A    No.  No.  I think you could have had email
13  on your phone.  I just didn't need it.
14       Q    Okay.  So let's -- I want to talk about your
15  duties and responsibilities as an assistant manager for
16  Ridley's, and we're going to start general and then
17  we're going to drill down.  So if you could give me
18  just a general summary of your duties and
19  responsibilities as an assistant manager for Ridley's.
20  You're on mute.
21       A    The duties that I had mainly were to --
22  the reconcile of, like, the end-of-day cash, like,
23  cash office end-of-day stuff.  That's pretty much,
24  like, the back office stuff that I would do.  And
25  then it was to order and fill in the freezer; order

Page 25

1   to fill in the dairy; order to fill the dry or
2   nonperishable items, and then just fill -- just fill
3   the shelves, you know stock, basically.  There's a
4   little bit of merchandising I did with some of the
5   product, but that's about it.
6        Q    Okay.  We talked about reconciling the cash
7   at the end of the day.  I assume that's counting the
8   registers, putting them in the safe, what have you?
9        A    Yeah, just collecting and calculating the
10  registers, and that was about it.
11       Q    Okay.  What would you do with the cash?
12       A    Make a deposit at the end of the day.
13       Q    Okay.  Would you actually take it to the
14  bank?
15       A    No.  I would not.
16       Q    Who would do that?
17       A    I believe Kelly.
18       Q    Did you ever make a bank deposit?
19       A    No.
20       Q    Okay.  You had access to the safe?
21       A    Yes.
22       Q    And why did you have access to the safe?
23  What did you do with the safe?
24       A    I would put the registers in the safe or
25  the money from the registers in the safe, just

STANTON MEATS vs RIDLEY'S FAMILY MARKETS
ANDREZ RIOS - 03/02/2023
Pages 26..29

Page 26

1  depending on what day it was, specifically. But all
2  the -- you know, you count it down, take all the
3  extra (inaudible) make the drawers for the next
4  morning. So you'd put the basic change and the
5  basic dollar amounts in the drawers, and then you'd
6  put it in the safe and you'd lock it.
7           And then when I got there in the morning,
8  I'd unlock it, open it up, give everybody their
9  register, and then go back to work stocking,
10  basically.
11      Q     Okay. Do you understand what I mean when I
12  say center store employees?
13      A     No.
14      Q     Okay. We're generally talking, you know, the
15  grocery department, frozen foods, dairy, maybe
16  cashiers.
17      A     Yeah, like, floor operations.
18      Q     Do you understand that?
19      A     Yeah, I understand the basics.
20      Q     So it's my understanding that the assistant
21  managers basically had -- the center store was, kind
22  of, the assistant manager's responsibility; is that --
23  is that accurate?
24      A     Yeah. It was divided by two. So there
25  was a nonperishable and basically, like,

Page 27

1  perishables, kind of a deal.
2      Q     And which one were you over?
3      A     I was over the dairy, frozen area over
4  there.
5      Q     Okay. So over the perishables?
6      A     Yes.
7      Q     Okay. And how many employees on any given
8  day would that consist of besides you?
9      A     (Inaudible) I think he was supposed to be
10  in between dairy and frozen. Are you there?
11      Q     Say that one more time. We just lost you.
12      A     Okay. I had a department manager for the
13  dairy. So he's a DM. That was about it. But, I
14  mean, I guess -- yeah. He didn't really, like -- he
15  wasn't, like, under me or something. He just, kind
16  of, told me to work, like, beside him and that, you
17  know.
18      Q     Any employees under that dairy manager?
19      A     I think we had one. I think he'd showed
20  up, like, maybe once or twice a week or something.
21  Something crazy. I can't remember specifically, and
22  I don't really remember.
23      Q     Okay. Any other employees in the perishables
24  department?
25      A     No.

Page 28

1      Q     Okay. And you said you worked beside the
2  dairy manager. I assume if the dairy manager had
3  questions or problems, he would come to you, and then
4  you could either address it or kick it up the chain of
5  command; is that fair?
6      A     Yes.
7      Q     Okay. Did you -- did you plan work for
8  anybody?
9      A     No.
10      Q     Okay. Did you do any scheduling?
11      A     No.
12      Q     Okay. So you're basically over the
13  perishables department. I assume when you're -- when
14  you're the senior manager on-site when the store
15  director isn't there, you're, kind of, over everything;
16  is that -- is that accurate?
17      A     Yeah. Yeah. That's the intent --
18  intention there, yeah.
19      Q     Okay. And during that time, I assume that,
20  you know, you're walking around making sure the store
21  is functioning, making sure employees are doing their
22  job. You know, if there's a cleanup or something that
23  needs to happen, you can assign somebody to go do that
24  or you do it yourself. You're just making sure the
25  store is functioning; is that a fair summary?

Page 29

1      A     Absolutely, yeah.
2      Q     Okay. Did you ever handle any employee
3  complaints that you remember?
4      A     No. I did not.
5      Q     Okay. I assume that as part of your walking
6  around and talking to employees, employees are going to
7  vent?
8      A     Oh, yeah, yeah. The basic complaints,
9  like -- not, like, a red book or anything, not,
10  like, HR discussion or -- but the griefs. The daily
11  griefs of the day, absolutely.
12      Q     And assistant manager, you do your best to
13  address those and either talk them down or if it's a
14  serious problem, you can escalate it if need be; is
15  that fair?
16      A     Yes. Absolutely.
17      Q     And during that time, I assume you're
18  providing feedback to employees if they need help or if
19  they're doing something wrong or need encouragement,
20  that's something you do?
21      A     Yeah, yeah. I definitely made it my duty
22  to get out there and try to do that with them, yeah.
23      Q     Okay. Did you do any training of employees
24  while you were there?
25      A     No. No. There's a lot of senior people

Page 30

1   there, so...
2      Q      How about -- I mean, you're only there for
3   three months or so.  Did you do any hiring during that
4   time?
5      A      No.
6      Q      Okay.  Ever have to sit in on any interviews
7   or anything?
8      A      No.  No.
9      Q      What about the evaluation process?  Did you
10  ever have the opportunity to participate in that?
11     A      No.  I don't believe so.  You know, I
12  don't remember.  I really don't.
13     Q      And I know it's -- you weren't there for very
14  long, so I understand that.  So is it something that
15  you may have participated in and you just don't
16  remember, or --
17     A      Yeah, I think maybe I did -- maybe I did
18  participate, but I just can't really remember.
19  It's, kind of -- can I use the restroom real quick?
20  I'm going to use the restroom real quick.  Just one
21  second, okay?  I'm sorry.
22          MR. WILLIAMS:  Take a break.  Let's
23  go off the record.
24          VIDEOGRAPHER:  Going off the record.
25  The time is 9:23 a.m., on March 2nd, 2023.

Page 31

1              (Off the record.)
2          VIDEOGRAPHER:  Okay.  Going back on
3   the record.  The time is 9:25 a.m. mountain time, on
4   March 2nd, 2023.
5      Q      (BY MR. WILLIAMS)  Thank you.  Okay.  So
6   when we took a quick break, we were talking about
7   employee evaluations, and it's my understanding you
8   may have done that, but you -- I mean, you honestly
9   don't remember; is that correct?
10     A      Yeah.  Yeah.  I don't know, yeah.
11     Q      Okay.
12     A      I think we've talked -- I think he was
13  talking to me about, you know, the evaluation
14  because we were, kind of, going through that at the
15  time.  But I just don't know specifically.  I can't
16  remember.
17     Q      And by "he," you mean Mr. Neil?
18     A      Kelly.  Yeah, yeah.
19     Q      Okay.  I mean, that's certainly something
20  that you would expect to do as an assistant manager,
21  wouldn't you?
22     A      Yeah, absolutely.  I wanted to do that.
23  That's why -- I'm sure I proactively went out there
24  and was looking to, you know, maybe evaluate or to
25  (inaudible) performances or something, you know.

Page 32

1   I'm sure of it.  I'm sure I pursued that, for sure.
2      Q      Okay.  Do you remember filling out any
3   written evaluation forms?
4      A      No.  Not that I know of.
5      Q      Okay.  Do you think you would have provided
6   feedback, at least?
7      A      Yeah, yeah.  In conversation, absolutely.
8      Q      Okay.  Were you ever involved in any employee
9   disciplinary matters?
10     A      No.
11     Q      Did you ever have to recommend discipline?
12     A      No.
13     Q      But just because it didn't happen during your
14  three months, or -- or -- or what?
15     A      Yeah, no.  I don't think so.  I don't
16  think anybody really -- I don't think it was
17  necessary, no.
18     Q      Okay.  Did you ever have to fire somebody or
19  recommend termination for anybody during that time
20  period?
21     A      No, sir.  No.
22     Q      Did you ever have to review applications or
23  sit in on interviews of new employees?
24     A      No.
25     Q      Okay.  Did you ever hop on Indeed and

Page 33

1   download resumes or anything like that?
2      A      No.
3      Q      Okay.  Do you know if you hired any employees
4   during that three-month period that you were there?
5      A      I don't -- no, I didn't.
6      Q      And do you know if the store hired any
7   employees during that time period?
8      A      Yeah, I think so.  I think it did, yeah.
9      Q      Okay.  Do you know who they -- what positions
10  they would have hired?
11     A      Cashier.  I'm sure I saw a couple of new
12  cashiers start when I was there, and then maybe,
13  like, a -- like, some people in the deli, kind of
14  deal, so...
15     Q      Did you have any input or say into the pay of
16  employees or pay increases, merit increases?
17     A      No.
18     Q      Okay.  At least not formally?  I assume
19  your -- your feedback and discussions with Kelly all
20  would go into that?
21     A      Yeah.  Yeah, like, as much as three
22  months' credit would give me, you know.
23     Q      Fair enough.  I assume you didn't have to
24  transfer any employees during that brief period of
25  time?

Page 34

1    A   No.  No.

2    Q   How about promotions?  Did you have any
3  promotions during that time that you participated in?

4    A   No, sir.

5    Q   Okay.  We talked about the reconciliation
6  that you would do.  Are there any other reports or
7  forms that you would fill out as an assistant manager
8  that you remember?

9    A   No.  No, sir.  I think maybe order forms
10  (inaudible).

11       THE COURT REPORTER:  Is he cutting --
12  is he glitching on your end?

13       MR. WILLIAMS:  Yeah.

14    Q   (BY MR. WILLIAMS)  Mr. Rios, if you can
15  hear me, you're glitching and breaking out.  If you
16  can go to a spot that maybe you have better
17  reception.

18    A   I'm so sorry.  Yeah, I'm -- I'm headed
19  there.

20    Q   Okay.

21    A   I apologize.

22    Q   No worries.

23    A   Yes, go ahead.  I'm sorry.

24    Q   Back in the car.

25    A   I'm here.

Page 35

1    Q   Okay.  So you were -- you broke up telling me
2  about other possible forms you may have filled out.
3  Tell me that again?

4    A   Yeah, so just maybe an order form, like,
5  for milk and eggs would be, like, the only thing
6  that I really filled out.  And the paperwork for the
7  cash office, the reconciliation paperwork.  You've
8  probably seen my name on that the bunch.  That's
9  about it that I can remember specifically.

10    Q   Okay.

11    A   And I don't remember all the paperwork I
12  filled out.

13    Q   Okay.  There were certainly a lot of forms
14  that managers and assistant managers would use?

15    A   Yes.  Absolutely, yeah.

16    Q   Okay.  So it's certainly possible that you
17  filled out more; you just don't remember them at this
18  time?

19    A   Absolutely.  Yeah.

20    Q   Okay.

21    A   Probably see my name on more than a couple
22  of forms for sure, yeah.

23    Q   You mentioned merchandising.  Tell me what
24  you did in regard to merchandising?

25    A   Ordered product and placed it, you know,

Page 36

1  on a shelf.  It was in, you know, a concise way as
2  far as -- you know, I guess as far as what people
3  want, I guess.  I don't know.  Yeah.

4    Q   So did you have -- I mean, it sounds like you
5  had some input as to where product is being displayed,
6  you know, if you're going to set up a special display
7  for something, if you're going to put up special
8  signage, something like that; is that fair?

9    A   Yeah.  Absolutely.  I definitely had the
10  reins on that -- that workload.

11    Q   Okay.  Product ordering.  Did you have -- are
12  you just filling empty shelves, or did you have
13  authority to order extra things for special events,
14  case lot sales, you know, holidays, stuff like that?

15    A   Yeah, yeah.  I think -- I can't remember
16  specifically, but I know I ordered for a holiday,
17  and I remember thinking, you know, these are the
18  things I'm going to order.  I have, kind of, like,
19  a -- just, kind of, made an event out of it.

20    Q   And so it was up to you to decide how much
21  ketchup or how much hot dog buns or whatever it is to
22  order; is that fair?

23    A   Yeah.  Absolutely.  Yeah.  Also with
24  regards to merchandising, it was involving, like,
25  what it looked like over there.  So if it was for a

Page 37

1  holiday, it looked like Halloween or it looked like
2  Valentine's Day in that area.

3    Q   And that was under your -- under your duties
4  and responsibilities?

5    A   Yeah, yeah.

6    Q   Okay.  What about employee or customer
7  safety?  I assume that as part of your -- I mean, you
8  described as being out there and walking around,
9  you're -- you're looking for safety issues; is that --
10  is that fair?

11    A   Yeah.  Absolutely.

12    Q   Okay.  What kind of safety issues would you
13  encounter on a day-to-day basis?

14    A   I think, you know, wet spills would be,
15  like, slip -- slip-and-fall, like, you know, like,
16  maybe overstuffing with product on shelves, like --
17  jeez, man, you know, I guess there's not a lot
18  unsafe at a store, but there is when you're there, I
19  guess.  I'm not sure.  I don't remember exactly, but
20  I know that -- you know, a lot of the stuff we
21  looked for, mainly just wet spills and floor sweeps,
22  you know.

23    Q   And you could direct somebody to go take care
24  of that or do it yourself if -- if everyone's busy?

25    A   Oh, yeah.  Yeah, I think one of the

STANTON MEATS vs RIDLEY'S FAMILY MARKETS
ANDREZ RIOS - 03/02/2023                                    Pages 38..41

Page 38

1  biggest -- biggest issues was there wasn't a ton of
2  people there to ask in the first place.  But it was,
3  you know, put to me that, you know, I could ask, you
4  know, certain people in each of the departments if
5  (inaudible).
6      Q    If they could help you?
7      A    Yeah, clean.
8      Q    Okay.
9      A    Sorry, did you not get that?
10     Q    No, didn't get that.
11     A    Okay.  You're good.
12     Q    Did you ever have to fill out any injury
13 reports or incident reports?
14     A    No.
15     Q    You had keys to the building, correct?
16     A    Yes.
17     Q    Okay.  And I assume -- you mentioned that you
18 were there primarily at the end of the day, so I assume
19 it was your responsibility to lock the building down?
20     A    Yes.
21     Q    Okay.  Would you -- how would you do that?
22 Describe your -- your process for securing the building
23 before you leave for the evening.
24     A    Okay.  So I'd walk the floor.  There's two
25 bathrooms.  I'd just check the bathrooms, check, you

Page 39

1  know, basically each corner of the store.  You know,
2  lock the door and then, you know, like I said with
3  the reconciliation, put everything away, and then
4  just walk out, lock the door.  I believe, if I
5  remember correctly, there is a security system and I
6  did have a code.  I believe so.
7      Q    So you would arm the security system?
8      A    Yes.
9      Q    Did you ever have to respond to an alarm or
10 call the police or anything?
11     A    No.  No.  I don't believe at that store I
12 did.
13     Q    Did you have -- are you still with me?
14     A    Yes, I am.  Yes, I'm here.  You got me?
15 Hello?
16     Q    We got you.  Can you hear me?
17     A    Yes.
18     Q    Okay.  So what about store financials, store
19 budgets?  Did you have any input into those?  Or I
20 assume you had a responsibility for making sure you
21 didn't exceed your -- your budgets that you got from
22 corporate?
23     A    Yeah.  Yes.  So, I mean, as far as
24 ordering product, yes.  As far as payroll, I had no
25 control over any of that, so...

Page 40

1      Q    Okay.  It's my understanding that you got
2  quarterly budgets from corporate; is that correct?
3      A    Yes.  It's nothing that I knew about, or
4  I --
5      Q    You weren't even there for a full quarter,
6  correct?
7      A    No.  Yeah, yeah.  At that point, I think
8  I'd have to be there for a full year at least to see
9  what a good budget would be for that company.
10     Q    Okay.  But that's something you would expect
11 to have involvement in as an assistant manager?
12     A    Yeah.  The expectation was for that.
13     Q    As part of your walking around the store, did
14 you use any checklists, any logs, or anything like
15 that?
16     A    No.  No, I think I -- I don't remember.  I
17 don't remember.  I'm sorry, I don't know if they had
18 a sweep log or not.  Are you there?  Are you there?
19     Q    Yeah.  Can you repeat that?  I'm sorry.
20     A    I don't remember if they had a sweep log,
21 like (inaudible).
22          THE COURT REPORTER:  Did you say you
23 don't remember if they had a sweep log?
24          THE WITNESS:  Like, a daily
25 walk-around log.

Page 41

1      Q    (BY MR. WILLIAMS)  Okay.  As assistant
2  manager, did you attend the weekly conference calls
3  with corporate?
4      A    Yeah.  No, no, no.  Sorry, no.
5          MR. WILLIAMS:  Why don't we go off
6  the record for a second.
7          VIDEOGRAPHER:  Going off the record.
8  The time is 9:41 a.m. mountain time, on March 2nd,
9  2023.
10         (Off the record.)
11         VIDEOGRAPHER:  Going back on the
12 record.  The time is 9:48 a.m. mountain time, on
13 March 2nd, 2023.
14     Q    (BY MR. WILLIAMS)  Okay.  When we -- when
15 we lost you, we were talking about the weekly
16 conference calls with corporate.  Did you
17 participate in those?
18     A    No.  There wasn't a weekly -- I did not
19 participate in the weekly conference calls, if there
20 was, no.
21     Q    Okay.  Were you even aware that there were
22 weekly conference calls?
23     A    No.
24     Q    Okay.  Did you have weekly meetings with your
25 managers that you attended?

STANTON MEATS vs RIDLEY'S FAMILY MARKETS
ANDREZ RIOS - 03/02/2023

Pages 42..45

Page 42

1   A   Yes.

2   Q   Okay.  Tell me about those?

3   A   We talked merchandising of the dairy.  We
4   would talk about the freezer, merchandising of the
5   freezer, if it was full; if it was empty.  You know,
6   a lot of (inaudible) talk, like, throw-aways, kind
7   of deal.  That's about it.

8   Q   Okay.  And is that a meeting that you would
9   have personally with -- with the perishable managers?

10   A   Yeah.  Well, yeah.  I would -- yeah.

11   Q   Okay.  And that was a weekly basis?

12   A   Yes.

13   Q   Where would you do those meetings?

14   A   Just, kind of, on the fly when I saw them.
15   Kind of, meet up with them, kind of deal.  Just
16   check in.

17   Q   Okay.  I want to talk about your -- your --
18   as part of your responsibilities, your ability to
19   commit Ridley's financially.  And, I mean, you know,
20   spend Ridley's's money.  And we talked about ordering.
21   We talked about filling the shelves.  We talked about,
22   you know, ordering for special projects that you had --
23   had some say and discretion in.  Any other -- any other
24   part of your responsibility that -- that would commit
25   Ridley's financially?

Page 43

1   A   No.

2   Q   Did you ever have to order repairs to any
3   equipment or replace doors or locks or anything like
4   that?

5   A   No.

6   Q   Okay.  Any other job duties and
7   responsibilities that we haven't talked about that jump
8   out at you?

9   A   No.

10   Q   Okay.  I mean, I think we talked about this
11   before, but would it be fair to say that, you know,
12   your primary duty as an assistant manager was walking
13   around the store, making sure it's functioning, making
14   sure, you know, people are doing their jobs, helping
15   out wherever you needed, just making sure the store is
16   operating efficiently; is that fair?

17   A   Yes.  I would like to make it very, very
18   clear, though, you know, in this deposition, that I
19   mainly stocked.  You know, besides the end-of-day
20   procedures, I was mainly required to stock the
21   freezer and the dairy shelves.

22       Now, you know, to make sure things closed
23   down right, to make sure people got out the door as
24   far as associates, those were more of the follow-ups
25   that I was doing.  And as far as my career as an

Page 44

1   assistant manager, this was the least responsibility
2   that I had ever had as an assistant manager.

3   Q   Okay.  You would agree with me that, I mean,
4   at least 20 to 30 percent of the time, you're still the
5   senior manager at -- on-site, whether you're stocking
6   shelves or stocking the freezers; is that -- is that
7   accurate?

8   A   Yeah, yeah.  So, you know -- and I think
9   that, you know, I was never just sole manager alone,
10   though.  There was always an assistant manager or a
11   store manager with me.  You know, like I said, you
12   know, I guess 20, 30 percent and, you know, pretty
13   significant during the day.  It was very minimal
14   that I was alone ever, so...

15   Q   Can you repeat that?  You were -- you were
16   going out?

17   A   Which part there?

18   Q   You're going to have to start from the
19   beginning.

20       THE COURT REPORTER:  I mean, I can
21   read what I got, unless you just want him to start
22   from the beginning.

23       MR. WILLIAMS:  Go ahead, Mary.  Why
24   don't you read back what you got?

25       THE COURT REPORTER:  And then you can

Page 45

1   tell me if there's anything missing.

2       (The answer was read back by the court reporter.)

3       THE WITNESS:  I was saying 20 or 30
4   percent of the day seems pretty significant during
5   the day, like, when you're there.  But it was -- you
6   know, like I said, it was never full-on 20 or 30
7   percent completely alone.  It was more, like,
8   10 percent alone, if hardly ever, and mainly because
9   people didn't want to stay totally until the end of
10   the night, so...

11   Q   (BY MR. WILLIAMS)  And by other managers
12   being there, you mean the department managers, like,
13   the grocery manager, the deli manager, what have
14   you?

15   A   Yeah.  We had a cash office manager that
16   was, kind of, acting as assistant.  And then we had
17   a liquor store manager, which, she walked around
18   like she was an assistant manager, and she pretty
19   much was doing everything.  She was scheduling.  She
20   was pretty much an assistant manager.  So, you know,
21   I was pretty fresh there.  I was pretty new.  So it
22   was, kind of -- they were established already.  I
23   was just joining the party, you know, so...

24   Q   And certainly learning how to do all the
25   things that they were doing?

STANTON MEATS vs RIDLEY'S FAMILY MARKETS
ANDREZ RIOS - 03/02/2023                                              Pages 46..49

Page 46

1    A    Yes.  Yeah, yeah.  So, you know, very
2  seldomly was I just left totally alone.  I wasn't
3  really on the responsibility level quite there, you
4  know, as far as that goes, yeah.
5    Q    You did mention that maybe -- maybe as little
6  as 10 percent of the time, you were actually alone as
7  the manager on-site?
8    A    Yes.
9    Q    Okay.
10   A    (Inaudible).  I could give you an exact
11  time, actually.  Kelly would come in at 7:00, and
12  you know, if he needed, he'd come in at 7:00.  He'd
13  have an opening manager there with him there, which
14  is definitely, like, the cash office manager.  Then
15  10:00 to 7:00, the mid-shift assistant manager would
16  come in and pretty much exactly from 7:00 p.m. to
17  10:00 p.m., was pretty much the time that I was
18  actually, like, alone.  So is that 20 or 30 percent?
19  We still could be on the 20 or 30 percent still.
20         MR. WILLIAMS:  Did you get that,
21  Mary?
22         THE COURT REPORTER:  I think.
23   Q    (BY MR. WILLIAMS) Can you just explain
24  that over?  We only got about half of that.
25   A    Oh, yeah.  So from 10:00 a.m. to

Page 47

1  7:00 p.m., there was a mid-shift manager.  And if I
2  was the closing manager, I would be there, you know,
3  from 7:00 p.m. to 10:00 p.m. as the only salaried
4  member of management.  And that was, you know, like,
5  pretty -- like, only closing days.  So I think it
6  was, like, two or three times a week, so...
7    Q    Okay.  And there were days where the store
8  manager -- the store director has days off and those
9  would be days that you would work, correct?
10   A    Yeah, I would open with the cash office
11  manager at that point.
12   Q    Okay.
13   A    And then there would be another assistant
14  manager, a salaried member of management that would
15  come in.  There was three -- I believe there was
16  three total salaried members of management.  Did you
17  get that?
18   Q    Three total salaried members of management,
19  you said?
20   A    Is it breaking up still?
21   Q    Yes.
22   A    Yes.
23   Q    Do you know for sure that they were salaried?
24   A    Yes.
25   Q    Okay.

Page 48

1    A    I know for me, I was, yeah, and those two
2  were, yes.
3    Q    And you said one was the liquor store
4  manager?
5    A    The liquor store manager was not a
6  salaried member of management.  (Inaudible).  The
7  assistant manager was me, myself, and Zack, which
8  would have been the assistant managers.  Kelly was
9  the store manager.  Only three total of us that were
10  salaried members of management.
11   Q    Hold on one second.  We're not getting hardly
12  any of that.  We've only got about, maybe, five or ten
13  minutes left.  Is there another place you can go that
14  has better reception?
15   A    Yeah.  I'm so sorry, I double booked a
16  little -- I had a meeting for my daughter.
17         MR. WILLIAMS:  Mary, let's go off the
18  record.
19         VIDEOGRAPHER:  Going off the record.
20  The time is 10:01 a.m. on March 2nd, 2023.
21         (Off the record.)
22         VIDEOGRAPHER:  Going back on the
23  record.  The time is 10:06 a.m. mountain time, on
24  March 2nd, 2023.
25   Q    (BY MR. WILLIAMS) Okay.  So when we lost

Page 49

1  you, we were talking about other management team
2  members.  So let me -- let me see if I can get that
3  organization right.  So up at the top, we have the
4  store director; is that correct?
5    A    Yes, sir.
6    Q    Okay.  And then under that, we have the
7  assistant manager, which is you; is that correct?
8    A    Yeah.
9    Q    Okay.  And then we have whatever other -- did
10  you call them department managers?  What are the other
11  managers?
12   A    No, sir.  So first off, it's Kelly, store
13  manager; then it's me, assistant manager; and
14  there's another assistant manager.  He has the same
15  responsibility -- well, supposed to be the same
16  responsibilities.
17   Q    Who's the other assistant manager?
18   A    His name was Zack.
19   Q    Zack.  Was he actually an assistant manager
20  or was he a department manager?
21   A    He's 100 percent assistant manager.  He
22  came from a different store.  He was the assistant
23  manager.  I remember talking to him about our pay,
24  about if there was going to be a bonus for that
25  store.  We talked -- it was just assistant manager

STANTON MEATS vs RIDLEY'S FAMILY MARKETS
ANDREZ RIOS - 03/02/2023

Pages 50..53

Page 50

1   talk, you know.  So I know for sure he was an
2   assistant manager.
3       Q    And did you -- did you work with Zack, or
4   tell me about that?
5       A    I did work with Zack, yeah.
6       Q    Okay.  Did you have two assistant managers at
7   the store?
8       A    Yes.
9       Q    Okay.  Is that -- you previously described
10  the split, kind of, between perishable and
11  nonperishable.  Is that where it split between you and
12  Zack?
13      A    Yes, sir.  Yes, sir.
14      Q    Okay.  Fair enough.  So when the store
15  director was not there, it's either you and Zack as
16  senior managers on-site, or occasionally, just Zack, or
17  occasionally, just you; is that fair?
18      A    Yes, yeah.
19      Q    Okay.  So how much of that time would it have
20  been just you?
21      A    You know, like I said, so there was never
22  really a morning that I'd be alone, if I showed up
23  in the morning.  If I was closing, there would be
24  that gap from about 7:00 p.m. to 10:00 p.m., where
25  it would be solely me closing the store.

Page 51

1       Q    Okay.  And on days where -- the store
2   director had days off, would that be the same?
3       A    So that would be when we had a cash office
4   manager, and so we would work -- so, like, Zack
5   would open.  I would work, like, a mid, like, a
6   10:00 a.m. to 7:00 p.m., and then the cash office
7   manager would close for that day.
8       Q    Okay.  So on days where you didn't have the
9   store director, would your and Zack's schedule overlap
10  somewhat?
11      A    Yeah, of course.  So those would be the
12  days that we overlapped; those would be the days
13  that we each had basically a half day for that day,
14  yeah.
15      Q    Got you.  Okay.  So it sounds like maybe the
16  20 to 30 percent is still a reasonable estimation?
17      A    I think so, yeah.  Honestly, yeah.  I
18  didn't think about it, but, yeah, absolutely.
19      Q    Okay.  Fair enough.  And that 20 to 30
20  percent -- I want to make sure the record is clear --
21  would be when you would be the -- alone as the manager,
22  correct?
23      A    Yes.
24      Q    Okay.
25      A    Yes.  Yeah.

Page 52

1       Q    Okay.  Otherwise, you're sharing duties and
2   responsibilities with Zack and/or the store director.
3       A    Yes, sir.
4       Q    Okay.  As assistant manager, did you keep a
5   calendar or day planner, anything like that?
6       A    No.
7       Q    Keep any other notes related to your work as
8   an assistant manager?
9       A    No.
10      Q    Other than your attorney, have you
11  communicated with anybody else about this lawsuit?
12      A    No, sir.
13      Q    Have you ever -- do you have a resume that
14  describes your duties and responsibilities as an
15  assistant manager for Ridley's?
16      A    Yes.  Yes, I do.
17      Q    Would you be willing to produce a copy of
18  that to me?
19      A    Sure.
20      Q    If you'll send it to your attorney, he can
21  send it to me.
22      A    Okay.  Yeah.
23      Q    Do you participate in social media at all?
24      A    Yes.
25      Q    Do you have a LinkedIn profile?

Page 53

1       A    I do not, no.  No, sir.
2       Q    Not saying that you have, but have you ever
3   described this lawsuit at all on social media?
4       A    No, sir.  No.  With everything on the
5   news, I thought, you know, this isn't the best one.
6       Q    Let me enter some documents here just so we
7   have a complete record.  Let me show you a document
8   that we'll mark as Exhibit 2 to your deposition.
9            (Exhibit No. 2 marked.)
10      Q    (BY MR. WILLIAMS)  For the record, this is
11  an Employee Termination Report --
12      A    Oh, yeah.
13      Q    -- showing your last day worked of August 9th
14  of 2019; is that correct?
15      A    Yes.
16      Q    Okay.  It says, And he got his paycheck from
17  the office, came back to the office, handed in his
18  radio, said he was done and left store; is that
19  accurate?
20      A    Yes.  Absolutely.
21      Q    Okay.  Why did you -- why did you decide to
22  quit Ridley's?
23      A    I saw my paycheck.
24      Q    Pardon me?
25      A    I saw my paycheck.  They handed me my

STANTON MEATS vs RIDLEY'S FAMILY MARKETS
ANDREZ RIOS - 03/02/2023

Pages 54..57

Page 54

1 paycheck. I went out to the parking lot, looked at
2 my paycheck, and it wasn't the amount that, you
3 know, I felt I should be getting paid, and so -- I
4 had already talked to them about the amount, and
5 yeah.
6        So they just didn't want to change it, and
7 so -- and working five days a week and then six
8 days, like, five-day-on, you know, six-day-on
9 schedule, just -- I just needed more money for the
10 hours. So, at that point, I just couldn't waste my
11 time anymore.
12    Q    Just wasn't working for you?
13    A    Yeah.
14    Q    Okay.
15    A    I'd been on another opening and close
16 shift also, so...
17    Q    Okay. Let me show you a document that we'll
18 mark as Exhibit 3 to your deposition.
19        (Exhibit No. 3 marked.)
20    Q    (BY MR. WILLIAMS) This is your pay
21 report. It shows your pay from when you started in
22 May of 2019 through August of 2019. Do you see
23 that?
24    A    Yeah.
25    Q    Okay. It shows a total --

Page 55

1    A    That -- I don't know.
2    Q    Total number of hours worked of -- maybe it
3 doesn't.
4    A    I would be very surprised if they had my
5 hours.
6    Q    Okay. Well, I'm not going to take the time
7 to try to figure it out. It shows a total amount paid
8 over that time period of approximately $11,000. Do you
9 see that?
10    A    Can you zoom in?
11    Q    You bet.
12    A    Yeah. Okay. Yeah. That's it. Yeah, you
13 can clearly see that it does not look like salary
14 checks. You know, pay adjustments don't happen in
15 salary checks. I worked for Walmart for five, six
16 years, you know, and my pay had never changed. It
17 was always the same exact paycheck every single
18 time. Those are some of the issues that I dealt
19 with.
20    Q    Okay. And those pay issues were the basis
21 for your going to the Labor Board in Colorado?
22    A    Yeah, yeah.
23    Q    Was there any resolution on that?
24    A    No. This is a form that looks
25 professional and it's a request of wages. So it's

Page 56

1 just a form that just looks professional. It has no
2 real validity to it and, you know -- so, you know, I
3 don't know if it's on record, but I know I talked to
4 a guy. I know I went to the library, printed off
5 the paper and, you know, filed it.
6    Q    Are you still with me?
7    A    Are you there?
8    Q    Okay. We got you now. Can you hear me?
9    A    Yeah.
10    Q    You understand that that wage claim is not
11 part of this lawsuit?
12    A    Yeah, yeah. Yes, sir.
13    Q    This lawsuit is limited to your contention
14 that you were misclassified; is that correct?
15    A    Yes.
16    Q    Okay.
17    A    I mean, is that correct?
18    Q    I'm asking you. Do you have that
19 understanding?
20    A    Yes. Yes.
21    Q    Yes, you have that understanding?
22    A    Are you there? Yes, I do. Yes.
23        MR. WILLIAMS: Okay. I have -- I
24 have nothing further.
25        MR. SHORT: No questions at this

Page 57

1 time.
2        MR. WILLIAMS: Okay. Hold on a
3 second. Do you have any spelling questions, Mary?
4        THE COURT REPORTER: I don't think
5 so.
6        MR. WILLIAMS: Sorry, Chad, it's
7 probably your turn to take us off the record.
8        VIDEOGRAPHER: Copy that. Going off
9 the record. The time is 10:19 a.m. mountain time,
10 on March 2nd, 2023.
11        (Off the record.)

```
                                        Page 58
 1                    REPORTER'S CERTIFICATE

 2   STATE OF UTAH    )

 3   COUNTY OF SUMMIT )

 4

 5        I, Mary R. Honigman, a Registered Professional

 6   Reporter, hereby certify:

 7        THAT the foregoing proceedings were taken before me

 8   at the time and place set forth in the caption hereof; that

 9   the witness was placed under oath to tell the truth, the

10   whole truth, and nothing but the truth; that the proceedings

11   were taken down by me in shorthand and thereafter my notes

12   were transcribed through computer-aided transcription; and

13   the foregoing transcript constitutes a full, true, and

14   accurate record of such testimony adduced and oral

15   proceedings had, and of the whole thereof.

16        I have subscribed my name on this 17th day of

17   March, 2023.

18              Mary Honigman

19        _____

                   Mary R. Honigman

20        Registered Professional Reporter #972887

21

22

23

24

25
```